**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ARDENT LABS, INC., d/b/a COMULATE, | |
| Plaintiff, | Case No. 26-cv-00591 |
| v. | |
| APPLIED SYSTEMS, INC., | |
| Defendant. | |

## COMPLAINT

Plaintiff Ardent Labs, Inc., d/b/a Comulate ("Comulate"), for its complaint against Applied Systems, Inc. ("Applied"), hereby alleges as follows:

## PRELIMINARY STATEMENT

1. This action brings claims for violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, as well as state law claims, and seeks to halt an entrenched monopolist's unlawful campaign to destroy a competitor it could not acquire or outcompete. Applied, which controls over 80% of the market for enterprise-level insurance agency management systems ("AMSs") and owns the industry's critical data infrastructure, launched a coordinated scheme to use its market power to eliminate Comulate—a startup whose innovative product has rapidly become the market-leading provider of automated insurance agency accounting software—and extend its dominance to the market Comulate developed and leads. Applied's anticompetitive scheme includes weaponizing sham litigation, disseminating false and defamatory accusations of IP "theft" to Comulate's customers, threatening to cut off all customers that refuse to abandon Comulate, and,

as Comulate only learned through outreach from concerned customers, conspiring with a third party, Slash Eureka Inc. d/b/a Ascend ("Ascend"), to monopolize the downstream market for automated insurance accounting software so that Applied's yet-to-be-launched inferior product, "Applied Recon" ("Recon"), will face no meaningful competition.  Applied's anticompetitive conduct has one purpose:  to harm competition by leveraging its stranglehold over the enterprise-level insurance AMS market into a second stranglehold over the adjacent market for enterprise-level automated insurance agency accounting software—a market Comulate created and revolutionized through genuine innovation.

1.      Applied does not compete—it destroys.  When a startup builds technology that Applied cannot match, Applied's playbook is simple: acquire or destroy.  Comulate, the fastest-growing insurance agency and brokerage technology company, refused to be acquired.  So Applied set out to annihilate it.  Unable to successfully compete with Comulate on price, quality, or other legal means, Applied resorted to unlawfully anticompetitive strategies.  Applied weaponized a sham lawsuit, lied to customers that Comulate is about to "go out of business," and threatened to cut off any client that continues working with Comulate—all to eliminate the competitor that Applied and its private equity owner, Hellman & Friedman LLC, are "very scared of" and track as "#1 on their list of competition."

2.      Applied's Applied Epic ("Epic") insurance agency management system ("AMS") has market power in the enterprise-level insurance AMS market with over 80% market share among enterprise insurance brokers.  And Applied's dominance over this market includes its ownership and control over Ivans, the essential data infrastructure that every competitor to Epic—and every insurance agency or brokerage customer—needs to operate.  Applied acquired Ivans in 2013 and promised to keep it an "open platform."  It broke that promise and has exercised

2

unchecked dominance ever since. Today, Applied controls who gets access to Ivans, on what terms, and for how long.

3.      Applied has leveraged its market power in enterprise-level insurance AMSs to squash competitors and eliminate customer choice. Applied lured customers into Epic with the promise of being able to integrate cutting-edge third-party products into Epic's "open" ecosystem, knowing that it is extremely costly and time-intensive for insurance agencies and brokerages to leave Epic once integrated. So, after years of marketing Epic as an "open platform" and locking in the vast majority of the largest agencies and brokerages as captive Epic users with no feasible way out, Applied has begun to illegally leverage its monopoly power to stifle competition in adjacent markets, swallowing up or destroying third-party applications. Epic customers are now being offered fewer and fewer integration options, with Applied's ultimate goal being to harm competition by forcing all its customers to exclusively use Applied's inferior products.

4.      Comulate represents everything Applied fears: genuine innovation it cannot replicate and founders who refuse to sell. Two Silicon Valley engineers with no insurance background founded Comulate in 2022. They quickly solved a problem Applied never could— automating insurance accounting, a process that costs insurance agencies and brokerages millions of dollars annually in manual labor and errors. Comulate's AI-powered platform became trusted core software for the industry's largest players, allowing insurance agencies and brokerages to increase efficiencies and reduce costs—ultimately benefitting millions of policyholders. Roughly 65–75% of large agencies and brokerages that use an enterprise-level automated insurance agency accounting software use Comulate.

5.      Applied's response followed its standard predatory pattern. In June 2023, after witnessing Comulate's market-leading capabilities in several demonstrations, Applied

3

abandoned ongoing partnership discussions and moved to try to acquire Comulate. Comulate's founders refused—repeatedly.

6.      Applied's President, Graham Blackwell, then launched a campaign of retaliation. When Comulate questioned if Applied was intentionally undermining Comulate's operations, Blackwell responded there was "***friction that you guys are going to feel***" because Applied was trying to build its own product that, in Blackwell's own words, is "***very similar to what you guys [Comulate] have done from a functionality perspective***." But rather than simply build a truly competitive product, Applied determined it would erect roadblocks to impede Comulate's—and all other competitors'—success. In Blackwell's words, Applied was intentionally hampering Comulate's growth because "why would we . . . make it easier for everyone else [to use Comulate]?" Applied has deployed this playbook before. When it felt threatened by the emergence of TechCanary, another innovative startup, Applied acquired it for nearly eight times revenue—then shut it down.

7.      Unable to acquire Comulate, Applied set out to destroy it through coordinated interference. Beginning in 2023, and building gradually through 2025, Applied systematically sabotaged Comulate's customer relationships by:

- Breaching a contractual agreement to grant Comulate access to an Epic test environment under a pilot program;

- Telling mutual customers that Comulate would "shortly go out of business";

- Falsely promising to deliver its own accounting automation product, Recon, on timelines Applied knew were unrealistic (indeed, Recon still is not market-ready);

- Fabricating months-long delays for giving customers access to Epic's Software Development Kit ("SDK"), required for integrating third-party software—and thereby delaying customers' ability to use and realize savings from Comulate;

- Demanding that Comulate sign agreements containing intellectual property assignment clauses designed to steal Comulate's technology;

- Withholding licenses to the Epic SDK to prevent Comulate's interoperability with Epic; and

- Declaring in November 2025 that Applied would block use of Comulate entirely.

8.     Applied even corrupted a supposedly independent industry trade organization, the Applied Client Network ("ACN"), to serve its anticompetitive aims.  ACN purports to be an independent 501(c)(6) organization serving the interests of users of Applied products and the insurance technology industry generally.  In reality, ACN operates as an extension of Applied's commercial strategy in contravention of its tax classification, as Applied selectively blackballs competitors from participating in ACN's flagship annual event, Applied Net.

9.     Comulate participated in Applied Net for years—even paying $75,000 to be a platinum sponsor of Applied Net 2024—building relationships with customers and demonstrating its cutting-edge technology.  But when Comulate's product gained traction, Applied decided to use its improper control of ACN to shut out Comulate.  ACN admitted that Applied had directed it to bar Comulate from Applied Net 2025—in clear breach of ACN's 2-year commitment to allow Comulate to sponsor, attend, and host a booth at Applied Net—because Blackwell decided that Applied's "***strategic direction and evolving priorities no longer align[ed]***" with Comulate being present.  Applied's in-house legal counsel tried to conceal Applied's involvement, falsely telling Comulate that Applied did not control which third-party products may exhibit at Applied

5

Net. But Applied's thinly veiled corporate-speak and its lawyer's misrepresentations simply could not be squared with what ACN itself said: that Applied decided who could present at Applied Net, and that Applied **would not allow any company to present** "**overlapping offerings [with Applied's] products.**"

10. In conjunction with its decision to block Comulate from interoperating with Epic, Applied escalated to using sham litigation as a weapon. On November 21, 2025, Applied filed a sham lawsuit in this Court falsely accusing Comulate of trade secret misappropriation and claiming that Comulate's use of the Epic SDK—the exact same use that Applied had previously repeatedly authorized and endorsed—was somehow illegal. Within hours, Applied sent emails to Comulate's customers accusing Comulate of "theft" and warning that customers who continued working with Comulate risked breach-of-contract claims.

11. Applied has effectively admitted in litigation that its public proclamation to nearly all Comulate customers that Comulate had stolen Applied's trade secrets was **false all along**. After filing its lawsuit and relying on those false allegations to defame Comulate and force mutual customers to end their commercial relationships with Comulate, Applied then amended its complaint against Comulate to **remove the core allegations of trade secret misappropriation**, because they were always bogus.

12. Applied's selective targeting of Comulate's customers reveals the scheme's true purpose. In the days immediately following Applied's filing of the sham lawsuit, Applied told some Comulate customers to cease using Comulate immediately. It told others they could continue until Q2 2026. Others received no notices at all. Applied's Chief Customer Officer told at least one customer that Applied **would not interfere with Comulate access until the litigation**

*resolved*—an admission that **Applied faces _no actual harm_ from Comulate's continued operation**.

13.     Then, on December 10, 2025, Applied emailed joint Comulate-Applied customers stating that Applied was "asking all customers to register or re-register their Comulate SDK integration" and that "[t]his will allow you to continue using the Comulate SDK integration through [Q2 of 2026]."   Applied's belated campaign to "register" its customers' Comulate integrations concedes that it has consistently and knowingly acquiesced to its customers' use of Comulate—until now.

14.     The implication is clear: Applied knows its claims are baseless, but it is targeting Comulate's largest and most strategic clients to destroy competition by forcing Comulate out of a market it has lawfully participated in for years.

15.     Applied's customers—who view Comulate as an invaluable, game-changing product that has transformed their capabilities but are locked into Applied's dominant insurance AMS—cannot meaningfully resist Applied kicking Comulate off of Epic and are left with no alternatives other than using Applied's un-released and unproven product, Recon.  Recon has been under development since 2024, but it is not slated to launch with full functionality until at least Q2 2026—the same deadline Applied has given customers to transition away from Comulate.  So to address customers who were understandably unwilling to be "guinea pigs" for Applied's Comulate copycat, Applied began referring customers to an ostensible third-party alternative called Ascend.  Ascend provides automated insurance accounting software but has been widely recognized as inferior to Comulate—indeed, in July 2025, Applied executive Chase Petrey described Ascend as a "premium finance company [i.e., a company that finances premiums], not

a direct bill [company]," and stated that it could not compete with Comulate, which Petrey called the "market leader."

16.     But while Applied has cast Ascend as an Applied "Preferred Referral Partner"—going so far as to distribute Ascend marketing materials to customers unhappy about the threat of losing Comulate—Applied has not told those customers that Ascend is now effectively nothing more than Applied's captive product. Based on Comulate's prior partnership conversations with Applied, and on information and belief, Ascend's "Preferred Referral Partner" agreement with Applied gives Applied the right to a portion of Ascend's revenue, and an option to acquire Ascend. And if Ascend never generates traction with customers, Applied will do exactly what it is trying to do to Comulate: revoke its SDK access to Epic and leave Recon as customers' only option. In fact, Applied has **confessed this is a possibility**, telling one customer that it "**will likely cut off SDK for Ascend next because Applied Recon will work for [the same functions].**" Multiple customers have independently raised concerns about the suspicious coordination between Applied and Ascend, with one calling Applied's push to encourage customers to use Ascend "collusion," even without knowing the extent to which the partnership, on information and belief, gives Applied control over Ascend's place in the marketplace.

17.     Comulate was tipped off to this coordination between Applied and Ascend by Comulate customers who found it very strange that Applied was suddenly promoting Ascend.

18.     Applied and Ascend are not natural partners. For years, the two companies have offered competing payments and financing products—and Applied does not take well to competitors. In fact, the competition between Applied and Ascend had taken on a personal quality. Applied executives maligned Ascend. Blackwell personally removed Ascend's CEO, Andrew Wynn, from Applied Net 2023 after discovering him in attendance despite being prohibited from

the conference.  Then in February 2024, Applied threatened former executive Saima Shaukat after she joined Ascend's internal advisory board, forcing her resignation within days.  In October 2024, Blackwell called Wynn a "snake."  And, as noted, in July 2025, Petrey told Comulate in no uncertain terms that Applied did not view Ascend as competitive with Comulate's offerings.  Yet, Applied is now working closely with Ascend to destroy Comulate, including by coordinating materially misleading and false messaging to Comulate's customers about the litigation *and this Court*.  In a January 7, 2026 email to a joint Applied-Comulate customer, Ascend's CEO wrote that "the ***courts***," ***plural***, "have upheld Applied's requirement for agencies to transition off Comulate by Q2 2026, linking to Applied's misleading press release (which falsely states that the Delaware Court "did not support Comulate's request for a TRO" when the Delaware Court did in fact issue a TRO).  There are two courts involved in the dispute:  the Delaware Court of Chancery and this Court.  Neither court has "upheld Applied's requirement for agencies to transition off Comulate."  The representation is irresponsible and false, and intended to create further customer confusion and damage to Comulate.

19.     Applied and Ascend are even marketing a fabricated "case study" to persuade customers to transition from Comulate to Ascend, detailing a purported ***2-month*** transition period and hundreds of thousands in dollars of savings that a major broker purportedly experienced in transitioning from Comulate to Ascend.  In reality—and as Applied knows or should know based on reasonable diligence—the transition took much longer, and any savings resulted because Ascend offered massively discounted, one-off, and below-cost pricing.

20.     Applied's anticompetitive strategy is working as intended.  Within days of Applied's defamation campaign, one of Comulate's largest customers moved to terminate its Master Services Agreement with Comulate—not because of any dissatisfaction with Comulate's

9

product, but solely because of Applied's accusations of trade secret misappropriation and theft. Other clients have raised grave concerns, saying that they were "***stuck in the middle***" after receiving cease and desist letters from Applied and noting that they were forced to continue using Applied Epic because "***moving away from an agency management system takes years.***" Nonetheless, clients have been clear-eyed about Applied's ploy.  One stated that it was "pulling for" Comulate because "competition is good and healthy, and . . . this shouldn't be a way to stifle that," but the reality is that "they've [Applied] got the ***stranglehold on the industry***."  Another acknowledged that Applied "has leverage in this situation" because customers "can turn off [Comulate's] end point solution much faster" and can more quickly "pivot away from [Comulate] than they can Applied."  Applied is holding the insurance industry hostage: exclusively use Applied's products or Applied will punish you by cutting you off entirely from Applied's market dominant products.

21.    Comulate's customers who are affected by Applied's actions have clearly expressed the harm that removing Comulate from the market would have on them.  In the words of one mutual customer, restricting their access to Comulate "represents a meaningful regression in technology, efficiency, and process control," because "Comulate has materially transformed the way we operate."  As another said, "transition[ing] off of Comulate [is] a last resort" because of the "substantial disruption to our business and operations" it would cause.  A third expressed that no competitive product in the marketplace "offer[s] the level of automation, intelligence, and reliability we experience with Comulate" or has the "seamless posting capabilities [of Comulate] . . . [which] has become foundational to our operations."

22.    Applied's own employees recognize the exploitation.  As its Senior Director of Partnerships put it, Applied's model is "***the shittiest way ever to build partnerships***" and its fee

structure constitutes "***triple dipping***."  Yet Applied maintains this system because it can. Customers are locked into Epic, switching costs are prohibitive, and Applied controls the essential data infrastructure (Ivans) that makes alternatives viable.  Applied has not even lived up to its promise to deploy modern application programming interfaces ("APIs") for accounting applications—forcing customers and third parties to rely on its antiquated SDK as the only way to connect custom-built customer solutions and third-party applications within a customer's Epic environment.  Applied has rigged the game in its favor.

23.     Comulate seeks emergency relief to halt Applied's unlawful campaign before it succeeds.  Every day Applied's scheme continues, Comulate risks losing customers, revenue, and reputation—damage that may become irreversible and could lead to Comulate's collapse.  Through this action, Comulate seeks a temporary restraining order, preliminary and permanent injunctive relief, compensatory and punitive damages, including treble damages under the Sherman Act, and restitution to remedy the hundreds of millions of dollars in harm Applied has inflicted on Comulate.

24.     This case will determine whether an entrenched monopolist can use sham litigation and its monopoly power to destroy innovation that customers want and need—and that ultimately benefits millions of policyholders.  Applied must be stopped.

## THE PARTIES

25.     Plaintiff Ardent Labs, Inc., which operates under the name "Comulate," is a highly successful insurance technology startup.  Comulate's first-of-its-kind accounting automation platform is used by the top insurance agencies and brokerages nationwide to streamline

11

their accounting functions. Comulate is a Delaware corporation headquartered in San Francisco, California.

26. Defendant Applied Systems, Inc. is a Delaware corporation with headquarters in Chicago, Illinois. Applied is the dominant player in the enterprise-level insurance AMS market. Its flagship software, Epic, is used by the vast majority of insurance agencies and brokerages, including eight of the 10 top insurance brokerage firms in the United States. Applied's majority owner is the private equity firm Hellman & Friedman LLC.

## JURISDICTION AND VENUE

27. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, because this case arises under the federal antitrust laws. This Court has supplemental jurisdiction over the related pendant state law claims pursuant to 28 U.S.C. § 1367 because the state law claims derive from a common nucleus of operative fact as Comulate's claims arising under 28 U.S.C. § 1331 such that they form part of the same case or controversy under Article III of the U.S. Constitution.

28. This Court has personal jurisdiction over Defendant Applied under 735 Ill. Comp. Stat. § 5/2-209(b)(4) because its principal place of business is in this State. This Court also has personal jurisdiction over Applied under 735 Ill. Comp. Stat. § 5/2-209(a)(1) and (a)(2) because Comulate's claims arise out of Applied's transacting business and committing tortious acts in this State.

29. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Applied's principal place of business is in this District and because a substantial part of the events and omissions giving rise to Comulate's claims occurred in this District.

## FACTUAL ALLEGATIONS

**I.      Comulate Was Founded in 2022 to Modernize Insurance Accounting**

30.      In 2022, after years of working for Silicon Valley tech companies, Comulate's co-founders Jordan Katz and Michael Mattheakis decided they wanted to solve a problem that no one else had cracked.

31.      The two were longtime friends with backgrounds in tech, known for their strong product and engineering skills.  They originally considered building revenue management software for software-as-a-service ("SaaS") companies but pivoted to insurance after recognizing a larger opportunity to deliver transformative solutions in that industry.

32.      Katz and Mattheakis quickly learned that the insurance industry offered them a perfect opening.  Accounting functions in the industry were bogged down by paper and spreadsheets, with people spending hours moving data from one to the other.  Teams of people worked around the clock to complete these labor-intensive tasks.

33.      By founding Comulate, Katz and Mattheakis hoped to offer the market something completely different:  a game-changing accounting automation and intelligence platform designed specifically for insurance agencies and brokerages.  Comulate provides artificial intelligence ("AI")-driven automation for accounting processes in insurance agencies and brokerages, focusing on tasks spanning the accounting lifecycle.

34.      Throughout 2022, Comulate developed a first-of-its-kind product designed to automate the direct bill reconciliation process.  Direct billing is when an insurance carrier bills the customer directly, collects the payment, and then remits the agency or brokerage's commission to it.  Comulate's direct bill product uses AI to process insurance carrier commission statements in any format (such as PDFs, spreadsheets, or even scanned mail), extract commission transaction

13

details automatically, and reconcile the statements to policies in the agency's AMS. Comulate works when the customer actively submits commission statements, and it also works in the background, without input from the user, to, for example, reconcile transactions by periodically scanning the AMS for policy data changes and automatically reconciling transactions when updates are found. Comulate's direct billing product is designed to be interoperable with Epic and other AMSs, including Vertafore.

35.     Comulate was the first mover in agency and brokerage accounting automation and initially focused on direct billing reconciliation automation. Comulate rolled out its direct billing automation product to paying customers in September 2022. Comulate's direct billing product did not compete with any Applied product at the time of its development or launch.

36.     Before Comulate, agencies and brokerages experienced substantial error rates in their manual billing processes that sometimes required teams of hundreds of people. By automating the end-to-end direct billing process, Comulate allows that same task to be completed with a fraction of the number of people, saving agencies and brokerages significant costs and dramatically reducing error rates. As Comulate customers attest, this is a game-changing product.[1]

37.     Comulate also offers insurance agencies and brokerages an automated carrier payables (or agency billing) product. Unlike direct billing, where the insurance carrier bills the policyholder directly (hence, "direct billing"), agency billing means that the insurance agency or brokerage (and not the carrier, hence "agency billing") bills the policyholder. The agency or brokerage collects its commission and pays the premium to the carrier. Comulate's agency billing product uses AI to automate reconciliation of carrier payables by identifying billing errors early,

---

[1]     *Story of Comulate's First User*, Comulate, https://comulate.wistia.com/medias/kvczsytmwd (last visited Nov. 30, 2025).

automating tracking and resolution of discrepancies, and automating tracking and timing of disbursements.

38.     Comulate was the first mover in the agency billing reconciliation automation segment.  Comulate began developing its agency billing automation product in September 2023 and several customers were using it by Q1 2024.  Comulate's agency billing product did not compete with any Applied product at the time of its development or launch.

39.     The market reception to Comulate has been overwhelmingly positive with a ***99% customer retention rate***.  Satisfied customers report that "our accounting team raves about it with unique passion," Comulate is the "best thing since sliced bread," and Comulate has "changed our lives."

40.     The company has matured rapidly, becoming the fastest growing company in the segment and becoming trusted core software for many of the industry's largest players.  In February 2025, Comulate announced $20 million in Series B funding led by top investors and currently employs approximately 30 people.

## II.     Applied Uses Vertical Integration and a Catch-or-Kill Strategy to Cement Its Monopoly Power in the Enterprise-Level Insurance AMS Market

### a. The Enterprise-Level Insurance AMS Market

41.     Insurance is a financial product that transfers risk from individuals and businesses to regulated insurers in exchange for premiums, converting the uncertainty of contingent losses into a predictable cost.  The U.S. insurance industry is the largest in the world, with approximately $3 trillion in total net premiums written as of 2024.  Major lines of retail insurance, often marketed and sold through third-party distributors, include property and casualty insurance (*e.g.*, personal auto and homeowners, commercial property, general liability), health and

employee benefits insurance (*e.g.*, medical, dental, vision, pharmaceutical), and life and annuity products (*e.g.*, term, whole, disability).

42.     Because insurance products, the willingness of insurers to underwrite risk, and potential insureds' individual risk levels vary widely, customers rely on "insurance agencies" and "insurance brokerages" to match risk to markets, negotiate coverage and price, and service policies over their life cycle, acting as intermediaries that sell insurance policies to potential insureds.

43.     As intermediaries, insurance agencies and brokerages facilitate submissions, quotes, binds, endorsements, renewals, and claims advocacy while coordinating among insureds, carriers, and third-party administrators.  For example, insurance agencies and brokerages manage multi-carrier marketing, binding and policy issuance, certificates of insurance, benefit enrollments, and ongoing service requests, claims intake and advocacy, loss-control coordination, remarketing insurance products at renewal, and document management.  They often handle compliance functions including state licensing, E&O risk management, and HIPAA compliance.  And, central to this case, agencies and brokerages are responsible for insurance-specific accounting functions for their clients and themselves.

44.     Insurance AMSs are one-stop-shop software platforms designed to assist insurance agencies and brokerages in managing these complex day-to-day operations, including accounting, client management, claims tracking, and policy management.[2]  Insurance AMSs function as the operational backbone for insurance agencies and brokerages, performing and/or

---

[2]     Both insurance agencies and brokerages are included in the market for enterprise-level insurance AMSs.  Though agencies and brokerages differ in some ways, enterprise-level insurance AMSs cater to both.  For simplicity, this complaint does not distinguish between agencies and brokerages.

16

facilitating a variety of functions that allow such entities to track policy-related information—including renewals, cancellations, and broker commissions—in a unified manner. AMSs also permit insurance agencies and brokerages to tailor their ecosystems by adding additional functionalities through third-party integrations. For example, agencies and brokerages can integrate third-party software to assist with data intake, quoting, and sales. AMSs are also connected to data hubs, such as Ivans, that enable carrier-to-agency data exchange.

45. Applied is an insurance technology giant that provides an insurance AMS through its software known as Applied Epic and a legacy system called Applied TAM.

46. Applied and other providers of AMSs sell these platforms to insurance agencies and brokerages throughout the United States to assist in the management of their complex businesses, serving as intermediaries between the millions of American individuals and businesses that purchase insurance and numerous commercial insurers, both large and small. The especially complex needs of large, "enterprise-level" insurance agencies and brokerages—which may manage tens of thousands to even millions of policies—require enterprise-level insurance AMSs that can efficiently and reliably process the scale of their businesses. Compared with smaller insurance agencies and brokerages, which may be able to manage their business without such sophisticated insurance AMSs, enterprise-level insurance agencies and brokers effectively have no choice. This market for enterprise-level insurance AMSs is one of the two relevant product markets for this antitrust lawsuit. As the dominant provider of enterprise-level insurance AMSs, Applied charges prices for its services above competitive levels.

47. Although many large companies in industries other than insurance employ commonly used business software, such as customer relationship management ("CRM") software (*e.g.*, Salesforce) and enterprise resource planning software (*e.g.*, Oracle NetSuite) to manage their

17

day-to-day operations, these traditional platforms do not adequately address the needs of the insurance brokerage industry. Insurance AMSs are specialized products for insurance agencies and brokerages that address their specific needs, such as commission tracking, policy-level invoicing, claims processing, and policy tracking. By contrast, customer relationship management and enterprise resource planning software are general products designed to be used by firms in a variety of business segments, and they assist businesses in tasks such as payroll, tracking customer activity, and sales. Given their general nature and inability to address the specific needs of insurance agencies and brokerages, platforms like Salesforce and Oracle NetSuite are not reasonable substitutes for an enterprise-level insurance AMS. This fact is well-recognized throughout the insurance industry.

48. There are no interchangeable substitutes for enterprise-level insurance AMSs. Such platforms are designed and used to manage the complex role of insurance agencies and brokerages, which act as intermediaries between purchasers of insurance and carriers that sell insurance. Managing that intermediary relationship between numerous consumers and insurers, each with their own unique coverages and policies, requires insurance agencies and brokerages to seamlessly and accurately track large amounts of insurance and financial data. Although other services or products—such as CRM and enterprise resource planning software—provide functionalities that may be able to complete some of the tasks that insurance AMSs assist with, those services or products do not fully address insurance agencies' and brokerages' specialized needs. And while insurance AMSs are industry-specific and provide robust and deep functionalities for insurance agencies and brokerages, customer relationship management and enterprise resource planning platforms are industry-agnostic (*i.e.*, designed to be used by companies in a variety of industries) and typically address a specific business segment (*e.g.*, sales).

18

Such ostensible alternatives therefore are not meaningful substitutes for enterprise-level insurance AMSs, because they do not supply the majority of the functionalities offered by AMSs. Insurance agencies and brokerages would thus not turn to them for the same essential purpose for which they rely on enterprise-level insurance AMSs.

49. Because of the unique benefits of insurance AMSs, and their low substitutability with other products, a hypothetical monopolist of enterprise-level insurance AMS platforms (or, an actual monopolist, like Applied) could profitably implement a small but significant, non-transitory increase in price ("SSNIP"), because customers of insurance AMSs would not switch to other types of products in sufficient numbers to make the increase unprofitable. Applied has exercised its actual monopoly over insurance AMSs to profitably charge above-market prices and fees to customers in the United States and to sustainedly raise its prices. Reflecting its monopoly power, Applied's EBITDA margins are consistently between 45–55%, roughly double the 18–26% average for public vertical SaaS companies. For example, as explained below, *see infra* ¶¶ 141–42, although integrating third-party software into an AMS is an industry-standard practice, Applied charges higher fees for customers who wish to add integrations to their Epic ecosystems than for customers who do not integrate third-party software.

50. Applied is the overwhelmingly dominant player in the enterprise-level insurance AMS market with few participants. It has provided insurance AMSs to enterprise-level insurance agencies and brokerages for over forty years and, as of today, its flagship AMS, Epic, is the "world's most widely used insurance agency management system . . . for growth-minded, mid-size, and enterprise independent agencies."[3] "Equipped with powerful tools," Epic "supports

---

[3] *Applied Epic: Insurance Agency Management Software*, Applied: Solutions https://www1.appliedsystems.com/en-us/solutions/for-agents/agency-management-system/applied-epic/ (last visited Nov. 30, 2025).

policy management, accounting, market access and quoting, reporting, sales, customer self-service, marketing automation, and more," and supports "the integration of Applied and third-party solutions" that operate on its platform.[4]

51.     In addition to Applied, the other participant in the relevant market for enterprise-level insurance AMSs is Vertafore.  But Applied is the undisputed and established frontrunner in the enterprise-level insurance AMS market.

52.     Indeed, in a recent press release, Applied boasted that it is the "***leading insurance technology specialist***" because "more agencies are leveraging an Applied agency management system than ***any other system*** among the largest agencies in the U.S."[5]  In a year-end 2024 report, Applied publicly claimed it is the "world's most widely used management system, with exponential growth in users since its launch."[6]  Among enterprise-level brokerages,[7] Epic is the AMS used by more than 81% of the market.[8]  Eight of the top 10 largest insurance brokerages in 2025 currently use an Applied AMS.[9]

---

[4]     *All Products*, Applied, https://www1.appliedsystems.com/en-us/solutions/for-agents/ (last visited Jan. 12, 2026).

[5]     Press Release, Applied, Applied Remains the Industry's Leading Provider of Agency Management Systems According to Multiple Industry Lists (Sept. 18, 2025), https://www1.appliedsystems.com/en-us/news/press-releases/2025/applied-remains-the-industrys-leading-provider-of-agency-management-systems-according-to-multiple-industry-lists/ (emphasis added).

[6]     Applied, The Applied Difference (2025), https://www1.appliedsystems.com/siteassets/the-applied-difference.pdf.

[7]     Large brokerages are those ranked in the top 100 of Business Insurance's 100 Largest Brokers of U.S. Business.  *BI Top 100 U.S. Brokers*, Bus. Ins. (June 26, 2025), https://www.businessinsurance.com/biresources/bi-top-100-u-s-brokers/ [hereinafter "BI Top 100 U.S. Brokers"].  Business Insurance's 2025 Top 100 U.S. Brokers is based on 2023 brokerage revenue generated by U.S.-based clients.

[8]     As measured by commercial retail revenue from U.S. offices of firms using Applied Epic.

[9]     BI Top 100 U.S. Brokers.

53.     To become the dominant market player and maintain that market power, Applied leveraged a two-pronged strategy to crush competition:  catch or kill.  Applied grows its business by acquiring smaller industry participants and industry-essential infrastructure and kills companies it views as threats to its market dominance.

54.     Through brass-knuckled consolidation efforts, Applied has successfully developed an insurance ecosystem upon which much of the industry depends and has no real choice but to continue to use.  Applied then uses this market control to derive above-market prices and fees, while stifling innovation and forcing the industry it holds hostage to use Applied's own inferior products.

55.     The enterprise-level insurance AMS market experiences significant barriers to entry that prevent nascent competitors from breaking into the market to challenge the established incumbency of Applied.  Among other things, it is extremely cost- and time-intensive for insurance agencies to switch from one AMS to another, disincentivizing potential market entrants from entering the market.  Moreover, developing a new insurance AMS product—even more so than developing a typical software application—requires amassing specialized software engineering talent, significant capital for infrastructure and marketing, and industry-specific knowledge to develop a product that is responsive to insurance agencies' needs.

56.     Switching costs are prohibitive.  Migrating from one AMS to another requires years of planning, millions (if not tens of millions) of dollars in implementation costs, and significant operational risk.  As customers have explained:

"*Moving away from an agency management system takes years.*"

"*It's not like we could replace our agency management system.*"

"*Obviously, they've [Applied] got the stranglehold on the industry.*"

57.     The enterprise-level insurance AMS market also has low market demand elasticity, meaning that customers are unlikely to respond to an increase in price by deciding to forgo purchasing an enterprise-level insurance AMS product altogether.  Given the complexities of the industry, enterprise-level insurance agencies and brokerages must use insurance AMSs to manage their business.  Thus, the enterprise-level insurance AMS market is not the type of market that a customer is likely to enter and/or exit lightly, meaning enterprise-level insurance agencies typically must bear any price increases to insurance AMSs as they cannot do without such services.

58.     The relevant geographic market is the United States.  Within the United States, all participants in the enterprise-level insurance AMS market compete with all other participants in the enterprise-level insurance AMS market.

### b. The Enterprise-Level Automated Insurance Agency Accounting Software Market

59.     Out of the many functions that insurance agencies and brokerages must perform as intermediaries, one of the most important is reconciling carrier commissions and payable statements to ensure that policyholders correctly pay for their insurance policies and to ensure that insurance agencies and brokerages, on the one hand, and carriers, on the other, are correctly paid for the services and coverage they respectively provide.

60.     The complexity of this task stems, in part, from how different carriers bill their customers. Through the direct billing model, an insurance carrier bills the policyholder directly, collects the payment from the customer, and then remits a commission to the insurance agency afterward.  In comparison, through the agency billing model, the insurance agency (and not the carrier) bills the policyholder on behalf of the carrier, collects payment from the policyholder, deducts its commission from the payment, then pays the balance (*i.e.*, the premium)

to the carrier.  Insurance agencies must conduct this accounting reconciliation for each of the policies they administer.

61.     Historically, this accounting function was performed manually by insurance agency and brokerage finance teams that expended significant time and expense manually entering and reconciling carrier bills.  With the advent of automation, particularly AI-powered automation, this task has been rapidly transformed, replacing finance teams with significantly more time- and cost-efficient software.  This market for enterprise-level automated insurance agency accounting software is the second of two relevant product markets for this antitrust lawsuit.[10]

62.     Comulate designed, markets, and sells software products that automate the direct and agency billing processes and other accounting functions that insurance agency and brokerages regularly and necessarily perform.  Comulate's product is compatible with Epic, Applied's insurance AMS, as well as with Vertafore and other insurance AMSs.  Comulate started selling its direct billing product in September 2022 and was selling its agency billing product by March 2024.

63.     Applied has designed and is marketing and selling a product that automates the direct billing process, and it expects to launch its direct billing product to customers in February 2026.  Applied is also currently marketing a product that automates the agency billing process, which it has publicly stated it expects to launch in Q2 2026.

64.     Automated insurance agency accounting software is significantly more accurate and cost- and time-efficient than manual entry, capable of handling complex workflows

---

[10]     Both insurance agencies and brokerages are included in the market for enterprise-level insurance AMSs.  Though agencies and brokerages differ in some ways, enterprise-level automated insurance agency accounting software caters to both.  For simplicity, this complaint does not distinguish between agencies and brokerages.

at fractions of the cost. Following the adoption of such software, insurance agencies have not reverted, and would not willingly revert, to the now-antiquated system of using manual entry for insurance reconciliation. Manual insurance accounting therefore is not reasonably substitutable with enterprise-level automated insurance agency accounting software, as insurance agencies will no longer tolerate such outdated means to perform crucial accounting tasks.

65. Non-insurance-specific automated accounting software also is not substitutable with automated insurance accounting software, as the unique accounting parameters of the insurance industry and insurance policies necessitate a specialized accounting software. For example, automated insurance accounting software is specifically designed to, among other things, automatically extract commission transaction details, automatically reconcile carrier statements to policies, and automatically track and resolve discrepancies and disbursements. By contrast, non-industry-specific automated accounting software does not cater to these needs at all, instead providing generalized assistance with normal bookkeeping functions. Accordingly, there is little to no cross-elasticity of demand between the insurance-specialized automated accounting software that entities like Comulate produce and more generalized automated accounting software products.

66. Because of the unique benefits of automated insurance agency accounting software, and its low substitutability with other products, a hypothetical monopolist of such software products could profitably implement a SSNIP, as users of such products would not switch to other types of products in sufficient numbers to make the increase unprofitable. Insurance agencies and brokerages, confronted with a SSNIP by a hypothetical 100% monopolist would not migrate to another product, like generalized accounting software, or revert to manual accounting, and would rather suffer the price increase.

24

67.     There is widespread industry recognition that automated insurance accounting software is a distinct product.  For example, customers universally report that Comulate's software is materially different than manual insurance accounting.  As one Comulate customer has explained, enterprise-level automated insurance agency accounting software like Comulate eliminates the need for manual "data entry, formatting spreadsheets, VLOOKUP macro-powered workbooks, copy and pasting, or manual reconciliation."[11]  And these differences make a material difference—Comulate customers report that their "direct bill revenue processes become 90% faster."[12]

68.     Applied itself has recognized that the automated insurance accounting market is a distinct market from the AMS market.  For example, in a February 2023 conversation between Brian Giometti, Applied's Senior Vice President of Corporate Development, and Katz, Giometti told Katz that Applied was "probably more open to partnership" because to "get smart on everything [Comulate is] doing and go try to do it ourselves" would take "years," as a product like Comulate was not "anywhere remotely near on [Applied's] roadmap."

69.     Applied and Comulate both participate in the enterprise-level automated insurance agency accounting software market.  Applied markets its own automated insurance agency accounting software product, Recon, as a distinct product from its other products and services, particularly its insurance AMS, Epic, and its payments processing product, Applied

---

[11]     Comulate, *M3 Transforms its Direct Bill Process with Comulate*, https://www.comulate.com/post/m3-transforms-direct-bill-process-with-comulate  (last  visited Jan. 14, 2026).

[12]     Comulate, *Houchens Insurance Group Upgrades Direct Bill Automation; Reduces Manual Work by 90% Within One Month*, https://www.comulate.com/post/houchens-insurance-group-reduces-manual-work-by-90-within-one-month-after-upgrading-direct-bill-automation      (last visited Jan. 14, 2026).

Pay.[13]  Recon is marketed as a distinct product from Epic and, once it launches, Applied intends to sell Recon separately from Epic.  Epic users will not automatically be given access to Recon once it launches.  Instead, customers must separately purchase a license to use Recon. Similarly, Comulate's first-of-its-kind accounting automation platform, used by the top insurance brokerages in the United States to streamline their accounting functions, is marketed and sold as a distinct product.  From inception, Comulate was designed to be a complementary product to Epic and other AMSs, not a competitive product.  Indeed, Comulate does not—and cannot—replace the vast majority of the functionalities of an AMS.

70. While the AMS market has existed for decades, Comulate created the enterprise-level automated insurance accounting market just a few years ago.  Like the myriad other third-party products that integrate with Epic to provide additional functionalities in users' Epic ecosystems, *see supra* ¶¶ 93–97, 100, 108, Comulate was only ever intended to enhance customers' experiences on insurance AMSs, including Epic.  And while customers can use an insurance AMS without automated insurance agency accounting software, they cannot use an automated insurance agency accounting software without an insurance AMS with which to interoperate.  Therefore, enterprise-level automated insurance agency accounting software is, and has always been, a product fully distinct from an AMS.

71. Other than Comulate, the only other company that sells enterprise-level automated insurance agency accounting software is Ascend.  Although other companies market

---

[13]     *Compare Applied Recon*, Applied, https://www1.appliedsystems.com/en-us/solutions/for-agents/financial-management/applied-recon/ (last visited Jan. 13, 2026), *with Applied Epic*, Applied, https://www1.appliedsystems.com/en-us/solutions/for-agents/agency-management-system/applied-epic/ (last visited Jan. 13, 2026), *and Applied Pay*, Applied, https://www1.appliedsystems.com/en-us/solutions/for-agents/financial-management/applied-pay/ (last visited Jan. 14, 2026).

and purport to sell enterprise level automated insurance agency accounting software, none of those products offer a solution that meets the requirements of insurance agencies and brokerages, and as a result, none of those companies capture any meaningful share of the market.

72. Furthermore, Applied recognizes Comulate as a competitor in this market. Although Comulate does not sell any insurance AMS product, Blackwell confessed in May 2025 that Applied was going to build a product "very similar" to what Comulate had done "from a functionality perspective" after Comulate refused to be acquired by Applied. And Blackwell has explained that "Comulate's offerings directly compete with an Applied product," namely, Applied Recon.

73. To be sure, Applied has recognized Comulate to be a particular threat in this relevant product market for enterprise-level automated insurance agency accounting software, given that Comulate was the first-mover that developed the market itself in 2022. Indeed, after one of Comulate's earliest demonstrations to Applied, in February 2023, Giometti told Katz "[y]our product showed very well." And Applied has recognized that Comulate's offerings are superior to its own and to those offered by other companies. In July 2025, Petrey lauded Comulate as the "market leader," the "category winner," and the "dominant player" in the automated insurance accounting software market.

74. The enterprise-level automated insurance agency accounting software market has low market demand elasticity, given that billing adjudication and reconciliation are essential functions of insurance agencies and brokerages. Thus, customers are unlikely to respond to an increase in the price of automated insurance agency accounting software products by foregoing the product whatsoever, as they cannot do without these services.

75. The relevant geographic market is the United States. The U.S. insurance accounting market differs from other global markets for various reasons, including because U.S. insurance accounting regulations differ significantly from other countries' regulations. Within the United States, all participants in the automated insurance accounting software market compete with all other participants in the automated insurance accounting software market.

## III. Applied's Monopoly Power in the Relevant Market for Enterprise-Level Insurance AMSs

76. Applied is a monopolist in the market for enterprise-level insurance AMSs. As noted above, Applied boasts that "more agencies are leveraging an Applied AMS than any other system among the largest agencies in the U.S."[14] In a year-end 2024 report, Applied publicly claimed it is the "world's most widely used management system, with exponential growth in users since its launch."[15]

### a. In 2013, Applied Systems Acquired Ivans, Provider of Essential Industry Infrastructure

77. Applied's dominance depends on controlling chokepoints that every market participant must pass through. The most important of these is Ivans: the insurance industry's primary data-exchange network, which Applied acquired in 2013 and now controls to deny or restrain competitors from the infrastructure they need to operate.

78. The insurance industry requires constant data exchange among carriers, agencies, brokerages, wholesalers, and reinsurers. In 1984, a consortium of industry participants founded Insurance Value Added Network Services ("Ivans") to provide this essential

---

[14] *See supra* note 5.
[15] Applied, The Applied Difference (2025), https://www1.appliedsystems.com/siteassets/the-applied-difference.pdf.

infrastructure. Ivans became the standard: today, no insurance AMS can function without Ivans connectivity, and no meaningful alternative exists for carrier-to-agency data exchange.

79.     From its founding until 2013, Ivans operated as an open platform available to all industry participants on equal terms. It was designed to serve the industry collectively, not to confer market power on or competitive advantage to any single firm.

80.     Applied's 2013 acquisition of Ivans' property and casualty division immediately raised alarms. It is unclear whether the transaction, which was potentially accomplished through a corporate transfer among commonly controlled entities, was subject to antitrust review. But industry participants recognized that Applied would now control the infrastructure on which Applied's own competitors depended. Applied could leverage that control to exclude rivals, raise their costs, or deny them access entirely. To address these concerns, Applied publicly committed to maintain Ivans as an "open platform."

81.     Six months after acquiring Ivans, Applied was itself acquired by private equity firm Hellman & Friedman LLC for $1.8 billion. Hellman & Friedman publicly touted that Applied was "uniquely positioned" as the dominant player in AMSs.[16] On information and belief, Hellman & Friedman maintains board representation and remains active in directing Applied's strategy, including with respect to Ivans.

82.     Applied broke its commitment to maintain Ivans's "openness." Today, Ivans operates under the same name but as a business unit under Applied's direct control. Its business head reports to Blackwell, who personally oversees access decisions and has taken a hands-on role in leveraging Ivans against competitors. As one former Applied employee who left

---

[16]     Press Release, Hellman & Friedman LLC, Hellman & Friedman to Acquire Applied Systems (Nov. 26, 2013), https://hf.com/hellman-friedman-to-acquire-applied-systems/.

because "[the company was] *not being ethical*" explained with respect to Ivans' management team: "Ivans really has lost a lot of power in the last couple of months. It's writing on the wall. *Our [Ivans's] marketing has been taken over*" by Applied.

83. Put differently, Applied's executive team destroyed any semblance of Ivans' independence from Applied's business objectives.

84. Applied now uses Ivans as a tool of exclusion. Even industry giants have been denied access, with Applied citing pretextual policies to justify refusals. As a senior employee at one leading CRM provider described it, Applied "*shuts [Ivans] down to Applied land*."

85. For the competitors that do obtain access, Applied structures contracts to maintain its leverage. Ivans's licenses run for only one year and may be terminated on 60-120 days' notice, leaving competitors perpetually at Applied's mercy. Anti-assignment clauses give Applied the unilateral power to terminate access if a competitor is acquired by any "direct competitor of Applied Systems"—an express acknowledgment that Applied wields Ivans to eliminate competitive threats rather than to serve industry needs. These provisions chill competition by hanging an existential threat over any new entrant.

86. Applied also uses Ivans to extract exorbitant fees. A former Ivans executive described Ivans (under Applied's control) as having "a *very bad reputation of being the extractor*"—"*just raising prices because they could because they had 80% of the market*" while "giving [customers] the *same technology and not enhancing it*."

87. When exclusion and extraction are not enough, Applied resorts to delay. Comulate's experience is illustrative. After requesting a standard Ivans partnership agreement on December 4, 2023, Comulate endured six weeks of obstruction caused by Applied:

30

- **December 4**: Comulate provides its details for an agreement.

- **December 6**: Comulate follows up.  No agreement.

- **December 12**:  An Ivans representative replies "I do not believe that there is a viable opportunity for a partnership here."

- **December 14**: Comulate pushes back, affirming it will proceed via Ivans.

- **January 2**:  Ivans blames its legal team and the holidays.

- **January 5**: Ivans promises a document "early next week."

- **January 11**:  Still no agreement.  Ivans explains it needed to "***jump through a few hoops***" to get it approved.

- **January 17**: Ivans claims the agreement is legal's "highest priority today."

- **January 19**:  Comulate finally receives the agreement, 46 days after its initial request.

88.    A six-week delay for Applied to provide a standard agreement for review is not an ordinary process.  It is obstruction designed to slow or prevent competitor access to essential infrastructure.

89.    Applied's ability to exclude competition in the U.S. market for enterprise-level insurance AMSs is further evidence of its monopoly power.  As explained above, Applied has used its ownership of Ivans as a "tool of exclusion" and to throttle competition.  A participant in a competitive market could not successfully implement such practices—which are widely despised by consumers (whose options are arbitrarily limited by the exclusionary actions of a single competitor that raise its rivals' costs)—without jeopardizing its market share.  The fact that Applied has been able to maintain such high market share while openly and discriminately disadvantaging its competitors demonstrates that Applied has the power to raise prices, restrict output, and exclude competition.

31

### b. In 2019, Applied Kills TechCanary, a Potential Competitor

90. In addition to wielding its monopolistic power to control new entrants to the market, Applied further ensures that it maintains its market dominance by acquiring smaller, would-be competitors to throttle competition. For example, in 2019, Applied acquired a promising insurance AMS called TechCanary. Before being acquired, TechCanary, which was built by integration with Salesforce, had gained traction among large insurance brokerages. Determined to maintain its position as the dominant insurance AMS, Applied paid a steep price for TechCanary—while TechCanary only generated $10 million in annual revenue, Applied paid nearly $80 million for TechCanary. Applied was willing to swallow this hefty premium to guarantee it could stop TechCanary before it became a real threat.

91. Applied told the market that it would integrate TechCanary into Applied Epic to enable customers to use Salesforce to manage their sales and marketing. But instead, Applied killed it. As one former TechCanary user explained, "Applied purchased [TechCanary] and shut it down six weeks after we launched the new management system."[17] By all appearances, Applied made no effort to integrate TechCanary into Applied Epic. Applied spent $80 million to eliminate an up-and-coming competitor.

### c. Applied Obtains Dominance in the Enterprise-Level Insurance AMS Market by Claiming That Applied Epic Is an "Open" Platform

92. Applied has long marketed Applied Epic as an "open" AMS that empowers customers to choose the best technology partners for their operations. By marketing Applied Epic as an open and flexible platform, customers were enticed to adopt Applied Epic with promises that

---

[17] Jason Contant, *How Brokers Feel About BMS Provider M&A*, Canadian Underwriter (Feb. 17, 2020), https://canadianunderwriter.ca/uncategorized/how-brokers-feel-about-bms-provider-ma/.

the platform would integrate seamlessly with their needs and stay at the cutting edge of technology by fostering an ecosystem of third-party developers who would provide functionality to meet their evolving needs. And, by the same token, third-party technology developers were invited and encouraged by Applied to invest time and effort into developing tools and products that would improve end customers' overall experience.

93. For example, on August 23, 2021, Applied announced that its latest version of Epic was a "[n]ew, open architecture" that would "enable greater choice, flexibility and operational efficiency" and allow customers "choice for how to **build in and around Applied Epic**."[18] Applied proclaimed that Epic would be an open platform for customers to build on and around through its "open, API-based architecture."[19] This open architecture would "enable[] easier data exchange in and out of the platform" so that customers and third parties would have "the flexibility to build the tech stack that is right for their business[es]."[20]

94. Applied advertised the "Open Architecture" of Applied Epic in detail on its website, illustrating how applications developed by Applied would stand on an equal footing with third-party applications like Comulate, within the Epic ecosystem. As illustrated by the below graphic, "Applied Applications" and "Third Party Applications" are depicted as having the same level of access.[21]

---

[18] Press Release, Applied, Applied Launches Fully Browser-Native Version of Applied Epic (Aug. 23, 2021), https://www1.appliedsystems.com/en-us/news/press-releases/2021/applied-launches-fully-browser-native-version-of-applied-epic
[19] *Id.*
[20] *Id.*
[21] *Opening Up Innovation*, Applied, https://web.archive.org/web/20211204094256/https://interact. appliedsystems.com/opening-up-innovation/p/1 (last visited Nov. 30, 2025).



95.     Applied emphasized to customers that Applied Epic's "open architecture" would allow customers to choose their own third-party technology solutions so customers could "be in control of [their] own tech destiny."[22]



---

[22]     *Id.*

96.     Applied proudly proclaimed to the world that its commitment to providing customers an open and neutral platform was a full "company transformation" as "closed business models are a thing of the past."[23] Applied advertised that Epic would serve as the foundation of a "digital ecosystem" that would bring all industry stakeholders together.

## This is more than a technology transformation – this is a company transformation.

Closed business models are a thing of the past. Applied is here as your partner to connect all stakeholders of the insurance lifecycle to create a more vibrant and valuable digital ecosystem of insurance. Peek into how our business is transforming beyond product innovation – from customer success and our partnership approach to how our internal culture is opening up to bring more diversity to our great industry.

97.     This "Open Approach" was a central pillar of Applied's promotion of Epic. ***Until recent months***, Applied's main webpage touted Applied's "Open Approach" as the first pillar of the corporate philosophy that made up "the Applied Difference."[24]

98.     Applied has used this "open ecosystem" messaging consistently, defining Epic as a "technology foundation" using a "standard, open, and secure cloud-native architecture" so that customers can "easily ***integrate [Epic] with the partners you choose*** as part of ***your*** tech stack."[25]

---

[23]     *Id.*

[24]     *Your Indispensable Insurance Technology Partner*, Applied, https://web.archive.org/web/202112 10060223/ https://www1.appliedsystems.com/ en-us/ (last visited Nov. 30, 2025).

[25]     *The Next Chapter in Our Innovation Story*, Applied, https://web.archive.org/web/20230110154116/ https://interact.appliedsystems.com/opening-up-innovation-the-next-chapter/p/1 (last visited Nov. 30, 2025).

**Part 1: Transforming Applied Epic**

# We're transforming Applied Epic to unlock new levels of value.

In a world where tech options are changing quickly, you need a technology foundation that is open, flexible, and easily integrates with the partners you choose as part of your tech stack. That's why we're transforming Applied Epic, taking it from a closed system to a standard, open, and secure cloud–native architecture wrapped in a RESTful API.

99. To assist developers in creating products on the Epic platform, Applied hosts a "Developer Center" webpage that "accelerates [developers'] design, development, and deployment processes by providing a comprehensive environment to explore available APIs, understand their capabilities, [and] generate credentials to connect your apps."[26]

100. As mentioned above, Applied also provides an SDK that "allows developers to access the Applied Epic database from their own code—giving developers the ability to read and write data to and from the Epic database." These tools allow third-party innovators to provide solutions to brokerages (and others) who use Epic.

101. Applied thus established market dominance as brokerages adopted Epic not just for Epic's core capabilities but because they believed they could use Epic as the foundation for a market of innovative and flexible third-party integrated solutions that meet their individual needs. Customers reasonably believed that, as promised, Applied would allow them to use the third-party solutions that best met their needs in conjunction with Epic. And developers like Comulate

---

[26]     *Overview*, Applied DevCenter, https://devcenter.myappliedproducts.com/ docs/overview (last visited Nov. 30, 2025).

reasonably believed they would be allowed to compete fairly to sell products developed on top of the Epic platform.

## IV. Applied Invites Comulate to Develop Within Applied's "Open Ecosystem," but Reverts to Its Catch-or-Kill Playbook After Comulate Demonstrates a Groundbreaking Product

102.     Despite its market dominance as a platform, Epic lacked certain functionality that customers desired.  In 2022, Epic had limited accounting automation functionality, meaning that customers were forced to manually perform much of their accounting work.  For large broker customers, this meant that hundreds of people were required to complete these manual tasks.

103.     Customer demand thus existed for a product that would complement existing insurance AMSs, including Epic, to provide this functionality.

104.     Comulate changed the landscape entirely, offering insurance brokerages the ability to automate 90% of the manual work involved in end-to-end policy accounting processes, saving insurance brokerages time and eliminating the risk of human error.

105.     Comulate works on top of separately purchased AMSs; in other words, agencies and brokerages buy Comulate's product to integrate with the AMS they already use.  To integrate Comulate's product with Epic, Comulate customers need access to the Epic SDK. Applied charges fees just to enable customers to access the Epic SDK.

### a.  Comulate Integrates with the Applied Epic Platform at Customers' Requests

106.     Comulate was first introduced to Applied in November 2022 when an early Comulate customer asked Comulate to integrate its product into the customer's existing Epic instance.  Applied facilitated Comulate's and the customer's access to the Epic SDK, which Comulate used to successfully integrate its product into the Epic platform.

107.     Applied did not require Comulate to sign any contracts to access the SDK for this customer.  This absence of legal barriers was unsurprising; Applied had designed and pitched Epic to this customer—and the entire market—as an "open" platform that would allow third parties to integrate their "apps" seamlessly into the Epic ecosystem.  It also represented that providing access to third parties to develop and implement their "third party applications" was the natural result of Applied's "company transformation" to an open "business model."  (As explained below, Applied would later repeatedly demand that Comulate sign onerous so-called "third party consultant contracts," then backed down in the face of Comulate's refusal and customers' continued demand for Comulate).

108.     Comulate's user base rapidly exploded after its launch.  Comulate identified a previously underappreciated problem that industry experts had called "critical," and insurance brokerages quickly realized the massive savings that could be achieved by using Comulate—to the ultimate benefit of policyholders.  Indeed, Comulate's customers are some of the largest insurance agencies and brokerages in the world.

**b.  The Parties Explore Mutually Beneficial Strategic Partnership**

109.     In or around November 2022, Comulate's and Applied's joint customers initiated discussions between Comulate and Applied regarding a potential collaboration.  To safeguard the confidentiality of technical and business information shared during these talks, the parties entered into a non-disclosure agreement on November 21, 2022.

110.     In December 2022, Applied requested a product demonstration from Comulate, which Comulate delivered.

111.     Applied liked what it saw and pursued Comulate.  On January 25, 2023, a senior Applied employee inquired about Comulate's long-term vision, including whether

38

Comulate's team was interested in a strategic partnership or an acquisition. Katz, on behalf of Comulate, responded that Comulate was not interested in being acquired, calling such discussions "premature."

112. After Comulate made clear that it was interested in a partnership and not acquisition, Applied's reaction suggested that it remained interested in proceeding on those terms. That reaction was unsurprising: after all, Comulate was a complementary product, and greater integration between Comulate and Applied would benefit Applied's existing customers and make Epic more attractive to the insurance brokerages not already using it.

### c. Applied Invites Comulate to Participate in a Pilot Program to Offer Cutting-Edge Automation Technology to Major Client 1

113. Beginning in February 2023, Comulate's and Applied's teams explored the contours of the financial relationship between Comulate and Applied, evaluating revenue-sharing models to ensure a partnership would be both operationally viable and strategically beneficial.

114. Applied realized that Comulate would be beneficial for Applied's largest customers. On March 3, 2023, Katz and Giometti held a conference call to discuss enhancing the companies' partnership. On this call, Giometti asked Comulate to provide its product to assist in the onboarding of Applied's largest customer ("Major Client 1"), which was in the early stages of adopting Epic as its AMS. Giometti acknowledged that bringing Comulate to Major Client 1 was a "value-add" and a "good solution" for Major Client 1. Major Client 1 thus added a heightened sense of urgency and a time-critical requirement for functionality that Epic lacked—and which it wanted Comulate to provide.

115. So, while Applied worked to entice Major Client 1, Applied negotiated with Comulate on the financial structure of a more formal partnership as Comulate continued developing its product. The parties discussed revenue sharing arrangements whereby Comulate

would pass on a percentage of revenue from its clients using Epic. The parties discussed a 5% revenue share, while Applied would remove the requirement for clients to pay Applied for an SDK license to integrate with Comulate's software (which customers considered part of Comulate's pricing).

116. This proposal was well received by certain members of the Applied team. As a senior Applied employee bluntly observed on an April 2023 call, the requirement to buy an SDK license on top of other fees is "***the shittiest way ever to build the partnerships***" and "***triple dipping***."

### d. Applied Encourages Comulate to Continue Developing its Epic Integration While Strategic Negotiations are Ongoing

117. While financial discussions were ongoing in parallel, Applied and Comulate had in-depth discussions regarding the technical aspects of Comulate's Epic integration, including data security, system compatibility, and workflow interoperability.

118. Comulate demonstrated its direct billing automation product to Applied in December 2022, February 2023, and twice in June 2023.

119. Comulate demonstrated its agency billing product at the Applied Net Conference in September 2024, and this demonstration was personally observed by Applied employees. Katz also personally demonstrated Comulate's agency billing product to Blackwell in November 2023 at Hellman & Friedman's office.

120. Comulate's team worked with Applied's engineers to address the technical aspects of integration, much of which centered on the Epic SDK, which Comulate used for connectivity with Epic. Most of Epic's third-party integrations rely on the Epic SDK for both development and to operate post-deployment.

40

121.    Prior to the integration discussions, Comulate had accessed and improved its integration with Epic using the SDK licenses of Comulate's and Applied's joint customers. Comulate needed to access the Epic SDK to develop its product because most of Epic's third-party integrations rely on the SDK.  As Epic's core function is to house the insurance data of customers who use it, neither customers nor their third-party service providers can access the customer's own data without going through Epic.  For example, after Comulate's AI reconciles transactions to policies, it must use Epic's SDK to post entries into a customer's general ledger in Epic.

122.    As Applied knew, without its own environment, Comulate could only gain access to the Epic SDK through its customers.  Applied knew that Comulate was accessing the Epic SDK through its customers—indeed, Applied readily acknowledged as much, and facilitated this setup.  Applied never objected to Comulate accessing the Epic SDK through its customers, and at no time had Applied ever required Comulate to agree to contractual restrictions in order to develop its product or use the Epic SDK.  For example, Applied executives had given Comulate direct access to the Epic SDK months earlier to perform work and pointed Comulate to its publicly available resources detailing the methods and functionality of the Epic SDK, without requiring any agreements from Comulate.



123.    In the discussions between Comulate and Applied's engineers, the parties discussed that Epic's SDK "doesn't work very well," including because it "breaks down for large updates."  Applied's employees admitted that requiring customers and developers to rely on the Epic SDK for day-to-day operations was a poor approach.

124.    Comulate identified numerous potential improvements to the Epic SDK and APIs that would improve their functionality for customers using third-party integrations.  For instance, Comulate highlighted the SDK's inability to grant differentiated levels of access to a given customer's data, which is customarily possible with modern APIs.  At the same time, Comulate flagged gaps in functionality, such as problems with real-time updates to account information that made the SDK cumbersome and not readily scalable.

125.    Applied and Comulate's teams examined options to address the limitations of the SDK.  Both teams agreed that a modern API-based integration would provide better security and scalability, and they discussed plans for Applied to build APIs for this purpose.  In the interim,

Comulate had no other option but to build integrations using the Epic SDK, with Applied providing technical support.

126.    To give Comulate its own access to a dedicated test environment, including an Epic SDK, on May 25, 2023, Comulate and Applied signed a Pilot Agreement (the "POC Agreement").  Through the POC Agreement, Applied promised to grant Comulate its own license to access a test environment to more conveniently develop its integration with the Epic SDK and Data Lake to facilitate Comulate's development and testing of its product outside its customers' SDK environments.

127.    Once the POC Agreement was signed, Comulate followed up about getting access to an Epic SDK test instance repeatedly over the course of several months.  When Comulate first asked about getting access to the test environment that it was entitled under the POC Agreement, on June 14, 2023, Applied replied that it would "get this moving."  But that was not true.  Despite Comulate following up on July 6, August 8, and August 14, Applied was radio silent. In the August 14 follow up, Comulate specifically told Applied that Comulate needed access to demo to a potential customer how Comulate works within the Applied Epic ecosystem. Ultimately, Applied never provided the access that Comulate was entitled to under the POC Agreement, thus breaching the POC Agreement and leaving Comulate with no other choice but to continue using the Epic SDK through Comulate's and Applied's joint customers.

128.    Applied knew that breaching its promise to give Comulate its own environment and SDK key meant that Comulate would have to continue accessing the Epic SDK through its customers.  Applied and Comulate discussed Comulate's use of the Epic SDK on scores of occasions during 2023, and Applied knew that Comulate was actively using the SDK to develop,

refine, and implement its Epic-integrated product. Applied did not object to or ask Comulate to stop using its customers' SDK access.

### e. Applied Suddenly Ends Partnership Discussions in June 2023 and Focuses on Acquiring Comulate

129. In June 2023, after months of technical cooperation, Comulate delivered two highly successful demonstrations that showcased its product integration with Epic. The demo highlighted real-time data synchronization and automation features, which was very well received by Applied stakeholders. Approximately one dozen Applied employees attended the June demonstrations, which were also recorded and subsequently viewed by Blackwell, Applied's now-President, then-CFO, who was responsible for mergers and acquisitions at Applied.

130. Applied was impressed by the June 9, 2023 demo of Comulate's technology. With the demo's successful showing of Comulate's capabilities, it appeared to Comulate that a formal agreement to continue the Applied-Comulate partnership was inevitable.

131. However, following the successful demo, Applied wanted to own the capabilities they saw. Not only that, Applied understood that Comulate was offering a product with functionality—AI-driven automation—that Applied was not offering and would take years to develop in-house. As Giometti had explained months earlier:

> "It's sort of like *how long you think it* [will] *take [Applied] to*, like, *get smart on everything you're doing and go try and do it ourselves, right*? And like, [Applied would] actually have to execute it. I mean, *that's like you're years away*, you know, from being realistic."

132. So rather than partner with Comulate, Applied began implementing its catch-or-kill strategy.

133. During a June 15, 2023 call between Katz, Blackwell and Giometti, Applied made clear it viewed Comulate as a target, not a partner. Applied congratulated Comulate's team

44

on the impressive success Comulate had already demonstrated and conveyed that Applied wanted to acquire, rather than partner with, Comulate. Comulate declined, as its enterprise value was set to increase significantly due to the company's and product's strong growth as an independent business.

134.     Applied was furious at Comulate's refusal to be caught. In retaliation, Applied killed the pilot project and put a formal partnership agreement on ice, throwing all of Comulate's efforts in furtherance of a formal partnership out the window and leaving in place what Applied itself called the "shitty" business model of requiring Comulate's customers to pay for SDK access through Applied. Applied also continued to deny Comulate its rights under the POC Agreement, freshly signed in May, failing to provide Comulate the test environment it promised in the POC Agreement.

135.     Nonetheless, Applied supposedly committed to keeping partnership discussions open. While there were talks of "discussing a framework for commercial partnership," the discussions did not materialize for months. When the parties finally resumed discussions in September 2023, Applied demanded revenue shares of Comulate's services up to 30%, which went far beyond the 5–10% the parties had originally discussed. At this point, Applied was solely interested in acquisition.

136.     Applied doubled down on its efforts to acquire Comulate. In late 2023, for example, Comulate and Applied had several meetings during which Applied emphasized that any partnership with Comulate would be in furtherance of a later acquisition. During a December 20, 2023 meeting between Blackwell and Katz, Blackwell went as far as proposing an immediate acquisition. Blackwell's offer was a short-term "partnership" that would have required Comulate to enter into an exclusivity agreement with Applied to create "a degree of integration that [the

parties would not] replicate with others in the market." The exclusivity agreement would restrict the features and functionality Comulate would offer to competing AMS providers and grant Applied an option to purchase Comulate at a predetermined price once Comulate achieved a certain revenue mark.

137.    Given Applied's dominance in the market, Comulate had no choice but to remain on friendly terms with Applied, and Comulate remained interested in pursuing a partnership with Applied. But since every "partnership" option Applied offered was "marriage without dating," and Comulate refused to be swallowed by Applied, Comulate kept declining Applied's overtures.

138.    Meanwhile, Applied remained laser-focused on catching Comulate via acquisition. Applied's Blackwell flatly rejected a non-acquisition focused partnership with Comulate, claiming that it was "hard for [Applied] to wrap our head around."

139.    Still, Comulate's product remained integrated with Epic, and an increasing number of Applied's large customers continued to use and demand access to Comulate. Comulate continued to utilize Applied's tools, including its SDK, through Comulate's mutual customers with Applied.

140.    Applied was aware of this and even supported it. Applied benefitted from customers' use of Comulate, both through higher overall customer satisfaction and also through a free revenue stream. Because Applied had never fully developed the APIs it promised would enable efficient connectivity for customer and third-party solutions, customers were forced to use the Epic SDK to implement their preferred technology solutions. And though granting access to the SDK required trivial effort from Applied, Applied charged customers monthly fees for this access. Applied charged a lower up-front price for a "runtime" SDK to be used with existing

46

solutions and a substantially higher up-front price for a "developer" SDK for custom integrations. Other than Applied's fees, the distinction between the two is not meaningful, as both offer substantially the same functionality. Applied conveyed that higher fees for "developer" SDK access reflects that active development assumes a greater degree of support from Applied software engineers, such as by troubleshooting issues and implementing technical requests. However, the fee Applied charged for SDK access—especially the significantly higher up-front fee for "Developer" SDK access—was yet another barrier Applied controlled to impede fair competition.

141.    In 2024, Applied began leveraging Comulate customers' requirement for SDK access to squeeze more cash out of its customers and cause additional friction for Comulate. For example, in January 2024, Applied falsely (and intentionally) told a mutual customer that it needed to purchase the more expensive "developer" SDK access, not just the "runtime" SDK access it had previously purchased, in order to work with Comulate. This made little sense, as Comulate's integration had already been built and could be deployed in a plug and play fashion, and previously Applied's policy was that Comulate customers would only require a runtime SDK. After Comulate called Applied out on its falsity, Applied backed off, claiming it had made a "mistake." But within months, Applied began requiring *all* Comulate customers to purchase "developer" SDK access, even though the customers' Comulate implementation was not actively being developed. On information and belief, Applied changed its policy to add greater friction and extract value from its customers who had chosen to work with Comulate.

142.    Though partnership talks had fallen through, Comulate and Applied ultimately executed an Ivans API Agreement in February 2024 after months of friction and six weeks of delay just to get the standard agreement (the "Ivans Agreement") for Comulate to review. As noted above, by early 2024, Applied was leveraging its control over Ivans to create friction and

impede would-be competitors who sought to enter the market. Pursuant to the Ivans Agreement, Applied licensed its Ivans API directly to Comulate.

143. Even without a formal partnership with Applied, Comulate continued to not only grow but thrive. By the end of 2024, Comulate had tripled its revenue over the past year, signed several dozen of the 100 largest insurance brokers as customers, and achieved more than 120% net revenue retention. On the strength of its performance, meteoric growth trajectory, and strategic vision, Comulate attracted $20 million in Series B financing.

144. With increased revenue, fundraising, and business, Comulate was able to further expand its product to include the first ever real-time automated cash-to-production dashboard, eliminating all spreadsheet tracking for the revenue cycle. This type of innovation—one that identifies an issue that no one else has solved and develops a solution that is unique, fast, efficient, and client-centered—is what sets Comulate apart and is the reason why Comulate was able to attract so many major customers within just a few years of its founding.

## V. Applied Intensifies Its Anticompetitive Campaign Against Comulate in 2024 to Unfairly Assist Applied's New Competing Product

145. In the latter half of 2024, Applied began to accept that it could not catch Comulate by acquiring it. Applied thus changed its tack, launching a campaign designed to eliminate Comulate's ability to integrate with Epic, destroy Comulate's relationship with joint Applied clients, and push Comulate out of the market.

146. At the same time, Applied began to develop a new product intended to perform the same functionality as Comulate, called "Applied Recon." Like Comulate, Applied marketed Recon as an AI-powered automated insurance accounting reconciliation tool that would handle direct bill automation, carrier payables, policy reconciliation, and other accounting functions.

48

### a. Applied Initiates Baseless Legal Threats Against Comulate

147.     In August 2024, Nicole Chimienti, an in-house attorney for Applied, served Comulate with a cease-and-desist letter, falsely claiming that Comulate advertising on its website that Comulate could be integrated with Applied Epic was trademark infringement and breach of the Ivans Agreement.  The accusations in the letter were frivolous, and Applied knew it: Comulate's access under the Ivans Agreement was wholly unrelated to the Epic integration Comulate advertised.

148.     Incredibly, when Comulate raised the cease-and-desist letter with Blackwell and Giometti, they both feigned ignorance of it.  Giometti tried to shirk the blame by pointing the finger at Applied's legal team, claiming they "sent out a bunch of those" and that the letter "would never get written from anybody coming from [his] group."

149.     Shortly after serving Comulate with the letter, Applied withdrew it, claiming—despite the letter being addressed to Katz and attaching the Ivans Agreement between Comulate and Applied—that the letter was sent in error, so Applied would take "no further action." Applied's frivolous legal threat went nowhere, but it illustrates one example of how Applied systematically weaponizes its control over the essential Ivans facility against disfavored competitors.  Moreover, the legal threat affirms that in-house attorneys for Applied assessed Comulate's integration with Epic and *raised no issues with Comulate's access to the Epic SDK*— which Comulate had been using for years with Applied's knowledge and consent.

### b. Applied Takes a Hostile Approach to Comulate at Applied Net 2024

150.     In September 2024, Applied changed tack toward Comulate, shifting away from partnership or acquisition and toward direct hostility.  The shift was marked by an in-person

conversation between Blackwell and Katz at Applied Net, the annual industry conference for users of Applied products.

151.    On September 11, 2024, Blackwell met in person with Katz at Applied Net. In that conversation, Blackwell expressed that Applied was no longer interested in acquiring Comulate, as Applied had begun organically developing its own product in the hopes of replicating Comulate. According to Blackwell, because Applied viewed Comulate as competition, Applied would block Comulate from Applied events going forward.

### c. Applied Surreptitiously Attends a Salesforce Event to Learn About Salesforce's Plans to Enter Applied's Market

152.    A week later, between September 17–19, 2024, Salesforce held its annual Dreamforce conference. Salesforce hosts Dreamforce each year in San Francisco to promote its newest products and developments to customers and industry players. Unlike Applied Net, Dreamforce is organized by Salesforce, not any non-profit user group, so Salesforce determines who may attend Dreamforce.

153.    Under its Program Agreement, Salesforce specifically prohibits any of "Salesforce's direct competitors" from attending Dreamforce, and prohibits any Dreamforce attendee from "[a]ccess[ing] or us[ing] [Dreamforce] for any competitive purposes, including to build a competitive product or service, or any product or service using similar ideas, features, functions or graphics as [Dreamforce], or for purposes of benchmarking or otherwise monitoring the Program's availability, performance or functionality."[27]

154.    In the days before Dreamforce, Applied learned that Salesforce would be announcing plans to expand its offerings to the insurance brokerage industry at Dreamforce. On

---

[27]    *Salesforce Program Agreement*, Salesforce (last updated May 2, 2025), https://www.salesforce.com/ company/legal/program-agreement/#events.

information and belief, Applied was alarmed at the potential entry of a major player into a market it monopolizes. So Applied sent a Corporate Development employee, Devin McNamara (reporting to Giometti), to attend Dreamforce and perform competitive intelligence on Salesforce's business plans to expand offerings to the insurance industry.

155.    Applied was required to agree to Salesforce's Program Agreement when it obtained credentials to attend Dreamforce. By agreeing to the Program Agreement, Applied misrepresented its intention to attend Dreamforce to conduct competitive intelligence. Applied had been concerned about the possibility of competition from Salesforce for years, and, on information and belief, had acquired TechCanary years ago to prevent Salesforce from gaining a foothold in the insurance brokerage market.

156.    At Dreamforce, Salesforce announced that it was expanding its Financial Service Cloud for Insurance Brokerages, an insurance brokerage-specific customer relationship management software, to include AI-powered automation. McNamara attended the event and captured images and detailed notes of Salesforce's planned offerings.



157.    Applied makes light of its conduct.   In a subsequent e-mail with Katz, McNamara joked that Katz should "keep an eye out for [him] in [San Francisco].. working on [his] spy skills."



158.    After seeing firsthand the customer excitement for Saleforce's planned entry into the insurance financial services technology space, the confidence Blackwell projected when he met with Comulate at Applied Net a week before evaporated.   Applied believed that its tightly maintained control of the insurance AMS market could slip.   In an effort to shore up its product offerings, Applied's Giometti, at Blackwell's request, reached out to Comulate requesting a call *less than 24 hours later*.   On September 20, 2024, Giometti gauged Comulate's openness to acquisition by Applied.   Giometti told Comulate that Applied was "looking to go make a really hard run" in the automated accounting space and offered Comulate a "narrow window" to revisit a potential acquisition of Comulate, claiming that "at the end of the day, we want happy customers."   Applied's overture was a direct about-face from the message Blackwell had conveyed less than two weeks earlier.

### d. Applied Exercises Improper Control Over a 501(c)(6) Non-Profit User Group, ACN, to Freeze Out Comulate and Other Perceived Competitors

159.    Giometti's claim that Applied "wants happy customers" could not have been further from the truth, as Applied's next move was to improperly use the Applied user group, ACN, to exclude Comulate from the segment's largest annual conference.

160.    ACN is a 501(c)(6) non-profit organization that was founded in the mid-1980s by a group of like-minded users of Applied AMSs to educate and facilitate the entire user community.[28]  As a 501(c)(6) non-profit, ACN is required to operate to the advantage of the entire insurance industry and cannot allow itself to be made a cudgel for the dominant market monopolist to wield against competitors.[29]

161.    ACN organizes the Expo Hall at Applied Net, which provides vendors a critical opportunity to build relationships with customers and demonstrate their products to customers in the Applied ecosystem.  Comulate participated in Applied Net in 2023 and in 2024, and paid ACN $75,000 as part of a two-year agreement to be a platinum sponsor of Applied Net. Comulate's contract with ACN provided that the agreement "shall renew . . . provided ACN or Comulate does not provide notice of intent to make changes to the terms by October 31, 2024." Neither ACN nor Comulate notified the other of any changes before the deadline, and the agreement renewed by its terms.

---

[28]    *About Applied Client Network*, Applied Client Network: About, https://www.appliedclientnetwork.org/About/About-Applied-Client-Network (last visited Nov. 30, 2025).

[29]    IRS regulations require 501(c)(6) organizations' activities to be devoted to improving business conditions for an entire line of business.  501(c)(6) organizations are expressly prohibited from engaging in activities designed to help a particular company.

162. In November 2024, Comulate fully expected and intended to attend Applied Net 2025, and repeatedly followed up with ACN for payment instructions for its platinum sponsorship of Applied Net 2025.

163. But on November 22, 2024—more than three weeks after the termination notice period ended—Emily Marxer *of ACN* emailed Comulate to advise that "***Applied*** has made the decision not to renew your sponsorship contract for Applied Net 2025 or any sponsorships associated with Applied Client Network and Applied Systems." Applied caused ACN to breach its contract with Comulate to serve its own anticompetitive ends.

164. Marxer made no pretense for why Comulate was being blackballed: "As *Graham [Blackwell]* discussed with Jordan, our company's strategic direction and evolving priorities no longer align with the opportunity to host Comulate as a sponsor at our events or within *our* organization." Marxer also had previously admitted that "*every single group who exhibits or sponsors is run past Brian [Giometti]*" of Applied, that Giometti "has to give the final approvals on that list of individual companies," and that Giometti intentionally does not grant approval to competitors because Applied "do[esn't] really want anyone with high *overlapping offerings within their products and services*" at Applied Net.

165. Applied's actions toward Comulate are part and parcel of its usual anticompetitive playbook. For example, before 2022, Applied Net hosted vendors who sold insurance payments processing products. But once Applied began developing its own payment processing product, called Applied Pay, it started cutting payment processing vendors out of Applied Net. As Marxer candidly put it, Applied Net "used to have tons of payment systems people. But now, . . . Applied Pay has come in and so now *they've nixed all of those exhibitors and sponsors because they aren't to compete with Applied*."

166. One such vendor was ePayPolicy. Before Applied developed Applied Pay, Applied recommended that its users use ePayPolicy to process payments. When Applied decided to create Applied Pay, it tried to buy ePayPolicy to give Applied greater market control in the insurance payments processing market. But when ePayPolicy refused to be bought, Applied kicked ePayPolicy out of Applied Net, forcing ePayPolicy out of a critical marketing opportunity so that Applied's users would use Applied Pay over ePayPolicy. To try and further control the insurance payments processing market, Applied also falsely suggested to its customers that using ePayPolicy presented security risks for customers, claiming that ePayPolicy's use of the Epic SDK left it at risk of being hacked and that these security risks would be "eased up" with Applied Pay. Applied's conduct toward Comulate is only part of a larger pattern of antitrust-violative behavior.

167. The retaliation Blackwell promised was now materializing against Comulate. Applied was exerting control over ACN—a purportedly independent 501(c)(6) nonprofit—to punish Comulate.

168. On May 9, 2025, Comulate spoke about ACN's authority over Applied Net with Lauren Kingston, in-house counsel for Applied. Kingston denied Applied's control of ACN. Despite Marxer's confession that *Applied* decided to cut Comulate out of Applied Net, Kingston claimed that ACN is its "own separate organization" that decides who may exhibit at Applied Net independently from Applied. Kingston's statement was not true, as Marxer expressly told Comulate's team that her orders were coming from Blackwell, Giometti, and Applied.

### e. Applied Creates New Legal and Process Hurdles Designed to Hamstring Customers Attempting to Use Comulate

169. Months before wrongfully freezing Comulate out of the most important industry group to its business, Applied began creating arbitrary hurdles to impede Comulate's clients from implementing Comulate's products, creating friction with customers' use of Comulate

55

wherever possible. Applied also delayed Comulate implementations, asking successive customers for the same information despite Comulate's implementation being largely plug and play, and creating weeks or months of red tape to delay implementations.

170. In and around September 2024, Applied delayed the process of providing one insurance brokerage customer ("Insurance Brokerage A") with the necessary access to Applied Epic to implement Comulate. On information and belief, Applied aimed to get Insurance Brokerage A to drop Comulate. Comulate's point of contact at Insurance Brokerage A put it bluntly: "***They're [Applied] not making this easy for us.***"

171. In December 2024, Applied—for the first time ever—requested that Comulate execute a third-party consulting agreement to continue its business relationship with a joint Comulate-Applied client ("Insurance Brokerage B"). Applied's demand was selectively targeted at Comulate, as even to this day, Comulate customers have other third-party vendors who are permitted to access Epic without a consulting agreement in place.

172. The proposed third-party agreement contained egregious terms that Comulate could not possibly accept. For example, Section 5 of the proposed agreement provided, without limitation, that Comulate may not use knowledge gained from its work relating to Applied software "to develop, create, link, and/or connect interfaces integrations tools or other solutions"— even though developing integration tools is the entirety of Comulate's business and exactly what Comulate does with Epic. In the same breath, the section included an IP assignment clause purporting to "automatically assign[] to Applied" Comulate's intellectual property in case of breach of the provision.

173. Section 6 of the proposed agreement included a sweeping clause: "All right, title, and interest, including copyright and other intellectual property rights, in and to the software,

work product, and documentation, and all graphics, user interfaces, logos, and trademarks in or on the same, are and shall remain the property of Applied or its licensors." This language is written so broadly that it would allow Applied to argue that it covers anything Comulate develops in connection with Applied's systems, putting Comulate's own technology and innovations at risk of being claimed by Applied.

174. The agreement also imposed strict limitations on its duration, remaining in effect for only six months, with 30-day termination rights for any party. It also provided that Applied may revoke the consultant relationship "if Applied determines that [the] Third-Party Consultant is a competitor of Applied." In other words, Applied would have the right to terminate the business relationship if it classified Comulate as a competitor.

175. As Applied knew, Comulate had previously worked with dozens of Epic customers and never executed a third-party agreement of this nature. The proposed agreement directly contradicted Applied's prior recognition of Comulate as a pre-built integration partner, ignored Comulate's other agreements with Applied, such as the November 2022 non-disclosure agreement and the Ivans Agreement, and completely undermined the integration efforts that Comulate had pursued jointly with Applied for years. More friction.

176. The work Comulate was doing with Insurance Brokerage B was identical to the work Comulate had done with other joint clients, including in that the work required Comulate to access Applied's systems through Insurance Brokerage B's license with Applied.

177. In January 2025, Applied once again requested that Comulate sign the third-party consulting agreement in order to access the Epic SDK and other tools through Insurance Brokerage B. Kingston, in-house counsel at Applied, made clear that, without signing the agreement, Comulate would not be able to pursue its business relationship with Insurance

Brokerage B.  Applied insisted that Comulate sign the agreement despite Comulate's repeated clarification that, before December 2024, it had never once been asked to sign a similar document.

178.     At this point, Applied's bad faith—and its playbook—became clear. Applied selectively demands third parties sign the third-party consulting agreement when Applied wants to create additional friction.  Early in the relationship, when Applied wanted to acquire Comulate, Applied never required Comulate to sign a third-party consulting agreement because it was trying to remain in Comulate's good graces so it could acquire Comulate and capitalize on Comulate's ingenuity.  But when Comulate's genesis reached a tipping point and Applied realized it could neither acquire Comulate nor outdo it, Applied's strategy shifted to killing the competition. Applied's first step in killing Comulate was to erect new barriers to access.

179.     Comulate refused to sign the agreement, and Comulate continued its work with joint Applied customers without further objection from Applied.

180.     In April 2025, Comulate sought to contract with two further joint customers, Insurance Brokerages C and D.  Once again, despite previously engaging in identical business arrangements without additional paperwork between Comulate and Applied, Applied arbitrarily insisted that Comulate execute the third-party consulting agreement that, in the event of a breach, would assign Comulate's own intellectual property to Applied and prevent Comulate from pursuing its core business, integrating with Applied.  Put differently, Applied once again sought to neutralize Comulate by insisting that it give up its own IP simply to use Applied's platform.

181.     Applied's insistence that Comulate execute the agreements delayed Insurance Brokerages C and D from gaining access to Comulate's services, harming Applied's own customers and jeopardizing Comulate's business relationships.

58

182. Comulate communicated its objections to the third-party agreement to Applied. In what can only be a concession of Applied's unreasonable and anticompetitive conduct, on May 2, 2025, Applied's counsel Kingston agreed that Comulate and Applied could enter into a direct agreement that would ***categorically permit*** Comulate to work with mutual Applied customers. Despite agreeing to allow Comulate to work with mutual Applied customers, Applied went dark and, in spite of multiple outreach attempts by Comulate, Applied never finalized the agreement.

183. On a May 9, 2025 call, when Comulate raised concerns about the inconvenience for existing mutual clients to sign third-party agreements, Kingston admitted that "we know there's a lot [of clients] out there that we don't even know about" who may be affected. In other words, Applied knew that its new demand impacted numerous customers it had not yet even tracked.

## VI. In the Midst of Its Campaign Against Comulate, Applied Announces Its "Competing" Product

184. Meanwhile, as Applied plowed forward with its campaign to thwart Comulate's growth and development, Applied simultaneously forged ahead with developing its own (vastly inferior) competing product. On April 29, 2025, Applied announced that it was developing an automated accounting product, at the time called "Automated Statements," which it planned to launch in fall 2025.

185. Applied's nascent "Automated Statements" product—which was later renamed Recon—was nothing more than an extremely poorly designed copy-cat of what Comulate had offered several years earlier.

186. In its press release announcing the copy-cat product, Applied boasted that the system would feature an "AI-powered statement recording and reconciliation application for

direct bill commission and agency bill payables"—the exact same base capabilities that Comulate already provided to customers. As Applied told the world, "Automated Statements" would "centralize[] and automate[] accounting workflows within Applied Epic to accelerate time-consuming reconciliation workflows and improve quality and confidence in an agency's financial data."[30]

187. But those capabilities were already available through Comulate, which provided both direct billing automation and agency billing automation to its customers[31]:



188. In the ensuing months, Applied heavily marketed its would-be software to Comulate's customers, though its software was not even fully developed. Blackwell acknowledged that Comulate was the market leader in automated accounting tools for insurance applications in his marketing efforts, promising to customers that Recon would be "***Comulate Plus***":

---

[30] Press Release, Applied, Applied Announces New AI-Powered Accounting Automation Solution (Apr. 29, 2025) https://www1.appliedsystems.com/en-us/news/press-releases/2025/applied-announces-new-ai-powered-accounting-automation-solution/.
[31] *Transforming Insurance With AI*, Comulate, https://www.comulate.com/ (last accessed Nov. 30, 2025).



**a.** **Blackwell Confirms Applied's Intentional Anticompetitive Measures to Destroy Comulate in a May 29, 2025 Conversation**

189.    On May 29, 2025, Katz, on behalf of Comulate, spoke with Blackwell to address the intentional friction Applied had imposed on Comulate and its customers over recent months. Incredibly, on this call, Blackwell ***confessed that Applied was actively working to impede Comulate to give its impending Recon product an unfair advantage***.

190.    Blackwell initially feigned ignorance of the issues that were creating friction between Comulate and its customers. But when pressed, Blackwell dropped the false pretense and admitted that he was personally involved in directing this campaign. Blackwell acknowledged that Applied began developing a new product in an attempt to replicate Comulate's functionality. He confessed that because Comulate refused to be acquired by Applied, Applied changed course and was "going to go build" a product that was "***very similar to what you guys [Comulate] have done*** from a functionality perspective" because that was the "***only alternative***" Applied had.

191.    Blackwell further admitted that "Comulate integrates a lot of [Applied's] customers," that **Comulate** is a "**good product**" that does "**cool stuff**," and that Applied knew other third-party products were not truly competitive at all, as the third-party products were not on par with Comulate.   According to Blackwell, because Applied knew that Comulate was the key competitor in the automated accounting market and that Applied could not actually build a better product, Applied was intentionally obstructing Comulate's ability to integrate with Applied and was treating Comulate disparately from others.

192.    Far from the fair platform that Applied promised Applied Epic's "Open Architecture" would facilitate, where "Applied Applications" would compete with "Third Party Applications" on a level playing field for the benefit of all end customers, Blackwell confirmed that the game was rigged, telling Comulate that there was "***friction that you guys [Comulate] are going to feel***" because there was a "***message***" that was coming "from the top [that] ***we want to win.***"

193.    Blackwell pointed to an exemplary instance in which a Comulate customer asked Applied to enable a minor feature within Applied Epic (allowing an additional transaction data element to be automatically written by Comulate).   Although Blackwell admitted that Applied **could** have easily accommodated the customer's trivial request, Applied refused to enable the feature specifically because it would enable Comulate's product to function better for the customer, and Applied was "***trying to drive points of differentiation***" between its product and Comulate.   That is, rather than build a better product, Applied was trying to create "points of differentiation" by including the trivial feature request as a core functionality ***within Applied's competing product*** while actively inhibiting Comulate's ability to make a functional product for its customers.   In Blackwell's words, Applied's view was "why would we . . . make it easier for

62

everyone else?"  Blackwell confirmed that the customer's minor request had made it up to him—the President of a 2,800-employee company—before he finally approved it, under unrelenting pressure from the shared customer.

194.    Although Applied eventually accommodated the request after acting as a significant roadblock, Blackwell's words confirm that Applied was on an anticompetitive, antitrust-violative tirade to push Comulate out of the market by any means necessary and clear the way for Recon.

195.    On that same May 29 call, Blackwell threatened Comulate by previewing the nuclear option available to it:  denying Comulate access to the Epic SDK, which is the essential means for Comulate to function within Epic's "open architecture."  Mere months later, Applied played this trump card—attempting to deny Comulate access to the Epic SDK.

### b. Applied Confirms in a July 1, 2025 Meeting that Applied Views Comulate as the "Category Winner"

196.    On July 1, 2025, Petrey, the General Manager for Applied Pay and Recon reporting to Blackwell, met with Katz to make one last overture to acquire Comulate.

197.    During the meeting, Petrey explained how Applied sees the market:  Comulate is the "*category winner*" in direct bill reconciliation—"***There is very clearly only one dominant player . . . which is Comulate***."  Petrey expressed that Comulate "understands the problem statement at a very different level than others in the space."

198.    Applied was far less optimistic about other technology solutions in the space, and Petrey admitted that Applied does not believe any are genuine competitors to Comulate. Applied viewed another third-party product, Ascend, as not competitive in the "direct bill" space where Comulate operates.  In Petrey's words, Applied believes "Ascend is closer to [Premium Finance Company A] than they are to Comulate.  ***[Ascend is] a premium finance company that***

*has the pizzazz of a Silicon Valley SaaS company*.  But . . . at [its] core, *it's a premium finance company*."  New market entrant Eventual Treasury was far behind the curve as a latecomer to this space and was "not nearly as tight on the problem statement" as Comulate is, according to Petrey.

199.    But Petrey also confidently declared that Applied was going to do an acquisition in this space in the coming months.  Petrey expressed the benefits of Applied acquiring the "category winner" (Comulate) to accelerate its own development:  "*If we can acquire a market leader like yourselves [Comulate] to start us off, it brings a huge accelerant*."  But Petrey hinted that Applied may still also be in ongoing acquisition discussions with Ascend and Eventual Treasury.

200.    The fact that Applied, after investing substantial time and effort into building Recon, wanted to buy both Comulate and potentially its smaller challengers is telling.  *Applied was very far from building a product that could compete on its own merit with Comulate*.

## VII.    Applied Ramps Up Interference with Comulate's Customers While It Prepares to Launch Its Competing Product

201.    Through the summer and fall of 2025, Applied held a customer pitch tour to promote Recon.  As part of that process, Applied provided demos to various customers and the negative feedback was damning.  As one customer stated after seeing a demo of Recon, "it's just . . . *it was a really bad product.  I don't know how else to say that.*"

202.    One prospective customer reported that Recon was even worse than other third-party competitors to Comulate, stating "*it was even worse than Ascend, who wasn't great either*."  Customers saw that Applied's product was nowhere near capable of performing what Comulate can do.

203.    Customers even reported that they were "very leery" about Applied products generally because they are typically "half baked."  Customers were therefore extremely

64

reluctant to be guinea pigs for Applied's new products. As another customer stated, Recon was "*not anywhere near capable* of what [Comulate] can do."

### a. Applied's Prospective Customers See Applied Recon as an Inferior Replacement for Comulate

204.     Based on its product description and customer feedback, Recon does not solve many of the insurance accounting inefficiencies that Comulate addresses. Comulate supports any statement type—scanned PDFs, carrier portal downloads, mailed checks, etc.—while Recon is limited to electronic downloads and a preselected set of "Certified Carriers," leaving brokers to manually key in a significant portion of their volume. As one prospective customer stated, Recon is "really just an enhanced version of their download reconciliation because you can't even drag and drop scanned PDFs. . . . So you still have to key in all your check statements or manual mailed statements."

205.     The difference extends far beyond ingestion. Comulate provides a comprehensive accounting automation platform that includes support for multiple AMS integrations, transaction type mapping, advanced reconciliation logic, full cash application workflows, direct bank integrations, automated receipt adjustments, passthrough processing, cash-to-production automation, and workload management, to name a few features. Recon offers none of these capabilities. Where Comulate eliminates entire functions and fundamentally transforms how a finance team operates, Recon automates just a few steps within an otherwise manual process.

206.     Customers also reported that Applied was "so far away from having an actual product" because of the limitations in the types of carrier statements Recon could handle. This customer expressed concern because, while Applied had developed Recon to function with 93 types of carrier statements, this customer has to handle 5,000 different types of carrier

statements. When this customer asked how to flexibly handle the system reading a statement incorrectly, Applied advised that the customer would be forced to "put in a ticket" for Applied support to manually address the problem.

207. Despite "not hav[ing] as much functionality" as Comulate, upon information and belief, Applied told customers that its pricing for Recon would be similar to that of Comulate. As one customer stated, Recon's "pricing was too close [to Comulate] to even consider changing."

208. Applied employees have directly admitted how disastrous Applied's technology offerings are, corroborating these customer concerns. For example, a former senior employee with responsibility for technological solutions said that Applied struggles to even do basic features like password resets properly. Moreover, the employee disclosed that Applied's leadership, including Blackwell, is focused solely on short-term strategy and is transitioning to a practice of no longer issuing SDK licenses to competitors and trying to restrict customer data access.

**b. In August 2025, Applied Imposes New Legal Roadblocks and Operational Friction to Squeeze Comulate**

209. After the negative feedback from customers regarding its Applied Recon demo, Applied recognized that customers were not persuaded by its marketing pitch and that it could not build a better product than Comulate on its launch timeline (or ever). So instead of building a better product, beginning in August 2025, Applied took its campaign against Comulate to another level.

210. More specifically, Applied ramped up its efforts to hinder Comulate's customers from using Comulate's services and lied to Comulate's customers about its products to stall these customers' use of Comulate. In conversations with joint Applied and Comulate

customers, Applied also blamed Comulate for technical issues with Applied's own products, including the SDK. These were, again, aimed at destroying Comulate's place in the market. Indeed, Applied stated in calls with Comulate's clients that it did not want to connect *any* new customers to Comulate, and its subsequent behavior bore up that admission.

211.     In or around August 2025, Comulate contracted with Insurance Brokerage E, a user of Epic. When Insurance Brokerage E approached Applied to inform Applied that it would be purchasing Comulate's product, Applied's response—desperate and rife with personal animosity—was telling. As Insurance Brokerage E explained, Applied's messaging was marked by direct "personal attacks." Insurance Brokerage E reported that Applied acted like a "jilted suitor," accusing Comulate and its personnel of "crazy arrogance" for declining Applied's repeated acquisition overtures. Applied also lied that Comulate was shortly going to be "out of business." Nothing could have been further from the truth—Comulate had been growing by leaps and bounds, was profitable, and was signing up new customers like Insurance Brokerage E at a rapid clip.

212.     When Insurance Brokerage E insisted that it use Comulate's services, Applied reverted to its tried-and-true obstructionist tack, representing that it would take months to provide Insurance Brokerage E with access to its SDK, without which Comulate could not provide its services. Only after Insurance Brokerage E pushed back did Applied agree to provide access within two weeks. On information and belief, Applied's misrepresentation about a lengthy, months-long timeline was a lie aimed at encouraging Insurance Brokerage E to ditch Comulate. More friction.

c. **Dissatisfied but Locked into Applied Epic, Applied's Largest Customer Asks to Adopt Comulate in September 2025**

213. By September 2025, Applied's process of onboarding its largest customer onto Epic was going poorly. Because of the customer's size and the complexity of its needs, this client's onboarding process was a multi-year operation. This client had been in the process of planning its onboarding to Epic since 2023, when its interest in Comulate had prompted the pilot program (which never got off the ground) and initial acquisition interest. Major Client 1 had again expressed interest in working with Comulate in 2024. The parties spent months in discussion, and Comulate presented Major Client 1 with pricing in October 2024. But behind the scenes, Applied dissuaded Major Client 1 from working with Comulate based on Applied's (false) representations that Comulate would not work at the scale required by Major Client 1, that it had a comparable product in development, and that this product would perform just as well as Comulate by the time the customer's onboarding was finished.

214. But by September 2025, Major Client 1 had reached its wits' end with Applied Epic. Major Client 1 reported extremely slow loading times within Epic, such that some screens took five minutes to load and posting a single statement took hours. Major Client 1 experienced disastrous month-end closings, month after month, using Epic, and desperately needed a solution to automate aspects of its workflow to alleviate internal resources that were under strain by the difficulties experienced with Epic. Major Client 1 was no longer willing to wait for Applied to finally launch Recon—and did not trust Applied in any case, in light of its experience with Epic. As Major Client 1 explained, it "would never want to be the first group on a new Applied product," and "if their code was good, we wouldn't even be having this conversation." So Major Client 1 reached out to engage Comulate to purchase its proven Epic-integrated product.

68

215.     Applied was panicked.  The summer's Recon roadshow had been a disaster and revealed to Applied just how far behind its technology was from Comulate.  But losing its largest prospective purchaser of Recon to Comulate would ensure the failure of Applied's new flagship product in the market for enterprise-level automated insurance agency accounting software.  Blackwell personally lobbied Major Client 1 not to adopt Comulate and privately implied to Major Client 1 that Applied would make integration of Comulate difficult because Applied would not "enable greater integration with Comulate."

216.     Regardless of Blackwell's pleas and threats, Major Client 1 insisted that it needed Comulate and that Applied "need[ed] to not be a barrier and be prohibitive to the [Comulate] solution working."  Applied acceded, but Blackwell personally ensured that Applied would slow-play ministerial steps necessary to Comulate's integration until Applied could give itself cover to attack Comulate overtly.  Major Client 1 needed Applied to sign a simple statement of work to enable it to work with Comulate, but Applied dragged its feet for weeks.  As Major Client 1 explained, it "[didn't] even have a statement of work to review and sign yet from Applied. . . . *It's literally with the president of Applied [Blackwell]*, so we can't escalate any more than we're escalating it."

217.     After weeks of foot-dragging, Applied committed to provide Major Client 1 the statement of work it needed to engage Comulate on November 21, 2025.  Applied never intended to follow through—that day, it provided no statement of work and sued Comulate instead.

### d.  Applied and Its Controlling Stockholder Engage Private Investigators in October 2025 Out of Fear of Competition with Comulate

218.     On October 6, 2025, a Comulate employee reported informally connecting with an old friend who coincidentally worked at Hellman & Friedman.  The Hellman & Friedman employee disclosed that Applied and Hellman & Friedman "are *very very scared* of" Comulate,

and their internal market analysis of startups in the space placed **Comulate as #1 on their list of competition**.

> "Was grabbing a beer with an old friend from middle school yday. I'm used to friends not having any clue what an insurance brokerage is but when I told him I work at Comulate his eyes lit up.
>
> **Turns out he works with Applied at Hellman & Friedman**. Was reporting **they are very very scared of us** [**Comulate**]. Apparently he led their market analysis of startups in the space and **we're #1 on their list of competition**.
>
> He had glowing things to say and was nerding out about how he thinks insurtech is a great space. Very invigorating and cool to hear."

219.    This unusually candid glimpse into Applied and Hellman & Friedman's internal perspective on Comulate reveals other key details. Despite reporting Applied is "very very scared" of Comulate, this employee "had glowing things to say" about Comulate. This affirms that, notwithstanding Applied's growing hostility toward Comulate, Applied knew that Comulate was a good-faith actor and was not engaged in unfair competition toward Applied.

220.    Three weeks later, an investment firm passing itself off as a potential investor in Comulate engaged a private investigator with the goal of gathering information on Katz, offering people $450 per hour to discuss "what makes Jordan Katz stand out" based on their prior work with Katz at other companies.

221.    On information and belief, the investment firm behind the private investigator was Hellman & Friedman LLC. Comulate was not seeking investors or otherwise engaging in fundraising efforts at the time.

e. **Applied Renews Its "Applied Recon" Marketing Blitz in October and November 2025 to Coincide with Its Plan to Eliminate Comulate**

222.    While Applied was trying behind the scenes to prevent its customers from using Comulate, in October 2025, Applied launched a new marketing push to generate excitement for Applied Recon's forthcoming launch in January 2026.

223.    On October 7, 2025, during the Applied Net 2025 conference—from which Applied banned Comulate from attending—Applied formally unveiled a demo of Recon to its captive audience. Customers were initially confused and surprised that Comulate was not on the vendor list for the conference, until the "very first session [Applied] showed a product called Applied Recon." Customers, who have seen firsthand Applied's anticompetitive, anti-consumer ways made the connection to Applied's effort to spotlight Recon, stating "oh, I know why Comulate's not here."

224.    Unsurprisingly, Applied markets Recon as if it were a Comulate equivalent, despite its gross shortcomings. But customers who attended Applied Net 2025 and saw Applied's demo recognized that Recon is "nowhere near what [Comulate] has to offer." Another customer in attendance stated that Applied is "going to go live with [Recon] pretty quick," but it's not anywhere near . . . capable of what [Comulate] can do."

225.    Around the same time, Applied updated its website to remove its commitment to operate Epic as a purportedly "open" platform. Applied's customer-facing lies of being a neutral platform that allows third-party applications to compete on an even footing with Applied applications had served its purpose—Epic had achieved market dominance and encouraged third parties to develop innovative solutions dependent on Epic integration, and the excessive switching costs made it unrealistic for customers to leave the Epic ecosystem.

226.     Now, Applied would shift to leveraging its monopoly power in Epic to crush competition and steal market share in applications, starting with Comulate.  Applied's betrayal of its "open" platform model was punctuated by a revision to Applied's webpage, as the "Open Approach" link on its homepage, which directed users to detail on Applied's "Open Ecosystem," was replaced with an "AI-Powered Insurance" link to a page describing Applied Recon and other as-yet unreleased AI-enabled features.  On its new "AI-Powered Insurance" page, Applied touted itself as a "vertical market specialist"—indeed, Applied has established itself as a vertical monopolist, and it consistently leverages its power over customers locked into Applied Epic to monopolize the secondary applications market, in violation of the spirit and letter of the antitrust laws.

227.     The side-by-side comparison of Applied's new updated website—from "open" to integration to "AI-Powered Insurance" is notable:



228. On November 12, 2025, Applied published a promotional video directed at customers claiming that Recon was "the industry's only AI-powered reconciliation solution built directly into Applied Epic." Directly targeting Comulate, the video urged customers to switch to its product that had "AI reconciliation built in, **not bolted on**." And on November 13, 2025, Applied hosted a webinar to introduce and promote Recon. During that webinar, Petrey stated that Recon "natively integrates with Epic's General Ledger, **eliminating the need for third party tools**."

229. And yet, a mere week before filing its lawsuit against Comulate, Applied was still facilitating integrations for new Comulate customers via the Epic SDK. In one call,

Garrett Gupton, an integration specialist at Applied, stated "*We know Comulate is good to go. We've worked with them for years. No issues.*"

230.     Applied directly targeted Comulate customers with e-mails promoting its Recon product **in parallel with** launching Applied's PR-driven lawsuit against Comulate. For example, in one message to a mutual customer dated November 21, 2025, Applied's representative offered discounts, promotional links, and requested a call to discuss Applied's AI-driven product suite. On information and belief, Applied's direct marketing push simultaneously with launching its lawsuit was designed to prime customers to adopt Recon when it executed the next step of its plan.

## VIII. Applied Launches Its Retaliatory Campaign by Threatening Comulate's Customers, Defaming Comulate, Filing a Baseless Lawsuit, and Compelling Comulate's Customers to Stop Using Comulate

231.     Applied's Comulate problem came to a head in November 2025. Applied's marketing push for its forthcoming flagship AI product, Recon, was flatlining as customers were unimpressed by the product. Applied and its controlling stockholder, Hellman & Friedman LLC, were "very very scared" of Comulate, which ranked #1 on their list of startup competitors. Hellman & Friedman LLC's purported private investigator had turned up nothing to weaponize against Comulate. And Major Client 1 was demanding a statement of work by November 21 so it could engage Comulate to make up for Applied's shortcomings. Applied needed to shut Comulate down, and fast.

232.     With no legitimate options left, Applied filed a frivolous lawsuit accusing Comulate of stealing trade secrets to act as cover for locking Comulate out of the Epic ecosystem and to defame Comulate to its customers. On November 21, 2025—the same day it had promised it would provide its largest customer a statement of work to enable Comulate—Applied filed the

action styled *Applied Systems, Inc. v. PBC Consulting Inc. and Ardent Labs, Inc., d/b/a Comulate*, N.D. Ill., Case No. 25-cv-14251, which is currently pending in this Court.

233.    That this case was Applied's calculated legal gambit is corroborated by its response to a cease-and-desist letter Comulate sent telling Applied to stop spreading misinformation and interfering with Comulate's customer contracts.  In its two-and-a-half-page response, Applied spent half the letter (defensively, and incorrectly) claiming that the litigation privilege immunized their tortious and defamatory conduct and that the exception for bad faith litigation was purportedly inapplicable.

### a. Applied Directly Threatens Comulate's Customers to Encourage Them to Terminate Their Relationship with Comulate

234.    Applied's lawsuit was coordinated with a simultaneous outreach effort directed at nearly all of Comulate's joint customers with Applied.  Within hours of filing, Applied began contacting joint Applied and Comulate customers to threaten them into terminating their relationships with Comulate and cease using Comulate services.  Applied told Comulate's customers that "directly or indirectly giving access to Comulate personnel to Applied Epic" is a purported "violation of your Agreement with Applied Systems."  Applied identified no provision in customers' agreements that this assertion was based on, deliberately leaving customers in doubt as to how Applied interpreted their agreements and whether they were indeed in violation.  The language was intentionally vague, but the message was clear: ditch Comulate or risk legal action from Applied.



235.    Applied's anticompetitive scare tactics worked.  Customers quickly began contacting Comulate, confused and outraged by Applied's actions but worried that they would have to cut ties with Comulate to stay out of Applied's crosshairs.  One customer understood Applied's letter as a "cease and desist," commanding it to cease using Comulate.  Another reported being told by Applied that "having [Comulate] operate through the SDK" is a "breach of the Applied agreement" and that Applied would "be successful in shutting [Comulate] down."

236.    In the immediate aftermath of Applied's message, customers recognized that Applied is engaged in wrongful anticompetitive conduct toward Comulate.  One agency professed that it had a "knee-jerk reaction to bullying" and that its employees were reluctant to switch to Applied's product that "doesn't seem to have the same potential or work." Another customer explained that "moving away from an agency management system takes years."  A third echoed this sentiment:  it was "not like we could replace our agency management system."  A fourth summarized the situation adroitly:

"Obviously, **they've got the stranglehold on the industry** for the most part.  You know, we think competition is good and healthy, and so this shouldn't be a way to stifle that for sure.  That's how we feel. So any event, yeah, we're kind of pulling for you guys, **but we have a lot of eggs in that basket, too**."

237.  Applied also asked the customers to "discuss this matter and next steps" with Applied.  Applied's messaging on these calls has varied dramatically from customer to customer and from week to week.  But across its various conversations with Comulate customers, Applied revealed its scheme to use its monopoly power to steal the market for enterprise-level automated insurance agency accounting software for itself.

238.  Immediately after sending its threatening November 21 email, Applied began speaking with customers about their continued use of Comulate and telling different customers vastly different things.  With some customers, Applied was clear that the customers had to immediately stop using Comulate; one even reported that its Comulate functionality was abruptly deactivated without its knowledge or consent, threatening to disrupt the agency's financial closing for November.  Several others were told that the absolute latest they could continue using Comulate was into the second quarter of 2026, by which time Recon would purportedly be rolled out.  Another customer currently in the process of onboarding Comulate into its workflow was told that customers "on Comulate are given until Q2 to unwind it," but for new customers, including this one, Applied would not enable Comulate at all.

239.  Applied also selectively told some customers that they could replace Comulate with antiquated offshore services that rely on manual data entry, ResourcePro or Patra. But most customers have recently transitioned **away** from these sorts of manual solutions and have no interest in taking a technological step back to antiquated and outdated manual processing, particularly one that would incur significant additional costs, be less efficient, and be prone to

77

more errors.  When some customers pushed back on this unworkable solution, Applied told some that Ascend could be a third-party alternative to Comulate—a curious suggestion given Petrey's characterization of Ascend as not being competitive with Comulate as a direct bill solution, describing them instead as a "premium finance company."

240.    But Applied made a shocking admission to one customer, revealing its anticompetitive scheme.  One customer said that Applied told it (in form or in substance) that "*[Applied] will likely cut off SDK for Ascend next because Applied Recon will work for agency bill as well*."  As explained below, Applied has now taken this plan one step further; it is hoisting up Ascend as its "Preferred Referral Partner" to customers and encouraging customers to use Ascend, with an eventual plan to acquire or shut down Ascend.

241.    On or about December 10, 2025, Applied seemingly changed course. Applied sent an email to joint Comulate-Applied customers stating that Applied was "asking all customers to register or re-register their Comulate SDK integration" and that "[t]his will allow you to continue using the Comulate SDK integration through [Q2 2026]."

242.    On information and belief, Applied made this representation to customers in an attempt to improve its litigating position in the Delaware Court of Chancery.  A week before Applied sent this email, Comulate had sought a temporary restraining order ("TRO") against Applied in the Delaware Court of Chancery.  Applied sent this email the *same day* its opposition to Comulate's motion for a TRO was due and, at the TRO hearing just two days later, Applied patted itself on the back for purportedly mooting the issue with its newfound promise.

243.    But Applied's assurance that customers could continue using Comulate through Q2 2026 was no assurance at all.

244.     There is an approximately six-month lead time for customers to transition off of Comulate's product and implement a new, alternative solution.  Customers must evaluate alternatives, negotiate contracts, plan integrations, migrate data, retrain staff, and run parallel systems before transitioning.

245.     Thus, by telling customers they will have access to Comulate only through Q2 2026—*i.e.*, through June 2026 at the latest—Applied is effectively telling customers they must take immediate steps to transition away from Comulate now.  This will represent an accelerated timeline for some customers.

**b.   Applied's Accusations of "Theft" Are False and Defamatory**

246.     Applied's outreach to Comulate's customers was predicated on the false and defamatory statement that Comulate had engaged in "theft."  Applied also directed customers to a press release intended to publicize its lawsuit against Comulate, and featured the release on its home page.  The linked press release falsely claimed that Comulate "misappropriated Applied's valuable trade secrets to speed up product development by reverse engineering critical functionality within Applied Epic, likely both to enhance the features and functionality of Comulate's product offerings and to build new offerings that would not have been viable without [Applied's] intellectual property."[32]

247.     Applied has effectively admitted in litigation that its public proclamation to nearly all Comulate customers that Comulate had stolen Applied's trade secrets was ***false all along***.  After filing a lawsuit on November 21, 2025, and relying on its allegations to defame Comulate and force their mutual customers to end their commercial relationships with Comulate,

---

[32]     Press Release, Applied, Applied System Sues Comulate for Fraud and Misappropriation of Trade Secrets (Nov. 21, 2025), https://www1.appliedsystems.com/en-us/news/press-releases/2025/applied-systems-sues-comulate-for-fraud-and-misappropriation-of-trade-secrets/.

Applied then amended its complaint against Comulate to **remove the core allegations of trade secret misappropriation** because they were never legitimate.

248.     But even as alleged in Applied's original complaint, Applied's accusations that Comulate somehow misappropriated trade secrets by accessing Epic and "reverse engineering" Epic's SDK and algorithms were not just completely false—they make no sense.

249.     Applied has been aware **for years** that Comulate has access to the Epic SDK.  Indeed, Applied personnel, including Blackwell, have acknowledged Comulate's regular use of its SDK without objection.  Applied's assertion that Comulate's use of the SDK is somehow improper is thus baseless.

250.     Comulate never accessed Epic to reverse engineer Epic's SDK or algorithms.  Instead, Comulate accessed Epic for the sole purpose of improving its customers' experiences with Comulate.  As explained above, Comulate is a complementary software that is integrated into the Epic ecosystem.  Comulate thus accessed Epic to develop and test new functionalities of its product to improve user experience—not to misappropriate any trade secrets.

251.     Moreover, nothing about Epic's SDK "methods" is a trade secret.  Applied publicly posts articles on its website that provide the exact information Applied now claims constitutes trade secrets.[33]

---

[33]     *E.g.*, *Generate Invoices*, Applied Epic: July 2023 Help File (July 2023), https://help.appliedsystems.com/Help/Epic/2023.2en-CA/Procedures/Procedures_Generate_Invoices.htm.



252.     Applied's claim that Comulate misappropriated proprietary Epic algorithms is similarly frivolous.  Comulate only ever accessed Epic using the same view that any of Epic's more than 100,000 users can see.  To Comulate's knowledge, there is simply no way to reverse engineer Epic's algorithms by merely using Epic or its SDK as a customer, and Applied gives no reason to believe there is any way to do this.  If there were, *any* Epic user could steal Epic's algorithms at any time.

253.     Applied thus knew that Comulate had not misappropriated any trade secrets when it sued Comulate.  The baseless nature of Applied's claims lay bare its true motive—the very same motive that Applied has candidly admitted to customers: to leverage the allegations of wrongdoing to try and crush Comulate as soon as possible.

254.     Applied's lack of urgency in pursuing its lawsuit further underscores that Applied's public statements of intellectual property theft are pure pretext.  Despite alleging

misappropriation of trade secrets, Applied has not acted with any urgency in its lawsuit. It never sought a temporary restraining order, and it waited until its coordinated public relations and litigation strategy was ready before stopping smaller Comulate customers from onboarding. Moreover, Applied told most customers they could transition away from Comulate by Q2 of next year—by which time Recon will purportedly have launched. And to at least one customer, Applied's Chief Customer Officer Trevor Bunker affirmatively stated that Applied _**would not interfere with that customer's access to Comulate until litigation is resolved**_. Applied thus knows that it faces _**no**_ threat to its intellectual property whatsoever by providing customers full and unimpeded access to Comulate—and the allegations of theft are baseless and defamatory.

## IX. Applied's Coordination with Ascend to Eliminate Comulate and Consolidate the Market

255. To execute its plan to eliminate Comulate from the market, Applied found an unlikely ally—Ascend.

### a. Applied Does Not Partner with Competitors—Making the Ascend Arrangement Extraordinary

256. Applied's business model is control, not collaboration. Applied does not partner or promote third-party software vendors that compete with its core business. When Applied launched its premium payments offering, Applied Pay, in 2022, it banned every competing payment vendor from Applied Net—the industry's flagship conference. Longtime exhibitors and former official partners like ePayPolicy were removed once Applied entered the market. Applied's pattern is to eliminate competitors from its ecosystem, not elevate them.

257. Where Applied has its own roadmap, Applied's need for control is explicit. Blackwell told Comulate in December 2023 that Applied would be "uncomfortable" partnering "through just like pure trust." Blackwell said that a partnership without "some kind of framework"

for acquisition would "probably not [be] a path that" Applied was interested in. And he made the alternative clear: "If we [Applied] feel like there isn't a concrete path to get married, we kind of default into . . . we just have to go build it."

### b. Ascend was a Premium Finance & Payments Company Until Comulate Established its Successful Automated Insurance Accounting Software

258. Ascend was founded in March 2021—a year before Comulate. Ascend's core business since its founding has been financial services: premium financing through its partner Honor Capital and premium payment processing through Stripe.

259. Comulate was founded in March 2022 as a pure software business that charged subscription fees for accounting automation. Wynn dismissed this business model to Katz as incapable of driving a venture-scale business—even though large brokerages were spending millions annually on manual accounting labor, a cost structure ripe for software disruption.

260. Wynn viewed Comulate as a threat from its founding. During Comulate's seed fundraise in late July 2022, Wynn systematically pressured potential investors to withdraw, claiming the companies were competitive—despite Ascend being a premium finance company and Comulate designing reconciliation software that did not overlap with Ascend's products. The interference worked: multiple insurance-focused investors withdrew.

261. On July 18, 2023, an industry publication ran an article highlighting several prominent brokerages using Comulate's platform. Within an hour of the article's publication, Wynn emailed Katz for the first time in almost a year: "I'd love to get together for lunch soon and share the latest on how things are going//trade notes." Evidence of Comulate's traction prompted immediate outreach to gather intelligence under the guise of friendly collaboration.

262.     Over the following eleven months, Ascend continued to struggle to gain adoption in the enterprise market with its payments and financing value proposition while Comulate's growth accelerated and became more widely known.

263.     On May 21, 2024, a go-to-market advisor told Comulate's CEO that he was "conflicted out" from helping Comulate.  When asked why, the advisor replied:  "I just asked if [Wynn] was okay with me working with you and he said no."  ***Days later, Ascend announced a direct bill product to compete directly with Comulate.***

264.     On June 9, 2024, another mutual advisor and investor emailed Wynn noting that Ascend and Comulate were now "competitors, or possibly approaching [being] direct competitors."  Wynn responded:  "***I see Comulate as an ally.***  *The more we try to hurt each other the less likely we both are to succeed.*"  Yet, within the last 19 days, Wynn had blocked an advisor from engaging with Comulate and launched a directly competing product—this profession of allyship was insincere.

265.     As Comulate's market traction continued to accelerate, Ascend publicly repositioned itself as an automation company while its core business remained financial services.  Ascend's own communications reveal the strategy.  In fall 2025, Ascend's careers page broadly claimed that "*[s]oftware costs . . . are now in free fall*" and that "*the future belongs to those that embed themselves into financial flows rather than simply selling SaaS.*"[34]  Despite its public repositioning as a software company, Ascend continued to struggle to compete with Comulate, losing 80–90% of head-to-head enterprise and strategic deals.

---

[34]     Ultimately, Ascend moved to a per-seat license model—a structure where Ascend earns more when brokerages are less efficient and need more staff.  This perverse incentive matters less if software was never the core product.  For Ascend, automation is a customer acquisition vehicle for financing and payments, which generate over 90% of its revenue.

266.     Nevertheless, Ascend's financials from May 2025 confirm that Ascend remains a **financial services company** regardless of its public positioning:

### Rounded Ascend Financial KPIs May 2025

| | |
|---|---|
| Monthly gross payments/financing volume | ~$100,000,000 |
| Monthly net revenue from payments/financing | ~$1,000,000 |
| Monthly software subscription revenue | ~$100,000 |
| Net Burn Since Inception | $20M - $30M |

267.     Applied knew as much:  As Petrey confirmed to Katz during their meeting on July 1, 2025, "*[a]t their core, [Ascend is] a premium finance company*."

**c.   Applied's Documented Hostility Toward Ascend (2021–2024)**

268.     Applied's hostility toward Ascend is extensively documented.  Applied and Ascend have competed directly for years—in premium payments (since 2022) and premium finance (since 2023).  Applied banned Ascend from exhibiting at or sponsoring Applied Net because Applied viewed Ascend as a direct competitor to Applied Pay.

| Product Offering | Applied | Ascend | Comulate |
|---|---|---|---|
| Payments (*ePayPolicy's core business*) | Yes (2022+) | Yes (2021+) | None |
| Premium Finance | Yes, via partners (2024+) | Yes, embedded (2021+) | None |
| Direct Bill automation | Planned (2026+) | Yes (2024+) | Yes (2022+) |
| Agency Bill automation (*Carrier Payables reconciliation*) | Planned (2026?+) | Unknown/Partial? (2026?+) | Yes (2024+) |

---- **Applied Competes Historically Directly with Ascend,** *not* **Comulate**

269.     Applied's hostility manifested across multiple dimensions:

85

a. **Personal animosity**:  In 2023, Blackwell personally removed Wynn from Applied Net after discovering Wynn in attendance despite being prohibited from the conference.   In October 2024—thirteen months before filing suit against Comulate—Blackwell described Wynn directly to Katz as "a snake."

b. **Advisory relationship interference**:  In February 2024, Ascend announced that Saima Shaukat, a former Applied/Ivans executive, had joined its advisory board. Applied's legal department immediately threatened Shaukat:  she could either resign or risk losing her Applied equity.  Within days, she resigned and social media posts promoting her role at Ascend were deleted.

c. **Platform access threats**:  At Applied Net 2023, Petrey told Katz that Applied "could just block out Ascend" if they chose to.

270.    Applied's treatment of Ascend was consistent with its established pattern toward competitors:  exclusion from industry events, impeded SDK access, blocked relationships, and sustained hostility until the competitor either sold to Applied or ceased to matter.

d. **The "Preferred Referral Partner" Agreement: Applied and Ascend's Inexplicable Reversal**

271.    On July 1, 2025, Petrey told Katz that Applied was "planning to do an acquisition in this space in [the] next 3–4 months" while dismissing Ascend as "not competitive." Katz had no further conversations with Applied, and no acquisition materialized over the next four months.

272.    Five months after the July 2025 meeting between Katz and Petrey, Applied filed a surprise lawsuit against Comulate.  In parallel, Applied's years-long pattern of hostility toward Ascend reversed overnight.  The company whose CEO Blackwell had called "a snake"

86

became Applied's exclusive "Preferred Referral Partner."  The CEO Blackwell had personally removed from Applied Net became the beneficiary of Applied's coordinated customer referrals.

273.    On information and belief, Applied and Ascend entered into a partnership agreement or agreements formalizing their coordination in the fall of 2025, in the months prior to the lawsuit.  Based on Applied's discussions of necessary agreement terms with Comulate in December 2023,[35] this partnership includes:

    a.  **Revenue sharing**: Applied receives a share of partner revenue from customers enabled by Applied's facilitation and/or referrals.

    b.  **Acquisition rights**: A right of first refusal if Ascend seeks to sell itself, and potentially an option to purchase Ascend at defined revenue thresholds.  Applied's December 2023 proposal to Comulate included call rights at predetermined valuations.  On information and belief, given Applied's conduct towards Comulate, Applied may have secured similar or stronger rights over Ascend.

    e.  **Applied and Ascend Coordinate to Destroy Comulate**

274.    Immediately following the November 21, 2025 litigation filing, Applied's representatives began reading from scripts promoting Ascend to Comulate customers; those scripts included statements that Ascend had pre-approved pricing for these customers.

275.    Applied did not disclose to customers the financial relationship that, on information and belief, exists between Applied and Ascend—to Applied's benefit.  This allowed Applied to present itself as offering third-party recommendations while actually promoting its own captive service provider.

---

[35] The existence and terms of any such agreement(s) are uniquely within Applied's and Ascend's possession.

276. In the weeks after Applied filed its lawsuit, two CFOs from Top 100 insurance brokers independently reported Applied's unexpected coordination with Ascend. One texted Comulate: "*We are being told a very hard end of June deadline and they are **pushing us to use Ascend which is weird to me***." Another reported: "*Word on the street is Epic will close the link with Comulate and **require all users to partner with Ascend**, sometime during mid 2026*." Both found the coordination sufficiently unusual to volunteer the information.

277. Applied's coordination with Ascend extended beyond referrals to active participation in Ascend's customer communications.

278. Between December 2 and December 8, 2025, Wynn made explicit written admissions of Applied's direction in emails to prospective customers:

   a. "Applied has been actively recommending Ascend to agencies that now need a replacement."

   b. "Applied plans to cut off [Comulate's] access in the near future. . . . Just to be clear, we're not in the same situation [as Comulate]—Ascend is actually a referral partner of Applied and they are recommending our software to agencies now looking for a replacement."

   c. "I can also share some details on how we're working with Applied to make this seamless (eg. no changes to SDK fees, etc)."

279. An Ascend sales representative confirmed the coordination: "As a preferred referral partner, Applied has been directing agencies to us for a seamless transition."

280. Applied and Ascend even coordinated their communications to undermine court orders and create false urgency. On January 7, 2026, Wynn emailed a prospect: "***Based on recent legal proceedings, the <u>courts have upheld Applied's requirement</u> for agencies to***

88

*transition off Comulate by Q2 2026*," and provided a link to Applied's website containing misleading statements about the litigation.

281.    These statements are demonstrably false.  Comulate obtained a temporary restraining order in the Delaware Court of Chancery that prohibited Applied from "interrupt[ing] existing joint customers' access to or use of [Applied's] Epic system for purposes of using [Comulate's] software" and required Applied to "allow onboarding for existing joint customers to [Applied's] Epic system."  The court did not "uph[o]ld" any transition requirement.

282.    Wynn's false statement mirrored Applied's own mischaracterization of the Delaware Court of Chancery's ruling.  On December 18, 2025, Blackwell sent joint Comulate-Applied customers an email accusing Comulate of mischaracterizing the Delaware Court of Chancery's order.  Blackwell wrote that "a Delaware court did not support Comulate's request for a TRO."  Applied's press release similarly claimed the Delaware Court of Chancery did "not to support Comulate's request for a Temporary Restraining Order"—omitting that the Court granted Comulate's request for a narrow temporary injunction protecting customer access.  The parallel misrepresentations left customers reaching out to Comulate trying to understand the actual legal situation.

283.    The coordinated strategy of undermining court orders demonstrates Applied's direction and/or direct influence over Ascend's communications, not merely passive referral of an independent vendor.

**f.  Applied and Ascend Deploy Misleading Marketing Materials About Customers' Migration**

284.    Applied and Ascend have deployed co-branded marketing materials and a companion "case study" of the only Comulate customer transition to Ascend.  The materials are riddled with false statements.

285.     The customer, a Top 15 insurance broker, became a Comulate customer in 2023.  Within six months of the initial contract, the customer's leadership was highly satisfied with the partnership, proposing a three-year partnership agreement and desire to be a long-term design partner.  The customer became a design partner, actively using features including Comulate's Cash Application module and praising its impact on operations.

286.     When renewal approached, the customer, as part of a company-wide initiative to slash software expenses, demanded a 70%+ price reduction.  Comulate declined:  the pricing proposed was unsustainable, and the larger opportunity for cost savings lay in reallocating staff to capture the full value of Comulate's automation. An employee's private assessment confirmed the issue was not Comulate:  "It's not that Comulate's not performing.  It's more of a reflection on [the customer] . . . not performing."

287.     The relationship continued into the next year, but the customer began seeking alternatives to meet its budget mandate.  ResourcePro, which Comulate had originally fully displaced through its automation, reengaged the customer alongside Ascend with a deal promising similar automation to what the customer became accustomed to at the price it needed. Ascend priced its software at 90% below what the customer had paid Comulate.  This pricing is economically irrational unless Ascend received something more valuable than contract revenue: the customer's endorsement as the flagship reference, positive public statements, and insight into Comulate's product and roadmap from a former large customer and design partner.

288.     Applied and Ascend then distributed co-branded marketing materials riddled with misstatements:  claiming a 60-day migration that actually took over six months and required custom development, attributing operational improvements that occurred on Comulate's platform to Ascend, and projecting savings based on the 90% discount unavailable to other

customers. Ascend's companion case study touts "2,400+ monthly statements" processed through "automation at scale" as a "200+ increase" over Comulate volume—when 2,400 is actually a ~1,000-statement reduction from the customer's actual monthly volume on Comulate. The ~1,000 missing statements appear to be processed by Ascend's offshore partner ResourcePro, whose own joint marketing describes the combined solution as providing only "65% automation."

289.     Applied's willingness to distribute these materials without apparent diligence demonstrates it is not acting as a neutral recommender of alternatives. Applied is driving customers from Comulate to Ascend regardless of whether customers are actually served by the transition.

### g. Applied's Pretextual Claims & Weaponization of Security Claims

290.     Both Comulate and Ascend use automated processes to interact with Epic for functions where Epic lacks SDKs and APIs. Applied is suing Comulate for this conduct while simultaneously partnering with Ascend and recommending Ascend to its customers.

291.     On data security, Applied's claims are equally hollow. Applied designated Ascend as its "Preferred Referral Partner" without conducting apparent diligence into Ascend's data practices—which include broadcasting customer policy and insured PII in sales demonstrations and public webinars according to customers who have commented on these activities to Comulate. Applied invokes security not as a standard it genuinely applies, but as a weapon to frighten customers away from competitors—regardless of whether its claims have any factual basis.

91

### h. Applied and Ascend Conceal Their Coordination

292. Despite their coordination, Applied minimized its relationship with Ascend to customers. In December 2025, Blackwell said he "didn't really know those guys [Ascend]" but had "met with them **very recently** and it was very positive and promising."

293. Blackwell's statement was false. Wynn visited Applied leadership at its Chicago headquarters between 2021 and 2023 for direct discussions. Applied engaged in acquisition conversations with Ascend earlier in 2025. Applied knew Ascend intimately—as an adversary it had spent years suppressing.

294. Ascend's public positioning around Applied shifted suspiciously. Ascend's website changes suggest deliberate optics management. From the creation of Ascend's current website in June 2024 until October 2025, Ascend showed Applied's logo in multiple places— despite no known partnership existing and Applied's documented hostility toward Ascend as a competitor during this period. Applied was not the only logo displayed without an actual partnership behind it; Ascend has a pattern of overstating relationships in its marketing.

295. By November 14, 2025—seven days before Applied filed suit—Applied's logo was removed in three of four places and in some areas replaced with Salesforce's. The pattern is telling: Ascend displayed a partnership that did not exist, then hid the real one once it formed. Ascend's selective disclosure continues today. Ascend prominently promotes the customer migration story on LinkedIn and in public materials, yet the "Preferred Referral Partner" arrangement with Applied is mentioned only in direct emails to prospects and never in public-facing content. If the partnership were purely intended to benefit customers, Ascend would promote it openly. Instead, it conceals it. This concealment stands in noted contrast to Ascend's promotion of other alleged partnerships, such as with Salesforce.



**Timeline: Applied's Logo Removed from Ascend's Website Seven Days Before Lawsuit**

### i. **Wynn's Swift Sympathy**

296. Applied filed its lawsuit against Comulate on November 21, 2025. Katz learned of the lawsuit at approximately 10:45 AM Pacific Time when a customer forwarded Applied's cease-and-desist communication.

297. Fifteen minutes later, and within approximately one hour of the first public article about the lawsuit, Wynn texted Comulate's CEO:

> "***Hey man, I'm genuinely sorry to see the applied BS. We may be competitors but big picture we're always on the side of startups/tech/builders so if there's anything we can do to help lmk.***"

298. Wynn had not contacted Katz in approximately two years. Yet he sent a text to Katz within an hour of the existence of the lawsuit becoming public, positioning Ascend as a fellow victim of Applied rather than its coordinated partner. On information and belief, Ascend was already operating as an affiliate of Applied at the time Wynn texted Katz. Wynn's professed solidarity with Comulate is also completely undermined by his previous actions to interfere with Comulate's business.

**j.  Applied Structures the Scheme to Eliminate Competition Under All Scenarios**

299.    Applied's conduct becomes rational only as a coordinated strategy to acquire market control at a fraction of fair value.  Applied could not acquire Comulate.  Applied could not build a competitive product.  Ascend also could not beat Comulate.

300.    The sudden alignment with Ascend makes strategic sense only if Comulate is eliminated.  In a competitive market, the partnership provides Applied nothing:  Applied and Ascend would continue to lose to Comulate.  But in a market where the leading competitor is removed by force, Ascend becomes the default option—and Applied controls the gates.  Applied decides who gets SDK access, on what terms, and for how long.  Ascend's survival depends entirely on Applied's continued permission.

301.    Ascend is an affordable acquisition target in a way Comulate never was.  Ascend generates a fraction of Comulate's software revenue, commands far lower valuation multiples, and lacks Comulate's deep relationships and long-term contracts with the industry's largest firms.  On information and belief, Ascend's founders have been seeking to sell the business.

302.    So Applied chose a third path:  destroy the market leader through sham litigation and customer coercion, transfer that market share to a weaker competitor Applied can control, then acquire or eliminate the resulting company at a fraction of Comulate's fair market valuation.  Through this scheme, Applied claims market leadership in accounting automation while eliminating the long-term competitive threat that Applied and its private equity owner Hellman & Friedman are "very scared of" and track as "#1 on their list of competition."  The scheme guarantees Applied prevails under any scenario:

a.  **Scenario A**:  Ascend captures Comulate's customers.  Applied benefits from referral economics.  Ascend's continued cash burn and its founders' desire to exit

94

create conditions for Applied to acquire Ascend at a fraction of Comulate's fair market value at the time of Applied's lawsuit—acquiring the customer base it transferred to Ascend through the coordinated campaign.

**b. Scenario B**: Ascend fails to capture sufficient market share or burns through its remaining capital. Applied terminates Ascend's SDK access (as Petrey threatened in 2023 and as Applied representatives have suggested as a possibility to customers). Recon launches. By then, Comulate is gone—eliminated not by competition but by coordinated foreclosure. Recon, with no remaining competitor, captures 100% of the market by default.

## X. Applied's Anticompetitive Conduct Serves to Leverage Its Monopoly Power over Enterprise-Level Insurance AMSs to Dominate and Exclude Comulate from the Market for Enterprise-Level Automated Insurance Agency Accounting Software

303. Through the broad array of practices detailed above, Applied leveraged its monopoly power over enterprise-level insurance AMSs to establish dominance over the related but distinct market for enterprise-level automated insurance agency accounting software. Together, Applied's practices are anticompetitive, unlawful, and injurious to Comulate, other potential competitors, consumers, and competition—cutting off Comulate's ability to serve the vast majority of consumers in the enterprise-level automated insurance agency accounting software market. For example:

- Applied intentionally imposed "friction" on the relationship between Comulate and its customers, raising Comulate's costs to compete in the market for enterprise-level automated insurance agency accounting software and self-preferenced Applied's own plans to compete in the market. Applied consistently disrupted Comulate's customer

95

relationships, degrading Comulate's compatibility with Epic, and improperly stalled the onboarding or servicing of Comulate's customers.

- Beginning in late 2024, Applied increased that friction by trying to condition Comulate's continued access to Epic on Comulate signing a third-party consulting agreement that barred Comulate from developing integration tools (a fundamental requirement for developing software interoperable with Epic), and requiring Comulate to "automatically assign" all of its intellectual property to Applied if it breached the provision. *See supra* ¶ 173. These terms, which were facially antithetical to an arrangement whereby a developer like Comulate designs and sells software compatible with an application platform, served merely to inhibit Comulate's ability to interface with the Epic platform.

- In 2025, Applied worked its machinations to exclude Comulate from attending the premier annual industry event, Applied Net. Applied's efforts to cut Comulate's ties with its customers is right out of Applied's playbook. Applied's exclusion of Comulate from Applied Net mirrors actions that Applied took years earlier when it sought to dominate the insurance agency payments processing market by barring from Applied Net ePayPolicy, a formerly successful company that had spurned Applied's acquisition overtures. *See supra* ¶¶ 167, 257.

304. Applied's strategy crescendoed in late 2025 when Applied filed its sham litigation. Before then, Applied knowingly allowed Comulate to access the SDK through its customers. But in tandem with its baseless trade secret misappropriation lawsuit, Applied announced its plan to cut off Comulate *entirely* from interoperating with Epic by telling customers who were "directly or indirectly giving access to Comulate personnel to Applied Epic" to "cease

to provide this access immediately."  Relatedly, Applied signaled that it would cut off all interoperability between Comulate and Applied via the Epic SDK, and suggested to Comulate and Applied's joint customers that granting Comulate access to Epic would be a violation of their contracts.  And, as explained above, if Applied is unable to acquire Ascend after the launch of Recon, it is all but certain that Applied will cut off Ascend's access to the SDK as well.  Such action does not merely impose friction on Comulate's relationships with customers—it deprives Comulate of the very means of providing services to its customers.

305.    Applied's sham litigation brought against Comulate was not intended to vindicate any valid intellectual property rights in its trade secrets, but rather to saddle Comulate with the costs of defending litigation.

306.    Applied's trade secret misappropriation claims are objectively unreasonable, as Applied's core allegations that Comulate "stole" trade secrets by using the Epic SDK are baseless.  For years, Applied knew that Comulate accessed and used the Epic SDK to allow Comulate's customers to use the software on Epic—indeed, Applied **authorized and endorsed** that use, and **financially benefitted from it**, earning revenues from customers that paid licensing fees for Comulate to access the SDK and experiencing increased demand for its own insurance AMS.  And, as Applied experienced firsthand, throughout that multi-year relationship, Comulate accessed the Epic SDK solely to optimize and service its own product to be interoperable with and functional on Epic.

307.    Moreover, Applied's trade secrets claims are facially suspect.  Applied claims that Comulate "reverse engineered" trade secrets, but Comulate has only ever had access to Epic's user-facing platform and the SDK, neither of which provide access to Epic's trade secrets.  Comulate simply could not have misappropriated trade secrets it never had access to.

97

308. Applied's trade secret claim merely speculates that because it is *possible* to reverse engineer its trade secrets through numerous SDK calls, Comulate *must* have been placing many SDK calls for that purpose. But Comulate's product is designed to run as background software on Epic that automatically syncs newly input customer data, so it automatically runs certain SDK methods at regular intervals (*e.g.,* Comulate runs the "Get_GeneralLedger_Receipt" method every 15 minutes). Over the course of an hour, Comulate typically sends at least 30 SDK method calls. The frequency with which Comulate places SDK calls is, in large part, a reflection of limitations in the Epic SDK. For example, to determine if new data has been uploaded to Epic, Comulate must ask for the last 30 days' worth of receipts on an hourly basis. Given its purpose and functionality, Comulate's product naturally places many more SDK calls than the typical insurer would.

309. Additionally, Applied fails to identify a single feature of Comulate that incorporates an alleged trade secret. This failure is all the more glaring because Applied allegedly has a record of **every SDK call made by Comulate** and possesses hundreds of Comulate emails. Nevertheless, Applied cannot identify a **single** Comulate product improvement that incorporates an Applied trade secret, because none exists.

310. The specious bases for Applied's trade secret misappropriation claims themselves suggest that Applied was animated to bring its lawsuit not by any valid interest in vindicating its intellectual property rights that were violated but to interfere with Comulate's ongoing business, imposing the burden and costs of defending against litigation to make Comulate a less efficient rival. Indeed, numerous other acts confirm that this was Applied's true intent.

311. In pursuing its intellectual property claims against Comulate, Applied did not act with urgency and never sought a temporary restraining order, demonstrating that Applied

does not harbor any true fear that Comulate is misappropriating its trade secrets (to be sure, Comulate never has). Moreover, in conjunction with its baseless litigation—filed the same day it had promised to provide Epic's largest customer with a statement of work to enable the customer's use of Comulate—Applied launched a coordinated public relations campaign oriented toward coercing customers off of Comulate to an alternative that did not "have the same potential or [even] work," amplifying the chilling effects of the litigation on Comulate's business. And, despite telling some customers that they had to immediately cease using Comulate or risk losing access to Epic as well, Applied told other customers they could continue using Comulate until Q2 2026, when Applied currently plans to launch its Recon software and likely cut off Ascend's Epic SDK access.

312. Applied's actions surrounding the litigation thus confirm that it was never about protecting Applied's intellectual property from misuse; it has always been about—consistent with Applied's established playbook—creating "friction" to disadvantage perceived competitors, restrict customer choice, and prevent competition.

313. Indeed, Applied's own customers recognize that Applied is simply angling to stifle meaningful competition through its "***stranglehold on the industry***," using its domination of the enterprise-level insurance AMS market to bully Comulate out of the enterprise-level automated insurance agency accounting software market.

314. Through these collective actions, Applied deprived enterprise-level insurance agencies and brokerages of their choice between automated insurance agency accounting software. Moreover, by removing Comulate from the market, Applied has given consumers no other option but to purchase enterprise-level automated insurance agency accounting software—essential to the operation of their businesses—from Ascend in the short term (which, as detailed above, will be similarly removed from Epic in Q2 2026) and from Recon thereafter. As detailed

99

above, the complex accounting demands of enterprise-level insurance agencies and brokerages *require* those entities to utilize sophisticated accounting software capable of automated reconciliation to meet those needs. By removing the only truly independent alternative for enterprise-level automated insurance agency accounting software from the market, Applied forced customers to purchase that much-needed capability from Applied.

315. Applied's anticompetitive actions lack any procompetitive justification and are economically irrational. By eliminating Comulate's access to Epic, Applied sacrificed revenue it would otherwise earn through selling and facilitating ongoing access to SDK licenses to Comulate's customers, willingly degraded the quality of product offerings on Epic, and sullied Applied's reputation with consumers—all to exclude Comulate so that Applied can establish a monopoly in the enterprise-level automated insurance agency accounting software market. Comulate and Epic are complementary products, and for several years unfettered competition in the markets for enterprise-level insurance AMS and enterprise-level automated insurance agency account software respectively led to both products obtaining sizeable market share based on consumers' choice, and each product's success enhanced the attractiveness of the other's offering. But Applied, seeing an easy (but unlawful) opportunity to expand its monopoly, decided to exclude Comulate from the enterprise-level automated insurance agency accounting software market and become the sole option for customers. Having foregone the economic benefits of the prior arrangement, Applied anticipates it will be able to recoup its short-term losses by later charging supracompetitive prices for Recon to captive insurance agencies and brokerages.

316. In sum, the anticompetitive purpose and effect of Applied's misconduct is to leverage its robust monopoly power in enterprise-level insurance AMSs to force customers to purchase Applied's product in the related market for enterprise-level automated insurance agency

accounting software. Absent Applied's anticompetitive conduct, customers would be able to choose between competing providers—including Comulate, Ascend, and Recon, if it were to enter and compete on price and quality—leading to robust competition benefitting insurance agencies and brokerages.

### a. Applied's Anticompetitive Conduct Harms Competition

317. The purpose and effect of Applied's conduct has been to foreclose or severely limit competition for enterprise-level automated insurance agency accounting software, which has harmed both Comulate as the leading provider of automated insurance accounting software, but also insurance agencies and brokerages as customers of such products.

318. Eliminating a strong, efficient competitor like Comulate lessens competition in the relevant market, eliminating pricing pressure that leads to lowered prices. Thus, if Recon were to have entered the market for enterprise-level automated insurance agency accounting software and legitimately competed on the merits, insurance agencies and brokerages would have benefitted from robust competition that drives down prices and motivates improved product quality and capability. Instead, through its exclusionary conduct, Applied has ensured it will be the dominant provider of such products, uninhibited by competition.

319. Moreover, the elimination of Comulate is a naked reduction of output, driving out of the market the most efficient and highest quality provider through non-competitive means, and likewise is a naked degradation of the quality of products in the relevant market. Rather than win business and/or market share by developing a competitive process and competing with Comulate on price and/or quality, Applied has resorted to intentionally interfering with Comulate's customer relationships and bringing sham litigation to displace Comulate from the market.

**b. Applied's Anticompetitive Conduct Will Irreparably Harm Comulate**

320.    As a direct response to Applied's outreach, multiple Comulate customers who were under contract with Comulate or in the process of deploying Comulate's software, including Major Client 1, moved to back out of their contracts with Comulate.  Each of these customers cited Applied's threat—or its outright refusal to allow customers to integrate Comulate with Epic—as the reason.  Other customers whose contracts with Comulate are coming up for renewal have asked about month-to-month renewal options rather than the contractually provided-for 12-month renewal terms.  Month-to-month renewal is significantly less lucrative than annual renewal because it creates uncertainty and business risk.  On information and belief, the customers seeking month-to-month renewal in lieu of annual renewal are doing so because of Applied's sham litigation and public false statements about Comulate.

321.    Applied's scheme to try to kill Comulate is anticompetitive.  Applied customers purchased, renewed, and kept their internal workflows compatible with Epic with the belief that Epic was an "open architecture" that would allow customers to choose their own technology providers, whether that be an Applied application or a third-party application such as Comulate.

322.    Applied thus locked in users to Epic, knowing that it would take customers years and significant expense to exit Epic and transition to a different insurance AMS once onboarded.

323.    After locking in users to Epic, Applied has now sought to remove the choice to use Comulate with the clear aim of forcing users to instead use Applied's forthcoming Recon software.  Applied is relying on the significant switching costs that customers would experience shifting away from Epic to force customers, after depriving them of the option to use Comulate

with Epic, to shift to Recon for their enterprise-level automated insurance agency accounting software needs.

324.     Applied knows that its statements to customers and refusal to allow customers to use Comulate on Epic will jeopardize Comulate's existing contracts and prospective economic advantage and threaten Comulate's very survival.  In fact, jeopardizing Comulate's survival was Applied's entire goal.

325.     Applied's unlawful, unfair, and anticompetitive conduct—including its deliberate interference with Comulate's contractual relations and business expectancies, and its dissemination of knowingly false information to Comulate's customers—has caused Comulate substantial harm.  As a direct and intended response to Applied's actions, existing Comulate customers, as well as customers actively integrating Comulate into their instances of Epic, have moved to terminate or paused further implementation of their agreements with Comulate. Comulate's agreements with these customers are expected to generate millions of dollars in annual recurring revenue.  Applied's misconduct has also eroded Comulate's hard-earned customer goodwill and damaged Comulate's reputation in ways that are difficult or impossible to quantify.

326.     As a direct, foreseeable, and intentional consequence of Applied's actions, Comulate has lost substantial enterprise value, including current and future profits, earned from the sales of its automation insurance accounting software to customers who, at Applied's urging or scared away by Applied's sham litigation, have terminated their agreements with Comulate. Given the superiority of Comulate's prices and product, but for Applied's unlawful conduct, Comulate would have retained those departing customers (consistent with Comulate's gross customer retention rate of 99%).  Furthermore, in conjunction with this loss of customers, Comulate has suffered diminished business valuation and artificially lost market share.  And, to

103

defend against Applied's baseless trade secret misappropriation lawsuit, Comulate has been forced to incur attorneys' fees and litigation expenses, draining resources that otherwise would have been invested in Comulate's growth and/or product improvement.

327.     Applied's losses stemming from Comulate's anticompetitive conduct are the type of injury that the antitrust laws are intended to prevent.  Applied's foreclosure of the enterprise-level automated insurance accounting software market has substantially harmed competition as a whole, and the injuries Comulate has suffered stem directly from that which makes them unlawful—namely, their tendency to foreclose the market by preventing customers from using competitor products regardless of price and/or quality.  As a result, consumers suffer. Insurance agencies and brokerages are left with worse products and prevented from automating tedious and error-prone processes; accordingly, insurance customers are deprived of potential reductions in costs associated with the savings Comulate's product can provide.

328.     And because the full consequences of Applied's wrongdoing will unfold over time, Comulate's damages will only continue to grow but are expected to exceed mid-nine figures.

## COUNT I

**Attempted Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**

329.     Comulate repeats and realleges each and every allegation above as if set forth fully herein.

330.     Applied has a market share of approximately 81% in the market for enterprise-level insurance AMSs.

104

331. Applied has monopoly power, *i.e.*, the ability to control prices, reduce output, and exclude competition, in the U.S. market for enterprise-level insurance AMSs, which is a relevant antitrust market.

332. Applied has attempted to monopolize the U.S. market for enterprise-level automated insurance agency accounting software, which is a relevant antitrust market, by means of the predatory, exclusionary, and anticompetitive conduct alleged herein.

333. Applied has specifically intended to monopolize the market for enterprise-level automated insurance agency accounting software by means of the predatory, exclusionary, and anticompetitive conduct alleged herein.

334. As a direct and foreseeable result of Applied's anticompetitive conduct, competition in the relevant market for enterprise-level automated insurance agency accounting software has been and/or will be unreasonably restrained in at least the following ways: (i) a lower cost, higher quality seller of enterprise-level automated insurance agency accounting software with the ability and incentive to drive competition is excluded from the market; and (ii) other potential entry to the relevant market for enterprise-level automated insurance agency accounting software is thwarted. Applied's conduct has no legitimate business purpose or procompetitive effect. Any non-pretextual business rationale for its conduct that Applied attempts to claim could have been achieved through less restrictive means.

335. Applied's anticompetitive conduct constitutes, *inter alia*, tying, monopoly leveraging, and depriving competitors of facilities essential to compete.

336. There is a dangerous probability that Applied will achieve monopoly power in the market for enterprise-level automated insurance agency accounting software due to its anticompetitive conduct. Specifically, Applied's practice of withholding software licenses from

third-party application developers, coercing customers to switch away from competing services to Applied's own services, and harassing competitors through sham intellectual property litigation, create a likelihood that Applied will obtain the ability to control prices, reduce output, and exclude competition in the market for automated insurance accounting software.

337.    Applied's conduct has had a substantial effect on interstate commerce.

338.    Applied's anticompetitive conduct has no efficiency justification, and its sole purpose and effect is to drive the most efficient and effective competitor from the relevant enterprise-level automated insurance agency software market, leaving customers with no meaningful choice but to utilize Ascend's or Applied's lower-quality products. Applied's conduct has harmed and/or will harm competition overall in the relevant market for enterprise-level automated insurance agency accounting software.

339.    As a direct and foreseeable result of Applied's anticompetitive conduct, Comulate has been and/or will be injured in its business and property and has suffered and/or will suffer substantial and calculable damages in the form of current and future lost profits, lost valuation, and artificially suppressed market share in amounts to be proven at trial.

## COUNT II

**Conspiracy to Monopolize in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and the Cartwright Act, Cal. Bus. & Prof. Code § 16720**

340.    Comulate repeats and realleges each and every allegation above as if set forth fully herein.

341.    Applied has a market share of approximately 81% in the market for enterprise-level insurance agency management services.

342.    Applied has monopoly power, *i.e.*, the ability to control prices, reduce output, and exclude competition, in the U.S. market for enterprise-level insurance agency management services, which is a relevant antitrust market.

343.    Applied willfully and intentionally conspired with Ascend to acquire monopoly power in the relevant market for enterprise-level automated insurance agency accounting software. This conspiracy consists of an agreement between Applied and Ascend to prevent Applied and Ascend's competitors and potential competitors, including Comulate, from interoperating with Epic such that the only viable options for enterprise-level automated insurance agency accounting software are Ascend, in the immediate term, and Recon, in the long run. The conspiracy enables Applied to exclude competition and acquire monopoly power in the relevant enterprise-level automated insurance agency accounting software.

344.    As a direct and foreseeable result of Applied and Ascend's anticompetitive conspiracy, competition in the relevant market for enterprise-level automated insurance agency accounting software has been and/or will be unreasonably restrained in at least the following ways: (1) a lower cost, higher quality seller of enterprise-level automated insurance agency accounting software with the ability and incentive to drive competition is excluded from the market; and (2) other potential entry into the relevant market for enterprise-level automated insurance agency accounting software is thwarted.

345.    Applied's anticompetitive conduct constitutes, *inter alia*, tying, monopoly leveraging, and depriving competitors of facilities essential to compete.

346.    Applied and Ascend's conspiracy has had a substantial effect on interstate commerce.

347. Applied and Ascend's conspiracy has no efficiency justification, and its sole purpose and effect is to drive the most efficient and effective competitor from the relevant enterprise-level automated insurance agency software market, leaving consumers with no meaningful choice but to utilize Ascend's or Applied's lower quality products. Applied's conduct has harmed and/or will harm competition overall in the relevant market for enterprise-level automated insurance agency accounting software.

348. As a direct and foreseeable result of Applied and Ascend's anticompetitive conspiracy, Comulate has been and/or will be injured in its business and property and has suffered and/or will suffer substantial and calculable damages in the form of current and future lost profits, lost valuation, and artificially suppressed market share in amounts to be proven at trial.

## COUNT III

### Unlawful Business Practices in Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq.

349. Comulate repeats and realleges each and every allegation above as if set forth fully herein.

350. Plaintiff is headquartered in California and has suffered (and will continue to suffer) the harm of Applied's unlawful conduct in California. Applied's conduct with respect to Comulate is thus subject to the California Unfair Competition Law.

351. Plaintiff has standing to assert a claim under the California Unfair Competition Law because it has suffered an injury-in-fact and economic injury as a result of Applied's unlawful acts. Applied's unlawful acts have caused one of Comulate's largest customers (Major Client 1) to move toward terminating its contract with Comulate, has caused at least one other customer to terminate its contract, caused other customers to switch to month-to-

month rather than long-term contracts, and has otherwise caused Comulate grave economic and reputational harm.

352.     As described in Counts I and II (*see supra* ¶¶ 330–50), Applied's conduct violated the Sherman Act.  As described in Counts V, VI and VII (*see infra* ¶¶ 373–413), Applied's conduct toward Comulate also constitutes tortious interference with prospective economic advantage, tortious interference with contract, and trade libel.  Applied's conduct thus constitutes unlawful business practices in violation of the Cal. Bus. & Prof. Code § 17200.

353.     As a result of Applied's unlawful business practices, Comulate has suffered, and will continue to suffer, substantial irreparable harm.

354.     For example, on November 25, 2025, Major Client 1, one of Comulate's largest clients, moved to terminate its Master Services Agreement with Comulate as a result of Applied's unlawful actions.  Comulate has thus suffered grave economic and reputational harm as a result of Applied's unlawful actions.

355.     A number of Comulate's other clients have indicated that they may have no choice but to terminate their business relationships with Comulate as a result of Applied's unlawful actions if Applied is not stopped.  Applied's actions are thus also likely to inflict additional substantial economic and reputational harm in the future. Applied's actions risk more than economic harm.  Given Comulate's size, its status as a startup, and its customer overlap with Applied, Applied's unlawful actions threaten Comulate's viability as a business, as well as its goodwill and reputation within the insurance industry.  Unless Applied's unlawful actions are enjoined, Comulate will suffer irreparable harm through the destruction of business and goodwill.

356.     Comulate thus has no adequate remedy at law absent injunctive relief.

**COUNT IV**

**Unfair Business Practices in Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq.**

357.    Comulate repeats and realleges each and every allegation above as if set forth fully herein.

358.    Plaintiff is headquartered in California and has suffered and will continue to suffer the harm of Applied's unlawful conduct in California.  Applied's conduct with respect to Comulate is thus subject to the California Unfair Competition Law.

359.    Plaintiff has standing to assert a claim under the California Unfair Competition Law because it has suffered an injury-in-fact and economic injury as a result of Applied's unfair business practices.  Applied's unfair business practices have caused one of Comulate's largest customers (Major Client 1) to move toward terminating its contract with Comulate, caused at least one other customer to terminate its contract, caused other customers to switch to month-to-month rather than long-term contracts, and caused Comulate grave economic and reputational harm.

360.    Among other things, Applied engaged in unfair business practices by, in retaliation for Comulate declining to sell, launching a campaign to push Comulate out of the automated accounting market and monopolize the market with its own product.  Applied's anticompetitive conduct includes, but is not limited to, the following acts:

- After maintaining a business relationship with Comulate for years, Applied suddenly insisted that Comulate sign third-party consulting agreements with onerous and anticompetitive terms.  These actions were intended to cause friction for Comulate customers and hinder customer uptake, thus harming Comulate's business relationships.

110

- Applied attempted to dissuade several of its clients from using Comulate in order to push Comulate out of the market. Applied attempted to charge these clients for additional SDKs, gave unduly long timelines for providing the Applied tools needed to use Comulate, and lied about the long-term viability of Comulate's product.

- Applied, to joint clients, falsely blamed Comulate for issues with its own technology, including the SDK.

- Applied, through ACN, arbitrarily and self-servingly excluded Comulate from the key professional network and conference within the insurance technology industry.

- In addition to filing a frivolous lawsuit, Applied sent a defamatory email to joint customers accusing Comulate of misappropriating trade secrets, falsely claiming that the joint clients would breach their contract if they continued to use Comulate, and threatening these joint clients with legal action if they continued to use Comulate.

- After sending its frivolous email, Applied had (and continues) to have one-on-one conversations with joint clients, telling them that they must cease using Comulate.

361. Applied's anticompetitive conduct violates the spirit and policy of antitrust law as it constitutes an attempt to monopolize the automated accounting market in violation of the spirit of the Sherman Act.

362. Applied used its monopolistic power in the AMSs market (*i.e.*, the primary market) to lure clients into using Applied Epic. In doing so, it promised that Applied Epic was an open platform that would allow clients to use third-party extension services, including Comulate.

363.    Applied has now taken anticompetitive actions to try to destroy Comulate, taking away that option from its customers and forcing customers to use Applied's own inferior product, Recon, in the related (secondary) market.

364.    Applied's propping up of Ascend as its newfound "Preferred Referral Partner" is nothing more than a false choice designed to stave off customer complaints and conceal the true nature of Applied's anticompetitive acts.    Applied is certainly not partnering with Ascend—a company whose founder Blackwell removed from Applied Net and called a "snake"—to improve customer choice.    Applied is no doubt lining its pockets by taking a handsome share of Ascend's revenues, while also planning to acquire Ascend once Recon is fully launched.    And if Ascend refuses to be acquired, Applied will follow the same playbook it has used against Comulate—cut off Ascend's access to the Epic SDK, thereby strangling Ascend.

365.    Transitioning away from Applied Epic to another AMS is not a viable option for Applied Epic clients because (i) it would take Applied Epic customers years and be prohibitively expensive to switch to an alternative AMS, and (ii) Applied's market dominance in the primary market leaves customers with no reasonable alternative options for an AMS.    Applied has thus "locked in" its clients to the Epic platform and, as a result, into Recon and out of Comulate.

366.    Applied's unfair business practices have harmed competition in the automated accounting market by eliminating a major competitor in the market, thus decreasing the quality of products and leaving the market open to a takeover by Recon.

367.    As a result of Applied's unfair business practices, Comulate has suffered, and will continue to suffer, substantial irreparable harm.

368.    For example, on November 25, 2025, Major Client 1, one of Comulate's largest clients, moved to terminate its Master Services Agreement with Comulate as a result of

112

Applied's unfair business practices.  At least one other customer, Insurance Brokerage E, has also terminated its contract, and other customers have switched to month-to-month rather than long-term contracts, Comulate has thus suffered grave economic and reputational harm as a result of Applied's unfair business practices.

369.     A number of Comulate's other clients have indicated that they may have no choice but to terminate their business relationships with Comulate as a result of Applied's unfair business practices if Applied is not stopped.  Applied's actions are thus also likely to inflict additional substantial economic and reputational harm in the future.

370.     Applied's unfair business practices risk more than economic harm.  Given Comulate's size, its status as a startup, and its customer overlap with Applied, Applied's actions threaten Comulate's viability as a business, as well as its goodwill and reputation within the insurance industry.  Unless Applied's actions are enjoined, Comulate will suffer irreparable harm through the destruction of business and goodwill.

371.     Comulate thus has no adequate remedy at law absent injunctive relief.

## COUNT V

### Tortious Interference with Prospective Economic Advantage

372.     Comulate repeats and realleges each and every allegation above as if set forth fully herein.

373.     Comulate has (or, in some instances, had) contractual business arrangements with its customers, including its joint clients with Applied.  These contractual relationships constitute economic relationships.

374.     As these contractual relationships contemplated payments to Comulate, they would yield future economic advantage for Comulate.

113

375.     In addition, Applied and Ascend were aware that Comulate continues to market its product to other prospective customers who use Epic as their AMS but have not yet adopted Comulate.

376.     Applied and Ascend were aware of Comulate's economic relationships with its clients and its potential for relationships with prospective customers.  Many of Comulate's clients are joint clients with Applied.

377.     On at least November 21 and November 24, 2025, Applied sent emails to Comulate's customers who used Epic, including Major Client 1 and Insurance Brokerage E.  Each of Applied's emails provided a link to a press release Applied posted on its website.  The email and press release falsely stated that Applied customers providing Comulate access to Epic were in breach of their contractual agreements with Applied and that Comulate had developed its intellectual property and product by "theft" of Applied's intellectual property.  Applied then held calls with nearly all of Comulate's customers who used Epic, further stating that Applied would no longer permit Comulate integration with Epic such that existing customers would need to cease using Comulate.  Applied also stated to some customers that, effective immediately, it would no longer allow new Comulate customers to enable Comulate.

378.     On December 10, 2025, Applied sent an email to Comulate's and Applied's joint customers stating that Applied was "asking all customers to register or re-register their Comulate SDK integration" and that "[t]his will allow you to continue using the Comulate SDK integration through [Q2 of 2026]."

379.     Because of the lead time needed for customers to transition off of Comulate's product and implement an alternative solution, customers need at least six months to transition away from Comulate in the event they are forced to do so.

114

380. By telling customers they will have access to Comulate only through Q2 2026, Applied effectively told customers that they must take immediate steps to transition away from Comulate now.

381. Applied's communications to Comulate customers and prospective customers was an independently wrongful act as it was in furtherance of Applied's conspiracy with Ascend to violate the antitrust laws (*see* Count I), constituted unfair business practices under California's Unfair Competition Law (*see* Count IV), and constituted defamation *per se* (*see* Count VII).

382. These emails and subsequent conversations resulted in customers ending their business relationships with Comulate. On November 25, 2025, Major Client 1 moved to terminate its contract with Comulate as a result of Applied's email. Insurance Brokerage E has also terminated its contract. Throughout December 2025 and January 2026, other customers have contacted Comulate regarding Applied's misleading statements.

383. Comulate has suffered substantial economic harm from the loss of its contract with Major Client 1 and Insurance Brokerage E.

384. Other customers have elected not to renew their contracts with Comulate on an annual basis (as is provided for in the customers' contracts) and have instead asked about month-to-month renewal options. Month-to-month renewal is significantly less lucrative for Comulate because it gives customers the option to walk away from the contract every month. Comulate is thus likely to suffer substantial economic harm from customers who transition to month-to-month renewal.

385. Other clients have expressed that they may have no choice but to terminate their agreements with Comulate as a result of Applied's actions if Applied is not stopped. Given

Comulate's status as a startup, further terminations risk Comulate losing its entire business and goodwill and thus suffering irreparable harm.

386.     Comulate has no adequate remedy at law absent injunctive relief.

387.     Because Applied's conduct of spreading false and defamatory information that it knew was false was malicious and in bad faith, Comulate is entitled to punitive damages.

## COUNT VI

### Tortious Interference with Contract

388.     Comulate repeats and realleges each and every allegation above as if set forth fully herein.

389.     Comulate had a contractual relationship with Major Client 1 and its other customers as further alleged herein.

390.     Applied was aware of Comulate's contractual relationship with Major Client 1 to provide Comulate's product, as Applied deliberately delayed approval of a statement of work that Major Client 1 asked from Applied so it could implement Comulate.  Applied was also aware of Comulate's contractual relationships with its other customers who also used Epic.

391.     On at least November 21 and November 24, 2025, Applied sent emails to Comulate's customers who used Epic, including Major Client 1 and Insurance Brokerage E.  Each of Applied's emails provided a link to a press release Applied posted on its website.  The email and press release falsely stated that Applied customers providing Comulate access to Epic were in breach of their contractual agreements with Applied, and that Comulate had developed its intellectual property and product by "theft" of Applied's intellectual property.  Applied then held calls with nearly all of Comulate's customers who used Epic, further stating that Applied would no longer permit Comulate integration with Epic.

116

392.    On December 10, 2025, Applied sent an email to Comulate's and Applied's joint customers stating that Applied was "asking all customers to register or re-register their Comulate SDK integration" and that "[t]his will allow you to continue using the Comulate SDK integration through [Q2 of 2026]."

393.    Because of the lead time needed for customers to transition off of Comulate's product and implement an alternative solution, customers need at least six months to transition away from Comulate in the event they are forced to do so.

394.    By telling customers they will have access to Comulate only through Q2 2026, Applied effectively told customers that they must take immediate steps to transition away from Comulate now.

395.    Applied made these statements to Comulate's clients to induce the clients to cease using Comulate, *i.e.*, to disrupt Comulate's contractual relationships with its clients.

396.    As a result of Applied's email and pressure in subsequent discussions, Major Client 1 moved to terminate its Master Services Agreement with Plaintiff on November 25, 2025.  Insurance Brokerage E also terminated its contract, while other customers have transitioned to month-to-month agreements.

397.    Because Applied's email (and its allegations) are false, Major Client 1's purported termination was not justified under the contract between Comulate and Major Client 1. Applied thus caused Major Client 1 to breach its contract with Comulate.  Similarly, Insurance Brokerage E's termination was not justified.

398.    Applied thus tortiously interfered with Comulate's contractual relations.

399.    As Major Client 1 was one of Comulate's largest clients, its breach has caused substantial economic and reputational harm to Comulate.  Comulate has also been harmed

by Insurance E's termination, as well as by certain customers transitioning to month-to-month contracts.

400.     Other clients have expressed that they may have no choice but to terminate their agreements with Comulate as a result of Applied's actions if Applied is not stopped.  Given Comulate's status as a startup, further terminations risk Comulate losing its entire business and goodwill and thus suffering irreparable harm.

401.     Comulate has no adequate remedy at law absent injunctive relief.

402.     Because Applied's conduct of spreading defamatory information that it knew was false was malicious and in bad faith, Comulate is entitled to punitive damages.

## COUNT VII

### Trade Libel

403.     Comulate repeats and realleges each and every allegation above as if set forth fully herein.

404.     As set forth in greater detail above, Applied has made serial false statements to impugn Comulate and its product, specifically including statements to Major Client 1 that Comulate would not work at the scale required by Major Client 1, that Applied had a comparable product in development, and statements to other Comulate customers or prospective Customers that Applied was developing "Comulate Plus."  In addition, on November 21, 2025, and over the following days, Applied emailed nearly all of Comulate's clients who also use Epic, and linking these clients to an Applied press release, falsely stating that Comulate's customers would be in breach of their agreements with Applied if the Customer allowed Comulate to access Epic, and falsely stating that Comulate developed its product and technology by "theft."  Applied's statements were deliberately intended to, and did, cause Comulate customers to believe that they

would be in breach of their Agreements by continuing to use Comulate, and that Comulate did not own its intellectual property. Applied affirmed its false statements in calls with Comulate's customers in the days after its email, confirming to all Comulate customers that Applied would require each Comulate customer to cease using Comulate. Applied's communications to Comulate's customers falsely conveyed that Customers were required to cease using Comulate or else be in breach of their agreements with Applied, and that Comulate did not own its intellectual property.

405.     These statements are lies; Comulate owns its intellectual property and did not engage in any "theft" in developing its Epic-integrated product. As Applied knows—because it provided Comulate access on multiple occasions—Comulate's intellectual property is its own, and Comulate engaged in no "theft" to develop its product. Applied was long aware of Comulate's SDK use and endorsed it. Furthermore, the joint clients' continued use of Comulate was not a breach of those clients' contracts with Applied.

406.     Applied knew its accusations were lies, and it made them intentionally, maliciously, in bad faith, and with the intent of destroying Comulate's business.

407.     Applied's accusations were derogatory to the legitimacy of Comulate's business and would naturally damage its reputation among its clients and, by extension, its business relationships and profits, as they (i) falsely alleged that the continued purchase and use of Comulate's product would subject joint clients to potential litigation and (ii) falsely accused Comulate of not having legitimate ownership of its intellectual property as a result of this false accusation of "theft."

408.     In fact, Applied's false accusations have already caused grave pecuniary and reputational repercussions to Comulate's business. As one example, on November 25, 2025,

119

Major Client 1 moved to terminate its business relationship with Comulate as a result of Applied's false statements. Insurance Brokerage E also moved to terminate.

409. Comulate has thus suffered particularized damages in the value of its contracts with Major Client 1 and Insurance Brokerage E, as well as additional damages in the form of reputational damages and goodwill. These particularized damages will continue to grow as further customers move to terminate agreements with Comulate, or through the loss of prospective customers.

410. Applied continues to contact Comulate's clients with false and defamatory accusations. Applied's ongoing outreach puts Comulate at risk of losing further clients, its industry reputation, goodwill, and possibly its entire business. Comulate thus faces irreparable harm if Applied's actions are not enjoined.

411. Comulate has no adequate remedy at law absent injunctive relief.

412. Because Applied's dissemination of defamatory *per se* statements was malicious and in bad faith, Comulate is entitled to punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests the Court to enter judgment in its favor and enter an order:

a. Adjudging and decreeing that Applied attempted to monopolize and conspired to monopolize the relevant market for enterprise-level automated insurance agency accounting software in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

b. Issuing preliminary and permanent injunctive relief to enjoin Applied from continuing the unlawful anticompetitive behavior described above, disseminating false

information about Comulate, engaging in unfair trade practices, and further interfering with Comulate's relations with its clients and prospective clients;

c. Declaring that Applied violated the California Unfair Competition Law through both unlawful and unfair business practices;

d. Awarding Plaintiff treble damages or single damages, as required by statute, or, alternatively, restitution, caused by Applied's violation of the antitrust laws;

e. Awarding Plaintiff compensatory damages based on Applied's tortious and defamatory conduct;

f. Awarding Plaintiff punitive damages based on Applied's bad faith and malicious tortious conduct;

g. Awarding Plaintiff punitive damages based on Applied's *per se* defamation of Plaintiff; and

h. Awarding Plaintiff pre- and post-judgment interest, as well as Plaintiff's reasonable attorneys' fees, expert fees, and other expenses and litigation costs; and

i. Awarding Plaintiff such other relief as this Court deems just, equitable, and proper.

*/s/ Rollo Baker*

Zachary Freeman
Brian Kerwin
MILLER SHAKMAN LEVINE & FELDMAN
LLP
30 West Monroe Street, Suite 1900
Chicago, Illinois 60603
(312) 263-3700

Rollo C. Baker (*pro hac vice* forthcoming)
Silpa Maruri (*pro hac vice* forthcoming)
Jared Ruocco (*pro hac vice* forthcoming)
Brian Campbell (*pro hac vice* forthcoming)
ELSBERG BAKER & MARURI PLLC
Empire State Building
350 Fifth Avenue, 38th Floor
New York, New York 10118
(212) 597-2600

Michael Eisenkraft (*pro hac vice* forthcoming)
COHEN MILSTEIN SELLERS & TOLL PLLC
88 Pine Street, 14th Floor
New York, New York 10005
(212) 838-7797

Nathaniel Regenold (*pro hac vice* forthcoming)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue NW, Suite 800
Washington, DC 20005
(202) 408-4600

*Attorneys for Plaintiff Ardent Labs, Inc. d/b/a
Comulate*

Dated: January 19, 2026