**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ARDENT LABS, INC., d/b/a COMULATE | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 26-cv-00591 |
| | ) | |
| APPLIED SYSTEMS, INC., | ) | |
| | ) | Hon. Manish S. Shah |
| Defendant. | ) | |
| _____ | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**APPLIED'S MOTION TO DISMISS COMULATE'S AMENDED COMPLAINT**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................... II

PRELIMINARY STATEMENT ...................................................................................... 1

SUMMARY OF ALLEGATIONS ................................................................................... 2

    A.    Comulate Rejected Applied's Proposals for A Commercial Relationship ............. 2

    B.    Comulate Created A Fake Company To Get Access To Applied's Platform .......... 4

    C.    The Alleged Ascend-Applied Conspiracy ................................................. 5

    D.    Applied's Alleged Exploitation of "Three Critical Infrastructure Gates" ............... 6

ARGUMENT ............................................................................................................ 8

I.     COMULATE LACKS ANTITRUST STANDING ........................................................ 8

II.    COMULATE'S ATTEMPTED MONOPOLIZATION CLAIM (COUNT I)
FAILS .............................................................................................................. 9

    A.    Comulate Does Not Plausibly Allege Anticompetitive Conduct ........................... 10

        1.    Applied Has No Duty To Deal With Comulate ........................................ 10

            (a)    Applied's Intellectual Property Concerns Explain Its
Refusal to Deal with Comulate .......................................................... 11

            (b)    The Limited Exceptions To Refusals to Deal Do Not Apply ........ 12

                (i)    The Aspen Skiing Exception Does Not Apply ................... 12

                (ii)    The Essential-Facilities Doctrine Does Not Apply ............ 16

        2.    Comulate's Tying Theory Fails .......................................................... 17

    B.    Comulate Does Not Plausibly Allege Specific Intent ........................................... 19

    C.    Comulate Does Not Plausibly Allege A "Dangerous Probability" Of
Monopoly Power .................................................................................. 19

III.   COMULATE'S CONSPIRACY CLAIMS (COUNTS II AND III) FAIL ........................ 20

IV.   COMULATE'S REMAINING CLAIMS (COUNTS IV–VIII) FAIL ............................. 24

CONCLUSION ......................................................................................................... 30

**Page(s)**

**Cases**

*Am. Acad. Suppliers, Inc. v. Beckley-Cardy, Inc.*,
  922 F.2d 1317 (7th Cir. 1991) .................................................................................. 20

*Am. Backflow & Fire Prevention, Inc. v. Hincks*,
  2025 IL App (2d) 250023 .......................................................................................... 25

*Apotex Corp. v. Hospira Healthcare India Priv. Ltd.*,
  2020 WL 58247 (S.D.N.Y. Jan. 6, 2020) .................................................................. 12

*Applied Sys., Inc. v. PBC Consulting Inc.*,
  2026 WL 381866 (N.D. Ill. Feb. 11, 2026) ................................................ 1, 8, 11, 25

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985) .............................................................................................12, 14

*Atl. Richfield v. USA Petroleum*,
  495 U.S. 328 (1990) ................................................................................................... 9

*Bayer Schering Pharma AG v. Sandoz, Inc.*,
  813 F. Supp. 2d 569 (S.D.N.Y. 2011) ....................................................................... 20

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) .............................................................................................21, 22

*Beverage v. Apple, Inc.*,
  101 Cal. App. 5th 736 (2024) ................................................................................... 24

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*,
  65 F.3d 1406 (7th Cir. 1995) .................................................................................... 16

*Car Carriers, Inc. v. Ford Motor Co.*,
  745 F.2d 1101 (7th Cir. 1984),
  *abrogated on other grounds by*
  *Schmees v. HC1.COM, Inc.*, 77 F.4th 483 (7th Cir. 2023) ........................................ 21

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
  20 Cal. 4th 163 (1999) .............................................................................................. 24

*Celonis SE v. SAP SE*,
  2025 WL 1810260 (N.D. Cal. June 30, 2025) ........................................................... 15

*CinemaCloudWorks, Inc. v. Comscore, Inc.*,
  2026 WL 84020 (C.D. Cal. Jan. 6, 2026) .................................................................. 11

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*,
173 F.3d 725 (9th Cir. 1999) ................................................................................. 28

*Cochran v. Ill. State Toll Highway Auth.*,
828 F.3d 597 (7th Cir. 2016) ................................................................................... 8

*Creation Supply, Inc. v. Hahn*,
608 F. Supp. 3d 668 (N.D. Ill. 2022) .................................................................... 25

*Daisy Mountain Fire Dist. v. Microsoft Corp.*,
547 F. Supp. 2d 475 (D. Md. 2008) ...................................................................... 16

*Data Gen. Corp. v. Grumman Sys. Support Corp.*,
36 F.3d 1147 (1st Cir. 1994),
*abrogated on other grounds* by
*Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010) ........................................ 11

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.*,
11 Cal. 4th 376 (1995) .......................................................................................... 27

*Ducere LLC v. Enbridge (U.S.) Inc.*,
2025 WL 81373 (N.D. Ill. Jan. 13, 2025) ............................................................. 13

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992) ......................................................................................... 17, 18

*Fishman v. Estate of Wirtz*,
807 F.2d 520 (7th Cir. 1986) ............................................................................ 16, 17

*Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr. of Durango*,
582 F.3d 1216 (10th Cir. 2009) ............................................................................. 15

*Frantzides v. Northshore Univ. HealthSystem Fac. Prac. Assocs., Inc.*,
787 F. Supp. 2d 725 (N.D. Ill. 2011) .................................................................... 21

*Goodman v. Goodman*,
2023 IL App (2d) 220086 ...................................................................................... 25

*Gulliver's Periodicals, Ltd. v. Charles Levy Circulating Co.*,
562 F. Supp. 539 (N.D. Ill. 1981) ......................................................................... 24

*Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*,
2016 WL 6091244 (N.D. Ind. Oct. 19, 2016) ....................................................... 18

*Hendricks Music Co. v. Steinway, Inc.*,
689 F. Supp. 1501 (N.D. Ill. 1988) .................................................................. 16, 19

*HomeLight, Inc. v. Shkipin*,
694 F. Supp. 3d 1242 (N.D. Cal. 2023) ................................................................ 23

*Honeywell Int'l Inc. v. Lone Star Aerospace, Inc.*,
2024 WL 4093183 (N.D. Tex. Sept. 4, 2024) ........................................................ 20

*In re Humira (Adalimumab) Antitrust Litig.*,
465 F. Supp. 3d 811 (N.D. Ill. 2020) ..................................................................... 23

*IHS Dialysis Inc. v. Davita, Inc.*,
2013 WL 1309737 (S.D.N.Y. Mar. 31, 2013) ....................................................... 24

*In re Indep. Serv. Orgs. Antitrust Litig.*,
203 F.3d 1322 (Fed. Cir. 2000) .............................................................................. 11

*Indiana Grocery, Inc. v. Super Valu Stores, Inc.*,
864 F.2d 1409 (7th Cir. 1989) .................................................................................. 8

*Ixchel Pharma, LLC v. Biogen, Inc.*,
9 Cal. 5th 1130 (2020) ............................................................................................ 27

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
466 U.S. 2 (1984) .................................................................................................... 17

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007) ................................................................................................ 23

*Levitin v. Northwest Cmty. Hosp.*,
64 F. Supp. 3d 1107 (N.D. Ill. 2014) ....................................................................... 8

*Litrinium, Inc. v. MACOM Tech. Sols. Inc.*,
2020 WL 4580506 (C.D. Cal. Apr. 27, 2020) ....................................................... 25

*Loren Data Corp. v. GXS, Inc.*,
501 F. App'x 275 (4th Cir. 2012) ........................................................................... 11

*Maritz Inc. v. Carlson Mktg. Grp., Inc.*,
2009 WL 3561521 (N.D. Cal. Oct. 30, 2009) ....................................................... 26

*Massey v. Merrill Lynch & Co.*,
464 F.3d 642 (7th Cir. 2006) .................................................................................. 26

*Meta Platforms, Inc. v. BrandTotal Ltd.*,
605 F. Supp. 3d 1218 (N.D. Cal. 2022) ................................................................. 27

*In re Microsoft Corp. Antitrust Litig.*,
274 F. Supp. 2d 743 (D. Md. 2003) ........................................................................ 16

*Midwest Gas Servs. v. Ind. Gas Co.*,
317 F.3d 703 (7th Cir. 2003) ...................................................................21

*Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*,
815 F. Supp. 2d 679 (S.D.N.Y. 2011)......................................................25

*Motor Works, LLC v. Safer Techs., Inc.*,
2010 WL 11485116 (N.D. Cal. Mar. 10, 2010) .......................................28

*N. Pac. Ry. Co. v. United States*,
356 U.S. 1 (1958) .....................................................................................18

*New York v. Facebook, Inc.*,
549 F. Supp. 3d 6 (D.D.C. 2021),
*aff'd sub nom. New York v. Meta Platforms, Inc.*,
66 F.4th 288 (D.C. Cir. 2023).................................................................15

*Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*,
472 U.S. 284 (1985) .................................................................................23

*Novell, Inc. v. Microsoft Corp.*,
731 F.3d 1064 (10th Cir. 2013) ..........................................................10, 15

*NYNEX Corp. v. Discon, Inc.*,
525 U.S. 128 (1998)............................................................................22, 23

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018) .................................................................................23

*OJ Com., LLC v. KidKraft, Inc.*,
34 F.4th 1232 (11th Cir. 2022).................................................................13

*Oxbow Carbon & Mins. LLC v. Union Pac. R.R. Co.*,
926 F. Supp. 2d 36 (D.D.C. 2013) ...........................................................21

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
555 U.S. 438 (2009) .................................................................................10

*Paladin Assocs., Inc. v. Montana Power Co.*,
97 F. Supp. 2d 1013 (D. Mont. 2000) ......................................................21

*Palmer v. BRG of Ga., Inc.*,
498 U.S. 46 (1990) ...................................................................................24

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
911 F.3d 505 (8th Cir. 2018) ....................................................................13

*Partington v. Bugliosi,*
    56 F.3d 1147 (9th Cir. 1995) ...................................................................28

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.,*
    729 F. Supp. 3d 298 (E.D.N.Y. 2024)....................................................24

*Pixels.com, LLC v. Instagram, LLC,*
    2015 WL 10943591 (N.D. Cal. Dec. 21, 2015)......................................19

*Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Ill., Inc.,*
    412 F. Supp. 3d 941 (N.D. Ill. 2019) ...............................................10, 13

*Reifert v. S. Cent. Wisconsin MLS Corp.,*
    450 F.3d 312 (7th Cir. 2006) .................................................................17

*Robinson v. HP, Inc.,*
    2025 WL 2802077 (N.D. Ill. Sept. 30, 2025)........................................18

*S. Bay Chevrolet v. Gen. Motors Acceptance Corp.,*
    72 Cal. App. 4th 861 (1999).................................................................24

*Schor v. Abbott Lab'ys,*
    457 F.3d 608 (7th Cir. 2006) .................................................................10

*SEI Glob. Servs., Inc. v. SS&C Advent,*
    496 F. Supp. 3d 883 (E.D. Pa. 2020),
    aff'd, 2022 WL 2356730 (3d Cir. 2022)................................................16

*SIC Metals, Inc. v. Hyundai Steel Co.,*
    442 F. Supp. 3d 1251 (C.D. Cal. 2020)................................................27

*Siva v. American Bd. of Radiology,*
    38 F.4th 569 (7th Cir. 2022) ...................................................................8

*SOLIDFX, LLC v. Jeppesen Sanderson, Inc.,*
    841 F.3d 827 (10th Cir. 2016) ...............................................................11

*Sosa v. DIRECTV, Inc.,*
    437 F.3d 923 (9th Cir. 2006) .................................................................25

*Spectrum Sports, Inc. v. McQuillan,*
    506 U.S. 447 (1993) ..................................................................... 9, 19, 20

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.,*
    64 F. Supp. 3d 665 (E.D. Pa. 2014).....................................................13

*Taha v. Int'l Bhd. of Teamsters, Loc. 781,*
    947 F.3d 464 (7th Cir. 2020) ...................................................................8

*Texaco Inc. v. Dagher*,
  547 U.S. 1 (2006) ........................................................................................ 23

*Tiz, Inc. v. Southern Glazer's Wine & Spirits, LLC*,
  2024 WL 2785142 (N.D. Ill. May 30, 2024) ............................................... 13

*United States v. Colgate & Co.*,
  250 U.S. 300 (1919) .................................................................................... 10

*United Wisconsin Grain Producers LLC v. Archer Daniels Midland Co.*,
  144 F.4th 976 (7th Cir. 2025) ....................................................................... 9

*Uppal v. Welch*,
  2016 WL 2909652 (N.D. Ill. May 19, 2016) ............................................... 25

*Vakharia v. Little Co. of Mary Hosp. and Health Care Ctrs.*,
  917 F. Supp. 1282 (N.D. Ill. 1996) ............................................................... 8

*VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*,
  2015 WL 5693735 (N.D. Ill. Sept. 28, 2015) ........................................ 12, 16

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*,
  540 U.S. 398–99 (2004) ............................................................ 10, 12, 15, 16

*Viamedia, Inc. v. Comcast Corp.*,
  951 F.3d 429 (7th Cir. 2020) ...................................................... 12, 13, 15

*Walter Kidde Portable Equip., Inc. v. Universal Sec. Instruments, Inc.*,
  669 F. Supp. 2d 895 (N.D. Ill. 2009) .......................................................... 19

*Wertymer v. Walmart, Inc.*,
  142 F.4th 491 (7th Cir. 2025) ..................................................................... 22

*White v. Keely*,
  814 F.3d 883 (7th Cir. 2016) ........................................................................ 8

*In re Zinc Antitrust Litig.*,
  155 F. Supp. 3d 337 (S.D.N.Y. 2016) .......................................................... 21

## Statutes

11 Hovenkamp, Antitrust Law ¶ 1902d ........................................................... 23

## Other Authorities

https://www1.appliedsystems.com/en-us/about-us/ecosystem/ ............................. 7

# PRELIMINARY STATEMENT

This is not the David and Goliath story that Comulate tries to portray. By Comulate's own account, it is the "dominant player," holding between 65% and 75% market share. Comulate is now seeking to use the antitrust laws to entrench that dominance and avoid accountability for its own misconduct. That is not what the antitrust laws were designed to do.

At its core, Comulate is complaining about a failed business negotiation between two established companies, not an antitrust violation. Between early 2023 and mid-2025, Applied proposed no fewer than four distinct commercial arrangements, and Comulate rejected every single one. The parties never signed a formal agreement and never made any joint offerings. Comulate cannot now invoke the antitrust laws to force a deal on its own terms.

What happens next confirms this is not an antitrust case. Rather than reach an agreement with Applied or compete on its own, Comulate created a fake company—PBC—to obtain the access to Applied's Epic platform that it now claims Applied was obligated to provide. "Comulate does not dispute that PBC is not a real company and that it was a front for Comulate to gain access to Epic." *Applied Sys., Inc. v. PBC Consulting Inc.*, 2026 WL 381866, at *4 (N.D. Ill. Feb. 11, 2026). When Applied discovered the fraud, it did what any company would do: it terminated Comulate's access and filed suit. The antitrust laws were not designed to protect a plaintiff from the consequences of its own fraud.

Comulate's antitrust theories are independently meritless. Businesses are free to choose their partners, and the narrow exceptions to that principle are not remotely satisfied here. But Comulate's antitrust theories face an additional, fundamental problem. A monopolization scheme ordinarily involves a firm taking market share for itself. Comulate's theory is different—and stranger. It alleges that Applied, the supposed monopolist, was not capturing the market for itself but was instead ***directing business to another company***, Ascend. On top of that, Comulate's

1

theory depends on Ascend knowingly agreeing to a scheme that, per Comulate's allegations, ends with Ascend being eliminated from the market. That is not how conspiracies work. The only plausible explanation is that, after discovering Comulate's fraud, Applied needed to give its displaced customers a transition path, and Ascend was the best option. A referral agreement with the best available alternative is pragmatism, not an antitrust violation.

Comulate's remaining non-antitrust claims are no more viable. Comulate's UCL claims attempt to repackage its failed antitrust theories under a California statute. And its tort claims fail three times over: the litigation privilege bars claims based on Applied's post-filing customer communications, the pre-litigation conduct is just the failed antitrust theories recast as tort predicates, and Comulate does not plausibly allege that Applied's conduct—rather than customers' own business judgment—caused the harm that Comulate claims.

Applied therefore respectfully requests that the complaint be dismissed with prejudice.

### SUMMARY OF ALLEGATIONS

Applied is a Chicago-based provider of cloud-based insurance software. *See* Amend. Compl. ("AC") ¶ 13. Its flagship product, Epic, is an insurance agency management system ("AMS"). *Id.* Comulate was founded in 2022 and sells "automated insurance agency accounting software"—a product that integrates with an AMS, including Epic and its main competitor Vertafore. *Id.* ¶¶ 1–2, 38. Comulate is "the dominant player" and "category winner" in the alleged market, holding 65–75% share, and that Applied has roughly no share. *Id.* ¶¶ 36–38. Comulate identifies Ascend, Eventual Treasury, and SimplePin as other participants in the market. *Id.* ¶ 39.

A.      **Comulate Rejected Applied's Proposals for A Commercial Relationship**

Comulate's claims arise from its choice to decline Applied's proposals for a commercial relationship. Although Comulate claims that Applied had a "voluntary, mutually beneficial, and profitable" relationship with Comulate that started to fray when Applied began an "exclusionary

2

campaign" against the company beginning in January 2024 (AC ¶¶ 3, 8), Comulate's own allegations show that their dealings were fraught and never developed into a relationship.

In early 2023, the parties began exploring the contours of a potential financial arrangement, discussing "partnership" and "revenue-sharing models." AC ¶¶ 88, 91–92. By June 2023, those discussions had collapsed after Applied "killed the pilot project and put a formal partnership agreement on ice." *Id.* ¶¶ 116, 117. The parties resumed discussions in September 2023, but the parties could not agree on terms. *Id.* ¶¶ 118–122. During this same period in 2023, Applied was also allegedly seeking "to block Comulate from providing services to" one of Applied's "largest and most strategically important" customers. *Id.* ¶¶ 257, 259. And throughout 2024 and into 2025, Comulate alleges continuing "friction" with Applied over SDK fees, third-party consulting agreements, and conference participation. AC ¶¶ 131–159.

All told, between early 2023 and mid-2025, Applied proposed no fewer than four distinct commercial arrangements—a 5% revenue-sharing model (AC ¶ 92), an outright acquisition (*id.* ¶¶ 88, 113–17), an exclusivity-and-right-of-first-refusal framework (*id.* ¶ 118), and a consulting agreement offering Comulate "blanket approval" for Epic integration (*id.* ¶ 147)—***and Comulate rejected every one***. The one document the parties signed—a "pilot" agreement to provide Comulate with SDK testing access—was ***never implemented*** (and there is no allegation Applied would earn any revenue under that agreement in any event). *Id.* ¶¶ 107–08. And, "[e]ven ***without formal partnership***, Comulate continued to grow." *Id.* ¶ 110 (emphasis added).

Instead, Applied's commercial dealings were exclusively with its own customers—the insurance agencies and brokerages that purchased Epic and, separately, SDK and Data Lake

licenses from Applied. AC ¶¶ 109–11.[1] Some customers chose to integrate Comulate's product with Epic, buying SDK access from Applied at Applied's standard pricing. *Id.* ¶¶ 109–10.

**B.** **Comulate Created A Fake Company To Get Access To Applied's Platform**

In 2024, Comulate created a fictitious company, PBC Consulting, under a fictitious identity to obtain its own sandbox account providing access to Applied's proprietary SDK and user interface to Epic. AC ¶¶ 8, 201–04. Applied discovered this activity in October 2025 and, on November 21, 2025, filed suit alleging breach of contract, misappropriation, and related claims. *Id.* ¶¶ 201–02. Applied informed joint customers of the lawsuit, stating that Comulate's SDK access had been revoked due to "clear evidence" of its theft of Applied's intellectual property and therefore providing Comulate access to Epic may result in "breach of their contracts with Applied." *Id.* ¶ 272. To minimize disruption to joint customers' business, Applied planned to allow customers access to Comulate's integration through the second quarter of 2026. *Id.* ¶¶ 213, 280–81.[2]

---

[1] Applied collected SDK and Data Lake licensing fees from these customers. *Id.* ¶ 109. Those fees reflect a *customer-to-Applied* relationship, not a *Comulate-to-Applied* relationship; and there is no allegation that any of that revenue from those licenses flowed to or from Comulate. Indeed, the Amended Complaint confirms that the alleged increases in those fees were charged to—and borne by—Applied's own customers. *See id.* ¶ 138 (quoting Applied sales representative's email to CRS Insurance Brokerage); *id.* ¶ 159 (alleging costs imposed on GKG Risk).

[2] Comulate speculates that Applied's response to the PBC fraud was merely "pretextual" because the supposed "exclusionary campaign" began in early 2024. *Id.* ¶ 8. But the specific allegations undermine that conclusory assertion given that, during the supposed "exclusionary" campaign that preceded Comulate's termination, Comulate commanded 65-75% of the relevant market and "continued to grow," up until November 21, 2025. *Id.* ¶¶ 38, 102, 297. And prior to November 2025, Applied alleviated the supposed "friction" on joint customers when they raised issues. *Id.* ¶ 132 (Applied "retreated and confirmed that the standard runtime SDK would be sufficient"); *id.* ¶ 154 (Applied's president personally intervened to approve a customer's request).

**C.      The Alleged Ascend-Applied Conspiracy**

The Amended Complaint alleges that Applied's decision to terminate Comulate was merely "the culmination of a 22-month campaign to *clear the field for Applied's product* that could not compete on merit." AC ¶ 215 (emphasis added); *see also id.* ¶¶ 247–49, 254. But Applied did not use its supposed monopoly power to force customers to use Applied's Recon product; rather, it gave customers the choice of whether *to use Ascend's product*. *Id.* ¶¶ 247–49.

On December 4, 2025, Applied and Ascend signed a Limited Referral Agreement ("LRA") designating Ascend as a "Preferred Referral Partner."[3]  Per the LRA, Applied merely "agrees to recommend Ascend as a potential solution for" approximately 60 "customers evaluating automated reconciliation software as an option," after being "impacted by market changes relating to use and access to Applied integration solutions such as SDK." AC ¶ 248. The "market changes" were Comulate's PBC fraud scheme; after which Applied initiated litigation, and notified its joint customers. *Id.* ¶¶ 201–02, 227. At that moment, Applied faced a practical problem of Comulate's own making: Applied customers who had integrated Comulate into their operations now needed an alternative because Applied could no longer in good faith continue to facilitate that access to a fraudster. Reflecting this genuine concern, the LRA contains representations that Ascend has not engaged (and will not engage) in the types of bad acts that Comulate had deployed. Ex. A. Following the LRA, Applied did not force customers to use Ascend (or Recon) but instead stated: "Whether you're leaning toward Ascend, utilizing ResourcePro or Patra, or exploring our new Recon solution launching in February, we're here to help." AC ¶ 237.

Given that the LRA is innocuous on its face, Comulate also resorts to (falsely) speculating "on information and belief" that there must be other secret, conspiratorial terms. AC ¶ 250.

---

[3]  Applied attached the LRA to its original motion to dismiss and does so again here. Ex. A.

Specifically, Comulate alleges that this supposed (and non-existent) side deal must contain the types of "revenue sharing" partnership that Comulate itself desired from Applied. *Id.* ¶¶ 92, 250. Comulate also alleges that this referral arrangement is an unlawful conspiracy to monopolize the accounting automation software market, and an illegal customer allocation agreement. AC ¶¶ 337–45. In connection with this, Comulate alleges that Ascend has agreed to an arrangement that will either in the short-term or long-term *eliminate* Ascend from the alleged market. *Id.* ¶ 254. Comulate offers no factual allegations explaining why Ascend would conspire to eliminate itself from the market and hand Applied a monopoly. Contradicting that assertion, Ascend's CEO texted Comulate's CEO in solidarity after Applied filed suit: "*I'm genuinely sorry to see the applied BS*. We may be competitors but big picture *we're always on the side of startups*" like Comulate. *Id.* ¶ 230 n.11 (emphasis added).[4]

### D. Applied's Alleged Use Of "Three Critical Infrastructure Gates"

Wide swaths of the Amended Complaint focus on allegations that Applied "exploit[ed] its control over three critical infrastructure gates—the Epic Software Development Kit ("SDK"), IVANS, and ACN—to foreclose" competition in the automated insurance agency accounting software market. AC ¶ 364(b); *id.* ¶ 130–213. But, per the allegations, the supposed gates—all of which occurred well before the revelation of the PBC fraud (*id.* ¶¶ 130–213)—had no impact on Comulate or competition. Comulate itself alleges that (1) it "continued to grow" during the supposed exclusionary campaign (*id.* ¶ 110); (2) "*[b]efore November 21, 2025*, Comulate's annualized revenue was *growing* ███████████████████████," and it only fell off after Applied's lawsuit (*id.* ¶ 297); and (3) *[b]efore November 21, 2025*, Comulate held the leading

---

[4] Comulate can only speculate, again on "information and belief," that this message was not genuine since "Ascend was already operating as an instrument" of Applied. *Id.*

independent position with between 65% and 75%" of the market (*id.* ¶ 307). The specific gate allegations underscore they were not used to "clear the field" of competition.

**SDK and API access to Applied's open platform**: Applied has long had an open policy permitting integrations "with hundreds of third-party companies" and Applied has "vigorously support[ed] those experiences to enable better agency workflows." AC ¶¶ 84, 293.[5] The Amended Complaint acknowledges that the legacy SDK had significant limitations. *Id.* ¶ 98 (Applied and Comulate recognized that the SDK "doesn't work very well" and "breaks down for large updates."). And the Amended Complaint alleges that a more modern API access would better facilitate third-party access to Epic. *Id.* ¶ 100 (both Applied and Epic "agreed that a modern API-based integration would provide better security and scalability."); *Id.* ¶ 77 (Applied's "API-based architecture" is designed to "enable easier data exchange in and out of the platform."). As such, in August 2025, Applied slowed down SDK authorizations while migrating to a modern API system and conducting an "assessment … of agencies and Third Parties using SDK beyond its intended scope." AC ¶ 163.

**IVANS**. Comulate does not allege that Applied denied it IVANS access. To the contrary, Comulate admits that Applied licensed Comulate a standard IVANS API Agreement. AC ¶ 74; *see also id.* ¶ 137. Comulate does not allege that this agreement has been terminated or that access has been revoked.

**ACN**. ACN is an annual industry conference and user forum—a marketing venue, not a competitive necessity as reflected by Comulate's continued growth after it missed one conference.

---

[5]  Comulate alleges that Applied "reversed its open platform philosophy" pointing to supposed changes to Applied's website. *Id.* But, per Applied's website, which Comulate's allegations incorporate into the complaint, Applied still maintains an "open approach to integrations" and has "100+ Custom and pre-built integrations." https://www1.appliedsystems.com/en-us/about-us/ecosystem/.

AC ¶¶ 66–71, 297.

**ARGUMENT**

To survive a motion to dismiss, Comulate must allege non-conclusory facts that state a plausible claim for relief. *Cochran v. Ill. State Toll Highway Auth.*, 828 F.3d 597, 599 (7th Cir. 2016). Antitrust laws "protect[] competition, not competitors." *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1413 (7th Cir. 1989). Courts thus scrutinize attempts to "transform ordinary business disputes into antitrust claims," to ensure that anemic cases do not proceed past a motion to dismiss to avoid the "enormous expense of antitrust discovery in cases with no reasonably founded hope of success."[6] In doing so, the Court "may reject sheer speculation, bald assertions, and unsupported conclusory statements." *Taha v. Int'l Bhd. of Teamsters, Loc. 781*, 947 F.3d 464, 469 (7th Cir. 2020).

**I.      COMULATE LACKS ANTITRUST STANDING**

Comulate's alleged injury defeats its antitrust claims. An antitrust plaintiff must allege injury "of the type the antitrust laws were intended to prevent." *Levitin v. Northwest Cmty. Hosp.*, 64 F. Supp. 3d 1107, 1121 (N.D. Ill. 2014) (cleaned up). Injury that only hurts the plaintiff—not "competition generally"—does not qualify. *Id.* at 1122 (dismissing antitrust claims on that basis).

This Court found that "Comulate does not dispute that PBC is not a real company and that it was a front for Comulate to gain access to Epic." *Applied Sys., Inc.*, 2026 WL 381866, at *4.[7] As highlighted above, Comulate alleges it continued to grow and dominate the market up and until

---

[6] *Vakharia v. Little Co. of Mary Hosp. and Health Care Ctrs.*, 917 F. Supp. 1282, 1300 (N.D. Ill. 1996); *Siva v. American Bd. of Radiology*, 38 F.4th 569, 575 (7th Cir. 2022).

[7]  The Court may "take judicial notice of public records, including public court documents, in ruling on a motion to dismiss under Rule 12(b)(6)." *White v. Keely*, 814 F.3d 883, 886 & n.2 (7th Cir. 2016) (taking into account various court findings of fraud, which show there "is a bit more to the story than what appears in [plaintiff's] complaint").

the initiation of Applied's lawsuit arising from Comulate's fraud. *Supra* at 6. Comulate's claims must be dismissed because antitrust law does not protect fraud or the "harms" that flow from a plaintiff's fraud. *Atl. Richfield v. USA Petroleum*, 495 U.S. 328, 334–40 (1990) (requiring that antitrust standing rest on injury "attributable to an anti-competitive aspect of the practice").

Comulate's remaining allegations of market-wide harm do not bridge this gap. Comulate points to Ascend's price increase after Applied's filing. AC ¶ 312.[8] It is unclear whether this is true. But in any event, Ascend is a separate company whose independent pricing decisions are not attributable to Applied absent well-pleaded allegations of a price-fixing conspiracy—which the Amended Complaint does not contain. The LRA is a customer-referral arrangement, not a price-fixing agreement; it contains no pricing terms whatsoever. And Comulate's own allegations explain the increase without any inference of conspiracy: Comulate concedes that Ascend had been offering 90% discounts to win customers (*id.* ¶ 241), and that Ascend's CEO acknowledged the product "could not stand independently as an economically viable product" at those prices (*id.* ¶ 313). A firm raising prices from an admittedly unsustainable floor to commercially viable levels is not evidence of anticompetitive harm—it is evidence of a competitor that was previously underpricing and corrected course.

## II.     COMULATE'S ATTEMPTED MONOPOLIZATION CLAIM (COUNT I) FAILS

Comulate does not plausibly allege any element of attempted monopolization. A plaintiff must plausibly allege "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993); *United Wisconsin Grain Producers LLC v. Archer Daniels Midland Co.*, 144 F.4th 976, 980 (7th Cir. 2025).

---

[8]   As to Applied, Comulate's pricing is "much higher" than "cheaper" Recon pricing. *Id.* ¶ 303.

### A.     <u>Comulate Does Not Plausibly Allege Anticompetitive Conduct</u>

Comulate attempts to plead two antitrust theories: a refusal-to-deal claim and a tying claim.[9] As shown *infra* §§ II.A.1 & II.A.2, Comulate fails to plausibly allege either.

### 1.     Applied Has No Duty To Deal With Comulate

The Court should reject Comulate's effort to force Applied to deal with a rival. *See, e.g.*, AC ¶¶ 7, 300, 304. Businesses "are free to choose the parties with whom they will deal." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009) (citing *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)). A claim premised on one competitor's "refusal to deal" with another thus lies at "the outer boundary" of the Sherman Act and only "rarely" qualifies as anticompetitive conduct. *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398–99, 409 (2004) ("*Trinko*"); *Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Ill., Inc.*, 412 F. Supp. 3d 941, 956 (N.D. Ill. 2019) (Shah, J.) (same).[10]

Here, it was Comulate that refused to deal with Applied. By Comulate's own telling, it is the dominant player, holding a 65–75% share and backed by lucrative venture capital funding. AC ¶¶ 38, 128, 318–19. *Aspen Skiing* was not designed to protect Comulate seeking to maintain its dominance through court-mandated access on preferred terms after it refused Applied's many proposals, without paying a dollar, and after creating a fake company to access Epic without

---

[9]   Comulate also references "monopoly leveraging", *see* AC ¶ 331, but the Seventh Circuit does not recognize a "free-standing theory of 'monopoly leveraging.'" *Schor v. Abbott Lab'ys*, 457 F.3d 608, 611–12 (7th Cir. 2006).

[10]   Three policy reasons explain why courts are skeptical about 'duty to deal' claims. First, forcing companies "to share the source of their advantage … may lessen the incentive … to invest in those economically beneficial facilities." *Trinko*, 540 U.S. at 407–08; *see also Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1073 (10th Cir. 2013) (Gorsuch, J.) ("[f]orcing firms to help one another would also risk reducing the incentive both sides have to innovate, invest, and expand"). Second, courts are "ill suited" to "act as central planners, identifying the proper price, quantity, and other terms of dealing." *Trinko*, 540 U.S. at 408. Third, "compelling negotiation between competitors may facilitate the supreme evil of antitrust: collusion." *Id.*

permission.  And, a plaintiff, especially a "dominant" one, cannot turn its own refusal into a duty-to-deal claim.  *Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275, 283 (4th Cir. 2012) (rejecting refusal-to-deal claim where the defendant "proposed terms for a commercial relationship with the plaintiff, which plaintiff had rejected").

    (a)    <u>Applied's Intellectual Property Concerns Justify Its Refusal To Deal With Comulate</u>

Applied refused to deal with Comulate because Comulate fraudulently accessed Applied's systems.  The assertion "of intellectual property rights is a presumptively rational business justification for a unilateral refusal to deal."  *SOLIDFX, LLC v. Jeppesen Sanderson, Inc.*, 841 F.3d 827, 841 (10th Cir. 2016); *In re Indep. Serv. Orgs. Antitrust Litig.* ("*Xerox*"), 203 F.3d 1322, 1328 (Fed. Cir. 2000) ("Xerox was under no obligation to sell or license its patented parts and did not violate the antitrust laws by refusing to do so.").[11]

Comulate's own allegations show that Applied had intellectual property concerns.  Applied filed suit accusing Comulate of fraudulently and unlawfully accessing Applied's technologies to misappropriate Applied's sensitive trade secrets, reverse engineer Applied's functionality to accelerate product development, and access other confidential information.  *See* AC ¶ 272; *see also id.* ¶ 253 (showing Applied's LRA with Ascend embodied Applied's intellectual property concerns).  Comulate tried to cast this all aside as "pretext."  *Id*. ¶ 364.  But, again, "Comulate does not dispute that PBC is not a real company and that it was a front for Comulate to gain access to Epic."  *Applied Sys., Inc*., 2026 WL 381866, at *4.  That fraud gives Applied a rational, lawful

---

[11]  *See also Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1188 (1st Cir. 1994) (presuming "a refusal to license is not exclusionary"), *abrogated on other grounds* by *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010); *CinemaCloudWorks, Inc. v. Comscore, Inc.*, 2026 WL 84020, at *6 (C.D. Cal. Jan. 6, 2026) (no anticompetitive conduct where defendant's actions were "taken pursuant to contractual rights, to protect proprietary data infrastructure, and to prevent free-riding").

reason to cut off access. *See also supra* at 4.

(b) <u>The Limited Exceptions To Refusals to Deal Do Not Apply</u>

Beyond Applied's intellectual-property justification, Comulate does not fall within the "limited exceptions to the right not to deal." *VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*, 2015 WL 5693735, at *7 (N.D. Ill. Sept. 28, 2015). Those exceptions are: (1) predatory pricing, which Comulate does not allege; (2) a refusal to deal under *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) ("*Aspen Skiing*"); and (3) the "controversial" essential-facilities doctrine. *VBR Tours*, 2015 WL 5693735, at *7. None applies.

(i) *The* Aspen Skiing *Exception Does Not Apply*

A narrow exception to the right not to deal exists where a defendant ended a profitable, longstanding business relationship without economic justification, showing "a willingness to forsake short-term profits to achieve an anticompetitive end." *Trinko*, 540 U.S. at 409 (describing *Aspen Skiing*). Comulate's allegations negate each of the *Aspen Skiing* requirements.

***First,*** Comulate and Applied never had a business relationship—let alone the profitable, longstanding one that *Aspen Skiing* demands.[12] The longstanding nature of the relationship is critical because only relationships that "develop and persist" over time can form the "optimal pattern" that an alleged monopolist might unlawfully disturb. *Aspen Skiing*, 472 U.S. at 604 n.31. Given this, cases applying this exception involved a longstanding, direct, bilateral, revenue-generating relationship. In *Aspen Skiing*, the parties' joint commercial relationship lasted for "several years." 472 U.S. at 603. In *Viamedia*, the parties maintained a direct contractual ad-rep

---

[12] In *Aspen*, "the Supreme Court upheld an antitrust verdict against a ski resort operator that had discontinued a longstanding agreement with a smaller rival to jointly sell 'all-Aspen' resort access tickets." *Apotex Corp. v. Hospira Healthcare India Priv. Ltd.*, 2020 WL 58247, at *4 (S.D.N.Y. Jan. 6, 2020).

arrangement under which Viamedia sold advertising on Comcast's behalf for years. *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 442–44 (7th Cir. 2020); *id.* at 456–57 (stressing that parties must have a longstanding "pre-existing relationship"). And in *Tiz, Inc. v. Southern Glazer's Wine & Spirits, LLC*, the defendants accepted over 131,000 orders and generated approximately $190 million in retail sales through the plaintiff's online marketplace platform over the course of nearly five years—a direct, bilateral commercial relationship in which the defendants voluntarily fulfilled orders placed through the plaintiff's platform. 2024 WL 2785142, at *14–15 (N.D. Ill. May 30, 2024). In each case, the prior course of dealing involved a direct, voluntary business relationship between the parties in which both sides participated and profited. Where no such relationship exists, the exception does not apply. *OJ Com., LLC v. KidKraft, Inc.*, 34 F.4th 1232, 1246 (11th Cir. 2022) (*Aspen* does not apply where no "joint offering by competitors" exists); *Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Ill., Inc.*, 412 F. Supp. 3d 941, 956 (N.D. Ill. 2019) (Shah, J.) (*Aspen Skiing* exception "is not applicable when ... there was no previous course of conduct suggesting that the refusal-to-deal was anticompetitive or irrational").[13]

Comulate does not allege that it had a profitable, longstanding relationship with Applied; it only alleges failed negotiations. Applied proposed four commercial arrangements between early 2023 and mid-2025. *See supra* at 3. Comulate—admitting it holds 65-75% of the alleged market, backed by $20 million in venture capital—rejected every one. AC ¶¶ 38, 92, 116–19, 121–22,

---

[13] *See also Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 518 (8th Cir. 2018) (affirming dismissal of refusal-to-deal claim where parties did not have a "voluntary, years-long relationship" regarding the competing products); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 64 F. Supp. 3d 665, 687 (E.D. Pa. 2014) (holding *Aspen Skiing* did not apply where the parties lacked a "long-standing preexisting course of dealing"); *Ducere LLC v. Enbridge (U.S.) Inc.*, 2025 WL 81373, at *7 (N.D. Ill. Jan. 13, 2025) (viewing lack of prior voluntary and profitable course of dealing as "all but fatal to [plaintiff's] refusal to deal claim"); *cf. Viamedia, Inc.*, 951 F.3d at 463 (finding *Aspen* exception applies where allegations "walked through the long-term course of dealing prior to [the defendant's] conduct").

128, 147. The parties never partnered, entered a revenue-sharing arrangement, or did joint business of any kind. *See* supra at 3. Applied never got a dime from Comulate. Indeed, as early as September 2023—just months after the parties began their discussions—Applied was already seeking to "block Comulate from providing services to" one of Applied's "largest and most strategically important" customers. *Id.* ¶¶ 257, 259. That is not a relationship that "develop[ed] and persist[ed]" into the kind of "optimal pattern" *Aspen Skiing* protects. 472 U.S. at 604 n.31. Indeed, these commonsense principles should especially apply here in light of allegations that Comulate threatened to kill Applied's entire business model. *See, e.g.*, AC ¶ 210 (alleging that Applied could "lose [its] competitive advantage … to the "Comulate[s] of the world").

Comulate tries to fill this gap with vague assertions that Applied "facilitated" Comulate's integration, gave "support," and held "in-depth discussions regarding the technical aspects of Comulate's Epic integration." AC ¶¶ 86, 88, 93. Discussions and demonstrations do not create a contract, a partnership, or a commercial relationship. And Applied employees answering technical questions about Applied's own SDK (*id.* ¶ 97)—a product Applied sells to Applied's customers— is not a "voluntary and profitable course of dealing" with a rival, but just an effort to service Applied's own customers. And reflecting there was no course of dealing *with Comulate*, as early as September 2023 (just months after the parties began their discussions), Applied was allegedly seeking to "block Comulate" from servicing a major customer. *Id.* ¶ 259.

Comulate's theory that Applied's "open-platform" statements created an implied commitment to unconditional access also fails. AC ¶¶ 76–83. Applied's ongoing open-platform policy, which supports integrations with "hundreds of third-party companies," means that Applied welcomes arrangements benefiting Applied and its customers. *Id.* ¶ 293; *supra* at n.5. That policy is open, but not foolish—it would be entirely irrational to grant uncompensated access to any

company that wants it, regardless of whether that company signed an agreement, paid a dollar, or admitted to fraud. *See Celonis SE v. SAP SE*, 2025 WL 1810260, at *1 (N.D. Cal. June 30, 2025) ("[Defendant] has no obligation to let its competitors access its databases in the way they prefer."); *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 24–29 (D.D.C. 2021) (dismissing refusal-to-deal claim because defendant had no obligation to offer third-party API access to competitors), *aff'd sub nom. New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023).

**Second**, Applied is not forsaking "short-term profits"—the other hallmark of *Aspen Skiing*. *Trinko*, 540 U.S. at 409. A refusal to deal is anticompetitive only if it is "irrational but for its anticompetitive effect." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1075 (10th Cir. 2013). Applied's alleged conduct is rational. Comulate (incorrectly) speculates that Applied and Ascend entered into a "revenue sharing agreement" similar to the ones Applied and Comulate discussed two years earlier. AC ¶¶ 92, 247–50. Under these allegations, Applied still earns hypothetical short-term profits—just through Ascend rather than Comulate. Applied's decision to work with Ascend instead of Comulate is not an antitrust violation. Choosing a willing partner over an unwilling one is not a "refusal to sell to rivals on the same terms," it is a rational business decision. *See Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr. of Durango*, 582 F.3d 1216, 1225 (10th Cir. 2009) (finding no antitrust violation where defendant "maximize[d] its chances of profitability in the short-term"). Nor can it show the discriminatory treatment that *Viamedia* examined, 951 F.3d at 463, because Ascend was allegedly willing to formalize the very type of commercial relationship that Comulate refused.

Comulate also gestures at licensing fees that Applied collected allegedly because customers licensed Applied's products "for the sole purpose of using Comulate's products." AC ¶ 109, 302–04. But Applied collected those fees from its own customers, under its own licensing agreements,

enabling integration with any third-party application. Those fees were not as consideration for any relationship with Comulate. *Id.* ¶¶ 55–56, 109. Moreover, Applied has not forsaken those fees; it is still earning them, so it is not abandoning any short-term profits. Under all scenarios, Applied pursues profits rather than forsaking them.

(ii) <u>*The Essential-Facilities Doctrine Does Not Apply*</u>

The Supreme Court has "never recognized" an essential-facility doctrine. *Trinko*, 540 U.S. at 411. Whether that doctrine is viable in this Circuit remains unclear.[14] But even assuming it is, a plaintiff must show that "duplication of the facility would be economically infeasible" and that "denial of its use inflicts a severe handicap on potential market entrants." *Fishman v. Estate of Wirtz*, 807 F.2d 520, 539 (7th Cir. 1986). This showing is "rare and [is] largely confined to situations where physical conditions virtually prohibit the obtaining of duplicate or comparable facilities." *Hendricks Music Co. v. Steinway, Inc.*, 689 F. Supp. 1501, 1509 (N.D. Ill. 1988).

Comulate's essential-facility theory fails because Comulate can compete without Epic. Comulate acknowledges that "other providers of AMS" exist, including Vertafore, a "meaningful participant" in the market. AC ¶¶ 26, 38. Comulate's product already works with Vertafore and others (*id.* ¶ 38) giving Comulate access to the roughly 19% of enterprise brokers that use non-Epic systems (*id.* ¶¶ 325, 333). Software, unlike physical infrastructure, can be duplicated, which is why courts reject claims that software products are essential facilities.[15]

---

[14] *VBR Tours*, 2015 WL 5693735, at *9–10; *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406, 1413 (7th Cir. 1995).

[15] *See SEI Glob. Servs., Inc. v. SS&C Advent*, 496 F. Supp. 3d 883, 899 (E.D. Pa. 2020), *aff'd*, 2022 WL 2356730 (3d Cir. 2022); *Daisy Mountain Fire Dist. v. Microsoft Corp.*, 547 F. Supp. 2d 475, 489–91 (D. Md. 2008) ("[T]he essential facilities doctrine should not be applied in a case involving technological innovations or information."); *In re Microsoft Corp. Antitrust Litig.*, 274 F. Supp. 2d 743, 744–45 (D. Md. 2003).

Comulate's "infrastructure control" theory—the Applied forecloses competition through its supposed control of Epic SDK, IVANS, and the Applied Client Network ("ACN")—repackaging fares no better. As an initial matter, Comulate grew revenue at ██████████ ████████ despite these gates, and its growth did not stop until *after* Applied's November 2025 lawsuit. AC ¶ 297; *supra* at 6-7. A facility that a plaintiff can use to become "dominant" for years, and continue growing through a supposed "freeze," is not a facility without which competition is impossible. *See Fishman*, 807 F.2d at 539.

Nor is any individual component of the alleged "stack" essential. Applied is transitioning the SDK to a modern API Suite—a move Comulate itself agreed was necessary for "better security and scalability." AC ¶ 100. Comulate does not allege that Applied denied it IVANS access; to the contrary, Comulate admits it has an IVANS API Agreement. *Id.* ¶¶ 74, 137. And exclusion from Applied Net—an annual industry conference—is a marketing inconvenience, not an antitrust violation. *Fishman*, 807 F.2d at 539.

### 2. Comulate's Tying Theory Fails

To establish an illegal tying arrangement under Section 1, a plaintiff must allege that the tying seller have "some economic interest in the sales of the tied product." *Reifert v. S. Cent. Wisconsin MLS Corp.*, 450 F.3d 312, 317 (7th Cir. 2006). And critically, "[t]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to *force* the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984) (emphasis added).

Whether Comulate characterizes its theory as a traditional tie, a *Kodak* aftermarket theory, or "monopoly leveraging"—it fails on the element of coercion. A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a

17

different (or tied) product, or at least agrees that he will not purchase that product from *any other supplier.*'" *Robinson v. HP, Inc.*, 2025 WL 2802077, at \*4 (N.D. Ill. Sept. 30, 2025) (quoting *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5–6 (1958) (emphasis added)); *Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*, 2016 WL 6091244, at \*4 (N.D. Ind. Oct. 19, 2016) (describing as "generally consistent with the law" that tying requires "conditioning purchases in the tying market to purchasing a good in the tied market or to not purchasing a good in the tied market from a rival").

Here, there is no plausible "tie" because Comulate alleges that Applied steers customers to ***Ascend***—a separate, independent company—and not only to Applied's own product (Recon). AC ¶¶ 247–49, 274. Under the LRA, Applied "agree[d] to recommend Ascend as a potential solution" for customers displaced from Comulate. *Id.* ¶ 248; *see also id.* ¶ 250 (Applied to customer in 2026: "Whether you're leaning toward Ascend, utilizing ResourcePro or Patra, or exploring our new Recon solution launching in February, we're here to help."). A seller that directs its customers to a third party's product is not "forcing" them to buy the seller's product. If anything, these allegations show the ***absence*** of a tie: customers had a choice of accounting automation providers—including Ascend, Recon, and other alternatives (or decide to forego automated providers altogether)—and were not compelled to purchase any particular one as a condition of using Epic. Comulate may prefer that customers also have the option of choosing Comulate, but excluding one competitor (an admitted fraudster) from a platform does not transform customers' remaining choices into a coerced "tie."[16]

---

[16] Comulate's original complaint did not use the word "aftermarket," and the Amended Complaint likewise does not plead the elements of a *Kodak* lock-in claim. *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 457–58 (1992). A *Kodak* theory requires that customers face an informational barrier preventing them from anticipating the defendant's aftermarket conduct at the time they purchased the primary product—an element Comulate has never alleged.

**B. Comulate Does Not Plausibly Allege Specific Intent**

Applied terminated the Comulate integration only after discovering Comulate's PBC fraud scheme. *See supra* at 4. Applied's post-termination conduct negates any inference of specific intent. Applied continues working with other third parties, including Ascend (AC ¶ 279) as well as "numerous other[s]" (*id.* ¶ 282; *see also id.* ¶ 293), and "committed to releasing modern application-programming interfaces ("APIs") that third-party developers could use to facilitate their products' interoperability with Epic" (*id.* ¶ 54). *See supra* at 14. A company that broadens third-party access, refers customers to another company (Ascend) instead of forcing them to use its products, while refusing to deal with a company (Comulate) that defrauded it does not plausibly show "specific intent" to monopolize. *Hendricks Music Co.*, 689 F. Supp. at 1543 (requiring that the defendant's conduct reflect an intent to restrain competition unreasonably, not merely an intent to prevail over one's rivals).

**C. Comulate Does Not Plausibly Allege A "Dangerous Probability" Of Monopoly Power**

Comulate fails to allege a "dangerous probability" of monopoly power, which independently defeats Count I. *Spectrum Sports*, 506 U.S. at 456. Comulate must allege that the "defendant threatens actual monopolization," which requires that Applied "currently has market power" that, left unchecked, "will tend to approach monopoly power." *Walter Kidde Portable Equip., Inc. v. Universal Sec. Instruments, Inc.*, 669 F. Supp. 2d 895, 901 (N.D. Ill. 2009).

Comulate alleges that Applied has a minimal presence in the alleged enterprise-level automated insurance agency accounting software market. AC ¶ 9 ("Recon was not yet ready for commercial launch"); ¶332 (referring only to Recon "pre-launch product"). A company cannot "be liable for attempted monopolization of a market in which it does not compete." *Pixels.com, LLC v. Instagram, LLC*, 2015 WL 10943591, at *1 (N.D. Cal. Dec. 21, 2015); *see also Am. Acad.*

19

*Suppliers, Inc. v. Beckley-Cardy, Inc.*, 922 F.2d 1317, 1320 (7th Cir. 1991) (defendant with 3% market share was not engaged in attempted monopolization).

Fundamentally, Comulate's own allegations defeat any inference of dangerous probability because Applied has been referring displaced customers to another company—Ascend—instead of forcing them to use Recon. AC ¶¶ 247–49; *see supra* at 5-6. Comulate's theory requires a chain of speculation: that Applied will eventually terminate Ascend's access (*id.* ¶ 254), that Recon will by then take over the market, and that no other entrant will emerge—all while Applied itself currently holds negligible market share. That is precisely the kind of "speculative" allegation that cannot satisfy the dangerous-probability standard. *See also Honeywell Int'l Inc. v. Lone Star Aerospace, Inc.*, 2024 WL 4093183, at *3 (N.D. Tex. Sept. 4, 2024) ("bare" and "conclusory" allegations of dangerous probability insufficient); *Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F. Supp. 2d 569, 579 (S.D.N.Y. 2011) (allegation that defendant's 29% market share "continued to increase" was speculative and insufficient) (citation omitted); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. at 459 ("dangerous probability" of achieving monopoly power must be based on defendant's actual "economic power" in that market).[17]

## III. COMULATE'S CONSPIRACY CLAIMS (COUNTS II AND III) FAIL

Count II alleges a conspiracy to monopolize under Section 2 of the Sherman Act; Count III repackages the same allegations as an unlawful market allocation agreement between

---

[17] Comulate alleges that Applied blocked SDK access for Eventual Treasury and SimplePin, two companies that had "negligible enterprise market share." AC ¶¶ 193, 246. But even if credited, those allegations do not establish that Applied is approaching monopoly power. Blocking potential entrants while directing existing customers to a more established third party (Ascend) is, at most, evidence that Applied seeks to influence who competes in the market—not that Applied is dangerously close to monopolizing it. Applied's alleged conduct is a refusal to deal with specific parties, properly analyzed under the demanding *Aspen Skiing* framework. *See supra* § II.A.

competitors under Section 1 of the Sherman Act. AC at p. 65. Both rest entirely on the LRA and Applied's relationship with Ascend. Both fail.

***First, the alleged conspiracy is implausible***. "[A] bare assertion of conspiracy," "speculative" allegations, and "conclusory" statements are not enough. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–57 (2007). As a threshold matter, a Section 2 conspiracy claim "can only accuse one firm of being a monopolist." *Midwest Gas Servs. v. Ind. Gas Co.*, 317 F.3d 703, 713 (7th Cir. 2003). Comulate's theory—that the conspiracy left "customers with no meaningful choice but to utilize Ascend's or Applied's" products (AC ¶ 344)—alleges a shared monopoly. Count II thus fails as a matter of law.[18]

Setting the shared-monopoly defect aside, the alleged conspiracy makes no sense under either Section 1 or Section 2. Comulate cannot explain why Ascend would agree to a scheme designed to eliminate itself from the market. Comulate's own "two scenario" theory concedes the problem: under one scenario, Applied acquires Ascend; under the other, Applied terminates Ascend's access and Ascend goes out of business. AC ¶ 254. These rely on pure speculation for which Comulate has not pleaded a plausible basis to support.[19]

---

[18] *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 382–83 (S.D.N.Y. 2016) ("[A] shared monopoly theory may not support a monopolization or attempted monopolization claim under Section 2."); *Oxbow Carbon & Mins. LLC v. Union Pac. R.R. Co.*, 926 F. Supp. 2d 36, 45–46 (D.D.C. 2013) (A "shared monopoly" cannot "support a Section 2 claim.").

[19] *See Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1109 (7th Cir. 1984) (holding that "it is inherently implausible ... that Ford conspired to injure itself"), *abrogated on other grounds by Schmees v. HC1.COM, Inc.*, 77 F.4th 483, 489 (7th Cir. 2023); *Frantzides v. Northshore Univ. HealthSystem Fac. Prac. Assocs., Inc.*, 787 F. Supp. 2d 725, 732 (N.D. Ill. 2011) (antitrust conspiracy implausible as the defendant had "no obvious incentive" to enter into the alleged agreement); *Paladin Assocs., Inc. v. Montana Power Co.*, 97 F. Supp. 2d 1013, 1034 (D. Mont. 2000) ("Courts cannot infer 'economically senseless' conspiracies under circumstances in which the defendants would have no rational motive to conspire.").

And Comulate's own allegations further undermine any inference of conspiracy. On the very day Applied filed suit, Ascend's CEO texted Comulate's CEO that he was "*sorry to see the [A]pplied BS*" and offered to do "anything … to help." AC ¶ 227 n.11 (emphasis added). It is implausible that an alleged co-conspirator would express solidarity with the conspiracy's target, and on the day the conspiracy allegedly reached its apex. Rather, such alleged outreach supports the "obvious alternative explanation" that the LRA was, as it appears to be, a simple referral agreement, and not the embodiment of an illegal agreement to put Comulate out of business. *Wertymer v. Walmart, Inc.*, 142 F.4th 491, 497 (7th Cir. 2025).

Comulate's only response is to speculate (once again) that the Ascend CEO's text was insincere because "Ascend was already operating as an instrument" of Applied. AC ¶ 227 n.11. But that is a "bare assertion of conspiracy" unsupported by factual allegations—precisely what *Twombly* holds insufficient. 550 U.S. at 555–57. Nor is Applied's shift from hostility toward Ascend to cooperation "inexplicable." AC ¶¶ 222, 268–74. After discovering that Comulate created a fake company to access Epic, Applied wanted to give its customers a viable alternative. Ascend was the only other firm with "meaningful scale" in the market. *Id.* ¶ 39. An "obvious alternative explanation" thus exists for the LRA, too.

**Second, the LRA is a vertical arrangement, not a horizontal conspiracy**. Under Section 1, per se condemnation—including of market allocation—applies only to "horizontal agreements among direct competitors." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998). Comulate labels Applied and Ascend "horizontal competitors" (AC ¶ 348) but that is contradicted by its own allegations showing that the relevant relationship is vertical in nature: Applied sells an AMS platform; Ascend sells accounting automation software that runs on top of it; Applied has zero market share in the alleged accounting automation market. *Id.* ¶¶ 4, 39, 63, 221–25. The LRA is

a referral agreement between an upstream platform and a downstream vendor—the type of vertical arrangement Comulate itself sought from Applied. *Id.* ¶¶ 92, 112–13. Vertical agreements receive rule-of-reason scrutiny, not per se condemnation. *Ohio v. Am. Express Co.*, 585 U.S. 529, 541–42 (2018); *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 907 (2007). Comulate— the dominant player commanding 65–75% of the market (AC ¶¶ 4, 36, 38)—cannot show that an agreement that refers business to Ascend instead of the dominant firm constitutes an unreasonable restraint of trade.

Even if Applied and Ascend were horizontal competitors, per se treatment is unwarranted: the LRA contains no price-fixing, output restriction, or territorial division. *See Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). It states only that Applied "***may*** refer Ascend" (Ex. A at 1) to certain customers—permissive language that does not obligate Applied to do anything. A platform potentially referring customers to an existing application vendor is just that: a referral agreement and not a per se unlawful market allocation agreement. *See In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d 811, 835 (N.D. Ill. 2020) (Shah, J.) ("In a market allocation agreement, competitors at the same level of a market allocate territories in order to minimize competition.") (dismissing claim); *HomeLight, Inc. v. Shkipin*, 694 F. Supp. 3d 1242, 1250–51 (N.D. Cal. 2023) (analyzing referral agreement under rule of reason and dismissing claim for failing to show "identifiable harm to competition").[20]

---

[20] In Count III itself, Comulate also references a "concerted refusal to deal" and a "group boycott," but neither characterization fits the alleged conduct. A group boycott, in its per se formulation, requires a "horizontal agreements among direct competitors." *NYNEX*, 525 U.S. at 135; *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 293–94 (1985). That doctrine is "properly restricted to concerted attempts by competitors to exclude horizontal competitors; it should not be applied ... to concerted refusals that are not designed to drive out competitors." 11 Hovenkamp, Antitrust Law ¶ 1902d, at 198 (cited in *NYNEX*, 525 U.S. at 136). Comulate does not allege that Ascend refused to deal with Comulate—to the contrary, Ascend's CEO offered to help. AC ¶ 227 n.11. And "market allocation" requires an agreement to divide

***Third, Comulate fails to plead specific intent***.  Under Section 2, Comulate must plead "that ***all parties*** to the conspiracy had the specific intent to monopolize."  *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 729 F. Supp. 3d 298, 335 n.25 (E.D.N.Y. 2024) (emphasis added).  As explained above, Comulate offers no factual allegations plausibly suggesting why Ascend would specifically intend to give its rival Applied a monopoly.[21]

## IV.     COMULATE'S REMAINING CLAIMS (COUNTS IV–VIII) FAIL

Comulate's UCL claims (Counts IV and V) repackage its failed federal antitrust theories under California's Unfair Competition Law.[22]  Count IV borrows from the Sherman Act, the Cartwright Act, and Comulate's tort claims—and falls with them.  *S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 880 (1999).  Count V fails because, for competitor plaintiffs, conduct is "unfair" only when it "threatens an incipient violation of an antitrust law."  *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999).  Applied's refusal to deal does not violate antitrust law and thus cannot support a UCL "unfair" claim.  California courts refuse to let plaintiffs "plead around" the "absolute bar to relief" by "recasting the cause of action as one for unfair competition."  *Beverage v. Apple, Inc.*, 101 Cal. App. 5th 736, 753 (2024) (citation omitted).

---

customers or territories among competitors.  *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49–50 (1990) (per curiam).  As for the "concerted refusal to deal," plaintiffs must show that "defendants affirmatively agreed among themselves not to deal with the plaintiff."  *Gulliver's Periodicals, Ltd. v. Charles Levy Circulating Co.*, 562 F. Supp. 539, 541 (N.D. Ill. 1981).  Comulate does not allege that Ascend refused to deal with Comulate.

[21]    *See IHS Dialysis Inc. v. Davita, Inc.*, 2013 WL 1309737, at *8 (S.D.N.Y. Mar. 31, 2013) (dismissing conspiracy to monopolize claim where plaintiffs failed to allege that the "purported [non-party] co-conspirators" had "a shared, specific intent to monopolize").

[22]    Applied maintains that Illinois law governs these claims but, for the purposes of this Motion, addresses the tort claims under California law and the defenses under Illinois law.  Hr'g Tr. 4:9-5:3 (Mar. 5, 2026).

Comulate's tort claims (Counts VI, VII, and VIII) are barred by the First Amendment's *Noerr-Pennington* doctrine. *Noerr-Pennington* shields private-party communications "sufficiently related to petitioning activity" from derivative state-law tort claims. *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 935 (9th Cir. 2006); *Litrinium, Inc. v. MACOM Tech. Sols. Inc.*, 2020 WL 4580506, at *5-8 (C.D. Cal. Apr. 27, 2020) (applying *Noerr-Pennington* to customer letters about "pending litigation"). The sham exception does not apply. This Court found that Applied will likely succeed on its breach-of-contract claims. *Applied Sys., Inc.*, 2026 WL 381866, at *4. Likely success "necessarily indicates that the litigation was not 'objectively baseless.'" *Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*, 815 F. Supp. 2d 679, 685–86 (S.D.N.Y. 2011).

Independently, the Illinois litigation privilege bars these claims to the extent they rest on Applied's post-filing customer communications. Illinois "absolutely" protects statements "pertain[ing] to proposed or pending legal proceedings." *Am. Backflow & Fire Prevention, Inc. v. Hincks*, 2025 IL App (2d) 250023, ¶¶ 23–24. The privilege reaches communications "not confined to specific issues related to the litigation," *Goodman v. Goodman*, 2023 IL App (2d) 220086, ¶ 26, bars derivative tort claims, and applies regardless of malice or intent, *see Uppal v. Welch*, 2016 WL 2909652, at *5 (N.D. Ill. May 19, 2016). Every challenged communication was made after Applied filed suit, directed at joint customers, and tied to the lawsuit or its consequences for Applied's platform. AC ¶¶ 275–76, 278, 280–81, 289–91, 234–38; *see Creation Supply, Inc. v. Hahn*, 608 F. Supp. 3d 668, 697 (N.D. Ill. 2022).

Comulate's attempt to avoid the actual text of these communications, which this Court preliminarily determined were largely subject to the litigation privilege, changes nothing. Hr'g Tr. 5:14-17 (Mar. 5, 2026). Whereas Comulate's original complaint (Compl. p.76) provided the

25

full text of Applied's November 21 communication, its Amended Complaint (AC ¶ 255) refuses to plainly put forth the communications' text. The Seventh Circuit does not condone such attempts to plead around a document's actual contents. *Massey v. Merrill Lynch & Co.*, 464 F.3d 642, 645 (7th Cir. 2006). The Amended Complaint incorporates the November 21 email by reference, and the text of that document controls over Comulate's characterization.

The only "sliver" of that email that this Court expressed hesitancy about—which the Court described as "advising, perhaps directing, joint customers to cut off Comulate's access to Epic," Hr'g Tr. 5:25-6:2 (Mar. 5, 2026)—was entirely justified. That sentence merely "ask[ed]" customers to stop giving "Comulate personnel" "direct[] or indirect[]" access to Epic. Ex. B. Comulate incorporated this email by reference (AC ¶ 255), and its text controls. *Massey*, 464 F.3d at 645. That ask was grounded in customers' own contractual obligations: their agreements with Applied, which prohibit disclosing Applied's software to third parties, including the fraudster behind PBC Consulting that had spent nearly two years exploiting Applied's intellectual property. Applied was entitled—indeed, obligated—to identify how that fraud occurred and take steps to prevent its continuation. And Comulate's unsupported characterization of that communication is contradicted by its own acknowledgement that Applied set a "unified … transition date of June 30, 2026" (AC ¶ 213)—it did not demand customers immediately cease using Comulate. Applied's conduct is the opposite of tortious interference; it is a platform owner protecting its IP and enforcing its contract rights.

Comulate's tort claims also fail on the merits. As a threshold matter, Comulate has failed to provide each contract with which it claims Applied interfered. Because Comulate similarly failed to plead that each of its contracts is not terminable at will, it may not maintain an action for tortious interference with contract. *Maritz Inc. v. Carlson Mktg. Grp., Inc.*, 2009 WL 3561521, at

*4 (N.D. Cal. Oct. 30, 2009) ("if a party to a contract is free to terminate the contractual relation when he chooses," a plaintiff "may not maintain a cause of action for intentional interference") (citation omitted).

Its interference claims (Counts VI and VII) also each require an "independently wrongful act." *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 393 (1995); *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1141–42 (2020). Comulate identifies four categories of predicate acts for each claim. AC ¶¶ 378, 384. None qualifies. The "22-month pre-litigation exclusionary campaign" (*id.* ¶ 378) recasts the failed antitrust theories. The post-filing communications are privileged. The "coordination with Ascend" (*id.*) fails as a conspiracy for the reasons in Sections III and IV.

Further, Applied's actions cannot be unlawful because Applied's management of access to its own platform for its own customers—including how it interpreted its SDK License, the pace at which it processed paperwork, and the scope of access it allowed—is not "independently wrongful" toward Comulate. Conduct "lawful and undertaken to enforce [one's] rights" cannot give rise to interference liability. *SIC Metals, Inc. v. Hyundai Steel Co.*, 442 F. Supp. 3d 1251, 1256 (C.D. Cal. 2020); *see also Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218, 1274–76 (N.D. Cal. 2022) (rejecting interference claim where platform enforced its terms of use).

████████████████████████████████████████████████████████████

██████████████████████████████████████████████[23] *See* Ex. C.

Comulate also cannot show causation: customers made their own business judgments about the risks of continued Comulate access. *See* Hr'g Tr. 7:12-16 (Mar. 5, 2026).

---

[23] Comulate incorporates the Master Agreement for PBC by reference, which was filed as Exhibit A in the related action (Case No. 1:25-cv-14251). *See* AC ¶¶ 8, 204.

Count VIII (trade libel) first fails[24] because no challenged statement is a false statement of fact. Comulate identifies four categories of allegedly false statements. AC ¶ 389. None qualify. The privilege covers the post-filing communications—Applied's press release and customer communications (*id.* ¶¶ 389(a), (b))—for the reasons above. Even apart from the privilege, Comulate alleges that Applied disclosed the facts underlying its lawsuit and then drew characterizations from those facts. AC ¶¶ 389(a), 390. When a speaker discloses the facts and the audience can evaluate them, those characterizations are opinion, not actionable misstatements. *Partington v. Bugliosi*, 56 F.3d 1147, 1156–57 (9th Cir. 1995) (holding that characterizations are non-actionable opinion when the speaker "merely outlines a set of facts, allowing the reader to draw his own conclusion about them."). The pre-litigation statement to ██████—that Comulate "doesn't work with any of the big five brokers" and lacked the scalability ████ required (AC ¶ 389(c))—is opinion about a competitor's abilities, not a verifiable assertion of fact. *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999) (holding that the reader would not interpret this type of "puffery" as a "reliably factual claim."). And the statement to ████████ that Comulate would soon be "out of business" (AC ¶ 389(d)), even if true, is a prediction about the future, not a statement of present fact.

Nor can Comulate show scienter. Comulate alleges that Applied knew its press-release characterizations were false "because it had authorized, facilitated, and profited from the same SDK access for years." AC ¶ 390. Comulate's sleight of hand comes from its use of the phrase "the same SDK access." Its own allegations distinguish two types of SDK access: access Applied

---

[24] Comulate must show: "(1) the defendant published a statement; (2) the statement tended to disparage the plaintiff's product or property; (3) the statement was provably false; (4) [Applied] acted with knowledge that the statement was false or with reckless disregard for its falsity; and (5) the statement caused specific pecuniary damage to the plaintiff." *Motor Works, LLC v. Safer Techs., Inc.*, 2010 WL 11485116, at *5 n.11 (N.D. Cal. Mar. 10, 2010) (citation omitted).

facilitated through customers' own licensed accounts (*id.* ¶¶ 109–10) and access Comulate got by creating a fictitious entity to bypass those arrangements (*id.* ¶¶ 201–04). Comulate does not allege that Applied authorized Comulate's fraudulent SDK access through the PBC account. To the contrary, the Complaint accepts that Applied first learned of the PBC fraud in October 2025. *Id.* ¶ 201. Applied's press release addressed the PBC fraud—which Applied did not authorize, facilitate, or profit from—and those statements were not knowingly false.

Counts IV through VII share a common fatal flaw: they are nothing more than Comulate's failed antitrust theories dressed in different clothing. Whether styled as UCL violations, tortious interference, or trade libel, each claim traces back to the same core allegation—that Applied acted wrongfully by enforcing its own contractual rights over its own platform against a party this Court has already found likely committed fraud. Comulate cannot plead around the absolute bar to relief that antitrust law imposes by recasting the same conduct as unfair competition or a tortious act. Comulate's tort claims impermissibly attempt to transform Applied's constitutionally protected speech into actionable wrongdoing. The communications Comulate challenge made after Applied filed suit were directed at joint customers and tied directly to the litigation—precisely the kind of speech that the First Amendment's *Noerr-Pennington* doctrine and Illinois's absolute litigation privilege exist to protect. That Comulate dislikes what Applied said does not convert protected speech into a tort. Stripping away the privileged communications, what remains are statements that are non-actionable as a matter of law: opinions about a competitor's capabilities, predictions about a company's future, and truthful disclosures about fraud that Applied never authorized. At every turn, Comulate asks this Court to penalize Applied for doing what any party is entitled to do: file suit, enforce its contracts, and communicate truthfully with its customers about ongoing litigation. That is protected conduct, not a tort.

## CONCLUSION

For these reasons, Applied respectfully requests that this Court grant Applied's Motion.

Dated:  April 3, 2026

Respectfully submitted,

*s/ Sam S. Stake*

Jonathan C. Bunge (Ill. Bar #6202603)
Nathan Hamstra (Ill. Bar # 6286325)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1101 N. Wacker Dr., Suite 2700
Chicago, IL 60606
(312) 705-7400
jonathanbunge@quinnemanuel.com
nathanhamstra@quinnemanuel.com

Sam S. Stake (admitted *pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111-4624
(415) 875-6600
samstake@quinnemanuel.com

Aaron H. Perahia (admitted *pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 S Figueroa Street
Los Angeles, California 90017
(213) 443-3000
aaronperahia@quinnemanuel.com

Sami H. Rashid (admitted *pro hac vice*)
David LeRay (admitted *pro hac vice*)
Salvadore J. Diaz (admitted *pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
295 Fifth Avenue
New York, New York 10016
(212) 849-7000
salvadorediaz@quinnemanuel.com

*Attorneys for Defendant Applied Systems, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2026, I filed the foregoing document with the United States District Court for the Northern District of Illinois using the CM/ECF system and caused it to be served on all registered participants via the notice of electronic filing.

*/s/ Sam S. Stake*
Sam S. Stake