**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| ARDENT LABS, INC., d/b/a COMULATE | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 26-cv-00591 |
| | ) | |
| APPLIED SYSTEMS, INC., | ) | |
| | ) | Hon. Manish S. Shah |
| Defendant. | ) | |
| | ) | |
| | ) | |

**MEMORANDUM OF LAW IN OPPOSITION TO COMULATE'S
RENEWED MOTION FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................II

PRELIMINARY STATEMENT ............................................................................................1

RELEVANT FACTS ...........................................................................................................2

      A.    Applied Controls Epic Access And Has Never Authorized Comulate To Use It ....................................................................................................................2

      B.    Comulate Built Its Business on Access It Never Had a Right To ..........................4

      C.    Applied Discovered Comulate Had Been Accessing Its Platform Through a Sham Entity and Running Automated Bots Through Customer Accounts..............5

      D.    Applied Enforced Its Contracts, Told Customers the Truth, and Gave Them Over Six Months to Transition ...........................................................................7

      E.    This Court Granted Applied's Preliminary Injunction And Denied Comulate's ...........................................................................................................8

      F.    Customers Left Because Comulate Cannot Perform - Not Because of Anything Applied Said .......................................................................................10

ARGUMENT ....................................................................................................................11

I.    COMULATE HAS NOT SHOWN A LIKELIHOOD OF SUCCESS.............................12

      A.    The Litigation Privilege Bars Applied's Communications.....................................13

      B.    Applied Told Its Customers The Truth.....................................................................14

      C.    Applied Is Not A Stranger To These Customer Relationships ..............................16

      D.    Applied's Conduct Was Not Independently Wrongful, And Was Justified ..........17

          1.    Applied's Conduct Was Not Independently Wrongful.............................17

          2.    Applied's Conduct Was Justified...............................................................20

      E.    Tortious Conduct Did Not Cause Comulate's Purported Harm ............................22

II.    COMULATE CANNOT ESTABLISH IRREPARABLE HARM.....................................23

      A.    Comulate's Losses Are Identifiable And Compensable In Damages.....................23

      B.    Comulate's Going-Concern Theory Fails.................................................................25

III.    THE EQUITIES AND PUBLIC INTEREST FAVOR APPLIED ...................................26

      A.    The Proposed Injunction Is Mandatory And Overbroad.......................................26

      B.    The Balance Of Harms Tilts Sharply In Applied's Favor .....................................28

      C.    The Public Interest Supports Denial ........................................................................29

IV.    IF ANY INJUNCTION ISSUES, THE COURT SHOULD REQUIRE A BOND ..........30

CONCLUSION..................................................................................................................30

i

## TABLE OF AUTHORITIES

### Cases

*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*,
    7 Cal. 4th 503 (1994) ...................................................................................................16

*Bar Indy LLC v. City of Indianapolis*,
    508 F. Supp. 3d 334 (S.D. Ind. 2020) ......................................................................25

*Bidi Vapor, LLC v. Vaperz LLC*,
    543 F. Supp. 3d 619 (N.D. Ill. 2021) ........................................................................24

*Borden, Inc. v. Kraft, Inc.*,
    1984 WL 1458 (N.D. Ill. Sept. 28, 1984) .................................................................24

*Butler v. Holstein Ass'n, USA, Inc.*,
    703 F. Supp. 3d 927 (C.D. Ill. 2023) ........................................................................15

*Chicago Women in Trades v. Trump*,
    778 F. Supp. 3d 959 (N.D. Ill. 2025) ........................................................................30

*Cook Inc. v. Bos. Sci. Corp.*,
    2002 WL 31236289 (N.D. Ill. Oct. 1, 2002)............................................................29

*CraneTech, Inc. v. Slack*,
    789 F. Supp. 3d 662 (N.D. Ind. 2025) ......................................................................24

*Creation Supply, Inc. v. Hahn*,
    608 F. Supp. 3d 668 (N.D. Ill. 2022), *aff'd sub nom. Creation Supply, Inc. v.
    Cherrie*, 61 F.4th 511 (7th Cir. 2023)..............................................................14, 15

*DM Trans, LLC v. Scott*,
    38 F.4th 608 (7th Cir. 2022) ........................................................................12, 23, 24

*Fresno Motors, LLC v. Mercedes Benz USA, LLC*,
    771 F.3d 1119 (9th Cir. 2014) ..................................................................................16

*Graham v. Med. Mut. of Ohio*,
    130 F.3d 293 (7th Cir. 1997) ....................................................................................26

*Herron v. State Farm Mut. Auto. Ins. Co.*,
    56 Cal. 2d 202 (1961) ...............................................................................................20

*HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*,
    545 N.E.2d 672 (Ill. 1989) ..................................................................................20, 21

*Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*,
  846 F.2d 1079 (7th Cir. 1988) ..................................................................................26

*Ixchel Pharma, LLC v. Biogen, Inc.*,
  9 Cal. 5th 1130 (2020) ..................................................................................17, 18, 20

*Korea Supply Co. v. Lockheed Martin Corp.*,
  29 Cal. 4th 1134 (2003) ..................................................................................22

*Lawson Prods., Inc. v. Morichelli*,
  707 F. Supp. 3d 759 (N.D. Ill. 2023) (Shah, J.) ...........................................23

*Mazak Optonics Corp. v. Marlette*,
  2017 WL 3394727 (N.D. Ill. Aug. 8, 2017) .................................................29

*Mead Johnson & Co. v. Abbott Lab'ys*,
  201 F.3d 883 (7th Cir. 2000) .......................................................................30

*Meta Platforms, Inc. v. BrandTotal Ltd.*,
  605 F. Supp. 3d 1218 (N.D. Cal. 2022) .......................................................18

*Mintel Int'l Grp. v. Neergheen*,
  2008 WL 2782818 (N.D. Ill. July 16, 2008) .............................................26, 29

*Nation v. Am. Capital, Ltd.*,
  682 F.3d 648 (7th Cir. 2012) ....................................................................20, 21

*Patriot Homes, Inc. v. Forest River Hous., Inc.*,
  512 F.3d 412 (7th Cir. 2008) .......................................................................27

*PepsiCo, Inc. v. Redmond*,
  1996 WL 3965 (N.D. Ill. Jan. 2, 1996) .....................................................24, 25

*PM Group, Inc. v. Stewart*,
  154 Cal. App. 4th 55 (2007) .....................................................................16, 22

*Radiant Glob. Logistics, Inc. v. Schmidt*,
  2026 WL 735197 (N.D. Ill. Mar. 16, 2026) ...............................................24

*Reeves v. Hanlon*,
  33 Cal. 4th 1140 (2004) ..............................................................................22

*Roland Mach. Co. v. Dresser Indus.*,
  749 F.2d 380 (7th Cir. 1984) .......................................................................28

*Rosenbaum v. Samler*,
  2025 IL App (1st) 240039, 269 N.E.3d 1141 ...........................................14, 15

*Savage v. Pac. Gas & Elec. Co.*,
   21 Cal. App. 4th 434 (1993) ..........................................................................................15

*SIC Metals, Inc. v. Hyundai Steel Co.*,
   442 F. Supp. 3d 1251 (C.D. Cal. 2020), *aff'd*, 838 F. App'x 315 (9th Cir.
   2021) ...............................................................................................................................18

*Wells Fargo Bank, N.A. v. Worldwide Shrimp Co.*,
   2018 WL 6696607 (N.D. Ill. Dec. 20, 2018) (Shah, J.).................................................21

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)..............................................................................................12, 23, 25

## Other Authorities

Fed. R. Civ. P. 65(c) .............................................................................................................30

## PRELIMINARY STATEMENT

Comulate built its business on access to which it had no right. Comulate refused every opportunity to make that access legitimate and then got caught accessing Applied's platform through a fake company with a fake signatory—running over 10.7 million unauthorized SDK calls over 18 months. Now it asks this Court to give it by injunction what it could never get by contract.

The Court should deny the motion for three reasons. *First*, Comulate has not shown tortious interference. Applied's communications to customers were almost entirely privileged; the narrow sliver the Court identified was truthful; Applied is not a stranger to these customer relationships; and Applied's conduct was justified. Comulate's renewed motion—43 new exhibits and a supplemental declaration—still does not answer the question the Court asked at the March 5, 2026 hearing: whether customer departures are attributable to tortious interference or independent customer judgment. The answer is independent customer judgment. Every customer in the record cites Applied's June 30 SDK cut-off as the reason for leaving. That cutoff is a lawful business decision pursuant to Applied's contracts, not a tort.

*Second*, Comulate cannot show irreparable harm. Its own pleading values its losses in the mid-nine figures and seeks treble and punitive damages. A party that puts a nine-figure price on its injury cannot claim money is inadequate.

*Third*, the proposed injunction is mandatory and overbroad. It would create a contract between Applied and Comulate that has never existed, while stripping Applied of the termination rights it bargained for with more than sixty customers. That is not preserving the status quo; it is amending preexisting and bargained-for contracts by court order. The Court should deny the motion.

1

## RELEVANT FACTS

### A.    Applied Controls Epic Access And Has Never Authorized Comulate To Use It

Applied Epic is an insurance Agency Management System ("AMS") that gives agencies and brokerages a single platform to manage accounting, reconciliation, billing, customer service, policy management, and related operations.   D.I. 41-1, Declaration of Graham Blackwell ("Blackwell Decl.") ¶ 3.   Applied invests nearly $200 million per year in research and development, more than half of which goes to Epic or Epic-related modules.  *Id.*  Epic competes with Vertafore's AMS360, BenefitPoint, and QQCatalyst, as well as HawkSoft, Nexsure, and startups like Iris.  *Id.* ¶ 5.  Epic holds approximately 40% of the U.S. AMS market on a seat-or-user basis.  *Id.* ¶ 4.  Applied's customers can switch to another AMS at any time.  *Id.* ¶ 5.

To help customers get the most out of Epic, Applied allows third-party software to connect to the platform through a software development kit ("SDK").  D.I. 41-2, Declaration of Christopher Peterlin ("Peterlin Decl.") ¶ 3.   Applied maintains over 100 such third-party integrations.  AC ¶ 316.  But open does not mean unlimited.  The SDK is a programmatic interface distinct from Epic's web-based user interface; it lets customers integrate other software but does not expose all of Epic's functions.  Peterlin Decl. ¶ 3.  Each customer receives a unique SDK key that "is specific to that customer, and it only permits access to their data."  *Id.* ¶ 4.

Two agreements between Applied and its customers govern access to Applied's relevant software: the Master Services Agreement ("MSA") and the SDK Schedule ("SDK").  D.I. 41-3, Master Services Agreement ("MSA"); D.I. 41-4, SDK Schedule ("SDK").

The MSA governs access to Epic.  It requires each customer to assign each user seat to a specific individual on a "Named Basis" and prohibits customers from sharing seats.  MSA §§ 3.2, 15.  Only the customer's own "Employees" may hold seats.  *Id.* § 3.2.  Customers may not let anyone other than an employee use the software.  *Id.* § 3.6(c).  The MSA also bars customers from

2

using Epic for "competitive analysis" or to develop or run "a competing software product." *Id.* § 3.6(f).[1]  That bar extends to customers who "allow another entity or person to do any of the foregoing." *Id.* § 3.6(h).  Applied may terminate the MSA "immediately" upon notice if it has a "good faith, reasonable belief" that a customer or one of its named users committed any "infringement or misappropriation." *Id.* §§ 13.1, 15.

The SDK Schedule governs SDK access and adds a second layer of restrictions.  Either party may end SDK access "for convenience"—without cause—"upon sixty (60) days' prior written notice."  SDK § 2.  No customer may "allow a third party to access the Applied Epic Integration Service SDK." *Id.* § 5.6(b).  The only exception is narrow: if a customer wishes to share SDK access with "a third-party consultant providing technical services" to that customer, Applied must first consent. *Id.* § 5.7.  Applied may grant or withhold consent "in its sole discretion." *Id.*  And before anyone gets access, the customer, the consultant, and Applied must all sign an Acknowledgement Form. *Id.*; MSA § 3.2.  The SDK separately bars using the SDK for "competitive analysis" or to develop or run "a competing software product." SDK § 5.6(f).

Both agreements contain anti-waiver provisions.  Modifications "will not be effective unless agreed to by both parties" in writing.  MSA § 2.3.  No provision may "be waived and no breach excused, unless such waiver or consent shall be in writing and signed by the party claimed to have waived or consented." *Id.* § 14.8.  Applied never signed any waiver or gave "prior written consent" under the SDK.  *See* SDK § 5.7.

---

[1]  This Court found in the companion case that Comulate's product "directly competes" with Applied "Recon product."  No. 25-cv-14251, D.I. 81, at 14.

**B.** **Comulate Built Its Business on Access It Never Had a Right To**

Unlike Applied, Comulate does not offer its own Agency Management System. AC ¶ 38. Its business model depends on data flowing out of Agency Management Systems and into Comulate's product. *Id.* Comulate's product extends beyond Epic. Comulate pleads that its product "is compatible with Epic, as well as with Vertafore and other insurance AMSs." *Id*. Comulate integrates with at least six platforms beyond Epic—AMS360, BenefitPoint, Sagitta, Dynamics, Salesforce, and Workday—and advertises those integrations on its website. Blackwell Decl. ¶ 14 & n.1. For Epic specifically, Comulate's product connects through the customer's own SDK key: the customer shares its key with Comulate, and Comulate's software reads and writes data in the customer's Epic instance. *See* Peterlin Decl. ¶¶ 3-4. Comulate has no independent right to access Epic; every connection runs through an Applied customer's account and depends for its authorization on that customer's bilateral agreement with Applied. SDK § 5.6(b).

Comulate previously sought a deal with Applied to access Epic at scale. *See* D.I. 7-2, Declaration of Jordan Katz dated January 20, 2026 ("Katz Decl."), ¶¶ 14, 37-40. Comulate also said what it planned to do with that access: Comulate marketed its product as the ███████████ ██████—its description of a tool designed to eliminate the competitive value of Applied's platform. D.I. 100-1, Declaration of Rollo Baker ("Baker Decl."); Baker Decl., Ex. 6. Comulate now asks this Court to compel Applied to keep providing the access that supports that ambition.

Applied previously engaged Comulate in a good faith effort to work together cooperatively. In May 2023, the two companies signed a proof-of-concept agreement that gave Comulate a test environment with SDK access. AC ¶ 106. That agreement expired. In June 2023, Applied offered to acquire Comulate. *Id.* ¶ 116. Comulate turned Applied down. *Id.* In December 2023, Blackwell from Applied proposed a short-term partnership with an exclusivity agreement and a right to purchase at a set price. *Id.* ¶ 118. Comulate turned that down too. *Id.* ¶ 122.

4

Through 2024 and into 2025, Applied continued to negotiate and permitted approximately sixty customer SDK-key integrations for Comulate while Applied and Comulate worked toward a formal agreement. *See* Katz Decl. ¶¶ 14, 37-40. Applied conditioned that accommodation on Comulate signing the required Third-Party Consultant Acknowledgement Form. SDK § 5.7; AC ¶ 142. Comulate refused. AC ¶ 143. In February 2025, Comulate raised $20 million in Series B funding. *Id.* ¶ 128. And as late as July 2025, Applied's President of Applied Pay, Chase Petrey, made one more acquisition overture—acknowledging that Comulate was the "category winner" and that acquiring it would bring "a huge accelerant." *Id.* ¶ 157. Comulate declined again. *Id.*

At every stage, Applied offered Comulate a legitimate path to access Epic—a proof-of-concept agreement, three acquisition offers, and a continuing accommodation conditioned on a signed Acknowledgement Form. Comulate refused each of these opportunities. Comulate never signed the Acknowledgement Form, and Applied never gave written consent. AC ¶ 143. Comulate's business depended entirely on another company's terminable-at-will permission—permission Applied conditioned on a contract Comulate would not sign. Now that Applied has ended that accommodation, Comulate wants a court order to replace the deal it refused to make.

### C. Applied Discovered Comulate Had Been Accessing Its Platform Through a Sham Entity and Running Automated Bots Through Customer Accounts

In October 2025, Applied detected anomalous activity from the PBC account—an abnormally high volume of SDK calls for a three-person insurance agency. Peterlin Decl. ¶ 9. Applied hired a forensic investigation firm, which concluded that Comulate was operating the account and that PBC was not a real agency. *Id.* That discovery led Applied to launch a broader investigation, which revealed that Comulate had accessed Applied's platform through multiple unauthorized channels beyond PBC. Peterlin Decl. ¶¶ 11-22.

5

In the companion case, Katz admitted under oath that "PBC [] is not a real insurance agency and is not a real entity" and that Comulate used it "for development" of its own products. *See* No. 25-cv-14251, D.I. 47-5 at ¶¶ 5-6. Comulate ran more than 10.7 million SDK calls through this fraudulent account over eighteen months. D.I. 41-5, Declaration of Richard Peters ("Peters Decl.") ¶ 13. The Court granted Applied a preliminary injunction on this basis. No. 25-cv-14251, D.I. 81.

The investigation also uncovered that Comulate was misusing Applied customers' Epic accounts. At least four customers had given Comulate direct logins to Epic's web-based interface—logins that provide broader access than an SDK key, including the ability to generate general-ledger entries and invoices. *See* Blackwell Decl. ¶¶ 6, 11; Peterlin Decl. ¶ 3. Peterlin identified accounts with usernames such as "COMULATE" and "COMMUM" that were "known to be run by Comulate." Peterlin Decl. ¶ 13. Peterlin identified other accounts as Comulate users based on the IP addresses from which they connected. *Id*. ¶ 11. Applied did not know about any of these logins until its investigation in late 2025. *See* Blackwell Decl. ¶ 11.

Under the MSA, each customer must assign each seat to a specific, named employee, and seats "cannot be shared." MSA §§ 3.2, 15; *id*. § 3.6(c). Comulate did not use these seats as an individual would. It ran automated bots through them. Peterlin Decl. ¶¶ 17-18. Applied's server logs record each user operation—every click, navigation, or query—as a "span." *Id*. ¶ 17. A typical session generates dozens or hundreds. *Id*. One Comulate session recorded over 7,000. *Id*. Another applied more than a hundred search filters to a single list view "in a matter of minutes." *Id*. ¶ 18. This behavior was "not … humanly possible" and came from an "automated program or 'bot.'" *Id*. Comulate also disabled client-side logging—the browser-based mechanism that records a user's activity within the platform—while using these accounts. *Id*. ¶ 15. The client-side logs showed only an initial page load and a session end, while the server-side logs showed

extensive activity during the same sessions. *Id*. ¶¶ 13-14. Peterlin replicated the technique using Chrome DevTools and confirmed that it caused activity to disappear from the client-side logs. *Id*. ¶ 15.

### D.     Applied Enforced Its Contracts, Told Customers the Truth, and Gave Them Over Six Months to Transition

On November 21, 2025, Applied filed suit against PBC and Comulate in this District. *See* No. 25-cv-14251, D.I. 1. After filing, Applied emailed joint customers to inform them of the suit. AC ¶ 276. At the time, Applied knew that customers had improperly assigned at least four user seats to Comulate personnel. *See* Peterlin Decl. ¶¶ 11-21. Because Applied did not yet know the problem's full scope, it addressed the issue it had confirmed—improper access to Epic itself through customer user seats—and told customers: "if you are directly or indirectly giving access to Comulate personnel to Applied Epic, we ask that you cease to provide this access immediately. Providing such access is a violation of your Agreement with Applied Systems, and we need to work with you to ensure your actions are complying." AC ¶ 276. The email addressed access to Applied Epic—the platform—not to the SDK.

Applied did not tell customers to terminate their relationships with Comulate. *See* Supplemental Declaration of Graham Blackwell dated April 7, 2026 ("Suppl. Blackwell Decl.") ¶ 3. Nor did Applied tell customers to stop using Comulate's products. *Id.* Applied asked its own customers to stop giving access to its own platform to Comulate in violation of the customers' agreements with Applied. AC ¶ 276. That request was accurate: customers could not assign their user seats to Comulate personnel under the Named Basis provision (MSA § 3.2), the Non-Employee Bar (*id.* § 3.6(c)), and the Competitive-Use Bar (*id.* § 3.6(f); SDK § 5.6(f)).

Applied later determined that it would no longer permit customers to use the SDK to integrate with Comulate. AC ¶ 281. Applied reached that decision based on Applied's uncovering

of Comulate's fraudulent scheme and violations of customer seat restrictions, among other things. Applied's contracts with its customers authorized that decision. The SDK Schedule provides that either party may terminate "for convenience upon sixty (60) days' prior written notice." SDK § 2. It also provides that customers may not "allow a third party to access the Applied Epic Integration Service SDK." *Id.* § 5.6(b); *see also id.* § 5.6(f) (prohibiting SDK use "for developing, using or providing a competing software product or service"). And any customer wishing to share SDK access with a third-party consultant must first get Applied's consent, which Applied may grant or withhold "in its sole discretion." *Id.* § 5.7. Applied may "refuse to approve, or … revoke its approval of" any third-party consultant it determines to be a competitor. *Id.*

Although Applied could have terminated the SDK integrations for any reason on sixty days' notice, Applied recognized that customers needed time for a smooth transition. SDK § 2. Applied told customers that it was "asking all customers to register or re-register their Comulate SDK integration" and that customers could "continue using the Comulate SDK integration through [Q2 of 2026]." AC ¶ 281. That gave customers over six months. As with its November 21, 2025 communications, Applied's follow-up communications did not demand that any customer end its relationship with Comulate. *See* Suppl. Blackwell Decl. ¶ 3. It gave customers a runway to plan an orderly transition.

### E. This Court Granted Applied's Preliminary Injunction And Denied Comulate's

In Applied's companion case, the Court granted Applied's motion for a preliminary injunction in the form Applied proposed. No. 25-cv-14251, D.I. 81, 82. The Court found that Applied showed a likelihood of success on its breach-of-contract claim, irreparable harm, and a favorable balance of equities. *Id.* D.I. 81 at 7-15. Before that ruling, Katz (the same individual who signed the PBC contract under a fake name that he verified as being accurate as part of the

contract signing) declared under oath that "if Applied obtains a preliminary injunction as broad and vague as the one it seeks, it is all but certain that Comulate will be put out of business almost immediately." No. 25-cv-14251, D.I. 60-1, Declaration of Jordan Katz dated January 13, 2026 ("Katz PI Opp. Decl.") ¶ 65. The Court granted the injunction. *Id.*, D.I. 82. Comulate is still in business. *See* D.I. 100-45, Supplemental Declaration of Jordan Katz dated March 26, 2026 ("Supp. Katz Decl."), ¶¶ 1, 5-24 (describing Comulate's ongoing operations and customer relationships).

On March 5, 2026, the Court denied Comulate's motion for a temporary restraining order and preliminary injunction in this case. D.I. 75 ("3/5/26 Hrg. Tr.") at 7:4-5. The Court made three relevant findings. First, "almost everything Applied said in its November 21, 2025 communication was privileged." *Id.* at 5:16-17. That ruling covered Applied's statements about the lawsuit, its descriptions of Comulate's conduct, and its communications to customers about the litigation and its implications. *Id.* at 5:20-24. Second, a narrow "sliver"—characterized by the Court as a portion in which Applied was "advising, perhaps directing, joint customers to cut off Comulate's access to Epic"—was potentially outside the privilege and supported "a likelihood of success on tortious interference and California Unfair Competition, to the extent that is based on tortious interference conduct." *Id.* at 5:25-6:11. Third, the record did not support "the likelihood of antitrust liability, even as an antitrust-lite analysis within California Unfair Competition law." *Id.* at 6:25-7:3.

In denying Comulate's motion, the Court explained that it was "not persuaded or satisfied that an injunction from me now is justified on the record." 3/5/26 Tr. at 10:5-6. The Court drew a line between harm "attributable to tortious interference" and harm from "independent customer judgment about risk and uncertainty" (*id.* at 7:13-16) and stated that it needed "some more in order to be persuaded that what happens after June really is anything attributable to tortious interference" (*id.* at 7:11-14). Because the Court denied the motion, it had no occasion to address whether the

9

sliver was independently wrongful, whether Applied's conduct was justified, or whether Applied's communications were truthful. 3/5/26 Tr. at 5:14-7:5.

Since the March 5, 2026 ruling, Comulate filed an Amended Complaint reasserting the same tortious interference and unfair competition claims. D.I. 77 ("AC"). The Amended Complaint confirms that Comulate views its losses as quantifiable: it seeks "treble damages," "compensatory damages," "punitive damages," and damages that "exceed mid-nine figures." AC ¶ 322; *id.* §§ XVI(f)-(h).

### F. Customers Left Because Comulate Cannot Perform - Not Because of Anything Applied Said

Comulate's tortious interference claims rest on the premise that Applied disrupted contracts or economic relationships. AC ¶¶ 375-387. The evidence in the record tells a different story.

Comulate puts terms into the record for only two of Comulate's agreements with its customers; both contracts give the Comulate customer an express right to walk away from the arrangement with Comulate. ▮▮▮ signed a contract on November 5, 2025 and terminated twenty days later—well within a thirty-day window during which ▮▮▮ could terminate for convenience (Katz Decl., Ex. 7 (Order Form § 4(a))) or without penalty for implementation or performance shortfalls (*id.* § 4(b)). *See* Katz Decl. ¶¶ 88-89, 93. ▮▮▮ chose the no-penalty route, citing Applied's IP allegations. *Id.* ¶ 93. ▮▮▮ terminated on December 5, 2025, exercising an express convenience-termination right and paying the ▮▮▮ early termination fee. *Id.* ¶¶ 94-95. Neither customer breached its contract with Comulate.

Six other customers terminated between March 5 and March 17, 2026, each citing Applied's June 30 SDK cutoff. Supp. Katz Decl. ¶¶ 6-11; Ex. A. Their reasoning was uniform: once Applied stops authorizing SDK access, Comulate will be unable to deliver the services it contracted to perform through Epic. ▮▮▮ formal termination letter stated as much,

10

characterizing Comulate's future inability to perform as a material breach by Comulate—while adding that ▮ would prefer to stay and would consider extending if the cutoff were lifted. *Id.*, Ex. A. The party that will fail to perform under that scenario is Comulate, not the customer. ▮ and ▮ each cited the same June 30 deadline. Supp. Katz Decl. ¶¶ 6-7, 9-11. For every customer in this group other than ▮, Comulate puts no contract terms into the record—no execution date, no term length, no termination provisions. *Id.*

The remaining evidence does not help Comulate. ▮ and other unnamed customers did not terminate; they declined to renew or moved to month-to-month terms. Katz Decl. ¶ 96; AC ¶ 385. Others walked away during onboarding or are still exploring cancellation rights. Katz Decl. ¶¶ 113-14. None has breached an existing contract with Comulate. And every customer statement Comulate relies on is hearsay relayed through Katz's declarations—selected and framed by the same Comulate CEO who now nonchalantly admits to orchestrating the PBC fraud. Supp. Katz Decl. ¶¶ 6-24; Katz Decl. ¶¶ 78-96. Aside from the declaration of a confessed fraudster, Comulate submits no other declaration from a customer or anyone else.

Across the entire record, Comulate has not identified a single customer agreement that was binding, non-terminable, and breached because of Applied's conduct. Even if Comulate could produce one, the customer would still need to show that Applied's communications—rather than Applied's lawful termination of SDK access or the customer's own business judgment—caused the breach. *See supra* §§ I.C, I.D. Comulate's customer relationships, like its access to Epic, were always contingent on conditions Comulate could not control and chose not to secure.

## ARGUMENT

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Comulate must show a likelihood of success

on the merits, that it is likely to suffer irreparable harm absent an injunction, and that the balance of equities tips in its favor. *See DM Trans, LLC v. Scott*, 38 F.4th 608, 617 (7th Cir. 2022).

## I.      COMULATE HAS NOT SHOWN A LIKELIHOOD OF SUCCESS

Comulate's renewed motion does not answer the question the Court asked. On March 5, 2026, the Court denied Comulate's motion because it was not persuaded that customer departures were "attributable to tortious interference as opposed to independent customer judgment about risk and uncertainty." 3/5/26 Tr. at 7:13-16. The Court allowed discovery and granted leave for a renewed motion. Comulate has now had that discovery. Its renewed motion submits forty-three new exhibits and a supplemental Katz declaration with dozens of purported customer statements. Mot. 1-18. Comulate has also filed an Amended Complaint with hundreds of new allegations. But Comulate still has not answered the Court's question. Instead, it treats the Court's preliminary findings as final, skips the independently-wrongful-conduct element entirely, and asks the Court to grant on a larger—but not materially different—record what the Court denied three weeks ago.[2]

Comulate asserts two tortious interference claims: interference with prospective economic advantage (Count VI) and interference with contractual relations (Count VII). AC ¶¶ 375-87. The full record defeats both claims on four independent grounds, any one of which suffices to deny the motion.

***First***, Applied's communications were almost entirely privileged (*infra*, § I.A), and the narrow sliver the Court identified was truthful (*infra*, § I.B). A defendant cannot be liable for interfering with contractual relations by giving truthful information to a third party.

---

[2] Comulate treats the Court's March 5, 2026 findings, which the Court stated were preliminary, as a final determination that relieves Comulate of its burden of proof. Mot. 15. The Court denied the motion because Comulate had not shown that customer departures were "attributable to tortious interference." 3/5/26 Tr. at 7:11-16. The Court also did not reach questions about wrongfulness, truth, or justification.

*Second*, Applied is not a stranger to these customer relationships. *Infra*, § I.C. Comulate's contracts with its customers promise a service that requires Applied's SDK; Applied is the party whose performance makes those contracts possible. A party in that position cannot commit tortious interference as a matter of law.

*Third*, Comulate has not shown that Applied's conduct was independently wrongful—an element that Comulate's tortious interference claims require on this record. Applied's conduct was justified in any event. *Infra*, § I.D. Enforcing bargained-for contractual rights after discovering fraud is not conduct proscribed by any legal standard.

*Fourth*, any customer departures trace to Applied's lawful decision to end SDK access, not to any tortious act. *Infra*, § I.E. Every customer in the record cites the June 30 cutoff. That is not tortious interference; it is the exercise of a contractual right Applied has always held.[3]

### A.      The Litigation Privilege Bars Applied's Communications

Applied's communications to customers about the lawsuit and their contractual obligations are privileged. Under Illinois law,[4] the privilege is "absolute" and "protects communications made before, during, and after litigation, so long as they pertain to proposed or pending litigation." *Creation Supply, Inc. v. Hahn*, 608 F. Supp. 3d 668, 697 (N.D. Ill. 2022) (applying the privilege to a tortious interference with contract claim), *aff'd sub nom. Creation Supply, Inc. v. Cherrie*, 61

---

[3]    Comulate's UCL claims depend on the tortious interference claims. The Court conditioned its March 5, 2026 UCL likelihood-of-success finding on "tortious interference conduct." 3/5/26 Tr. at 6:9-11. The UCL "unlawful" prong uses the tortious interference claims as its predicate violation. AC ¶ 358. If the tortious interference claims fail, the UCL "unlawful" claims fail with them. The UCL "unfair" prong rests on an antitrust theory the Court rejected. 3/5/26 Tr. at 6:25-7:3. Comulate's renewed motion supplies no expert market analysis or product-market definition that would change that result. Comulate does not brief likelihood of success on its Sherman Act, trade libel, defamation, or antitrust-based UCL theories. Mot. 15-18.

[4]    The Court applied Illinois law to Applied's defenses at the March 5, 2026 hearing. 3/5/26 Tr. at 5:14-24.

13

F.4th 511 (7th Cir. 2023). The privilege extends to communications with third parties who have "an interest in the litigation." *Rosenbaum v. Samler*, 2025 IL App (1st) 240039, ¶ 56, 269 N.E.3d 1141, 1155.

The Court found on March 5, 2026 that "almost everything Applied said in its November 21, 2025 communication was privileged"—including Applied's statements about the lawsuit, its descriptions of Comulate's conduct, and its communications to customers about the litigation and its implications. 3/5/26 Tr. at 5:14-24. The Court identified one "sliver"—characterized by the Court as a portion in which Applied was "advising, perhaps directing, joint customers to cut off Comulate's access to Epic"—as potentially outside the privilege. *Id.* at 5:25-6:4. That sliver pertained to pending litigation and asked customers to comply with their existing contractual obligations governing access to Epic. *See supra*, Facts § D. A communication reminding customers of their own contractual duties in connection with pending litigation pertains to that litigation. *Creation Supply*, 608 F. Supp. 3d at 697.

The privilege applies equally to every other communication that Comulate identifies. Blackwell's December 18 email updated customers on Delaware TRO proceeding's outcome. Mot. 14; Baker Decl., Ex. 36. The March 5, 2026 press release informed customers about the proceedings in this Court. Mot. 14-15; Baker Decl., Ex. 37. And Applied's follow-up calls to customers discussed the pending litigation and the contractual obligations governing customers' use of Epic. Mot. 11-12; Katz Decl. ¶¶ 79-80. Each of these communications "pertain[ed] to proposed or pending litigation," and Applied directed each one to parties with "an interest in the litigation." *Creation Supply*, 608 F. Supp. 3d at 697; *Rosenbaum*, 2025 IL App (1st) 240039, ¶ 56.

**B.      Applied Told Its Customers The Truth**

Applied's unprivileged statements were true, and truthful statements cannot form the basis for either form of tortious interference. A "person cannot incur liability for interfering with

14

contractual or economic relations by giving truthful information to a third party." *Savage v. Pac. Gas & Elec. Co.*, 21 Cal. App. 4th 434, 449-50 (1993). Illinois law is the same: "Conveying truthful information does not make a defendant liable for an intentional tortious interference." *Butler v. Holstein Ass'n, USA, Inc.*, 703 F. Supp. 3d 927, 938 (C.D. Ill. 2023).

Comulate takes issue with Applied telling customers: "if you are directly or indirectly giving access to Comulate personnel to Applied Epic, we ask that you cease to provide this access immediately. Providing such access is a violation of your Agreement with Applied Systems." Mot. 10; AC ¶ 276. That statement was true. Applied's customer agreements require that each user seat be assigned to a specific, named employee and "cannot be shared." MSA §§ 3.2, 15. Customers may not let any "non-Employee" use the software. *Id.* § 3.6(c). Customers may not use the software to develop or run "a competing software product." *Id.* § 3.6(f). And the SDK Schedule bars customers from letting any "third party" use the SDK without Applied's written consent. SDK §§ 5.6(b), 5.7. Comulate personnel are not employees of any Applied customer. Customers that gave Comulate access—whether through user seats or SDK keys—were violating their agreements with Applied. *See supra*, Facts §§ A, D.

Comulate's remaining falsity allegations fail for independent reasons. The December 18, 2025 Blackwell email and the March 5, 2026 press release are privileged for the reasons in Section I.A. Baker Decl., Exs. 36, 37; Mot. 14-15. The statement that "even if Comulate wins, we still won't be allowing them to integrate with Epic" (AC ¶ 214) is not a factual misrepresentation—it is Applied's business position under SDK Schedule § 2. The ▬▬▬▬▬ communication was accurate: the MSA bars customers from sharing access with non-employees and from disclosing Applied's confidential information. MSA §§ 3.6(c), 14.4; Mot. 11 (citing Baker Decl., Ex. 28). And Ascend's statement that "the courts have upheld Applied's requirement for agencies to

15

transition off Comulate" (Katz Decl. ¶ 110) is a third party's characterization, not Applied's. Comulate has not identified a single unprivileged false statement of fact.

### C.     Applied Is Not A Stranger To These Customer Relationships

The tortious interference claims also fail because Applied is not a stranger to the contracts at issue.  Interference with contract "is committed only by 'strangers—interlopers who have no legitimate interest in the scope or course of the contract's performance.'"  *PM Group, Inc. v. Stewart*, 154 Cal. App. 4th 55, 65 (2007) (quoting *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 514 (1994)).  Where the defendant's own performance is necessary for the plaintiff's contracts to be fulfilled, the defendant has a "legitimate interest in the scope or course of the contract's performance" and is not an interloper.  *Id.* at 65-66.

The *PM Group* court reversed a $1.6 million verdict against Rod Stewart for interfering with six subcontracts that the promoter had signed with subpromoters for Stewart's concert performances.  154 Cal. App. 4th at 65-66.  The promoter could not deliver a Stewart concert without Stewart.  Stewart's refusal to perform ended the subcontracts, but his refusal was not the act of a stranger.  *Id.*  Comulate is in the promoter's position.  Comulate sold its customers an Epic reconciliation service it cannot deliver without Applied's SDK.  Applied's refusal to keep authorizing SDK access ends Comulate's ability to perform, but its refusal is not the act of an interloper.  Applied, like Stewart, is the party whose cooperation makes the downstream contracts possible.  *See also Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125-26 (9th Cir. 2014) (holding that a party with "a substantial, continuing economic interest and necessary involvement" in a transaction is "not-a-stranger").

This is a structural defect, not a factual one.  It does not matter what Applied said to customers, whether those statements were privileged, or whether customers left because of Applied's communications or its SDK decision.  Applied is the party whose performance underlies

every Comulate customer contract that depends on Epic. It cannot be an interloper in those relationships. The claims fail on this ground alone.

### D. Applied's Conduct Was Not Independently Wrongful, And Was Justified

Even setting aside the above arguments, Comulate's tortious interference claims fail on their own terms. Both require independently wrongful conduct, and Comulate cannot show any. And even if it could, justification is a separate defense: Applied acted to protect contractual and platform interests that the law treats as equal or superior to Comulate's.

### 1. Applied's Conduct Was Not Independently Wrongful

Comulate cannot show independently wrongful conduct to succeed on either of its tortious interference claims. A plaintiff claiming interference with a contract "must allege that the defendant engaged in an independently wrongful act," except where the contract is not terminable at will. *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1148 (2020). This requirement exists because terminable contracts carry an inherent risk of nonrenewal or termination; without it, "a competitor's good faith offer that causes a business to withdraw from an at-will contract could trigger liability." *Id.* The same requirement applies to interference with prospective economic advantage: the defendant's conduct must be "wrongful by some legal measure other than the fact of interference itself." *Id.* at 1142.

Comulate has not shown that any of its purported contracts are enforceable and non-terminable. *See* Mot. 15-18. The only two contracts for which Comulate puts terms into the record both contained termination-for-convenience provisions, and both customers exercised those provisions. *See supra*, Facts § F. The remaining customers either declined to renew, walked away during onboarding, or entered agreements whose terms Comulate did not put into the record. *Id.* Comulate has failed to show any contract constitutes a "formally cemented economic relationship … deemed worthy of protection from interference." *Ixchel*, 9 Cal. 5th at 1145 (citation omitted).

Comulate's interference claims thus both require independently wrongful conduct. Comulate cannot satisfy that element. Applied enforced its own contractual rights, and the "coordinated campaign" Comulate describes disaggregates into lawful conduct.

Enforcing bargained-for contractual rights is not conduct "proscribed by" any "determinable legal standard." *Ixchel*, 9 Cal. 5th at 1142. A defendant that "undertak[es] to enforce its rights" is not liable for interference "even if it knew that such conduct might interrupt a third party's contract." *SIC Metals, Inc. v. Hyundai Steel Co.*, 442 F. Supp. 3d 1251, 1256 (C.D. Cal. 2020), *aff'd*, 838 F. App'x 315 (9th Cir. 2021); *see also, e.g.*, *Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218, 1276 (N.D. Cal. 2022) (holding no tortious interference where the defendant informed the plaintiff's contract counterparty that the plaintiff had violated the defendant's terms, even though the defendant "was motivated in part by [its] desire to enforce its own separate contract terms"). Undertaking to enforce its contractual rights is precisely what Applied did here. Applied's conduct addressed two distinct contractual violations. Applied's MSA requires that each user seat be assigned to a specific, named employee and "cannot be shared" with non-employees. MSA §§ 3.2, 3.6(c), 15. Applied's November 21 email asked customers to stop assigning user seats to Comulate personnel—a request that tracked those restrictions. *See supra*, Facts § D. Separately, Applied's SDK Schedule bars customers from letting any "third party" use the SDK without Applied's written consent, which Applied may grant or withhold "in its sole discretion." SDK §§ 5.6(b), 5.7. Applied withheld that consent because Comulate refused to sign the required Acknowledgement Form (AC ¶ 143) and because Applied no longer wished to do business with a company that had accessed its platform through a sham entity. *See supra*, Facts §§ A, C.

18

Comulate's "coordinated campaign" theory fares no better. Mot. 4-10, 14-17. For one thing, Comulate's renewed motion offers no likelihood-of-success argument on this evidence: it treats the Court's March 5, 2026 finding as dispositive and skips to proximate cause. Mot. 15-18. For another, the conduct Comulate highlights occurred almost entirely in October and November 2025—after Applied discovered that Comulate had been operating the PBC Consulting sham account on Applied's platform (Peterlin Decl. ¶ 9) and before Applied filed suit. *See, e.g.*, Mot. 7 (October 28, 2025 customer dinner); Mot. 7 (November 3, 2025 internal Slack message about ███ ); Mot. 8 (November 14, 2025 ███ Statement of Work delay). A company that discovers fraud on its systems investigates that fraud, consults counsel, and manages its business operations while preparing to act; that is pre-litigation enforcement, not tortious interference. This conduct also has nothing to do with the harm that Comulate itself identifies: Applied's decision to end SDK support at the end of Q2 2026.

But even if the Court considered the full scope of the alleged "campaign," each component is independently lawful. Accelerating Applied's own competing product is lawful competition. Mot. 4; Blackwell Decl. ¶ 15. Offering customers competitive pricing is lawful competition. Mot. 7. Gathering information from customers about their use of a competing product is standard market research. Mot. 8-10. And managing the pace and terms of Applied's own contractual deliverables to a customer—including a Statement of Work that Applied was not obligated to provide, especially after discovering Comulate's fraud —does not violate any "determinable legal standard." *Ixchel*, 9 Cal. 5th at 1142. Applied had no obligation to help Comulate succeed on its platform, let alone after learning of Comulate's fraud, and declining to expedite Comulate

19

integrations or to implement an SDK feature upgrade does not give rise to liability. *See id.*[5] Applied's internal communications confirm these lawful motives: Applied wanted to " █████████ " and " ████████████████████████████████████████ " Baker Decl., Exs. 13, 39.

### 2. Applied's Conduct Was Justified

Even if any Comulate contract were non-terminable, Applied's conduct was justified and therefore cannot form the basis for a valid claim. A defendant is privileged to interfere "where the defendant was acting to protect an interest which the law deems to be of equal or greater value than the plaintiff's contractual rights." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 677 (Ill. 1989) (recognizing the privilege). The Seventh Circuit affirmed that a "multimillion-dollar investment … gave [the defendant] a legitimate interest in protecting [the company's] value"—"an interest that the law deems equal or superior to [plaintiff's] contractual rights." *Nation v. Am. Capital, Ltd.*, 682 F.3d 648, 651-52 (7th Cir. 2012) (affirming summary judgment on privilege grounds). California law is in accord: a defendant defeats interference claims by acting to protect a legally protected interest. *Herron v. State Farm Mut. Auto. Ins. Co.*, 56 Cal. 2d 202, 206 (1961) (privilege covers protection of an existing legal right).

The privilege covers competing contract rights. This Court recognized that "when A has a valid contract with C, and C enters into a contract with B, and the enforcement of A's contract depends on the non-enforcement of B's contract, A is privileged to use any reasonable means to bring about a breach of B's contract with C to protect his own interest." *Wells Fargo Bank, N.A.*

---

[5] Comulate relies on an August 2025 email reporting that the SDK "would only be available until the end of the year." Mot. 22 (citing D.I. 76 at 2). That was because Applied was migrating from the SDK to a modern API system for "better security and scalability" and paused SDK authorizations during that transition. AC ¶¶ 77, 100, 163; *see also* D.I. 103-1 at 7.

*v. Worldwide Shrimp Co.*, 2018 WL 6696607, at \*13 (N.D. Ill. Dec. 20, 2018) (Shah, J.) (citation omitted). Applied (A) has contracts with its customers (C) barring third-party SDK access. SDK §§ 5.6(b), 5.7. Comulate (B) entered contracts with those same customers that depend on SDK access. The privilege applies.

Applied acted to protect three interests: its customer agreements restricting Epic and SDK access (*supra*, Facts § A), its platform after finding automated bots and disabled logging (*supra*, Facts § C; Peterlin Decl. ¶¶ 15, 17-18), and its right to decide who may use the SDK (SDK §§ 2, 5.7). Applied gave customers more than six months to transition—far beyond the contractual minimum. *See supra*, Facts § D. These interests are what the privilege exists to shield. *HPI Health Care Servs.*, 545 N.E.2d at 677 (shielding conduct protecting interests that outweighed the plaintiff's contractual rights).

Comulate has not shown that Applied acted for any purpose other than protecting its own contractual and platform interests. Each action Comulate challenges followed (1) Applied's October 2025 discovery that Comulate had created a sham entity to access Applied's platform; (2) Applied's discovery that Comulate had run automated bots through customer user seats that the MSA restricts to named, individual employees—not software programs; and (3) Applied's discovery that Comulate had disabled logging to hide Comulate's activity. Peterlin Decl. ¶¶ 9, 15, 17-18; MSA §§ 3.2, 3.6(c). Applied enforced its contracts, exercised its right to decide whether to let third parties use the SDK, and gave customers over six months to transition. A competitive motive does not negate the privilege; a party may act on both competitive and contractual grounds at the same time. *See Nation*, 682 F.3d at 654 (holding that the privilege was not overcome where

21

the defendant acted to protect its investment, even though its conduct also served its own financial interests).[6]

### E.    Tortious Conduct Did Not Cause Comulate's Purported Harm

Comulate has not shown that any tortious act by Applied was a substantial factor in causing its harm. *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1164-66 (2003). The causation inquiry asks whether Applied took a ***tortious*** action that prompted customers to leave—not just any action. *See id.* at 1159; *see also Reeves v. Hanlon*, 33 Cal. 4th 1140, 1152-53 (2004) (plaintiff must show wrongful act induced the harm).

The lack of any contract between Applied and Comulate independently defeats causation. The court in *PM Group* held that because Stewart and the promoter never formed a binding contract, the downstream subcontracts "could [never] have been performed." 154 Cal. App. 4th at 65. The defendants did not cause the subcontracts to fail. *Id.* Comulate is the promoter here. Applied never contracted with Comulate, never signed the Acknowledgement Form, and never gave the written consent that its customer agreements require. SDK § 5.7; AC ¶ 143. Comulate's customer contracts depended on SDK access that Applied was free to end at any time. SDK § 2. Applied exercised that right. Customers left. That sequence is not tortious causation.

Comulate's own evidence confirms this. The six customers who terminated after March 5 each cited the June 30 SDK cutoff—not the November 21 email. Supp. Katz Decl. ¶¶ 6-11; *see*

---

[6]    Comulate's evidence of account deactivations at ████████ and ████████ (Mot. 12) do not undermine justification. The ████████ account—username "COMUMM"—was one of the automated bot accounts Comulate ran through a customer user seat. ████████'s representative confirmed as much, describing it as "████████ ████████" Baker Decl., Ex. 32. That is exactly the unauthorized non-employee access that the MSA prohibits. MSA §§ 3.2, 3.6(c). Applied deactivated it for that reason. The ████████ deactivation was an unrelated technical issue caused by excess load in a shared environment, and Applied restored SDK access the same day. Baker Decl., Ex. 33.

*supra*, Facts § F. ███████'s termination letter cited Comulate's future inability to perform as the reason. ██ added that it would prefer to stay but for the June 30 cutoff. Supp. Katz Decl., Ex. A (D.I. 100-46). The two earlier departures confirm the same pattern through different exit routes. ████ invoked a no-penalty exit within a thirty-day convenience window, citing Applied's (privileged) IP allegations, not any directive from Applied. Katz Decl. ¶ 93. ███████ exercised an express convenience-termination right. *Id.* ¶¶ 94-95. No customer breached its contract with Comulate at Applied's direction. Each exercised its own contractual rights in response to a business reality: Comulate cannot deliver on Epic without Applied's SDK. Customers chose to leave Comulate rather than leave Applied. That choice reflects business judgment, not induced breach.

## II.    COMULATE CANNOT ESTABLISH IRREPARABLE HARM

The Court should find that Comulate has not shown irreparable harm. The movant must show that irreparable harm is "likely," not merely "possible." *Winter*, 555 U.S. at 20, 22 (holding that injunctive relief cannot rest on "a possibility of irreparable harm"). Comulate's losses are identifiable, calculable, and compensable in money. Comulate's going-concern theory also fails.

### A.    Comulate's Losses Are Identifiable And Compensable In Damages

Comulate's losses are economic injuries that money can fix. Losses that "translate into lost profits" cannot support irreparable harm where those losses are "identifiable and calculable." *DM Trans*, 38 F.4th at 618-19 (affirming denial of preliminary injunction; "harm stemming from lost customers or contracts may be quantifiable if the lost customers or contracts are identifiable").

Lost customers, lost revenue, diminished goodwill, and reputational injury are all compensable as lost-profit damages. This Court held that harm to "customer relationships, loss of revenue, and harm to customer goodwill" amounts to "lost profits." *Lawson Prods., Inc. v. Morichelli*, 707 F. Supp. 3d 759, 766-67 (N.D. Ill. 2023) (Shah, J.) (denying a preliminary

23

injunction on that basis). Comulate's own pleading confirms that its losses are quantifiable: Comulate seeks "treble damages," "compensatory damages," "punitive damages," and damages "exceed[ing] mid-nine figures." AC ¶ 322; *id.* §§ XVI(f)-(h). A party that prices its harm at nine figures cannot claim that money falls short. A movant fails to show irreparable harm when it "requested money damages" in the same action. *Borden, Inc. v. Kraft, Inc.*, 1984 WL 1458, at *17 (N.D. Ill. Sept. 28, 1984) (rejecting an irreparable-harm argument on that basis). Applied is solvent and can pay any judgment.

Comulate's "bare assertions" of irreparable harm fail without proof that its losses defy monetary valuation. *Bidi Vapor, LLC v. Vaperz LLC*, 543 F. Supp. 3d 619, 632-33 (N.D. Ill. 2021) (denying a preliminary injunction for lack of such proof). But Comulate knows its mutual customers and each one's revenue. Katz Decl. ¶¶ 75, 114. That distinguishes this case from those Comulate cites, where the plaintiffs could not identify at-risk customers. Mot. 18-19. Comulate can track its losses customer by customer and value them precisely. A plaintiff suffers no irreparable harm where it is "able to readily identify" lost customers. *CraneTech, Inc. v. Slack*, 789 F. Supp. 3d 662, 682 (N.D. Ind. 2025) (finding no irreparable harm on that basis).

Switching costs do not change the analysis. Damages need only be "reasonably estima[ble]," not precisely calculable. *DM Trans*, 38 F.4th at 620. Comulate argues that customers who switch may not switch back. Mot. 19 (citing Katz Decl. ¶ 82). Even if that were true, lost profits from departed customers are standard damages. *Radiant Glob. Logistics, Inc. v. Schmidt*, 2026 WL 735197, at *4 (N.D. Ill. Mar. 16, 2026) (denying preliminary injunction where movant "can identify customers who transferred business" and other potential losses were speculative). Onboarding, migration, and retraining costs are quantifiable. *See id*. *3. Comulate's harm differs from the harm in *PepsiCo, Inc. v. Redmond*, 1996 WL 3965, at *30 (N.D. Ill. Jan. 2, 1996). That

24

case involved a former executive who took strategic plans to a competitor, making the misappropriation's sales impact impossible to measure. *Id.* Comulate's situation involves a known customer base, each generating identifiable revenue. Katz Decl. ¶¶ 75, 114.

### B. Comulate's Going-Concern Theory Fails

Comulate's going-concern theory fails. Irreparable harm must be "likely," not speculative. *Winter*, 555 U.S. at 22 (rejecting injunctive relief resting on "a possibility of irreparable harm"). Comulate has not met that standard. Even when a business faces potential closure, the movant must provide specific financial data showing that money damages are inadequate; speculation about possible insolvency without such evidence fails to carry the burden. *See Bar Indy LLC v. City of Indianapolis*, 508 F. Supp. 3d 334, 359 (S.D. Ind. 2020) (holding that even where a business faces potential closure, the movant must provide "specific financial data" to show that money damages are inadequate, and that speculation about possible insolvency without such evidence fails to carry the burden). Comulate has not met that standard.

Comulate's product works with "other insurance AMSs." AC ¶ 38. Losing the Applied integration does not end Comulate's business. No one guaranteed that integration. Comulate never had a contract with Applied. Comulate's access was always subject to Applied's customer agreements, which let Applied approve third-party SDK access "in its sole discretion" and end SDK access "for convenience" on sixty days' notice. SDK § 2. Applied tolerated about sixty SDK-key integrations during negotiations, conditioned on an Acknowledgement Form Comulate refused to sign. AC ¶ 143. A company that built its business on another company's terminable permission cannot claim irreparable harm when that permission ends.

That reason alone suffices. But the permission also ended for good reason. Comulate ran automated bots through customer seats and disabled logging to hide the activity. Peterlin Decl. ¶¶ 15, 17-18. Comulate fabricated PBC Consulting—a sham entity with a fictitious signatory—

25

using it for eighteen months to run over 10.7 million SDK calls.  *See* Peters Decl. ¶ 13; *see also* No. 25-cv-14251, D.I. 47-5 ¶¶ 5-6.  Applied need not tolerate a company that engaged in this fraud.  Comulate's loss follows from Applied enforcing its contracts after finding fraud—not from tortious interference.  Courts decline to grant equitable relief to a party "engaged in misconduct." *Mintel Int'l Grp. v. Neergheen*, 2008 WL 2782818, at *6 (N.D. Ill. July 16, 2008) (denying relief on that basis).[7]

## III.     THE EQUITIES AND PUBLIC INTEREST FAVOR APPLIED

Even if Comulate could show a likelihood of success and irreparable harm, the motion fails.  The proposed injunction is mandatory and overbroad.  The balance of harms favors Applied.  The public interest supports denial.

### A.     The Proposed Injunction Is Mandatory And Overbroad

The Court should deny the injunction because it compels Applied to act and rewrites Applied's contracts.  Courts "cautiously view[] and sparingly issue[]" mandatory injunctions. *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997) (holding that mandatory injunctions are "rarely issued" because they "require[] the court to command the defendant to take a particular action").  The court must tailor relief to the wrong, not hand the movant a better position than it held before.   *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1094 (7th Cir. 1988) ("[T]he scope of injunctive relief must not exceed the extent of the plaintiff's protectible rights.").

---

[7]   Comulate points to the Delaware Chancery Court's observation that "the possibility that Comulate could be forced out of the market entirely does threaten irreparable harm."  Mot. 19 (citing D.I. 32-15 at 66:1-4).  The Chancery Court denied most of Comulate's TRO request and entered an order that merely memorialized Applied's own representation that it would keep access through Q2 2026.  D.I. 41-6 at 2-4.  Comulate dismissed the Delaware action in January 2026; the order is no longer in effect and applied Delaware law, not Seventh Circuit standards.

*First*, the injunction is mandatory.  Comulate gets SDK access only because Applied's customers share their SDK keys.  That sharing requires Applied's approval "in its sole discretion." SDK § 5.7.  Applied does not approve of any such access after Q2 2026.  An order barring the June 2026 cutoff for the lawsuit's duration (Mot. 20-21) would compel Applied to keep allowing third-party access over its own objection and despite its clear contractual rights.  That is affirmative conduct, not restraint.  The Court recognized this: "[a] mandatory injunction requiring Applied to guarantee access or to positively influence customers toward Comulate is not preservation of the status quo."  3/5/26 Tr. at 6:18-20.  Comulate's proposed order does exactly what the Court cautioned against.  The proposed order guarantees continued access by barring Applied from exercising its contractual right to deny it.  Comulate calls the injunction "narrowly tailored" because it covers only "existing joint customers."  Mot. 20.  But maintaining SDK access for existing customers is itself affirmative help: Applied must keep allowing access to its own systems and supporting Comulate's integrations on its own infrastructure.

*Second*, the injunction is overbroad.  Applied's contracts let Applied end SDK access "for convenience upon sixty (60) days' prior written notice."  SDK § 2.  On termination, "all licenses granted to Licensee under this Schedule will immediately cease."  *Id.* § 3.  Blocking the cutoff would void that right and rewrite each contract to strip Applied of its contractual right to terminate for convenience.  The order would also create a duty from Applied to Comulate that no agreement has ever imposed—Comulate is not a party to the SDK Schedules.  The proposed order runs through trial with no end date.  Mot. 20-21.  That is broader than the Chancery Court's order, which was "limited in duration, narrow in scope."  D.I. 41-6, at 4.[8]

---

[8]  The order is also hopelessly vague.  It bars "interfering" with customer relationships (Mot. 23) but does not say what conduct it forbids.  *See Patriot Homes, Inc. v. Forest River Hous., Inc.*, 512 F.3d 412, 415 (7th Cir. 2008) (vacating injunction for lack of specificity).

## B.     The Balance Of Harms Tilts Sharply In Applied's Favor

That overbreadth tilts the balance sharply toward Applied. The court should weigh Applied's harm from the injunction against Comulate's harm from denial. *Roland Mach. Co. v. Dresser Indus.*, 749 F.2d 380, 387 (7th Cir. 1984) (setting the balancing framework). The less likely the movant is to win, the more the balance must favor the movant. *Id.*

Comulate claims that its harm "vastly outweighs any burden on Applied." Mot. 22. The opposite is true. The injunction would strip Applied of the right to decide who reaches its platform. Applied controls SDK access through contracts requiring its consent "in its sole discretion." SDK § 5.7. Comulate frames the injunction as preserving "existing business relationships— relationships that Applied has no contractual right to terminate." Mot. 21. But Applied does have that right. The SDK lets either party terminate "for convenience" on sixty days' notice. SDK § 2. Applied's MSA lets Applied terminate immediately on a good-faith belief of infringement. MSA § 13.1. Applied has already exercised those rights. The injunction would override them.

Comulate's no-harm evidence addresses the wrong time period. Mot. 21-22. Both documents Comulate cites—the ▮▮▮▮▮▮▮ SDK license and the Rhodes email—cover SDK access through Q2 2026, not the indefinite court-ordered access Comulate now seeks. Baker Decl., Ex. 40; *id.* Ex. 16; *see also id.* Ex. 41 (confirming that ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮). That Applied maintained access through a defined transition period says nothing about the harm of compelling access for the lawsuit's duration.

Against that concrete harm, Comulate's exaggerated harms do not tip the balance. In the companion case, Katz swore that Applied's injunction would make it "***all but certain that Comulate will be put out of business almost immediately.***" Katz PI Opp. Decl. ¶ 65 (emphases added). The Court granted that injunction in the form Applied proposed. No. 25-cv-14251, D.I. 82. Comulate is still operating.

28

### C.      The Public Interest Supports Denial

The public interest favors denial.  The public interest is "served by enforcing contracts." *Cook Inc. v. Bos. Sci. Corp.*, 2002 WL 31236289, at *6 (N.D. Ill. Oct. 1, 2002) (weighing the public interest against an injunction).  The public interest also supports "preventing others from the unauthorized use of … confidential information for their own benefit." *Mazak Optonics Corp. v. Marlette*, 2017 WL 3394727, at *3 (N.D. Ill. Aug. 8, 2017) (same).

The Court noted at the March 5, 2026 hearing that "the public interest is not weighty either way in this private pursuit."  3/5/26 Tr. at 6:23-24.  But that observation did not reach the contract-enforcement interests now at stake.  Applied is enforcing its own contracts—barring non-employee access (MSA § 3.6(c)), third-party SDK access (SDK § 5.6(b)), and competitive use (MSA § 3.6(f); SDK § 5.6(f)).  Applied stopped tolerating Comulate's violations after finding fraud.  *See supra*, Facts § B.  Granting the injunction would force Applied to give SDK access to a company whose conduct prompted the termination.  No party ever agreed to that duty.  The public interest in deterring fraud weighs against that result.  *Mintel*, 2008 WL 2782818, at *6 (declining equitable relief to a party engaged in misconduct).

Comulate's competition-policy reframing fails.  Mot. 22-23.  That framing matters only if Comulate showed a likelihood of success on its antitrust claims.  The Court found on March 5, 2026 that the record did not support "any conclusions about the likelihood of antitrust liability, even as an antitrust-lite analysis within California Unfair Competition law."  3/5/26 Tr. at 6:25-7:3. Nothing in the renewed motion changes that finding.  Comulate offers no expert market analysis and does not define the relevant market.  Comulate points only to Ascend's pricing (Katz Suppl. PI Decl. ¶¶ 32-33), but Ascend is a separate company making its own pricing decisions.  A competitor's price increase after a rival exits does not show anticompetitive conduct. Applied maintains over 100 integrations (AC ¶ 316) and stopped tolerating Comulate's SDK use after

29

finding fraud. That some customers wish to continue providing their SDK keys to Comulate for continued use (*cf.* Mot. 17, 22) does not make Applied's conduct tortious.

## IV. IF ANY INJUNCTION ISSUES, THE COURT SHOULD REQUIRE A BOND

The Court should require a bond if it issues an injunction. A movant must post enough security "to pay the costs and damages sustained by any party found to have been wrongfully enjoined." Fed. R. Civ. P. 65(c). Courts should "err on the high side" because "damages for an erroneous preliminary injunction cannot exceed the amount of the bond." *Mead Johnson & Co. v. Abbott Lab'ys*, 201 F.3d 883, 888 (7th Cir. 2000). An injunction here would force Applied to host a competitor on its platform, surrender termination rights it has already exercised, and bear ongoing infrastructure costs through trial.

Comulate's request for a nominal bond fails. *See* Mot. 23. Comulate's cited authority set a nominal bond where the enjoined party identified no expected damages. *Id.* (citing *Chicago Women in Trades v. Trump*, 778 F. Supp. 3d 959, 996 (N.D. Ill. 2025)). That is not the case here. Comulate itself supplied the measure of damages when it argued in the companion case that Applied needed to post a $50 million bond based on Comulate's purported revenue from Applied's customers. *See* No. 25-cv-14251, D.I. 61 at 15. That measure applies in reverse. The Court recognized as much in the companion case, setting a $1 million bond and inviting further briefing on the amount. *Id.*, D.I. 81 at 15. Applied respectfully requests the same process here if the Court is inclined to grant relief.

## CONCLUSION

For these reasons, Applied respectfully requests that this Court deny Comulate's Motion.

Dated:  April 7, 2026

Respectfully submitted,

/s/ Sam S. Stake

Jonathan C. Bunge (Ill. Bar #6202603)
Nathan Hamstra (Ill. Bar # 6286325)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, Illinois 60606
(312) 705-7400
jonathanbunge@quinnemanuel.com
nathanhamstra@quinnemanuel.com

Sam S. Stake (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, California 94111
(415) 875-6600
samstake@quinnemanuel.com

Aaron H. Perahia (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 S Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443-3000
aaronperahia@quinnemanuel.com

Sami H. Rashid (*pro hac vice* pending)
David LeRay (*pro hac vice* forthcoming)
Salvadore J. Diaz (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
295 Fifth Avenue
New York, New York 10016
(212) 849-7000
salvadorediaz@quinnemanuel.com

*Attorneys for Defendant Applied Systems, Inc.*

31

## CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2026, I filed the foregoing document with the United States District Court for the Northern District of Illinois using the CM/ECF system and caused it to be served on all registered participants via the notice of electronic filing.

*/s/ Sam S. Stake*

32