**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ARDENT LABS, INC., d/b/a COMULATE,<br><br>Plaintiff,<br><br>v.<br><br>APPLIED SYSTEMS, INC.,<br><br>Defendant. | Case No. 26-cv-00591 |

**PLAINTIFF COMULATE'S MEMORANDUM OF LAW IN OPPOSITION TO APPLIED'S MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**


INTRODUCTION .......... 1

FACTUAL BACKGROUND .......... 3

A. Applied's Established Dominance Over the Insurance AMS Market .......... 3

B. Applied's Campaign to Monopolize the AIAAS Market .......... 4

C. Applied Conspires with Ascend to Implement Comulate's Exclusion .......... 6

D. Applied's Misconduct Harmed Competition and Comulate .......... 8

LEGAL STANDARD .......... 9

ARGUMENT .......... 9

I. COMULATE'S ALLEGATIONS MUST BE VIEWED AS A WHOLE .......... 10

II. COMULATE HAS ANTITRUST STANDING TO CHALLENGE APPLIED'S ACTIONS .......... 11

III. COMULATE PLAUSIBLY PLEADS ATTEMPTED MONOPOLIZATION (COUNT I) .......... 13

A. Applied Has Engaged in Exclusionary Conduct to Monopolize the AIAAS Market .......... 13

1. Applied's Coercive Course of Conduct Is Facially Exclusionary .......... 13

2. Applied Monopolistically Refused to Deal with Comulate .......... 15

3. Applied Has Tied Its Control Over Insurance AMS to the AIAAS Market .......... 22

B. Applied's Specific Intent to Monopolize the AIAAS Market Is Inferable From Its Exclusionary Conduct .......... 25

C. Applied Has a Dangerous Probability of Achieving Monopoly Power in the AIAAS Market .......... 27

IV. COMULATE PLAUSIBLY PLEADS A CONSPIRACY TO MONOPOLIZE (COUNT II) .......... 30

A. Applied and Ascend Conspired to Eliminate Comulate from the AIAAS Market .......... 30

B. Comulate Plausibly Pleads Specific Intent for Applied to Monopolize the AIAAS Market .......... 32

V. COMULATE PLAUSIBLY PLEADS A CONSPIRACY TO UNREASONABLY RESTRAIN TRADE (COUNT III) .......... 34

A. Applied and Ascend Are Engaging in A Group Boycott .......... 34

B. Applied and Ascend Have Colluded to Allocate the AIAAS Market .................. 37

VI. COMULATE PLAUSIBLY PLEADS UCL AND TORT CLAIMS ................... 38

A. The FAC Plausibly Alleges UCL Claims For Unlawful Business Practices and Anticompetitive Misconduct (Counts IV-V) ................................................ 38

B. The FAC Plausibly Alleges Tort Claims (Counts VI-VIII) ................................. 39

1. Applied's Privilege Defenses Fail ........................................................ 39

2. Comulate Plausibly Alleges Tortious Interference (Counts VI-VII) ........ 41

3. Comulate Plausibly Alleges Trade Libel (Count VIII) ............................ 43

CONCLUSION ......................................................................................................... 44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agnew v. Nat'l Coll. Athletic Ass'n*,
683 F.3d 328 (7th Cir. 2012) ........................................ 34

*Alarm Detection Sys., Inc. v. Vill. of Schaumburg*,
930 F.3d 812 (7th Cir. 2019) ........................................ 9, 43

*Am. Backflow & Fire Prevention, Inc. v. Hincks*,
2025 WL 3514107 (Ill. App. Ct. Dec. 8, 2025) ........................................ 40

*Am. Tobacco Co. v. United States*,
328 U.S. 781 (1946) ........................................ 34

*American Academic Suppliers, Inc. v. Beckley-Cardy, Inc.*,
922 F.2d 1317 (7th Cir. 1991) ........................................ 28

*Arista Recs. LLC v. Lime Grp., LLC*,
532 F. Supp. 2d 556 (S.D.N.Y. 2007) ........................................ 34

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................ 9

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985) ........................................ passim

*August v. Hanlon*,
975 N.E.2d 1234 (Ill. App. Ct. 2012) ........................................ 40

*Bayer Schering Pharma AG v. Sandoz, Inc.*,
813 F. Supp. 2d 569 (S.D.N.Y. 2011) ........................................ 28

*Bell Atl. Corp. v. Twombly*,
550 U.S. 554 (2007) ........................................ 9

*Bently Rsrv. LP v. Papaliolios*,
160 Cal. Rptr. 3d 423 (Ct. App. 2013) ........................................ 44

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
65 F.3d 1406 (7th Cir. 1995) ........................................ 22

*Boulware v. Nev. Dep't of Hum. Res.*,
960 F.2d 793 (9th Cir. 1992) ........................................ 40

*Byton N. Am. Co. v. Breitfeld*,
2020 WL 3802700 (C.D. Cal. Apr. 28, 2020) ........................................................ 41

*Car Carriers, Inc. v. Ford Motor Co.*,
745 F.2d 1101 (7th Cir. 1984) ........................................................ 33

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
973 P.2d 527 (Cal. 1999) ........................................................ 38

*Celonis SE v. SAP SE*,
2025 WL 3013158 (N.D. Cal. Oct. 27, 2025)........................................................ 14, 38

*CinemaCloudWorks, Inc. v. Comscore, Inc.*
2026 WL 84020 (C.D. Cal. Jan. 6, 2026) ........................................................ 21

*City of Mishawaka v. Am. Elec. Power Co.*,
616 F.2d 976 (7th Cir. 1980) ........................................................ 10

*City of Rockford v. Mallinckrodt ARD, Inc.*,
360 F. Supp. 3d 730 (N.D. Ill. 2019) ........................................................ 45

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*,
173 F.3d 725 (9th Cir. 1999) ........................................................ 44

*Collins Inkjet Corp. v. Eastman Kodak Co.*,
781 F.3d 264 (6th Cir. 2015) ........................................................ 23

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962)........................................................ 10, 27

*CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*,
150 F.4th 1056 (9th Cir. 2025) ........................................................ 14

*Covad Commc'ns Co. v. Bell Atl. Corp.*,
398 F.3d 666 (D.C. Cir. 2005)........................................................ 20

*Creation Supply, Inc. v. Hahn*,
608 F. Supp. 3d 668 (N.D. Ill. 2022) ........................................................ 40

*Crimpers Promotions, Inc. v. Home Box Off., Inc.*,
554 F. Supp. 838 (S.D.N.Y. 1982) ........................................................ 35

*CRST Van Expedited, Inc. v. Werner Enters.*,
479 F.3d 1099 (9th Cir. 2007) ........................................................ 38

*Dale v. Deutsche Telekom AG*,
2023 WL 7220054 (N.D. Ill. Nov. 2, 2023) ........................................................ 12

*Data Gen. Corp. v. Grumman Sys. Support Corp.*,
36 F.3d 1147 (1st Cir. 1994) .......... 21

*Diva Limousine, Ltd. v. Uber Techs., Inc.*,
392 F. Supp. 3d 1074 (N.D. Cal. 2019) .......... 38

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*,
111 F.4th 337 (4th Cir. 2024) .......... 3, 10

*E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*,
637 F.3d 435 (4th Cir. 2011) .......... 27

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) .......... 39

*Epicor Software Corp. v. Alt. Tech. Sols., Inc.*,
2013 WL 2382262 (C.D. Cal. May 9, 2013) .......... 41

*Fashion Originators' Guild of Am. v. FTC*,
312 U.S. 457 (1941) .......... 36

*Fishman v. Estate of Wirtz*,
807 F.2d 520 (7th Cir. 1986) .......... 13, 22

*Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr. of Durango*,
582 F.3d 1216 (10th Cir. 2009) .......... 20

*Frame-Wilson v. Amazon.com, Inc.*,
664 F. Supp. 3d 1198 (W.D. Wash. 2023) .......... 34

*Frantzides v. Northshore Univ. HealthSystem Fac. Prac. Assocs., Inc.*,
787 F. Supp. 2d 725 (N.D. Ill. 2011) .......... 33

*FTC v. Deere & Co.*,
2025 WL 1638474 (N.D. Ill. June 9, 2025) .......... 11

*fuboTV inc. v. Walt Disney Co.*,
745 F. Supp. 3d 109 (S.D.N.Y. 2024) .......... 11

*G. Heileman Brewing Co. v. Anheuser-Busch Inc.*,
676 F. Supp. 1436 (E.D. Wis. 1987) .......... 26

*Goodman v. Goodman*,
226 N.E.3d 704 (Ill. App. Ct. 2023) .......... 41

*Great Escape, Inc. v. Union City Body Co.*,
791 F.2d 532 (7th Cir. 1986) .......... 25

*HomeLight, Inc. v. Shkipin*,
694 F. Supp. 3d 1242 (N.D. Cal. 2023) ........................................................................ 37

*Honeywell International Inc. v. Lone Star Aerospace, Inc.*,
2024 WL 4093183 (N.D. Tex. Sep. 4, 2024)................................................................... 28

*Hytera Commc'ns Corp. v. Motorola Sols., Inc.*,
623 F. Supp. 3d 857 (N.D. Ill. 2022) ............................................................................ 39

*In re Burlington N., Inc.*,
822 F.2d 518 (5th Cir. 1987) ....................................................................................... 40

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
313 F. Supp. 3d 931 (N.D. Ill. 2018) .................................................................... passim

*In re High Fructose Corn Syrup Antitrust Litig.*,
295 F.3d 651 (7th Cir. 2002) ....................................................................................... 31

*In re Humira (Adalimumab) Antitrust Litig.*,
465 F. Supp. 3d 811 (N.D. Ill. 2020) ............................................................................ 37

*In re Indep. Serv. Orgs. Antitrust Litig.*,
203 F.3d 1322 (Fed. Cir. 2000)..................................................................................... 21

*In re Neurontin Antitrust Litig.*,
2009 WL 2751029 (D.N.J. Aug. 28, 2009) ................................................................... 40

*In re Surescripts Antitrust Litig.*,
608 F. Supp. 3d 629 (N.D. Ill. 2022) ................................................................ 25, 30, 32

*In re Text Messaging Antitrust Litig.*,
630 F.3d 622 (7th Cir. 2010) ....................................................................................... 30

*In re Turkey Antitrust Litig.*,
642 F. Supp. 3d 711 (N.D. Ill. 2022) ............................................................................ 32

*Indiana Grocery, Inc. v. Super Valu Stores, Inc.*,
864 F.2d 1409 (7th Cir. 1989) ..................................................................................... 27

*Jacobs v. City of Chi.*,
215 F.3d 758 (7th Cir. 2000) ......................................................................................... 9

*Kearney & Trecker Corp. v. Giddings & Lewis, Inc.*,
452 F.2d 579 (7th Cir. 1971) ....................................................................................... 28

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
359 U.S. 207 (1959)............................................................................................... 35, 36

*Kochert v. Greater Lafayette Health Servs., Inc.*,
463 F.3d 710 (7th Cir. 2006) .......... 11

*Kubiak v. City of Chi.*,
810 F.3d 476 (7th Cir. 2016) .......... 9, 12, 31, 42

*Kurczaba v. Pollock*,
742 N.E.2d 425 (Ill. App. Ct. 2000) .......... 40

*L&W/Lindco Prods., Inc. v. Pure Asphalt Co.*,
979 F. Supp. 632 (N.D. Ill. 1997) .......... passim

*Lorain J. Co. v. United States*,
342 U.S. 143 (1951) .......... 14, 16, 17

*Marion Healthcare, LLC v. S. Illinois Healthcare*,
2018 WL 1318054 (S.D. Ill. Mar. 14, 2018) .......... 23

*Maritz Inc. v. Carlson Mktg. Grp., Inc.*,
2009 WL 3561521 (N.D. Cal. Oct. 30, 2009) .......... 41

*McGarry & McGarry, LLC v. Bankr. Mgmt. Sols., Inc.*,
937 F.3d 1056 (7th Cir. 2019) .......... 11

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*,
708 F.2d 1081 (7th Cir. 1983) .......... 22, 29

*McWane, Inc. v. FTC*,
783 F.3d 814 (11th Cir. 2015) .......... 15

*Memorex Corp. v. Int'l Bus. Mach. Corp.*,
555 F.2d 1379 (9th Cir. 1977) .......... 12

*Mendez v. Perla Dental*,
646 F.3d 420 (7th Cir. 2011) .......... 10

*Meta Platforms, Inc. v. BrandTotal Ltd.*,
605 F. Supp. 3d 1218 (N.D. Cal. 2022) .......... 42

*Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*,
815 F. Supp. 2d 679 (S.D.N.Y. 2011) .......... 39

*N. Pacific Ry. Co. v. United States*,
356 U.S. 1 (1958) .......... 23

*New York v. Facebook, Inc.*,
549 F. Supp. 3d 6 (D.D.C. 2021) .......... 18

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
513 F.3d 1038 (9th Cir. 2008) .......... 43

*Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*,
311 F. Supp. 2d 1048 (D. Colo. 2004) .......... 22

*Novell, Inc. v. Microsoft Corp.*,
731 F.3d 1064 (10th Cir. 2013) .......... 14, 19

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
472 U.S. 284 (1985) .......... 35

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018) .......... 12

*OJ Commerce, LLC v. KidKraft, Inc.*,
34 F.4th 1232 (11th Cir. 2022) .......... 18

*Pac. Gas & Elec. Co. v. Bear Stearns & Co.*,
791 P.2d 587 (Cal. 1990) .......... 43

*Pac. Steel Grp. v. Com. Metals Co.*,
600 F. Supp. 3d 1056 (N.D. Cal. 2022) .......... 42

*Paladin Assocs., Inc. v. Mont. Power Co.*,
97 F. Supp. 2d 1013 (D. Mont. 2000) .......... 33

*PeopleBrowsr, Inc. v. Twitter, Inc.*,
2013 WL 843032 (N.D. Cal. Mar. 6, 2013) .......... 39

*PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy*,
530 F. Supp. 3d 301 (S.D.N.Y. 2021) .......... 35

*Photovest Corp. v. Fotomat Corp.*,
606 F.2d 704 (7th Cir. 1979) .......... 23

*Pixels.com LLC v. Instagram, LLC*,
2015 WL 10943591 (N.D. Cal. Dec. 21, 2015) .......... 28

*Ploss v. Kraft Foods Grp., Inc.*,
197 F. Supp. 3d 1037 (N.D. Ill. 2016) .......... 27, 28

*Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*,
508 U.S. 49 (1993) .......... 39

*Reapers Hockey Association, Inc. v. Amateur Hockey Association Illinois, Inc.*,
412 F. Supp. 3d 941 (N.D. Ill. 2019) .......... 18

*Schor v. Abbott,*
*Lab'ys*, 457 F.3d 608 (7th Cir. 2006)............................................................................ 13

*Sheridan v. Marathon Petroleum Co. LLC*,
530 F.3d 590 (7th Cir. 2008) ............................................................................ 23, 24

*SIC Metals, Inc. v. Hyundai Steel Co.*,
442 F. Supp. 3d 1251 (C.D. Cal. 2020) ............................................................................ 42

*SOLIDFX, LLC v. Jeppesen Sanderson, Inc.*,
841 F.3d 827 (10th Cir. 2016) ............................................................................ 21

*Spectrum Sports, Inc. v. McQuillan*,
506 U.S. 447 (1993)............................................................................ 27

*SuperTurf, Inc. v. Monsanto Co.*,
660 F.2d 1275 (8th Cir. 1981) ............................................................................ 33

*Swanson v. Citibank, N.A.*,
614 F.3d 400 (7th Cir. 2010) ............................................................................ 9

*Teradata Corp. v. SAP SE*,
2018 WL 6528009 (N.D. Cal. Dec. 12, 2018)............................................................................ 23

*Tetra Tech EC, Inc. v. CH2M Hill Inc.*,
2022 WL 254346 (N.D. Cal. Jan. 27, 2022)............................................................................ 41

*Thompson v. Frank*,
730 N.E.2d 143 (Ill. App. Ct. 2000) ............................................................................ 41

*Thompson's Gas & Elec. Serv., Inc. v. BP Am. Inc.*,
691 F. Supp. 2d 860 (N.D. Ill. 2010) ............................................................................ 27

*Tiz, Inc. v. So. Glazer's Wine & Spirits, LLC*,
2024 WL 2785142 (N.D. Ill. May 30, 2024)............................................................................ passim

*Toys "R" Us,* Inc. v. FTC,
221 F.3d 928 (7th Cir. 2000) ............................................................................ 35, 36

*United States ex rel. Graziosi v. Accretive Health, Inc.*,
2017 WL 1079190 (N.D. Ill. Mar. 22, 2017)............................................................................ 44

*United States v. Apple, Inc.*,
2025 WL 1829127 (D.N.J. June 30, 2025)............................................................................ 14

*United States v. Google LLC*,
778 F. Supp. 3d 797 (E.D. Va. 2025) ............................................................................ 15, 25

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) ........................................................................................ 15

*United States v. Topco Assocs., Inc.*,
405 U.S. 596 (1972) ........................................................................................ 37

*United Wis. Grain Producers LLC v. Archer Daniels Midland Co.*,
144 F.4th 976 (7th Cir. 2025) ........................................................................................ 13

*Uppal v. Welch*,
2016 WL 2909652 (N.D. Ill. May 19, 2016) ........................................................................ 40

*Viamedia, Inc. v. Comcast Corp.*,
951 F.3d 429 (7th Cir. 2020) ........................................................................................ passim

*Wagner v. Magellan Health Servs., Inc.*,
121 F. Supp. 2d 673 (N.D. Ill. 2000) ........................................................................ 25, 33

*Walter Kidde Portable Equip., Inc. v. Univ. Sec. Instruments, Inc.*,
669 F. Supp. 2d 895 (N.D. Ill. 2009) ........................................................................ 27

*X Corp., Inc. v. Bright Data Ltd.,*
*782 F. Supp. 3d 770 (N.D. Cal. 2025)* ........................................................................ 14

**Other Authorities**

Areeda & Hovenkamp, *Antitrust Law*,
(4th and 5th eds. 2024) ........................................................................ 3, 10, 36, 37

Erik Hovenkamp, *The Antitrust Duty to Deal in the Age of Big Tech*,
131 Yale L. J. 1483 (2022) ........................................................................ 14

## INTRODUCTION

Applied points to Comulate's 65-75% market share of the relevant market in an attempt to deflect attention from its actions. But that market share is merely a November 2025 snapshot of what Applied now has successfully extinguished. Comulate earned it on the merits, despite the 22-month exclusion campaign that Applied waged against Comulate. Customers sought to preserve access to their chosen vendor and even submitted declarations to this Court in support of Comulate despite voicing, in writing, fear of Applied's retaliation. The preliminary injunction has been denied; the June 30, 2026 SDK cutoff is weeks away; and [redacted]. Applied invokes Comulate's prior market position as proof of healthy competition while, in real time, engineering the elimination of that very competition. That is what the Sherman Act was enacted to prevent.

Applied is a monopolist that controls Epic, the dominant insurance agency management system ("AMS") software platform, depended upon by more than 81% of America's largest insurance agencies and brokers to house their financial data and carry out their daily operations. Because switching to another AMS would cost these agencies millions of dollars and disrupt operations, Applied's customers are locked into the Epic platform.

For years, Applied touted its "open" ecosystem of AMS integrations, encouraging third-party developers like Comulate to innovate new products and markets for Epic customers. But after innovators prove these adjacent markets are profitable, Applied makes an inferior, copycat offering and uses its monopoly power and exclusionary tools to force customers to abandon these pioneering, superior solutions in favor of Applied's products. Applied knows it cannot compete on the merits, so it captures customers' business by destroying competition.

Comulate is Applied's latest victim. In 2022, at Applied's and its customers' prompting, Comulate began a years-long, profitable arrangement with Applied to provide a product that Epic

lacked. Comulate developed a first-of-its-kind enterprise automated insurance agency accounting software ("AIAAS") for insurance agencies and brokers, which works on top of Epic. When customers' enthusiastic response to Comulate demonstrated that AIAAS was a viable market, Applied decided it wanted to own that market too—as it did previously for other Epic-adjacent fields, like insurance premium payments. So in December 2023, Applied's President offered Comulate a binary choice: Applied would either acquire Comulate or "go build it." Comulate declined to sell or become an Epic exclusive.

But fair competition was never Applied's plan. For the next 22 months, as Applied tried but struggled to develop its own alternative AIAAS solution ("Recon"), Applied removed Comulate from the segment's primary trade group and flagship conference, imposed ever-increasing vendor-specific SDK pricing on customers that consumed up to 54% of Comulate's annual contract value at individual accounts, and used its control over customers' Epic access to block the only other independent AIAAS entrants (Eventual Treasury and SimplePin). Then, immediately after Applied's largest, most important customer selected Comulate over Recon (despite Applied's multi-year efforts to avoid that result and causing incredible consternation at the highest executive levels of Applied), Applied moved to bring the gates down on Comulate entirely via customer coercion and threats to cut off Comulate's integration by June 30, 2026. But because Recon was an inferior product that was not yet ready to fully absorb Comulate's displaced customer base on the timeline Applied was implementing, and because Applied wanted cover for its anticompetitive scheme, Applied signed an agreement allocating ~60 Comulate customers to its horizontal competitor, Ascend—a company whose CEO Applied's President had called "a snake" 13 months earlier—and coordinated with Ascend to displace Comulate through false marketing materials and customer coercion.

At bottom, Applied uses its monopoly power in the AMS market, along with anticompetitive, exclusionary tactics—technological barriers and chokepoints (SDK, IVANS, and ACN), threats, and false statements and misrepresentations—against its own customers to force them to abandon competing solutions that allow those customers to interact with its own data stored on Epic. Taking the allegations as a whole, as the Court must, Comulate plausibly alleges that Applied's acts all are "part of the same scheme to perpetuate dominance or drive [Comulate] from the market," *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 355 (4th Cir. 2024) (quoting Areeda & Hovenkamp, *Antitrust Law* ¶ 310c7 (4th and 5th eds. 2024)), *cert. denied*, 2026 WL 79821, at *1 (U.S. Jan. 12, 2026), to eliminate competition on the merits. The motion should be denied in full.

## FACTUAL BACKGROUND

### A. Applied's Established Dominance Over the Insurance AMS Market

Applied dominates the enterprise insurance AMS market through its flagship insurance AMS platform, Epic, which commands more than 81% of the market. FAC ¶ 49. Applied's dominance stems, in part, from the lock-in effect of insurance AMS platforms, as customers cannot switch platforms without causing years of disruption and costing millions of dollars. *Id.* ¶¶ 25-27. Applied also controls the necessary infrastructure through which complementary products participate in Epic-adjacent markets—the Epic software development kit ("SDK"), the IVANS data exchange network (access to which is required to compete with the Epic AMS itself), and the Applied Client Network ("ACN")—and Applied wields each chokepoint as a unilateral lever, throttling, conditioning, or terminating access for third-party developers while granting its own competing products unimpeded passage. *Id.* ¶¶ 53-73. Indeed, Applied has selectively used these controls to exclude or eliminate more than a dozen firms from adjacent markets that Applied sought to control, forcing Epic customers to adopt Applied's own product. FAC ¶¶ 177-98.

Comulate entered this landscape in 2022 to provide functionality that insurance AMSs (including Epic) lacked, supplying first-of-its-kind enterprise AIAAS to insurance agencies. *Id.* ¶¶ 38, 82-83. Relying on Applied's representations that it would maintain Epic as an open platform for third-party app development, Comulate built its product to interoperate with Epic through the SDK. *Id.* ¶¶ 76-81, 86. Because Comulate was a valuable complement to Epic and an additional, profitable revenue stream for Applied, Applied enabled Comulate's SDK integration through enabling customer accounts, providing technical support, onboarding customers, and promoting Comulate's capabilities. *Id.* ¶¶ 86-112. Applied generated significant annually recurring revenue in SDK and Data Lake fees from Comulate's integration with customers' Epic environments, *id.* ¶¶ 109-12, and Comulate grew to be a successful company, providing its AIAAS product to 65-75% of enterprise insurance agencies leveraging AIAAS software, most on Epic, *id.* ¶ 38.

### B. Applied's Campaign to Monopolize the AIAAS Market

Applied coveted the AIAAS market pioneered by Comulate but recognized that developing a true competitor to Comulate would take "years" because Comulate's capabilities were not "anywhere remotely near [Applied's] roadmap." *Id.* ¶¶ 36, 41, 116. Thus, between 2023 and 2025, Applied attempted to acquire Comulate on several occasions and alternatively sought an exclusive partnership with a right of first refusal to purchase. *Id.* ¶¶ 113-23. Believing in the value and promise of its own product, Comulate declined to sell or submit to exclusivity, so Applied decided to build its own competing AIAAS product, Applied Recon. *Id.* ¶¶ 123-26. But Recon has been unable to compete on the merits, being called "a really bad product" with "flatlining" marketing and as late as July 2025, Applied continued to seek acquisition of Comulate because it would be "a huge accelerant" for Applied's efforts to enter the market. *Id.* ¶¶ 9, 156-57, 164, 285.

Unable to acquire or outcompete Comulate, Applied chose a third, improper path: forcibly remove Comulate from the market by leveraging Applied's market power over customers in the

insurance AMS market. Beginning in January 2024, Applied imposed escalating "friction" on Comulate through its customers, including discriminatory SDK pricing (and removing Comulate from "Applied's runtime SDK—the cheaper integration—authorization list"); sending baseless cease-and-desist letters; imposing novel, burdensome consulting agreements; slow-rolling technical permissions; and blocking functionality improvements for joint customers. *Id.* ¶¶ 131-54. And in late 2024, Applied caused ACN to breach an auto-renewed sponsorship agreement with Comulate to exclude it from the industry's flagship conference, Applied Net, because Applied had classified Comulate as a competitive threat. *Id.* ¶¶ 139-41.

Yet customers kept turning to Comulate due to its market-leading capabilities. *Id.* ¶ 160. With Recon nearing launch, and *months before Applied claims to have discovered the PBC sandbox account*, Mot. at 4, Applied moved in August 2025 to close the market on two fronts at once. It froze *new* SDK authorizations, blocking Eventual Treasury and SimplePin from entering AIAAS. *Id.* ¶¶ 163, 246. At the same time, it told shared customers that Comulate itself would be cut off, including one customer that was told Comulate "would only be available until the end of the year when something was going to happen." *Id.* ¶¶ 162, 208-09.

Then, as alleged in the FAC (¶¶7, 271-74) and confirmed by expedited discovery, Applied learned that Applied's largest customer had chosen Comulate over Applied's Recon—an outcome Applied had spent two years' work to prevent. Applied formed a [redacted] to undermine Comulate, and its now-President, Graham Blackwell, and CMO, Courtney Raines, agreed [redacted] to [redacted]—thereby imposing a technical block to customers' continued or new use of Comulate. Dkt. 97-6 (Baker Ex. 6); Dkt. 118-1 (Suppl. Ex. 1).

After deciding to clear the AIAAS field for Recon's launch, Applied contrived a public pretextual justification for Comulate's impending expulsion. On November 21, 2025, Applied

filed a trade secret misappropriation lawsuit against Comulate, labeling Comulate's SDK-based integration that Applied facilitated and profited from for years as "fraud" and "theft." *Id.* ¶¶ 201-02. Applied broadcast those accusations to Comulate's customers the same day, threatening them with contractual liability if they continued to use Comulate and giving them a June 30, 2026 deadline by which they needed to abandon Comulate. *Id.*

Applied's intellectual property concerns are cover for Applied's exclusionary campaign. *Id.* ¶¶ 206-15. Applied's own President of Applied Recon, Chase Petrey, declared Comulate the "category winner" that "understands the problem statement at a very different level than others in the space." *Id*. ¶¶ 36, 156. Applied's private equity owner, Hellman & Friedman, admitted to being "very very scared of" Comulate. *Id*. ¶¶ 158. Unable to beat Comulate, Applied committed to its exclusionary aims months before it supposedly discovered the PBC account central to its litigation. *Id.* ¶¶ 206, 208. Even while Applied's lawsuit continues, Applied's Chief Customer Officer, Trevor Bunker, has told customers: "Even if Comulate wins [], we still won't be allowing them to integrate with Epic." *Id.* ¶ 214. And Applied subsequently amended its complaint to remove core trade-secret allegations because Applied had baselessly claimed information it published online as trade secrets, further demonstrating that purported intellectual property concerns were never Applied's true motivation. *Id.* ¶¶ 203-05.

**C. <u>Applied Conspires with Ascend to Implement Comulate's Exclusion</u>**

Applied also coordinated with Ascend—Applied's direct competitor and the only independent AIAAS provider currently permitted to continue interoperating with Epic—to displace Comulate's customers. *Id.* ¶¶ 42, 237, 243, 253, 279.

The day Applied filed suit, Applied executives began calling Comulate's customers to recommend Ascend at pre-negotiated prices—coordination that "Applied would not have been able to provide" without advance planning. FAC ¶ 227. Shortly after, Ascend was contacting

customers directly, telling them "Applied plans to cut off [Comulate's] access in the near future" and offering Ascend as the recommended replacement. *Id.* ¶¶ 229-30. They jointly distributed co-branded marketing materials to Comulate customers that contained false representations overstating Ascend's capabilities and understating the amount of time it takes to transition from Comulate to Ascend. *Id.* ¶¶ 234, 240-44. After the Delaware Court's temporary order protecting customer access, Applied and Ascend misrepresented the decision to Comulate customers as upholding Applied's June 2026 cutoff date. *Id.* ¶¶ 236, 238, 287-91.

Ascend is a tool of Applied's exclusionary scheme. Ascend operates under the same SDK license Applied invokes against Comulate, and has "documented violations of identical restrictions" that Applied has chosen not to enforce. FAC ¶¶ 174-75, 217, 254. Indeed, Applied already told at least one customer that it "will likely cut off SDK for Ascend next because Applied Recon will work [just] as well." *Id.* ¶ 332.

For Applied, temporarily coordinating with Ascend met two objectives. First, when Applied filed its lawsuit, days after its most important customer chose Comulate over Recon, Recon could not fully absorb the AIAAS market on the timeline Applied was administering. Ascend filled the gap as an interim "bridge" while Applied cleared the field of all other independent providers (Comulate, SimplePin, Eventual Treasury). Once Recon is ready, Applied will eliminate Ascend through acquisition at a fraction of Comulate's value or termination of its SDK access. *Id.* ¶¶ 164-65, 223, 267-69, 284-86. And second, the "Limited Referral Agreement," or "LRA," provides antitrust cover for the very arguments Applied presses in its motion.[1] *Id.* ¶¶

[1] As alleged in the FAC, there are numerous reasons to doubt the bona fides of the LRA. It was created one day after Comulate's Delaware litigation filing (a draft of which was shared with Applied several days in advance to attempt settlement), which challenged Applied's anticompetitive and exclusionary practices and specifically raised Ascend. *See Ardent Labs, Inc., d/b/a Comulate v. Applied Systems Inc.*, C.A. No. 2025-1405-BWD (Del. Ch.). The LRA lacks the [redacted] that Applied previously stated were absolutely necessary for any referral agreement. FAC ¶¶ 250-51. And evidencing consciousness of guilt,

247-53.

The LRA lets Applied park Comulate's customers with a controllable placeholder, buy time for Recon to launch, and then either acquire Ascend cheaply or cut Ascend off the same way it cut off Comulate—ending up with the entire market regardless of which path it takes. *Id.* ¶ 254. The LRA is a parking lot.

### D. Applied's Misconduct Harmed Competition and Comulate

Applied's conduct harmed competition in the AIAAS market by forcing customers to abandon the highest-quality, independent developer and constricting supply, thereby pushing Epic-integrated insurance agencies toward inferior, Applied-controlled alternatives. *Id.* ¶¶ 308-11. Comulate's exclusion will result in increased prices for consumers. To illustrate, after jointly forcing consumers away from Comulate, Ascend materially increased its prices—raising per-seat rates by approximately 55%, imposing four-seat minimums, and creating annual spend floors around [redacted] that exceed what many customers had paid for Comulate—for a product substantially worse than Comulate. *Id.* ¶¶ 312-13.

Applied's exclusionary campaign has caused concrete and substantial injury to Comulate. Within four months of Applied escalating its exclusionary campaign, Comulate's revenue [redacted]. *Id.* ¶ 297. Major customers terminated their contracts with Comulate, while others paused, rescaled, or reconsidered their deployments as the June 2026 termination deadline looms. *Id.* ¶ 296. Comulate has not signed any new Epic customer since, and Epic customers [redacted] ahead of the June 30 deadline. *Id.* ¶ 297. Furthermore, Comulate lost substantial enterprise value and suffered reputational injury from Applied's publicly

---

Applied's President has lied to customers that he did not even know of Ascend until recently, despite having personally described Ascend's CEO as a "snake" a year ago and personally excluding him from the 2023 Applied Net conference. *Id.* ¶ 222.

disseminated accusations of theft and reverse engineering. *Id.* ¶¶ 320-21. These are antitrust injuries stemming from Applied's exclusionary conduct, not losses caused by competition on the merits. *Id.* ¶ 322.

**LEGAL STANDARD**

On a motion to dismiss, the court must "accept as true all of the well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiff."[2] *Kubiak v. City of Chi.*, 810 F.3d 476, 480-81 (7th Cir. 2016). Furthermore, the court may not consider allegations outside the complaint, including those offered by the defendant. *See Jacobs v. City of Chi.*, 215 F.3d 758, 765-66 (7th Cir. 2000). To survive dismissal, a complaint need allege "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007).[3] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), "even if it strikes a savvy judge that actual proof of the facts alleged is improbable," *Twombly*, 550 U.S. at 556; *see also id.* ("Asking for plausible grounds . . . simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct].").

**ARGUMENT**

Comulate plausibly alleges that Applied violated federal and state antitrust, unfair competition, and tort laws by excluding its rival from the AIAAS market. In its motion to dismiss,

---

[2] Applied has ignored this well-settled standard by disputing Comulate's allegations and offering its own false narrative. Applied's allegations and inferences (which they draw in their own favor) are disallowed and cannot be weighed against Comulate's. *See Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010).

[3] This standard equally applies to those claims considered by the Court in Comulate's motions for preliminary injunction. *See Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, 930 F.3d 812, 823 (7th Cir. 2019) (plaintiff entitled to inferences in its favor on motion to dismiss, even if preliminary showing does not demonstrate a likelihood of success on the merits).

Applied concedes—by failing to challenge—the following: that the alleged insurance AMS market and the alleged AIAAS market are plausible relevant antitrust markets and that Applied possesses monopoly power in the insurance AMS market. FAC ¶¶ 22, 34, 49-51; *see Mendez v. Perla Dental*, 646 F.3d 420, 423-24 (7th Cir. 2011) (arguments not raised in opening brief are waived).

## I. COMULATE'S ALLEGATIONS MUST BE VIEWED AS A WHOLE

When assessing the anticompetitive effects of Applied's alleged misconduct, Comulate "should be given the full benefit of [its] [allegations] without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962). As the leading antitrust treatise explains, monopolistic conduct must be considered holistically:

> In a monopolization case conduct must always be analyzed as "a whole." A monopolist bent on preserving its dominant position is likely to engage in repeated and varied exclusionary practices. Each one viewed in isolation might be viewed as de minimis or an error in judgment, but the pattern gives increased plausibility to the claim.

Areeda & Hovenkamp, *Antitrust Law* ¶ 310c7. Indeed, "[i]t is the mix of the various ingredients of [a monopolist's] behavior in a monopoly broth that produces the unsavory flavor." *City of Mishawaka v. Am. Elec. Power Co.*, 616 F.2d 976, 986 (7th Cir. 1980).

The Fourth Circuit recently applied these principles to facts that closely parallel those presented here, explaining that the challenged "scheme or conduct must be considered as alleged, not in manufactured subcategories." *Duke Energy*, 111 F.4th at 355-56 (reversing summary judgment where the defendant terminated a competitor's interconnection on pretextual grounds and accompanied the termination with additional foreclosure tactics). Thus, "'aggregation is appropriate' when individual acts are all 'part of the same scheme to perpetuate dominance or drive the plaintiff from the market.'" *Id.* at 355 (quoting Areeda & Hovenkamp, *Antitrust Law*

¶ 310c7); *see also fuboTV inc. v. Walt Disney Co.*, 745 F. Supp. 3d 109, 135-36 (S.D.N.Y. 2024) (rejecting defendants' "piecemeal or siloed approach to antitrust claims," which "ask[ed] the Court to look at only one aspect of the [scheme], one moment of time of [defendants'] dealings with their downstream customers, or one segment of the [relevant] market, in isolation"). Courts "should stay focused on the *effect* [the challenged] conduct has on competition," *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 453 (7th Cir. 2020) (emphasis added), given myopically categorizing challenged conduct into particular types of illustrative anticompetitive conduct "isn't required," *FTC v. Deere & Co.*, 2025 WL 1638474, at *6 (N.D. Ill. June 9, 2025).

Applied's attempt to compartmentalize each component of its monopolistic scheme into separate, isolated categories runs headlong into these principles. Instead, the Court must assess Comulate's allegations as a whole, looking beyond merely "slot[ting] [them] into a recognized antitrust category," because "function beats form in antitrust matters." *Id.*

## II. COMULATE HAS ANTITRUST STANDING TO CHALLENGE APPLIED'S ACTIONS

Contrary to Applied's arguments, Mot. at 8-9, Comulate plausibly pleads both antitrust standing and injury. It is well-established that "competitors in the affected market have antitrust standing." *Viamedia*, 951 F.3d at 482; *accord McGarry & McGarry, LLC v. Bankr. Mgmt. Sols., Inc.*, 937 F.3d 1056, 1065 (7th Cir. 2019). And Comulate alleges that Applied and Ascend compete with Comulate in the AIAAS market and through their actions unlawfully excluded Comulate from that market, harming competition and consumers. *See* FAC ¶¶ 39, 44, 308-17.

For antitrust injury, a plaintiff must plausibly allege its "claimed injuries are of the type the antitrust laws were intended to prevent and reflect the anticompetitive effect of either the violation or of anticompetitive acts made possible by the violation." *Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 716 (7th Cir. 2006) (internal quotation omitted). Applied suggests that

Comulate's injuries fall outside the protection of the antitrust laws because they purportedly stem from the PBC account and Comulate's alleged "fraud." Mot. at 8-9. But even assuming Applied's characterizations were true—they are not and cannot be credited on a motion to dismiss, *see Kubiak*, 810 F.3d at 480-81—"a plaintiff's wrongdoing is not a defense to an antitrust suit." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 946 (N.D. Ill. 2018). Thus, in *Dealer Management Systems*, the court rejected defendants' argument that the plaintiff's alleged violation of cyber-security laws barred its antitrust claims. *See id.* at 946-49. Likewise, the Ninth Circuit has held that the "alleged theft by [plaintiff] of [defendant's] trade secrets is not a bar to [plaintiff's] antitrust action." *Memorex Corp. v. Int'l Bus. Mach. Corp.*, 555 F.2d 1379, 1382 (9th Cir. 1977); *see also id.* ("A wrongful act committed against one who violates the antitrust laws must not become a shield in the violator's hands against operation of the antitrust laws. This is particularly true when the defendant has other remedies available to him.").[4]

Applied also asserts that Comulate's "allegations of market-wide harm" do not suffice, while narrowly focusing on its *own* interpretations of Ascend's alleged price increase. Mot. at 9. That argument fails.[5] Comulate describes in detail how Applied and Ascend excluded Comulate and other competitors from the relevant market, leading to increased prices, reduced output, and decreased quality, FAC ¶¶ 301, 308-11, 316, all "proof of actual detrimental effects [on competition]," *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018) (alteration in original) (internal

[4] Applied, of course, has other remedies available to it, including its pending lawsuit against Comulate.

[5] Applied's attempt to undermine the import of Ascend's substantial price increases despite its poor quality, Mot. at 9, is incorrect: Ascend's pricing behavior is indicative of a competitor, following the unlawful exclusion of rivals that would have constrained prices through competition, raising its prices to supracompetitive levels. FAC ¶¶ 312-13; *see Dale v. Deutsche Telekom AG*, 2023 WL 7220054, at *14 (N.D. Ill. Nov. 2, 2023) (noting "[d]irect evidence" of "actual detrimental effects on competition" include "increased prices[] or decreased quality in the relevant market"). And on a motion to dismiss, Comulate's plausible allegations regarding Ascend's price increases and the reasonable inferences drawn therefrom must be credited, notwithstanding Applied's preferred explanation. *See Kubiak*, 810 F.3d at 480-81.

quotation omitted). Comulate also details how Applied and Ascend's misconduct directly caused injury to Comulate, including lost profits and lost enterprise value. FAC ¶¶ 318-23. These injuries, caused by a monopolist and its co-conspirator anticompetitively forcing a rival out of the market, suffice to plead antitrust injury. *See Viamedia*, 951 F.3d at 482.

## III. COMULATE PLAUSIBLY PLEADS ATTEMPTED MONOPOLIZATION (COUNT I)

Comulate plausibly alleges "[a]n attempted monopolization claim, which involves an unsuccessful or incomplete attempt to achieve a monopoly" and requires "(1) specific intent to monopolize, (2) exclusionary conduct directed to accomplishing this purpose, and (3) a dangerous probability of achieving monopoly power." *United Wis. Grain Producers LLC v. Archer Daniels Midland Co.*, 144 F.4th 976, 980 (7th Cir. 2025).

### A. Applied Has Engaged in Exclusionary Conduct to Monopolize the AIAAS Market

Comulate not only plausibly alleges both an *Aspen Skiing* claim and a tying claim, *see infra* Sections III.A.2-3, Comulate's allegations also state a viable claim of monopolistic conduct more generally, *see infra* Section III.A.1.

#### 1. Applied's Coercive Course of Conduct Is Facially Exclusionary

Comulate plausibly alleges a coordinated course of exclusionary conduct by which Applied used its monopoly power in the insurance AMS market to foreclose customers from continuing to deal with Comulate, all with the purpose and effect of dominating the AIAAS market.[6] FAC ¶¶ 25-27, 49, 81, 131-65, 255-93. Like Applied, dominant technology platforms often rotely invoke the

[6] Contrary to Applied's argument, Mot. at 10 n.9, the Seventh Circuit recognizes that a monopoly leveraging "strategy" violates the antitrust laws when, as here, it amounts to recognized unlawful conduct under Section 2 of the Sherman Act. *Schor v. Abbott Lab'ys*, 457 F.3d 608, 610-11, 613 (7th Cir. 2006); *see Fishman v. Estate of Wirtz*, 807 F.2d 520, 536 (7th Cir. 1986).

refusal-to-deal doctrine to insulate themselves from antitrust claims.[7] But as the case law confirms, monopolists' actions are facially exclusionary when, like here, they involve exerting monopoly power to *force customers not to transact with one's rivals*. *See Lorain J. Co. v. United States*, 342 U.S. 143, 152 (1951) (holding newspaper defendant's "attempt to regain its monopoly . . . by forcing advertisers [*i.e.*, customers] to boycott a competing radio station violated [Section] 2"); *see also CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 150 F.4th 1056, 1072 (9th Cir. 2025) (confirming "[a] monopolist's efforts 'to limit the abilities of third parties to deal with rivals' is . . . not a [unilateral] refusal to deal" (quoting *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013))).

Thus, in *Celonis SE v. SAP SE*, presented with materially similar factual allegations, the court concluded that "efforts to prevent one's customers from dealing with one's rivals d[id] not fall under a refusal-to-deal framework" and supported plausible actual and attempted monopolization claims. 2025 WL 3013158, at *1-2 (N.D. Cal. Oct. 27, 2025).[8] Likewise, in *X Corp., Inc. v. Bright Data Ltd.*, the court concluded that the counter-plaintiff plausibly alleged actual and attempted monopolization claims where the counter-defendant was "forcing its own customers not to deal with [data] scrapers," including the counter-plaintiff. 782 F. Supp. 3d 770, 780 (N.D. Cal. 2025). So too in *United States v. Apple, Inc.*, the court upheld the government's monopolization and attempted monopolization claims where Apple used various forms of anticompetitive conduct, including implementing technological barriers and limitations, to "impos[e] restrictions on developers and smartphone users" to monopolize smart phone markets. 2025 WL 1829127, at *12 (D.N.J. June 30, 2025). And in *United States v. Google LLC*, the court

[7] Erik Hovenkamp, *The Antitrust Duty to Deal in the Age of Big Tech*, 131 Yale L. J. 1483, 1488, 1497, 1499 (2022).

[8] Applied's reliance on a prior opinion in that case, Mot. at 15, is misplaced. The court later clarified that its framing of refusals to deal, relied on by Applied, was "incorrect." *Id.* at *1.

concluded after trial that the defendant violated the antitrust laws by, among other things, engaging in "anticompetitive policies, practices, and technology changes" that were not in its "customers' best interests," rejecting a refusal-to-deal defense. 778 F. Supp. 3d 797, 864-67 (E.D. Va. 2025).

As detailed in the complaint, Applied's anticompetitive conduct includes: (1) increasing the cost and friction of customers using Comulate through discriminatory SDK pricing and related restrictions; (2) making false and misleading statements to customers about Comulate; (3) using Applied-controlled infrastructure and approval channels to disadvantage Comulate while favoring Applied-approved alternatives; and (4) coercing customers to transition away from Comulate by announcing that Comulate's Epic integration will be terminated by June 30, 2026. *Id*. ¶¶ 131-65, 202, 213, 227-30, 255-93. To be sure, Applied's President admitted Applied was "intentionally obstructing Comulate's ability to integrate with Epic" and could—as it plans to—deploy "the nuclear option" of cutting off Comulate's Epic SDK access altogether because it viewed Comulate as a strong, not weak, competitor. *Id*. ¶¶ 149-55, 158. Such actions were taken to eliminate Comulate not by competition on the merits but through technological barriers, commercial friction, and customer coercion, amounting to anticompetitive, exclusionary conduct. *See United States v. Microsoft Corp.*, 253 F.3d 34, 70-71 (D.C. Cir. 2001) (en banc) (per curiam); *McWane, Inc. v. FTC*, 783 F.3d 814, 832-33 (11th Cir. 2015).

### 2. Applied Monopolistically Refused to Deal with Comulate

This case presents one of those "limited circumstances under which a monopolist's refusal to deal with another party [is] illegal anticompetitive conduct." *Viamedia*, 951 F.3d at 454 (internal quotation omitted); *see Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601 (1985) ("right to refuse to deal with other firms" is not "unqualified").[9] Applied's abrupt and

[9] Applied cites multiple reasons why courts safeguard parties' right to select their business partners, Mot. at 10 n. 10, but ignores that, as with many rights, there are limitations. "If a firm has been 'attempting

extreme decision to kick Comulate off Epic and out of the AIAAS market bears all the hallmarks of such unlawful conduct: "[1] a prior course of voluntary conduct, [2] sacrifice of short-term profits, and [3] refusal to sell to rivals on the same terms as other potential buyers." *Viamedia*, 951 F.3d at 463; *see also Tiz, Inc. v. So. Glazer's Wine & Spirits, LLC*, 2024 WL 2785142, at *14 (N.D. Ill. May 30, 2024) ("No factor is always decisive by itself . . . it is enough to allege plausibly that the refusal to deal has some of the key anticompetitive characteristics identified in *Aspen Skiing*." (internal quotation omitted)).

**_a._ Applied Abandoned a Prior Course of Voluntary Conduct**

Applied "elected to make an important change in *a pattern of distribution* that had originated in a competitive market and had persisted for several years." *Viamedia*, 951 F.3d at 456 (emphasis added) (quoting *Aspen Skiing*, 472 U.S. at 603). Applied invited third-party developers to build applications interoperable with Epic through the SDK, marketing the platform's "Open Architecture" and equal treatment of first- and third-party applications. FAC ¶¶ 52-55, 76-80. Comulate accepted that invitation in 2022, and in a mutually beneficial arrangement Applied directly facilitated Comulate developing and interoperating its AIAAS software with Epic through the SDK thereafter, promoting Comulate's capabilities to customers, recognizing Comulate as a "value-add" to Epic, and profiting directly from annual SDK and Data Lake fees that customers paid specifically to enable Comulate. *Id.* ¶¶ 81-83, 88-91, 93-105, 109-12; *see also id.* ¶ 128 (noting mutual success under this arrangement).[10] That Comulate and Applied productively and

to exclude rivals on some basis other than efficiency,' it is fair to characterize its behavior as predatory." *Aspen Skiing*, 472 U.S. at 605 (quoting Robert Bork, *The Antitrust Paradox* 138 (1978)). Applied's suggestion that Comulate's success in the AIAAS market *before* Applied brought down the gates somehow negates a colorable *Aspen Skiing* claim, Mot. at 10-11, therefore is far afield. What matters is whether Applied, "as a purposeful means of monopolizing" the AIAAS market, blocked Comulate by revoking its SDK access and through other actions. *Lorain J.*, 342 U.S. at 155.

[10] Even as Applied began to see Comulate as a potential competitive threat in the AIAAS market, Applied (initially) continued to support Comulate's integration with Epic through the SDK, profiting from

profitably operated through this model of interoperability for years "supports [the] presumption that the joint arrangement was efficient and profitable." *Viamedia*, 951 F.3d at 456. Yet, despite this arrangement, Applied plans to forcibly expel Comulate from Epic in order to corner the AIAAS market for itself. FAC ¶¶ 125, 177-200, 206-12, 216-18; *see Tiz*, 2024 WL 2785142, at *15 (crediting defendants' "departure from a voluntary and established business practice").

Applied's "direct" and "bilateral" argument is not supported by the law or the FAC.[11] Mot. at 12-14. The Sherman Act "prohibits an enterprise from refusing to deal with another entity when this course of action is undertaken in furtherance of monopolization." *L&W/Lindco Prods., Inc. v. Pure Asphalt Co.*, 979 F. Supp. 632, 638 (N.D. Ill. 1997) (citing *Lorain J.*, 342 U.S. at 154). *Aspen Skiing* and *Viamedia* applied that principle to joint-product and platform terminations on facts parallel to those pleaded here: a long-running profitable course of dealing, short-run profit sacrifice, and bottleneck control used to force switching in a complementary market. 472 U.S. at 608-11; 951 F.3d at 462.[12] Thus, in *Tiz*, Judge Maldonado concluded there was a "prior course of voluntary conduct" where the parties' relationship was defined by the plaintiff online alcohol platform placing purchase orders with the defendant alcohol distributors on behalf of its alcohol retailer customers, 2024 WL 2785142, at *1, 3, 14, without any formalized "contract,"

---

the relationship. *Id.* ¶¶ 96, 113, 132 & n.7, 204-05. Applied also says that it has yet to terminate Comulate's IVANS contract. Mot. at 7. But Applied need not take the formal step because it already has engineered IVANS to be effectively inoperable for Comulate's product. FAC ¶¶167-69.

[11] Applied's assertion that it "never got a dime from Comulate," Mot. at 14, is inconsistent with the FAC. Comulate paid Applied directly under the IVANS contract. FAC ¶ 63. That is in addition to the fees that customers pay Applied specifically to enable Comulate. *See infra* n.14. And the notion that Comulate refused to deal or was somehow unreasonable, Mot. at 10-11, is nonsensical given the FAC alleges that Applied withdrew from each engagement it cites. *See, e.g.*, FAC ¶¶ 117-21, 47. In addition, Applied breached the POC agreement and refused to engage further on any remotely reasonable terms. *See id.* ¶¶ 106-08.

[12] Contrary to Applied's suggestion, Mot. at 2-4, 13-14, Applied and Comulate's "failed negotiations" suggest that their arrangement—under which Comulate integrated with Epic and provided services to customers with Applied's consent and assistance, all without a formal agreement—was a mutually acceptable, economically efficient outcome. *See Viamedia*, 951 F.3d at 456.

"partnership," or "commercial relationship" like Applied demands, Mot. at 14.

Applied relies on *OJ Commerce, LLC v. KidKraft, Inc.*, 34 F.4th 1232 (11th Cir. 2022), to argue that an *Aspen Skiing* claim requires a "joint offering by competitors." Mot. at 13. But that argument is contrary to Seventh Circuit case law recognizing that a voluntary course of conduct need not be between two horizontal competitors. *See Viamedia*, 951 F.3d at 442-45, 459 (*Aspen Skiing* claim plausibly alleged where relevant relationship was vertical, between "interconnects" and "ad rep services"); *Tiz*, 2024 WL 2785142, at *4 (also involving vertical relationship).[13]

***b.*** **Applied Is Sacrificing Short-Term Profits**

Applied is forgoing revenues, derived from annually recurring SDK and Data Lake fees earned from customers, by forcing more than 60 customers to migrate away from Comulate.[14] FAC ¶¶ 109 & n.6, 134-38, 148, 172, 302-05, 319. These allegations are confirmed by Dave Stephens, Applied's VP of CX for Recon, who on a public March 25, 2026 customer webinar stated that customers switching to Recon "were able to get rid of the SDK when they signed up for Recon" and ended up "paying less just for [Recon] than the SDK alone." This is Applied's own VP confirming the sacrificed revenue stream on a public webinar.[15]

Applied's profit sacrifice extends beyond forfeited migration revenue to refused new revenue. When Alera Group sought to purchase a standard Data Lake subscription to support its

---

[13] The other cases Applied relies on, Mot. at 13-15, are also distinguishable. In *Reapers Hockey Association, Inc. v. Amateur Hockey Association Illinois, Inc.*, the plaintiff hockey team sued for not being permitted to join the defendant amateur hockey league, thus there was no prior voluntary course of conduct. 412 F. Supp. 3d 941, 947-48 (N.D. Ill. 2019). And in *New York v. Facebook, Inc.*, the court expressly recognized that conduct mirroring the facts alleged here—"Facebook's alleged scheme of serially revoking API access from competitor apps" to obstruct their development—"could form the basis of a plausible refusal-to-deal claim under *Aspen Skiing*." 549 F. Supp. 3d 6, 19-20, 31 (D.D.C. 2021).

[14] Given Applied's infrastructural revenues from Comulate customers ranges from [redacted] to [redacted] annually per customer, Applied is forgoing hundreds of thousands, if not millions, of dollars annually in a short-term play to monopolize the AIAAS market. FAC ¶ 304.

[15] While this statement was made after the FAC was filed, it confirms the well-pled allegations. To the extent the Court has any doubt as to the plausibility of the FAC allegations regarding short-term profit sacrifice, Comulate requests leave to amend to include these additional facts.

use of Comulate, Applied refused the sale upon learning the subscription would benefit Comulate, declining to deal with a willing buyer on the same terms offered to its other customers. FAC ¶ 305.

That otherwise economically irrational conduct confirms Applied's exclusionary campaign is designed to accept short-term losses in exchange for establishing dominance over the AIAAS market once Comulate is eliminated. *Id.* ¶¶ 9, 112, 254, 306-07; *see Aspen Skiing*, 472 U.S. at 610-11 (such evidence "supports an inference that [defendant] was not motivated by efficiency concerns and that it was willing to sacrifice short-run benefits and consumer goodwill in exchange for a perceived long-run impact on its smaller rival").[16]

Applied argues that a refusal to deal is anticompetitive only if it is "irrational but for its anticompetitive effect." Mot. at 15 (quoting *Novell*, 731 F.3d at 1075). But the Seventh Circuit specifically *rejected* such a rule, especially at the pleading stage, as "potential[ly] overweighting" one of multiple *Aspen Skiing* factors. *Viamedia*, 951 F.3d at 460-63. Regardless, Applied's exclusion of Comulate *is* irrational but for its anticompetitive effect. Applied losing revenue and reducing the utility of Epic makes economic sense only in the service of Applied's goal to drive Comulate out of business, enabling Applied to dominate yet another market.

Applied also argues that it continues to collect SDK and Data Lake fees from customers that have been forced to abandon Comulate. Mot. at 15-16. Comulate's allegations refute Applied's self-serving and legally improper factual contention, explaining that many customers purchase SDK and Data Lake access "solely to enable Comulate." FAC ¶¶ 109 & n.6, 302-03. Furthermore, Applied Recon runs natively inside Epic and "does not require an SDK license" or a Data Lake subscription to function. *Id.* ¶¶ 57, 168, 176. Therefore, for those customers that already

[16] To be sure, Comulate's customers have recognized that Applied's actions are a monopolistic ploy. FAC ¶¶ 10, 277, 294-95, 299-300, 313-15; *see Tiz*, 2024 WL 2785142, at *15 (crediting retailers "express[ing] dissatisfaction with Defendants' conduct").

have migrated to Recon (and for those that soon will), Applied is giving up the infrastructural fees that it earned from Comulate's third-party integration. *Id.* ¶ 304. These allegations, confirmed by Applied's own executive on a public webinar, *see infra* note 27, "do[] not require a 'speculative leap' to presume" that Applied has lost some revenue by disabling Comulate's integration with Epic and forgoing infrastructural fees. *Tiz*, 2024 WL 2785142, at *14 (even "marginal losses of short-term profits" sufficed for *Aspen Skiing* claim).

Finally, Applied argues that forsaking short-term profits was a "rational business decision," Mot. at 15, but that amounts to an improper argument that the challenged refusal to deal was procompetitive. *See Viamedia*, 951 F.3d at 460 (holding "balancing anticompetitive effects against hypothesized justifications depends on evidence and is not amenable to resolution on the pleadings"); *Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 676 (D.C. Cir. 2005) (reversing dismissal where court improperly weighed "competing explanations" of the challenged conduct).[17]

#### *c.* Applied Targeted Comulate and Other AIAAS Developers for Prejudicial Treatment

Ignored by Applied's motion, Applied opportunistically discriminated against Comulate and other competitors that it seeks to drive from the AIAAS market but continues to promote other third-party developers' use of SDK integrations in other complementary markets that Applied does not currently seek to dominate. FAC ¶¶ 53, 143, 175, 181, 193, 245-46, 293, 306-07; *see Aspen Skiing*, 472 U.S. at 603-04 & n.30 (crediting fact that defendant continued dealing with competitors in other "competitive" markets supported conclusion that its "decision to terminate [that course of dealing in a less competitive market] was thus a decision by a monopolist to make an important change in the character of the market"); *Viamedia*, 951 F.3d at 459 (crediting that "[d]efendant

[17] In the single case Applied cites, Mot. at 15, the Tenth Circuit affirmed *summary judgment* where the record showed the defendant refused to deal "to avoid an *unprofitable* relationship." *Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr. of Durango*, 582 F.3d 1216, 1225 (10th Cir. 2009).

continued to deal with competitors in other competitive markets"). That Applied claims to continue facilitating hundreds of other applications integrating with Epic through the SDK, all while cutting off SDK access for every competing AIAAS provider other than Ascend, confirms Applied's discriminatory behavior toward Comulate was motivated by predatory—not efficiency—concerns.[18] *See Aspen Skiing*, 472 U.S. at 610-11.

Applied's PBC sandbox defense, Mot. at 11-12, is legally irrelevant and factually erroneous. On the law, the Seventh Circuit has expressly held that any balancing of the anticompetitive effects and purported procompetitive justifications of a refusal to deal is inappropriate at the pleading stage. *See Viamedia*, 951 F.3d at 462 ("[T]he calculation of procompetitive benefits net of anticompetitive harms does not easily lend itself to a *pleading* standard."). Even the *Xerox* decision Applied leads with makes the point: "[i]ntellectual property rights do not confer a privilege to violate the antitrust laws." *In re Indep. Serv. Orgs. Antitrust Litig.*, 203 F.3d 1322, 1325 (Fed. Cir. 2000).[19]

On the facts, Applied decided to exclude Comulate from Epic *months before* it discovered the PBC account (and years after it began systematically disfavoring Comulate to raise its costs by

[18] Furthermore, Applied's campaign to coerce customers off Comulate by the end of June 2026, *see supra* Section III.A.1, further confirms Applied's monopolistic aims. *See Viamedia*, 951 F.3d at 459 (crediting defendant "[d]iscourag[ing] customers from doing business with its smaller rival"); *Tiz*, 2024 WL 2785142, at *15 (same).

[19] The other cases Applied relies on are not to the contrary. Mot. at 11 & n.11. Three of four affirmed *summary judgment* to a defendant that refused to sell or license patented or copyrighted material, asserting valid intellectual property rights. *See SOLIDFX, LLC v. Jeppesen Sanderson, Inc.*, 841 F.3d 827, 831, 841 (10th Cir. 2016); *Indep. Serv. Orgs.*, 203 F.3d at 1324, 1327-28; *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1187 (1st Cir. 1994). Those cases also are factually distinguishable given that Comulate challenges Applied's exclusion of Comulate and other AIAAS competitors from Epic, not any refusal by Epic to license or make available its trade secrets. *CinemaCloudWorks, Inc. v. Comscore, Inc.* also is distinguishable, as the court there dismissed an *Aspen Skiing*-style claim because the plaintiff "d[id] not allege that [defendant] voluntarily dealt with [plaintiff] for a period only to terminate without justification." 2026 WL 84020, at *6 (C.D. Cal. Jan. 6, 2026). Conversely, Comulate alleges that Applied invited and supported Comulate in providing its AIAAS services to Epic customers through the SDK integration for several years, only to terminate that relationship when Applied was on the cusp of launching its competing product.

disrupting SDK and Data Lake access and ACN sponsorship).[20] FAC ¶¶ 130-159, 162, 206-08. Furthermore, after it commenced its trade secret litigation against Comulate, Applied told customers they must terminate their relationship with Comulate regardless of whether Comulate prevailed in litigation because Applied "still wo[uld]n't be allowing [Comulate] to integrate with Epic." *Id.* ¶ 214; *see id.* ¶¶ 213, 227-38. Such actions confirm that Comulate's removal from Epic is not the result of—nor reasonably tailored to—any alleged fraudulent or improper conduct by Comulate but rather is a means to Applied's monopolistic ends.[21]

### 3. Applied Has Tied Its Control Over Insurance AMS to the AIAAS Market

Applied does not contest any of the four elements for a *per se* tying claim, *see Tiz*, 2024 WL 2785142, at *22, instead contending that Comulate has not alleged a tying arrangement that "forces" customers to purchase a tied product, *i.e.*, an AIAAS product. Mot. at 17-18. But that argument misreads the law and overlooks allegations detailing how Applied has coerced customers

[20] As evidenced by Applied's expedited discovery, after Applied's largest customer, [redacted], told Applied on October 17, 2025, that it would be using Comulate, Applied formed a [redacted] to undermine Comulate, and its now-President, Graham Blackwell, and CMO, Courtney Raines, agreed [redacted] to [redacted]—thereby imposing a technical block to customers' continued or new use of Comulate. Dkt. 97-6 (Baker Ex. 6); Dkt. 118-1 (Suppl. Ex. 1).

[21] Contrary to Applied's suggestion, Mot. at 16, the Seventh Circuit has expressly recognized that the "essential facilities" doctrine has been "endorsed" and never "rejected" by the Supreme Court. *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1413 (7th Cir. 1995); *see MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1132-33 (7th Cir. 1983) (enumerating four elements). Applied's sole argument is that Epic is not an "essential" platform because there exists at least one other insurance AMS platform, Mot. at 16-17, but Applied ignores the law it cites. "To be essential, a facility *need not be indispensable*; it is sufficient if duplication of the facility would be economically infeasible and if denial of its use *inflicts a severe handicap on potential market entrants*." *Fishman*, 807 F.2d at 539 (emphases added) (internal quotation omitted). Applied does not dispute that an insurance AMS platform is not feasibly "duplicat[ed]," and Epic—which serves 81% of the insurance AMS market—is the principal, indispensable means by which an AIAAS provider may serve most enterprise insurance agencies. FAC ¶¶ 47, 49. Such facts plausibly suggest that Epic is an essential facility. *See Fishman*, 807 F.2d at 540 (upholding the district court's factual finding that the Chicago Stadium was an essential facility, even though there existed ostensible alternatives for professional basketball exhibition); *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1110-11 (D. Colo. 2004) (denying summary judgment where defendant controlled four of six rock radio stations, thereby controlling only 73% of the "rock radio advertising and promotional support market").

to purchase AIAAS products against their preference, foreclosing competition on the merits.

"In a tying agreement, a seller conditions the sale of a product or service on the buyer's buying another product or service from or (as in this case) *by direction of* the seller." *Sheridan v. Marathon Petroleum Co. LLC*, 530 F.3d 590, 592 (7th Cir. 2008) (emphasis added). Subject to an unlawful tie, "[t]he [buyer] will purchase the tied product 'not because the party imposing the tying requirement has a better product or a lower price' but because the seller has 'power or leverage' in the market for the tying product." *Viamedia*, 951 F.3d at 468 (quoting *N. Pacific Ry. Co. v. United States*, 356 U.S. 1, 5-6 (1958)). Consequently, "[t]he principal evils of tying arrangements are the foreclosure of competitors in the tied product market and the denial to buyers of the advantages of marketplace shopping." *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 724 (7th Cir. 1979).

"Unlawful ties need not be explicit contractual provisions preventing buyers from purchasing the tied product from third parties." *Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 272 (6th Cir. 2015); *see, e.g.*, *Marion Healthcare, LLC v. S. Illinois Healthcare*, 2018 WL 1318054, at *6 (S.D. Ill. Mar. 14, 2018) ("non-explicit" tying); *Teradata Corp. v. SAP SE*, 2018 WL 6528009, at *14 (N.D. Cal. Dec. 12, 2018) ("de facto" tying). Rather, what matters is whether, "[a]s a practical matter," Applied has used its control over Epic and the SDK integration to deprive customers of any choice other than using Applied or Ascend, the only two remaining AIAAS providers allowed to compete on an artificially narrowed playing field. *Viamedia*, 951 F.3d at 470.

Applied has done exactly that. FAC ¶¶ 149-55, 227-38, 255-300 (Applied created "friction" for Comulate in order "to win" customers, including by cutting off Comulate's Epic SDK access and coercing customers to switch); *id.* ¶ 162, 208 (Applied previewed Comulate

"would only be available" until late 2025); *see Viamedia*, 951 F.3d at 470 (crediting evidence that defendant "ended its relationship with [plaintiff] specifically to obtain" customers' business). Because customers cannot move away from Epic due to prohibitive switching costs, locking 81% of enterprise insurance AMS customers onto Epic, FAC ¶¶ 27, 49, 81, 295, and because customers may not use Comulate, Eventual Treasury, or SimplePin, *id.* ¶ 246, customers must change their AIAAS provider before Comulate becomes unavailable in Q2 2026 to the only two remaining options: Recon or Ascend, *id.* ¶¶ 278-81, 297-99.[22]

Applied argues that customers nevertheless have a "choice" between Ascend and Recon. Mot. at 18. But because of the control Applied wields over Ascend—including SDK License violations Applied has chosen not to enforce and the threat to revoke Ascend's Epic SDK integration whenever Applied chooses—Ascend is just a temporary stand-in for Applied. FAC ¶¶ 174, 217, 222-25, 250-51. In other words, Ascend is merely a "transitional vessel," Applied having foreshadowed to at least one customer that Ascend's SDK access will be cut off next. *Id.* ¶¶ 223, 332. In any event, even on Applied's own framing, the asserted choice between Recon and Ascend does not defeat the tie. Tying requires only that the seller condition the sale of the tying product on the buyer's purchase of the tied product "from or . . . by direction of the seller." *Sheridan*, 530 F.3d at 592. By restricting AIAAS access to two Applied-designated providers—and reserving the putative unilateral right to revoke either at will, FAC ¶¶ 222-25, 250-51—Applied effects the tie just the same. The illusory choice between Recon and Ascend does not

[22] To be sure, numerous customers subjected to Applied's coercive conduct recognize they are being forced to migrate away from Comulate to Recon or Ascend. *Id.* ¶ 294 (recounting how customers "can't cut off Applied like [they] can cut off Comulate" so are transitioning away); *id.* ¶ 299 (detailing multiple former Comulate customers who have transitioned to Recon or Ascend because of Applied's coercion, expressing that "Applied's conduct and their threats to shut down Comulate's access to the SDK is the only factor that is affecting our decision" to depart from Comulate); *see Viamedia*, 951 F.3d at 470 (crediting customer statements that independently recognized the effect of defendant's coercive conduct).

change that Applied has functionally "conditioned" customers' access to Epic on using the AIAAS of Applied's choice. *Viamedia*, 951 F.3d at 470; *Google*, 778 F. Supp. 3d at 864.

### B. Applied's Specific Intent to Monopolize the AIAAS Market Is Inferable From Its Exclusionary Conduct

"[S]pecific intent to monopolize implies an intent to control prices or destroy competition unreasonably," *L&W/Lindco Prods.*, 979 F. Supp. at 639, and "may be inferred from 'conduct that is in itself an independent violation of the antitrust laws or that has no legitimate business justification other than to destroy or damage competition.'" *In re Surescripts Antitrust Litig.*, 608 F. Supp. 3d 629, 648-49 (N.D. Ill. 2022) (quoting *Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 541 (7th Cir. 1986)). "Courts are wary to dismiss antitrust cases on intent solely on the pleadings because evidence of intent is often in the control of the defendants." *Wagner v. Magellan Health Servs., Inc.*, 121 F. Supp. 2d 673, 681 (N.D. Ill. 2000).

Applied anticompetitively forced Comulate out of the AIAAS market by cutting off Comulate's Epic SDK integration, forcing customers to switch to one of only two remaining AIAAS providers (both under Applied's control) and tying Applied's control over the insurance AMS market to establish a new dominance over the AIAAS market. *See supra* Section I.A.1. Although Applied proffers that these actions are justified because of Comulate's so-called "fraud scheme," Mot. at 19, that contrivance is belied by uncontested statements that Applied hatched its exclusionary plans months before discovering any purported impropriety by Comulate, FAC ¶¶ 162, 208; *see In re Surescripts*, 608 F. Supp. 3d at 649 (specific intent plausibly alleged where defendant's "only purpose" for engaging in the challenged conduct "was to eliminate competition"); *L&W/Lindco Prods.*, 979 F. Supp. at 639 (similar). Notably, Applied's President, Graham Blackwell, on May 29, 2025, conceded when talking to Comulate's CEO that Comulate was a "good product" doing "cool stuff" and that other third-party products were not truly

competitive;[23] admitted "Applied was intentionally obstructing Comulate's ability to integrate with Epic" because the "message" was coming "from the top [that] we want to win," so why "make it easier for everyone else?"; and "preview[ed] the nuclear option," put into play months later, "to remove Comulate from the field: cutting off Comulate's access to the Epic SDK." FAC ¶¶ 149-55; *see id.* ¶ 158 (Applied and Hellman & Friedman, Applied's private equity owner, were "very very scared" of Comulate's success); *id.* ¶ 210 (Applied's CEO, Taylor Rhodes, "specifically call[ed] [Comulate] out" in meetings as a target to "move faster against"); *G. Heileman Brewing Co. v. Anheuser-Busch Inc.*, 676 F. Supp. 1436, 1473 (E.D. Wis. 1987) (noting "[s]pecific intent can be proven by direct evidence of statements made by responsible officers or employees of the defendant").[24]

Furthermore, Applied "has excluded more than a dozen firms other than Comulate from competitive markets using the same infrastructural controls and tactics it has deployed against Comulate." FAC ¶ 198. ePayPolicy is the closest precedent. Applied tried to acquire ePayPolicy; when ePayPolicy refused, Applied removed it from ACN and Applied Net, told customers ePayPolicy left them "at risk of being hacked," and telegraphed SDK decay: "ePayPolicy will continue to work, but not sure how long until that SDK becomes a moot point." *Id.* ¶¶ 180-82. Applied never formally terminated ePayPolicy's SDK access because its other actions were

[23] In fact, Applied previously made several overtures to acquire or exclusively partner with Comulate on untenable terms. FAC ¶¶ 115-19. After those attempts failed, including because Applied was unwilling to make a reasonable offer or was dilatory, *id.* ¶¶ 120, 147, Applied determined the easiest way to achieve Comulate's success was to—unlawfully—force Comulate out of the AIAAS market and drive customers to its inferior, self-made product, *id.* ¶¶ 255-56.

[24] Applied argues that its "post-termination conduct negates any inference of specific intent," pointing to its cooperation with Ascend (its co-conspirator) and other third-party developers to continue providing services to customers through the Epic SDK. Mot. at 19. But specific intent does not require foreclosing every third party in every market; it requires plausible allegations that Applied targeted the independent rivals in the AIAAS market Recon is entering. The complaint alleges exactly that. Despite its years-long relationship with Comulate—and relationships with other third-party developers that are not the targets for exclusion—Applied has weaponized its SDK integrations against Comulate, Eventual Treasury, and SimplePin to dominate the market in which they competed. FAC ¶¶ 181, 193, 282.

sufficient to degrade ePayPolicy's ability to compete so that "Applied Pay launched into an empty field." *Id.* ¶ 333. Applied's current campaign runs the same sequence, evincing Applied's monopolistic intent. *See E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 453 (4th Cir. 2011) (specific intent plausible where plaintiff "alleged various actions undertaken by [defendant] over time to protect its dominant market position"); *Continental Ore*, 370 U.S. at 709-10 & n.15 (defendant's prior pattern of conduct is relevant to "ascertain the monopolistic intent").

### C. Applied Has a Dangerous Probability of Achieving Monopoly Power in the AIAAS Market

Comulate plausibly alleges Applied possesses a dangerous probability of attaining monopoly power—"the power *to exclude competition* or to control price," *Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037, 1069 (N.D. Ill. 2016) (emphasis added) (quoting *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1414 (7th Cir. 1989))—in the AIAAS market. The inquiry is measured by the totality of the defendant's economic power, barriers to entry into the relevant market, and the trajectory of the challenged conduct, not a simplistic pre-campaign "snapshot" of the defendant's market share before the challenged conduct began. *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993) (noting the need "to consider the relevant market and the defendant's ability to lessen or destroy competition in that market"); *L&W/Lindco Prods.*, 979 F. Supp. at 637 ("[M]arket share is at best an indicator of market power." (internal quotation omitted)); *Thompson's Gas & Elec. Serv., Inc. v. BP Am. Inc.*, 691 F. Supp. 2d 860, 868 (N.D. Ill. 2010) ("The ultimate inquiry . . . remains whether the defendant has or reasonably might come close to having the ability to control total market output and prices[.]" (internal quotation omitted)); *see also Walter Kidde Portable Equip., Inc. v. Univ. Sec. Instruments, Inc.*, 669 F. Supp. 2d 895, 901-02 (N.D. Ill. 2009) (noting dangerous probability is

"best addressed on a motion for summary judgment or at trial").[25]

*First*, Applied controls 81-92% of the enterprise insurance AMS market, FAC ¶ 49, and exercised its Epic SDK control to foreclose every independent AIAAS rival other than Ascend from competing in the AIAAS market, *id.* ¶¶181, 193. Applied's control over that bottleneck—and over IVANS data and customer outreach via ACN—confers power on Applied to exclude competition. *See Ploss*, 197 F. Supp. 3d at 1069; *L&W/Lindco Prods.*, 979 F. Supp. at 637 (noting that market power is the "power over price" or "the ability to cut back the market's total output and so raise prices" (internal quotation omitted)).[26]

*Second*, the displacement of customers to Recon already is underway. Within the first four months after Applied filed suit, Comulate lost significant revenue, signed no new Epic customers,

[25] Assessing dangerous probability of success "requires an appraisal of the alleged offender's ability to achieve the forbidden result, his intent, and the nature of his overt actions. In an antitrust context we must consider the firm's capacity to commit the offense, the scope of its objective, and the character of its conduct. The ultimate concern is the firm's actual or threatened impact on competition in the relevant market." *Kearney & Trecker Corp. v. Giddings & Lewis, Inc.*, 452 F.2d 579, 598 (7th Cir. 1971) (J. Stevens).

[26] None of the cases Applied relies on suggests otherwise. In *Pixels.com LLC v. Instagram, LLC*, the court concluded there were no plausible allegations of "dangerous probability" because Instagram indisputably did not compete in a proposed "photo-printing market" and furthermore could not, by enforcing a trademark, dominate that market. 2015 WL 10943591, at *1 (N.D. Cal. Dec. 21, 2015). In contrast, Applied unequivocally competes in the AIAAS market, debuting Recon in 2025 and standing to inherit a large, captive customer base once Comulate is driven from Epic. FAC ¶¶ 129, 164. In *American Academic Suppliers, Inc. v. Beckley-Cardy, Inc.*, the Seventh Circuit affirmed *summary judgment* because there was "a horde of existing competitors" and "new entry [wa]s exceedingly easy," greatly diminishing the defendant's ability to dominate the market. 922 F.2d 1317, 1320 (7th Cir. 1991). Here, customers may choose between only Recon and Ascend, both of which are controlled by Applied and will not face competition from new entrants, given that Applied has cut off any new Epic SDK integrations. FAC ¶¶ 206, 308. In contrast to *Honeywell International Inc. v. Lone Star Aerospace, Inc.*, where the court concluded there were no "factual allegations" whatsoever explaining the defendant's "share of the market" or "how [it] interact[ed] with competitors to demonstrate the probability of attaining monopoly power," 2024 WL 4093183, at *3 (N.D. Tex. Sep. 4, 2024), Comulate details how Applied will inexorably gobble up locked-in customers once it excludes Comulate from the AIAAS market. FAC ¶¶ 294-96. And whereas in *Bayer Schering Pharma AG v. Sandoz, Inc.*, the plaintiff did not explain why the fact that the relevant market was "dominated by a small number of large producers" suggested a dangerous probability of obtaining monopoly power, 813 F. Supp. 2d 569, 580 (S.D.N.Y. 2011), Comulate details why the constrained market resulting from Applied's monopolistic scheme is imminently susceptible to Applied's unfettered control. FAC ¶¶ 216-54.

and lost numerous customers that terminated their contracts (in addition to the remainder of Comulate's Epic customers, all of which did not commit to remaining on Comulate after June 30, 2026). FAC ¶¶ 296-97. Recon, meanwhile, has signed up over 200 customers, more than 100 of which are live, within two months of preliminary launch despite Recon being an inferior product.[27] By June 30, 2026, Recon will be one of only two options left to Epic customers and, as already observed, will inherit most of Comulate's customers. *See L&W/Lindco Prods.*, 979 F. Supp. at 637 (crediting that defendant stood to absorb plaintiff's market share, that there otherwise were only a few competitors in the market, and that the number of competitors "ha[d] been declining," to conclude that plaintiff adequately pleaded dangerous probability, despite defendant having a small current market share).

*Third*, contrary to Applied's suggestion, Mot. at 20, Ascend's presence in the market does not defeat Applied's dangerous probability of achieving monopoly power. Ascend remains in the market only so long as Applied allows, FAC ¶ 332 (noting Applied "will likely cut off SDK for Ascend next"), and Applied regardless need not be the *only* firm left standing to have monopoly power, *see MCI Commc'ns*, 708 F.2d at 1107.

*Fourth*, Applied has run this playbook before and successfully achieved monopoly power by doing so—including against ePayPolicy in the insurance payment processing market. FAC ¶¶ 178-83. Applied has implemented these strategies and more against Comulate and other AIAAS providers, and its inevitable dominance over the AIAAS market is just as certain.

[27] During publicly accessible webinars in March 2026, Applied's President and Vice President of Growth separately told attendees Recon has approximately 150 to 200 live customers. To the extent the Court has any doubt as to whether Comulate has plausibly pled this element, it should be given leave to amend to include these additional facts.

## IV. COMULATE PLAUSIBLY PLEADS A CONSPIRACY TO MONOPOLIZE (COUNT II)

"For conspiracy to monopolize the plaintiff must prove 1) the existence of a combination or conspiracy, 2) overt acts in furtherance of the conspiracy, 3) an effect upon a substantial amount of interstate commerce and 4) the existence of specific intent to monopolize." *In re Surescripts*, 608 F. Supp. 3d at 648). Applied effectively challenges only the first and fourth elements, Mot. at 21, 24, but Comulate plausibly alleges both.

### A. Applied and Ascend Conspired to Eliminate Comulate from the AIAAS Market

Comulate pled sufficient facts establishing an agreement between Applied and Ascend to exclude all other competitors from the AIAAS market—the challenged restraint. FAC ¶ 347. As an initial matter, Applied and Ascend's coordinated campaign to migrate customers off Comulate by no later than Q2 2026 and their "Limited Referral Agreement" ("LRA") are direct evidence of that unlawful agreement. *See In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628-29 (7th Cir. 2010). On the same day Applied sued Comulate for alleged trade secret misappropriation (and after Applied decided to shut off Comulate's Epic integration), Applied and Ascend began contacting Comulate's customers to convey that Comulate's access to Epic would be "cut off" in the "near future" (by Applied terminating Comulate's SDK access regardless of the outcome of Applied's lawsuit), that customers therefore would need to switch AIAAS products, that Ascend and Recon were the only viable "replacement[s],"[28] and that Ascend and Applied had already worked out pricing terms for the transition. FAC ¶¶ 162, 208, 227-30, 232, 245-46, 292. That "hard end of June deadline" engendered a sense of urgency in customers to quickly make the shift to

[28] Although Applied suggested to some customers that they could switch to offshore, manual data entry services like ResourcePro and Patra, FAC ¶ 237, those are not viable options for insurance agencies seeking automated accounting solutions, *id.* ¶¶ 42, 279.

avoid potentially catastrophic business disruption.[29] *Id.* ¶¶ 233, 237-38, 280, 294-300. And on December 4, 2025, weeks after beginning their joint conduct, Applied and Ascend reduced to writing, at least in part, their agreement to direct [redacted] away from Comulate due to the looming "[redacted]," *i.e.*, Comulate's expulsion from Epic. *Id.* ¶¶ 247-49; *see* Dkt. 105-1 at 1. Thus, Applied and Ascend's agreement to coerce customers to leave Comulate is not speculative, Mot. at 22; it is directly confirmed by customers' statements, Applied and Ascend's actions, and the LRA itself.[30] *See Dealer Mgmt. Sys.*, 313 F. Supp. 3d at 950-51.

Applied argues that the challenged agreement nevertheless is "implausible" by improperly drawing inferences in its own favor from Comulate's allegations. Mot. at 22. Not only is doing so impermissible, *Kubiak*, 810 F.3d at 480-81, but Applied's conclusions are themselves implausible. Applied first tries reframing the text from Ascend's CEO within an hour of Applied's filing of its lawsuit against Comulate, suggesting it undermines any supposed conspiracy to drive Comulate from the market. Mot. at 22. But the inference that Wynn's text was a disingenuous attempt to obfuscate Ascend's coordination with Applied, especially given that both companies began a coordinated outreach to Comulate's customers with pre-prepared financial terms and marketing materials that same day, FAC ¶¶ 227-30, is highly plausible. Applied also suggests that Applied and Ascend's sudden about-face and close collaboration after years of animosity is immaterial. Mot. at 22. But given Ascend's incentives to cooperate with Applied in order to survive, especially given its experience being blocked by Applied from the premium payments market, FAC

[29] That deadline corresponds with Recon's full-scale launch. *Id.* ¶¶ 214, 218.

[30] The nature of Applied and Ascend's joint referral campaign, despite their historic head-to-head competition in premium payments and premium financing, and Ascend's incentives to cooperate with Applied's machinations, given its founders' desire to exit the company and Applied's complete control over Ascend's survival, FAC ¶¶ 217-25, are strong circumstantial evidence supporting the existence of such an agreement. *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 654-55 (7th Cir. 2002).

¶¶ 222-25, that about-face is suggestive of Ascend's willingness to acquiesce to Applied's conspiratorial demands. *See In re Turkey Antitrust Litig.*, 642 F. Supp. 3d 711, 726 (N.D. Ill. 2022) (noting "[m]otive to conspire" may support inference of conspiracy); *Dealer Mgmt. Sys.*, 313 F. Supp. 3d at 952-54 (rejecting defendants' "exculpatory explanations" and crediting their motive to conspire). Likewise, Applied bought time to further develop Recon so it has the technical capacity to absorb the entire AIAAS market, while giving it antitrust cover for the very arguments it now makes here. *See* FAC ¶¶ 217, 247-54; *see supra* Factual Background Section C.

### B. Comulate Plausibly Pleads Specific Intent for Applied to Monopolize the AIAAS Market

Contrary to Applied's suggestion, Mot. at 24, Comulate plausibly alleges Ascend has the requisite specific intent to support a conspiracy to monopolize claim. When Ascend signed the LRA, it was losing 80-90% of head-to-head enterprise opportunities to Comulate. FAC ¶ 221. Ascend's owners were pursuing a profitable exit, having "engaged in acquisition conversations" with Applied earlier in 2025 and parallel discussions with another major payments company, *id.* ¶¶ 224-25; Ascend's continued Epic access depended on Applied's SDK permissions, *id.* ¶¶ 217, 246, 254; and the LRA delivered Ascend a designated set of approximately sixty Comulate customers, from which Ascend extracted a 55% per-seat price increase and quadrupled minimum commitments, *id.* ¶¶ 248, 312-13. This is motive.

Comulate therefore alleges that Ascend is Applied's "potential-competitor-turned-partner," benefiting from the exclusion of all other competitors from the AIAAS market, including by positioning itself for potential acquisition by Applied. FAC ¶¶ 225, 250-51, 254; *In re Surescripts*, 608 F. Supp. 3d at 649-51 (co-conspirator had specific intent for defendant to monopolize the relevant market where non-compete agreement was premised on the logic, applicable here, that "it is better to divide a bigger pie of monopoly profits by agreement than to

compete to win a larger share of a smaller pie of competitive profits"). Moreover, Ascend's willing participation in Applied's scheme to coerce customers to transition away from Comulate demonstrates that Ascend "shared [Applied's] specific intent to . . . unreasonably exclude [Comulate]," establishing a specific intent to monopolize. *SuperTurf, Inc. v. Monsanto Co.*, 660 F.2d 1275, 1283 (8th Cir. 1981); *see also Wagner*, 121 F. Supp. 2d at 681 (co-conspirators' "deliberate and willful attempts to exclude [plaintiff] from seeing" patients under managed care organization's out-of-network coverage sufficed to plausibly allege specific intent).

Applied's "shared monopoly" argument, Mot. at 21, misreads Comulate's allegations and further misstates the law. Ascend was selected because Ascend is "willing to serve as the interim provider . . . until Recon is fully ready," FAC ¶¶ 216-17, and Applied has told customers it "will likely cut off SDK for Ascend next," *id.* ¶ 332. Applied's earlier playbook against SimplePin corroborates the trajectory: Applied tolerated SimplePin in Canada only until Applied Pay launched there in September 2025, when it blocked SimplePin. *Id.* ¶ 181.[31]

Although Ascend temporarily benefits from being a "bridge" between Comulate and Applied, *id.* ¶ 217, such cooperation benefits Applied in the long run, calcifying its control over the AIAAS market (already having unrivaled control over the key infrastructure that enables it),

[31] Thus, contrary to Applied's contention, Mot. at 21 & n.19, Comulate explains why Ascend would willingly conspire with Applied to eliminate Comulate in the short-term, out of either fear or the hope of salvaging some economic benefit from its situation. Ascend was losing 80-90% of head-to-head enterprise deals at any pricing the free market would support. FAC ¶ 221. The LRA gave Ascend what competition on the merits could not: a captive customer universe and pricing freedom the open market had specifically rejected. *Id.* ¶¶ 248, 312. The cases Applied cites therefore are distinguishable, given plaintiffs there failed to plead any purported motivations underlying the co-conspirators' actions. *See Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1110 (7th Cir. 1984) (noting, given factual inconsistencies in the complaint, there was no reason to believe Ford—a scrutinous buyer—would enter an agreement under which it would "become the victim"); *Frantzides v. Northshore Univ. HealthSystem Fac. Prac. Assocs., Inc.*, 787 F. Supp. 2d 725, 732 (N.D. Ill. 2011) (concluding, in the absence of any contrary allegations, there was "no obvious incentive" for the co-conspirator to conspire with the defendant); *see also Paladin Assocs., Inc. v. Mont. Power Co.*, 97 F. Supp. 2d 1013, 1034 (D. Mont. 2000) (granting summary judgment where the alleged conspiracy "d[id] not make economic sense," in addition to lacking corroborative evidence).

*id.* ¶¶ 52-75; *see Frame-Wilson v. Amazon.com, Inc.*, 664 F. Supp. 3d 1198, 1206-07 (W.D. Wash. 2023) (crediting third-party sellers' "reluctant[]" participation in Amazon's monopolistic scheme as plausibly alleging a specific intent to monopolize).

Even if the purpose of Applied and Ascend's conspiracy were to establish a "shared monopoly," that would state a cognizable conspiracy to monopolize claim. *See Arista Recs. LLC v. Lime Grp., LLC*, 532 F. Supp. 2d 556, 580 (S.D.N.Y. 2007) (recognizing a "shared monopoly" conspiracy to monopolize claim is viable where, as here, "two or more competitors seek to allocate a market and exclude competitors, even if they do not form a single corporate entity" (internal quotation omitted)); *see also Am. Tobacco Co. v. United States*, 328 U.S. 781, 814-15 (1946) (affirming conspiracy to monopolize conviction of three competitor defendants).

## V. COMULATE PLAUSIBLY PLEADS A CONSPIRACY TO UNREASONABLY RESTRAIN TRADE (COUNT III)

Comulate plausibly alleges each element for its Section 1 claim: "(1) a contract, combination, or conspiracy (meaning, an agreement); (2) a resulting unreasonable restraint of trade in a relevant market; and (3) an accompanying injury." *Dealer Mgmt. Sys.*, 313 F. Supp. 3d at 949 (citing *Agnew v. Nat'l Coll. Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012)). Addressed here, Applied and Ascend's conspiracy to exclude their rival, Comulate, from the AIAAS market is an unreasonable restraint of trade that violates the antitrust laws.[32]

### A. Applied and Ascend Are Engaging in A Group Boycott

Comulate plausibly alleges Applied and Ascend conspired to force their only remaining competitor out of the AIAAS market, constituting a concerted refusal to deal and group boycott. "[J]oint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the

[32] With respect to the first and third elements, *see supra* Sections IV.A and II.

competitive struggle" are condemned as *per se* illegal group boycotts under established law. *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 936 (7th Cir. 2000) (quoting *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985)); *see Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212 (1959). Comulate alleges Applied and Ascend did just that, forcing Comulate's customers to migrate to their competing AIAAS offerings.

Using its control over SDK access to Epic, Applied guaranteed it will cut off Comulate from providing AIAAS services to the vast majority of insurance agencies and brokers that use—and are locked into—Epic. FAC ¶¶ 26-27, 193, 213, 230, 233, 237, 276-78, 295, 297, 299, 300, 332; *see Dealer Mgmt. Sys.*, 313 F. Supp. 3d at 952 (crediting allegations that defendants "conspired to block" their competitor by "withholding authorization and disabling third-party credentials"). And in conjunction, Applied and Ascend coerced Comulate's customers to migrate by no later than Q2 2026 to one of only two remaining viable options—the AIAAS programs the co-conspirators provide.[33] FAC ¶¶ 217-18, 227, 229-30, 232-36, 240-44, 247-54, 280-81, 287-91, 294-300.

This coordinated campaign to shunt consumers onto Ascend or Recon functions to eliminate Comulate from the AIAAS market, thereby eliminating competition. *See PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy*, 530 F. Supp. 3d 301, 318, 344-45 (S.D.N.Y. 2021) (group boycott plausibly alleged where competitors coordinated to blacklist plaintiff, issue false press statements, and ran targeted ad campaigns against plaintiff, which caused pharmacies to reconsider relationship with plaintiff); *Crimpers Promotions, Inc. v. Home Box Off., Inc.*, 554 F. Supp. 838, 841, 847 (S.D.N.Y. 1982), *aff'd*, 724 F.2d 290 (2d Cir. 1983) (group boycott plausibly alleged where defendants HBO and Showtime coerced independent

[33] Given that customers are being forced to switch providers, Applied's argument that the LRA is merely a "permissive" referral agreement, Mot. at 23, rings hollow.

programmers and cable show suppliers to boycott plaintiff's cable television trade show); *Fashion Originators' Guild of Am. v. FTC*, 312 U.S. 457, 461-62, 465 (1941) (affirming that defendants forcing retailer-customers to cease purchasing clothing from plaintiffs constituted unlawful group boycott).

Applied's arguments to the contrary are unavailing. Applied suggests Applied and Ascend are not horizontal competitors, Mot. at 22-23, but Applied (through Recon) and Ascend compete in the AIAAS market that the LRA governs, FAC ¶¶ 39, 164, 221, 227-38, 246-54, 304, 313, 332; *see* Dkt. 58-1 at 4 n.3 (acknowledging Recon has launched). Although Applied *also* has a vertical relationship with Ascend (and Comulate), that does not supplant its horizontal relationship—and rather reinforces the conspiracy, leveraging Applied's control over the Epic SDK integration as the principal means for excluding Comulate. *See* Areeda & Hovenkamp, *Antitrust Law* ¶ 2201a ("Most anticompetitive concerted refusals to deal have rivals as their intended targets, but the immediate refusal is often directed to a vertically related firm such as a supplier, dealer, or customer.").

Applied also argues Comulate's group boycott claim fails because Ascend (unlike Applied) has not "refused to deal with Comulate." Mot. at 23 n.20. This is doubly wrong. *First*, Applied and Ascend together are coercing *Comulate's customers* not to deal with Comulate. *Second*, there is no such legal requirement: the Seventh Circuit concluded that Toys "R" Us engaged in an unlawful group boycott by organizing toy manufacturers to disfavor "warehouse clubs," with which Toys "R" Us competed but never directly dealt. *See Toys "R" Us*, 221 F.3d at 931-33, 936; *see also Klor's*, 359 U.S. at 212-13 (group boycott adequately pleaded where defendant coordinated manufacturers and distributors not to sell to its competitor, with which defendant did not directly deal); *Dealer Mgmt. Sys.*, 313 F. Supp. 3d at 952 n.10 (expressly rejecting Applied's argument).

### B. Applied and Ascend Have Colluded to Allocate the AIAAS Market

Comulate also plausibly alleges that Applied and Ascend's agreement and combined efforts to divide Comulate's customers between themselves—"allocat[ing]" customers, as opposed to geographic territories, "in order to minimize competition," *In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d 811, 836 (N.D. Ill. 2020)—constitutes unlawful market allocation.

Such horizontal customer-allocation agreements are per se unlawful. *See United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972). The allocation here is not inferred; it is express. Under the LRA, Applied "agree[d] to recommend Ascend . . . to approximately sixty (60) agencies impacted by market changes relating to . . . Applied integration solutions such as SDK," FAC ¶ 248—that is, Comulate's customers—and the LRA further provides that "[a]ny referral provided under this Agreement shall be limited in scope to the customers identified by Applied," *id.* ¶ 249. The latter restriction, coupled with the market dynamics whereby Ascend survives at Applied's pleasure, means Ascend cannot independently pursue customers; Applied dictates which customers Ascend may serve. *Id*. That is the essence of an unlawful customer-allocation agreement between horizontal competitors. *See* Areeda & Hovenkamp, *Antitrust Law* ¶ 2030b ("As a general proposition, the per se rule against naked horizontal market-division agreements applies equally to firms that were actual competitors before the division agreement took effect *and to firms whose competition was merely potential*." (emphasis added)).[34]

[34] The only case other than *Humira* that Applied relies on is distinguishable. Mot. at 23. There, the court determined that a referral agreement that paid a 25% commission to the defendant-real estate platform—which was challenged as a *price fixing* agreement—should be analyzed under the Rule of Reason. *See HomeLight, Inc. v. Shkipin*, 694 F. Supp. 3d 1242, 1250-51 (N.D. Cal. 2023). Comulate does not challenge a mere referral agreement—it challenges Applied and Ascend's coordinated efforts to split up Comulate's customers.

## VI. <u>COMULATE PLAUSIBLY PLEADS UCL AND TORT CLAIMS</u>

### A. <u>The FAC Plausibly Alleges UCL Claims For Unlawful Business Practices and Anticompetitive Misconduct (Counts IV-V)</u>

Applied's cursory attempt to dismiss Comulate's UCL claims fails. Comulate states a UCL claim for Applied's "unlawful" business practices (Count IV) because it states violations of federal and state antitrust laws, *see supra* Sections II-V, and claims for tortious interference with prospective economic advantage and contract, and trade libel, *see infra* Section VI.B. *See CRST Van Expedited, Inc. v. Werner Enters.*, 479 F.3d 1099, 1107 (9th Cir. 2007) (reversing dismissal of UCL claim where plaintiff pled tortious interference with contract); *Celonis*, 2025 WL 3013158, at *4 (denying motion to dismiss UCL claim where plaintiff stated Sherman Act claim).

Comulate also states an unfair competition claim under the UCL (Count V) because it plausibly alleges that Applied's anticompetitive misconduct, at a minimum, violates the "spirit and policy" of the antitrust laws. *See supra* Sections II-V. Contrary to Applied's construction, Mot. at 24, conduct is "unfair" under the UCL if it "threatens an incipient violation of an antitrust law, ***or*** violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, ***or*** otherwise significantly threatens or harms competition." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 565 (Cal. 1999) (emphases added); *see also Diva Limousine, Ltd. v. Uber Techs., Inc.*, 392 F. Supp. 3d 1074, 1090 (N.D. Cal. 2019) ("[I]t is not just conduct that threatens a violation of an actual antitrust law that supports a UCL unfairness claim."). And as explained above, Comulate plausibly alleges violations of antitrust laws because the FAC alleges that Applied's purported IP concerns for blocking Comulate's SDK access were pretextual and that Applied's true motivation was to further entrench and expand its

monopoly power, so Comulate is not "plead[ing] around" any bar to relief.[35] Mot. at 24.

### B. The FAC Plausibly Alleges Tort Claims (Counts VI-VIII)

#### 1. Applied's Privilege Defenses Fail

*Noerr-Pennington*. Applied's argument that Comulate's tort claims are barred by the *Noerr-Pennington* doctrine, Mot. at 25, is premature and fails on the merits. "[C]ourts in this District have found that the *Noerr-Pennington* issue is inappropriate for resolution at the motion to dismiss stage, especially when the plaintiff included allegations that the petitioning activity amounted to a sham." *Hytera Commc'ns Corp. v. Motorola Sols., Inc.*, 623 F. Supp. 3d 857, 875-76 (N.D. Ill. 2022) (collecting cases). Litigation is a sham if it is "objectively baseless" and a cover for "an attempt to interfere *directly* with the business relationships of a competitor." *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 61-62 (1993).

Comulate's FAC plausibly alleges sham litigation. *First*, Comulate alleges that Applied's lawsuit is objectively baseless. Applied brought a "meritless lawsuit" based on alleged theft of its trade secrets but has since abandoned its core trade secret theory after Comulate pointed out that Applied publishes its purported trade secrets on its public website. FAC ¶¶ 203, 275, 283. Applied's alternative theory, which relies entirely on "information and belief" allegations of theft, is equally unfounded, as there is "no way to reverse engineer Epic's algorithms by merely using Epic or its SDK." FAC ¶ 203. *Second*, Comulate alleges that Applied's suit is part of its campaign to drive Comulate and others from the market, which included sending Comulate a baseless cease-and-desist letter, delaying integrations for Comulate customers, threatening to shut off Comulate

[35] If the Court dismisses Comulate's antitrust claims based on a pleading deficiency, "rather than a *categorical legal bar*," Comulate still states an unfair competition claim. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1000-01 (9th Cir. 2023) (affirming UCL unfairness claim despite rejecting Sherman Act claim); *PeopleBrowsr, Inc. v. Twitter, Inc.*, 2013 WL 843032, at *4 (N.D. Cal. Mar. 6, 2013) ("[A] violation of the unfair prong of the UCL does *not* necessarily require establishing a violation of the Sherman Act.").

for unspecified reasons, and discriminatory pricing. FAC ¶¶ 131-38, 141, 146, 153, 159, 162.

Despite judicial consensus in this District that *Noerr-Pennington* defenses are not resolved on a motion to dismiss, Applied cites, Mot. at 25, an out-of-circuit case, *Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*, 815 F. Supp. 2d 679, 685–86 (S.D.N.Y. 2011), to argue that the Court's preliminary finding of a likelihood of success on Applied's breach of contract claim precludes Comulate's sham litigation argument. Other courts, including the Ninth and Fifth Circuits, have recognized that some success on the merits does not preclude a sham finding. *See Boulware v. Nev. Dep't of Hum. Res.*, 960 F.2d 793, 798 (9th Cir. 1992) ("initial success on the merits" does not "by itself preclude[] a finding that a suit was a sham"); *In re Burlington N., Inc.*, 822 F.2d 518, 527 n.6 (5th Cir. 1987) (similar); *In re Neurontin Antitrust Litig.*, 2009 WL 2751029, at *22 (D.N.J. Aug. 28, 2009) (similar).

<u>*Litigation Privilege*</u>. Applied stretches the Illinois litigation privilege, which is "necessarily narrow" because it is absolute, beyond its breaking point. *August v. Hanlon*, 975 N.E.2d 1234, 1247 (Ill. App. Ct. 2012). Applied's tortious communications were made outside any court proceeding, to non-litigants, and went beyond any pleading. The Court has also preliminarily found at least portions of Applied's out-of-court statements non-privileged, and Comulate may be able to prove its claims at trial. Hr'g Tr. 5:25-6:8 (Mar. 5, 2026); *see Kurczaba v. Pollock*, 742 N.E.2d 425, 430-31, 439-41 (Ill. App. Ct. 2000) (litigation privilege did not reach an attorney's dissemination of a complaint to non-litigants). Here, Applied's defamatory statements to the parties' joint customers were not part of counsel's effort to advocate for Applied in this forum. *See Am. Backflow & Fire Prevention, Inc. v. Hincks*, 2025 WL 3514107, at *6 (Ill. App. Ct. Dec. 8, 2025) ("The privilege applies to statements made in legislative, judicial, and quasi-judicial

proceedings.").[36] Applied's statements were rather designed to advantage Applied in its business dealings against Comulate. *See Thompson v. Frank*, 730 N.E.2d 143, 145-46 (Ill. App. Ct. 2000) (privilege inapplicable to out-of-court statements to parties uninvolved in the litigation).

Finally, Applied's assertion that Comulate is somehow "attempt[ing] to avoid the actual text" of Applied's November 21 communications, Mot. at 25-26, is facile. Applied submitted extensive evidence of these communications to the Court on a separate motion. Hr'g Tr. 5:14-17 (Mar. 5, 2026). These communications and Applied's ensuing discussions with customers (*see* FAC ¶ 364(d)-(e)) are plausibly alleged to exceed the litigation privilege.

**2. Comulate Plausibly Alleges Tortious Interference (Counts VI-VII)**

Comulate plausibly pleads tortious interference with contract and with prospective economic advantage. Applied first argues that Comulate fails to state a claim for tortious interference with contract because it did not attach copies of the contracts at issue to the FAC. But there is no requirement that a plaintiff must do so, and the Court should not dismiss on this basis. *See Byton N. Am. Co. v. Breitfeld*, 2020 WL 3802700, at *6 (C.D. Cal. Apr. 28, 2020) (denying motion to dismiss where defendant was given "sufficient . . . notice of the nature of the claim"); *Epicor Software Corp. v. Alt. Tech. Sols., Inc.*, 2013 WL 2382262, at *4 (C.D. Cal. May 9, 2013) (same).

Applied similarly attempts to invent, Mot. at 26-27, a requirement that Comulate plead that the contracts with which Applied tortiously interfered are not terminable at will. There is no such requirement. *See Tetra Tech EC, Inc. v. CH2M Hill Inc.*, 2022 WL 254346, at *4 (N.D. Cal. Jan. 27,

---

[36] Applied's other cited cases reinforce the narrow reach of the litigation privilege. *Uppal v. Welch*, 2016 WL 2909652, at *5 (N.D. Ill. May 19, 2016) (explaining that the litigation privilege encompasses "statements directed to a court in the course of litigation"); *Creation Supply, Inc. v. Hahn*, 608 F. Supp. 3d 668, 697 (N.D. Ill. 2022) (discussing litigation privilege as it pertains to attorney conduct in the practice of law); *Goodman v. Goodman*, 226 N.E.3d 704, 712 (Ill. App. Ct. 2023) (litigation privilege applies to surveillance intended to collect evidence to use in divorce proceedings).

2022) (declining to dismiss a tortious interference with contract claim because "the 'at will' element is not clearly presented in the FAC here; [plaintiff] did not expressly allege that its contract with [defendant] was an at-will contract," and plaintiff "expressly disputes this element"). Applied's sole cited case, *Maritz Inc. v. Carlson Mktg. Grp., Inc.*, 2009 WL 3561521, at *4 (N.D. Cal. Oct. 30, 2009), is easily distinguished because, in that case, there was "no dispute that the [contract] was terminable at" will. But the FAC makes no such allegation and Comulate disputes that its customer contracts are terminable at will. *See* PI Reply at 9.

Moreover, even if any customer contracts were terminable at will, the FAC alleges several independently wrongful acts committed by Applied. FAC ¶¶ 130, 378. First, Comulate plausibly pleads that Applied violated the Sherman Act and Cartwright Act. *See supra* Sections II-V; *Pac. Steel Grp. v. Com. Metals Co.*, 600 F. Supp. 3d 1056, 1080–81 (N.D. Cal. 2022) (denying motion to dismiss tortious interference claim where plaintiff alleged violations of Sherman Act and Cartwright Act).[37] Second, Applied's statements (i) falsely accusing Comulate of theft, FAC ¶¶ 282-83, and (ii) mischaracterizing court orders, *id.* ¶¶ 289-90, were libelous and not privileged. *See infra* Section VI.B.3. Applied argues that its threats to customers were not wrongful because they were "lawful and undertaken to enforce [Applied's] rights." Mot. at 27. But Applied cites only summary judgment decisions (that in any event are factually inapposite),[38] and the claim cannot be dismissed on this basis. The FAC plausibly alleges that Applied's conduct was unlawful,

[37] Applied's attempt, Mot. at 27, to portray its extensive anticompetitive conduct as the mere "management of access to its own platform for its own customers" ignores that inferences must be draw in favor of Comulate, not Applied. *See Kubiak*, 810 F.3d at 480-81. In any event, that characterization is not credible. Applied's executives have confessed the company's true objective: to defeat a competitor, not to "enforce [its] rights." Mot. at 27. Blackwell admitted that Applied's actions were part of a deliberate strategy to create "friction" for Comulate because it "want[ed] to win." FAC ¶ 152. And Applied's Chief Customer Officer conceded that the merits of its lawsuit were irrelevant, because "[e]ven if Comulate wins, [Applied] still won't be allowing [Comulate] to integrate with Epic." FAC ¶ 8.

[38] *SIC Metals, Inc. v. Hyundai Steel Co.*, 442 F. Supp. 3d 1251 (C.D. Cal. 2020); *Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218 (N.D. Cal. 2022).

*e.g.*, FAC ¶¶ 276, 364, and no allegations of the FAC establish any contractual right for Applied to selectively repudiate its prior express authorization of its customers' use of Comulate.[39]

Finally, Applied's conclusory argument, Mot. at 27, that Comulate failed to allege causation fares no better. The FAC extensively alleges that Applied's actions proximately caused customers (including [redacted]) to terminate contracts and deprived Comulate of future business opportunities. *See* FAC ¶¶ 294-301. The FAC also alleges numerous ways in which Applied caused disruption of Comulate's contractual relations, *e.g.*, *id.* ¶¶ 271, 296, which is all that is necessary to state a claim under California law. *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 791 P.2d 587, 592 (Cal. 1990). Applied's argument also relies on the inapplicable preliminary injunction legal standard. *See Alarm Detection Sys.*, 930 F.3d at 823.

**3. Comulate Plausibly Alleges Trade Libel (Count VIII)**

Applied's arguments for dismissing the trade libel claim—that Applied's statements were opinion and that Comulate failed to allege scienter, Mot. at 28–29—are not persuasive.

*First*, Comulate has plausibly alleged that Applied issued four different false statements of fact with the knowledge that they were false. *See* FAC ¶¶ 161, 215, 267, 289, 389-90. None of those statements are protected opinions. Applied's post-filing statements did not, as Applied argues, "merely outline[] a set of facts, allowing the reader to draw his own conclusion about them." Mot. at 28. Applied told customers exactly what to think—*e.g.*, that Comulate stole Applied's trade secrets—leaving no room for interpretation. FAC ¶ 389. Similarly, Applied's statements that Comulate "doesn't work with any of the big five brokers" and would go "out of

---

[39] Applied misleadingly cites "the Master Agreement for PBC." Mot. at 27 n.23. But PBC is not a joint customer, and this contract does not govern the rights that Applied purports to have enforced against its customers. As the Court has seen in Comulate's submissions in other motion practice, *e.g.*, Dkt. 120 at 2, Applied's contracts with joint customers expressly authorized customers to use Comulate. The interpretation of those contracts, not part of the FAC, and issues of waiver, acquiescence, and estoppel, are for another day.

business," *id.*, were presented as verifiable facts. *See Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1053 (9th Cir. 2008) (defendant's claim to have a "95% rate of up-time service" was factual); *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 732 (9th Cir. 1999) ("The statement that Coastal was not paying its bills . . . is clearly one of fact[.]"). That the statements were baseless does not make them "puffery," contrary to Applied's suggestion, Mot. at 28. *See Newcal*, 513 F.3d at 1053 (distinguishing "specific" assertions from puffery). And even if the statements were couched as opinions (they were not), they are still actionable because they "implie[d] a provably false assertion of fact." *Bently Rsrv. LP v. Papaliolios*, 160 Cal. Rptr. 3d 423, 430 (Ct. App. 2013).

*Second,* Comulate has plausibly alleged scienter. Applied knew its statements accusing Comulate of trade secret theft were false when it made them: it knew the SDK accessed via the PBC account was the same SDK that Applied facilitated Comulate's access to, and profited from, for years without objection, and it knew there is no way to reverse engineer Epic's algorithms simply by using the Epic SDK as a customer.[40] *See* FAC ¶¶ 83, 86-87, 112, 203, 215. Applied's attempt to redefine "access" by pointing to the user account through which Comulate accessed the SDK, Mot. at 28, misses the point—the *level* of access was the same regardless of which account was used. FAC ¶ 215. Moreover, Applied again improperly attempts to draw inferences in its favor and invoke material not alleged in the FAC. Mot. at 28-29; *see supra* note 2.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the Court should deny Applied's Motion to Dismiss Comulate's Amended Complaint in full. To the extent the Court grants Applied's motion to dismiss in full or

---

[40] Applied does not contest that Comulate plausibly alleged scienter with respect to the statements that Comulate "doesn't work with any of the big five brokers" and would soon go "out of business." Any contrary argument is therefore waived. *United States ex rel. Graziosi v. Accretive Health, Inc.*, 2017 WL 1079190, at *10 (N.D. Ill. Mar. 22, 2017).

in part, Comulate respectfully requests that the Court do so without prejudice and provide Comulate leave to replead to correct any deficiencies. *See City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 753 & n.12 (N.D. Ill. 2019).

Dated: May 4, 2026

Respectfully submitted,

By: */s/ Rollo Baker*
ELSBERG BAKER & MARURI PLLC
Rollo Baker (admitted *pro hac vice*)
Silpa Maruri (admitted *pro hac vice*)
Jared Ruocco (admitted *pro hac vice*)
Brian Campbell (admitted *pro hac vice*)
Chase Shelton (admitted *pro hac vice*)
The Empire State Building
350 Fifth Avenue, 38th Floor
New York, NY 10118
(212) 597-2600
rbaker@elsberglaw.com
smaruri@elsberglaw.com
jruocco@elsberglaw.com
bcampbell@elsberglaw.com
chshelton@elsberglaw.com

*Attorneys for Ardent Labs, Inc., d/b/a Comulate*

MILLER SHAKMAN LEVINE & FELDMAN LLP
Zachary Freeman
Brian Kerwin
30 West Monroe Street, Suite 1900
Chicago, IL 60603
Telephone: 312-263-3700
zfreeman@millershakman.com
bkerwin@millershakman.com

COHEN MILSTEIN SELLERS & TOLL PLLC
Michael Eisenkraft (admitted *pro hac vice*)
88 Pine Street, 14th Floor
New York, NY 10005
(212) 838-7797
Meisenkraft@cohenmilstein.com

Nathaniel Regenold (admitted *pro hac vice*)
1100 New York Avenue NW, Suite 800
Washington, DC 20005
(202) 408-4600
nregenold@cohenmilstein.com