# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| ARDENT LABS, INC., d/b/a COMULATE,<br><br>     Plaintiff,<br><br>  v.<br><br>APPLIED SYSTEMS, INC.,<br><br>     Defendant. | Case No. 26-cv-00591 |

## PLAINTIFF COMULATE'S MOTION
## <u>FOR RECONSIDERATION</u>

MILLER SHAKMAN LEVINE &
FELDMAN LLP
Zachary Freeman
Daniel M. Feeney
Brian Kerwin
30 West Monroe Street, Suite 1900
Chicago, IL 60603
(312) 263-3700
zfreeman@millershakman.com
dfeeney@millershakman.com
bkerwin@millershakman.com

COHEN MILSTEIN & TOLL PLLC
Michael Eisenkraft (admitted *pro hac vice*)
88 Pine Street, 14th Floor
New York, NY 10005
(212) 838-7797
meisenkraft@cohenmilstein.com

Nathaniel Regenold (admitted *pro hac vice*)
1100 New York Avenue NW #800
Washington, DC 20005
(202) 408-4600
nregenold@cohenmilstein.com

By: /s/ *Rollo Baker*
   Rollo Baker

ELSBERG BAKER & MARURI PLLC
Rollo Baker (admitted *pro hac vice*)
Silpa Maruri (admitted *pro hac vice*)
Jared Ruocco (admitted *pro hac vice*)
Brian Campbell (admitted *pro hac vice*)
Chase Shelton (admitted *pro hac vice*)
Empire State Building
350 Fifth Avenue, 38th Floor
New York, NY 10118
(212) 597-2600
rbaker@elsberglaw.com
smaruri@elsberglaw.com
jruocco@elsberglaw.com
bcampbell@elsberglaw.com
cshelton@elsberglaw.com

*Attorneys for Ardent Labs,
Inc., d/b/a Comulate*

**INTRODUCTION**

Comulate respectfully moves pursuant to Federal Rules of Civil Procedure 54(b) and 59(e) to seek reconsideration of the Court's April 21, 2026 order denying Comulate's renewed motion for a preliminary injunction (the "PI Motion"). In seven weeks, Applied will block every Comulate customer (the "Mutual Customers") from using Comulate with Applied's agency management system ("AMS"), Epic. That blockade is tortious. In denying the PI Motion, the Court appears to have misunderstood that Mutual Customers have two contracts that protect their right to integrate the two products—one with Applied (authorizing them to give Comulate access to Epic) and another with Comulate (entitling them to Comulate's service). Yet Applied has *not* terminated, and does not wish to terminate, *its* valuable contracts with Mutual Customers—which govern not just Comulate's access to Epic, but a whole host of third-party "Authorized Integrations" bargained for by the parties. To avoid that costly result, Applied has threatened to narrowly breach those contracts—by blocking only Comulate—to coerce Mutual Customers into violating *their* contracts with Comulate as a defense mechanism. Tort law does not permit interference of that kind. By June 30, 2026, the harm from Applied's manipulative conduct will be irreparable: ███ ████████████████████████████████████████████ .

For these reasons, as set forth more fully below, the Court made manifest errors of law and fact in denying the PI Motion. Comulate respectfully asks the Court to reconsider its ruling and grant the only relief that will permit Comulate to stay viable while litigating this case on the merits.

**FACTUAL BACKGROUND**

As the Court knows, Applied has announced that on June 30, 2026, it will block Mutual Customers from using Comulate. Dkt. 97-42 ¶¶ 13–29. Mutual Customers comprise 70% of Comulate's revenue. Dkt. 9-1 ¶ 76. And while 30% of its revenue base would theoretically remain,

Comulate—a small tech startup one-hundredth of Applied's size—

. *Id.* ¶ 114. As Comulate's CEO has attested under penalty of perjury, if all Mutual Customers are blocked on June 30, ████████████████████████, *id.*, ██████

████████████████████████████████████████

████████████████████████. Katz Decl. ISO Reconsideration ("Katz Decl.") ¶ 10.

Even before the Court denied Comulate's PI Motion, joint customers had begun terminating or altering their contracts—draining Comulate's revenue and destabilizing its future. Dkt. 9-1 ¶¶ 93, 94, 96, 113. At least 15 other customers regrettably had informed Comulate that—contrary to their wishes—the June 30 cutoff date will force them to terminate their contractual agreements with Comulate and switch to Recon or Ascend. Dkt. 97-42 ¶¶ 13–29. After the Court denied Comulate's PI Motion ████████████████████████████. Katz Decl. ¶ 5. ████████████████████████. *Id.* ¶ 9. And Applied has been sending "Notice of Termination—Comulate Integration" letters to all Mutual Customers, which threaten "breach" of unspecified contractual provisions should customers continue to use Comulate after June 30.

Critically, Applied's threatened blockade contravenes its own contractual obligations to Mutual Customers. As the Court knows, for years Applied promoted Comulate to Epic customers, celebrating Comulate as an "Authorized Integration"—a third-party application whose integration Applied would permit—and encouraging Comulate to improve its interoperability with Epic on that basis. *See, e.g.*, Dkt. 97-30, 118-2, 118-3, 118-38. Applied then enshrined Mutual Customers' right to use Comulate with Epic in its contracts with those customers. *E.g.*, Dkt. 118-2. Specifically, Applied's customer contracts (its Master Service Agreements and Schedule SDKs) delineate each of the third-party products that Mutual Customers may utilize with Epic—lists that expressly include Comulate, among others. *Id.* Accordingly, to lawfully end Mutual Customers' right to use

2

Comulate with Epic, Applied must terminate those otherwise binding, written agreements—a move that effectively would disrupt *all* third-party integrations for Mutual Customers. Dkt. 123-9.

Applied has not exercised that right. Rather, it has threatened to block just one contractually authorized integration: Comulate. And while that blockade would amount to a breach of Applied's Mutual Customer contracts, Applied is betting—rightly, as it turns out—that its threatened shutoff will prompt Mutual Customers to terminate their service agreements with Comulate, thereby leaving Applied's contracts untouched. *E.g.*, Dkt. 97-42 ¶¶ 23, 25, 27. As the record reflects, although Mutual Customers uniformly prefer to continue using their contracted-for accounting automation software (Comulate), Epic is too fundamental to their business operations to take a stand against Applied. *See id.*

Put simply, if forced to choose Epic (the platform) or Comulate (an integration with the platform), customers rationally must pick the former. But Applied intentionally manufactured that choice. And it has no legal right to do so. Applied will weaponize the same non-existent, but seemingly Court-validated, contract "rights" against the next third-party developer in short order. By coercing Mutual Customers to terminate their service contracts with *Comulate*—rather than terminate the third-party access contracts it has with those same customers—Applied has tortiously interfered with Comulate's contractual relations. California law makes this explicitly clear.

If allowed to implement its June 30 blockade, Applied will wipe out Comulate. The near certainty of that result, which will be triggered at the end of next month, mandates a preliminary injunction while this antitrust and tort litigation proceeds.

## **PROCEDURAL HISTORY**

Comulate moved for a preliminary injunction on January 20, 2026. Dkt. 6. The Court denied that motion, while inviting renewal, because it was not convinced that, if Applied were able

to terminate customers' access to Comulate's products via Applied's Epic platform on June 30, 2026, any subsequent customer terminations would be "attributable to tortious interference as opposed to independent customer judgment about risk and uncertainty and . . . [therefore] not proximately caused by Applied's conduct." Dkt. 75 ("Mar. Tr.") at 7:4–16.

Comulate renewed its motion for a preliminary injunction on March 23, 2026. Dkt. 92. With the benefit of some discovery, Comulate introduced additional evidence to bridge the perceived causation gap between Applied's tortious interference and customers' terminations. The Court denied the PI Motion in an oral ruling on April 21, 2026. Dkt. 130, 131. It concluded that "Applied is under no duty, contractual or tort, to continue to support Comulate's product, and therefore that 'the harm experienced by Comulate from a June 30th' cutoff would be the result of 'harsh but authorized business practices' as opposed to "tortious conduct." Dkt. 130 ("Apr. Tr.") at 4:22–23, 5:1–4. Citing that Comulate has not yet "gone out of business," the Court concluded "it can adapt to a non-Epic World." *Id.* at 5:24–6:1.

### LEGAL STANDARD

Motions for reconsideration under Rule 59(e) are warranted "to correct manifest errors of law or fact or to present newly discovered evidence." *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1269 (7th Cir. 1996). "A Court may commit a manifest error of fact if it ignores, overlooks, or misapprehends the facts before it." *United States v. Mendoza*, 2026 WL 810665, at *2 (N.D. Ill. March 24, 2026). Manifest errors of law occur from "the 'wholesale disregard, misapplication, or failure to recognize controlling precedent.'" *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000). Moreover, under Rule 54(b), a court may reconsider a non-final order, such as a denial of a preliminary injunction, to prevent "a manifest injustice." *Bolton v. Bryant*, 2014 WL 13110698, at *2 (N.D. Ill. Dec. 23, 2014).

4

**ARGUMENT**

To obtain a preliminary injunction, a plaintiff "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Respectfully, the Court committed at least two manifest errors in evaluating the likelihood that Comulate will (i) suffer irreparable harm absent an injunction and (ii) succeed on the merits of its tortious interference claims. *First*, the Court misunderstood that Comulate will survive being cut off from Applied's Epic platform on June 30, 2026. Contrary to the Court's factual conclusion, Comulate will not and cannot survive in any sustainable form. Comulate simply cannot "adapt to a non-Epic world." *Second*, the Court misapprehended the parties' contractual obligations vis-à-vis Mutual Customers. Applied's pronouncement of a June 30 cutoff is not merely a "harsh business practice," but constitutes an unlawful manipulation of the separate, but complementary, contracts that guarantee Mutual Customers' right to use Comulate with Epic. By compelling a disruption of *Comulate's* written agreements by threatening to breach its own, California law counsels that Applied has interfered—intentionally and tortiously—with Comulate's contracts.

## I.     The Court Manifestly Erred in Evaluating Irreparable Harm

Without an injunction, Applied will terminate Mutual Customers' access to Comulate on June 30. On that date, Comulate will ███████████████████████. The Court's conclusion that Comulate can survive this cutoff and "adapt to a non-Epic world" (Apr. Tr. 5:24–6:1) was manifestly incorrect. Comulate, in fact, will suffer irreparable harm.

Courts routinely recognize that "[t]he threat of being driven out of business is sufficient to establish irreparable harm." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022);

*see also Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1090 (7th Cir. 2008) (the "potential loss of . . . [a plaintiff's] entire business" is an irreparable harm). In denying the PI Motion, this Court agreed that Comulate produced "some evidence that [the cutoff] is an existential threat." Apr. Tr. 5:16–17. But the Court misdiagnosed the dire nature of Comulate's circumstances. As noted above, Mutual Customers account for ███ of Comulate's revenue base—an amount Comulate cannot survive without. Dkt. 9-1 ¶¶ 76, 115; *see hiQ Labs*, 31 F.4th at 1189 (plaintiff established likelihood of irreparable harm where its CEO asserted the company would need to "shutter its operations" absent an injunction). Even if, as the Court suggested, Comulate's losses were "compensable," Apr. Tr. 5:15, Comulate has established irreparable harm because it has shown it will ███████████████████████████████████ ███████████. *See* Katz Decl. ¶ 10 (Comulate will need to "wind down" operations); *hiQ Labs*, 31 F.4th at 1188 ("[S]howing a threat of extinction is enough to establish irreparable harm, even when damages may be available and the amount of direct financial harm is ascertainable.").

Applied's actions have sent Comulate on the path to elimination—a fate that only the requested preliminary injunction can prevent. After Applied's announcement of the June 30 cut-off, numerous customers moved to terminate their contracts with Comulate or demanded precarious month-to-month agreements as a wait-and-see measure. Dkt. 9-1 ¶¶ 93, 94, 96, 113; Dkt. 97-42 ¶¶ 5–12. Before this Court denied the PI Motion, at least 15 other customers had indicated they will terminate their use of Comulate unless the June 30 cutoff is enjoined. Dkt. 97-42 ¶¶ 13–29. Since the Court's ruling, ████████████████████████████████. Katz Decl. ¶ 5. For example, on May 6, 2026, in the week following Applied's notice, ██████████ terminated its contract with Comulate; its CFO wrote: "███████████████████████████ ███████████████████" *Id.* ¶ 7. ██████████ also requested a refund of fees prepaid through

September 15, 2026, indicating it would have continued with its contract absent Applied's notice. *Id.* Likewise, ███████████ communicated that "with Applied cutting off our SDK access, our contract with Comulate will end." *Id.* ¶ 8. Ultimately, whether or not Mutual Customers affirmatively breach or cancel their Comulate contracts, Applied's blockade will render Comulate's performance impossible. Simply put, if the June 30 blockade stands, Comulate cannot "adapt to a non-Epic world." Apr. Tr. 5:25–6:1.

In denying the PI Motion, the Court observed that Comulate "has not . . . gone out of business." Apr. Tr. 5:25. That is only because June 30 has not arrived. As that day approaches and ever more customers accede to Applied's threat, Comulate has begun ████████████████. Katz Decl. ¶ 9. The Seventh Circuit has held that "alleged harm need not be occurring or be certain to occur before a court may grant relief." *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011). The evidence shows Comulate cannot "adapt" without Epic, given Epic's dominance in the AMS market and the prohibitive switching costs. Dkt. 9 at 22; *see also* Apr. Tr. 5:7–9 (discussing switching costs). Applied holds 92.3% of the market where Comulate's revenue is concentrated—brokerages with over $100 million in annual revenue. FAC ¶¶ 18, 325, 338, 404–408. Comulate is already operating in the remaining 7.7% of the relevant market through smaller AMSs, and even if it could expand there, any new business would replace, at most, a tiny fraction of its revenue from the exponentially larger Epic market. FAC ¶ 38. That would not save Comulate.

Further, even if Comulate wanted to develop its own AMS, the switching costs this Court has acknowledged (Apr. Tr. 5:7–9) prevent customer migration off Epic at any meaningful scale, and any new AMS entrant faces two Applied chokepoints: Epic SDK access and IVANS access, on which any operating AMS depends. FAC ¶¶ 75, 185–188. Compounding this, the standard IVANS Exchange API Partner Agreement is terminable on 60-to-120 days' notice and contains

anti-assignment provisions that purport to give Applied unilateral authority to veto any acquirer it designates a "direct competitor"—meaning Applied could pull IVANS access at any point during a multi-year AMS build, rendering the investment worthless.

In short, the only realistic adaptation available to Comulate in a "non-Epic world" is to ███████████. Dkt. 9-1 ¶ 114 ("███████████████████████████████████████████ ███████"). Comulate thus faces "a presently existing actual threat" of imminent and lasting harm that money damages cannot repair. 11A *Wright & Miller's Federal Practice and Procedure* § 2948.1 (3d ed. 2026); *Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632 (7th Cir. 2005) ("[I]t is precisely the difficulty of pinning down what business has been or will be lost that makes an injury 'irreparable[.]'"). The Court's contrary determination was manifestly wrong.

## II. The Court Manifestly Erred in Evaluating Likelihood of Success on the Merits

This Court also erred in assessing the strength of Comulate's tortious interference claims. In denying the PI Motion, it concluded that "Applied is under no duty, contractual or tort, to continue to support Comulate's product." Apr. Tr. 4:22–23. That runs contrary to California law, which imposes a general duty not to interfere with another party's contracts or business relationships. *See hiQ Labs*, 31 F.4th at 1192–93. Such duty is especially apparent here, where Applied's interference is both coercive and wrongful: threats calculated to compel breaches of Mutual Customer contracts with Comulate that would insulate Applied from breaching its *own* contractual obligations to provide those same customers with access to Epic for Comulate.

### A. Applied Tortiously Interfered with Comulate's Contracts

Under California law, elements of intentional interference with contractual relations are "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting

8

damage." *hiQ Labs*, 31 F.4th at 1191. Comulate need not prove an actual breach to satisfy the fourth element; indeed, "interference with [Comulate's] performance may give rise to a claim for interference with contractual relations if [its] performance is made more costly or more burdensome." *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 791 P.2d 587, 592 (Cal. 1990).

Comulate "has shown a sufficient likelihood of establishing each of these elements." *hiQ Labs*, 31 F.4th at 1191. At a minimum, it has raised "serious questions going to the merits"—the appropriate test where, as here, the movant could go out of business absent an injunction while the other party's interests involve non-existential matters (e.g., preserving goodwill). *Id.* at 1189–91.

To begin with, Applied has never disputed its knowledge, or the validity, of Comulate's contracts with Mutual Customers. Dkt. 9-1 ¶¶ 88–96. Nor could it: Applied actively facilitated the contracts at issue and expressly authorized the SDK integrations on which they depend. *See* Dkt. 97-5 (███████████████████████████████████); Dkt. 97-30 ████

████████████████████████████████████████████████

█████████████████); Dkt. 118-2 (SSDK authorizing Comulate integration to Epic).

Moreover, by identifying Comulate as an "Authorized Integration" in its own customer agreements, Applied contractually agreed that Mutual Customers could use Comulate with Epic.

**Authorized Integrations(s).** The foregoing license is limited to the following Authorized Integrations and no others:

| Epic SDK Method | Authorized "To" Software | Authorized "From" Software |
|---|---|---|
| Get_option | Comulate | Applied Epic |
| Get_lookup | Comulate | Applied Epic |
| Client | Comulate | Applied Epic |
| Broker | Comulate | Applied Epic |
| Employee | Comulate | Applied Epic |
| Policy | Comulate | Applied Epic |
| Line | Comulate | Applied Epic |
| General Ledger | Comulate | Applied Epic |
| Transaction | Comulate | Applied Epic |
| Risk | Comulate | Applied Epic |
| General Ledger | Applied Epic | Comulate |
| Transaction | Applied Epic | Comulate |

Dkt. 118-2. In other words, Applied contractually committed itself to allow Mutual Customers to use Comulate with Epic for the duration of those agreements. *Id.*; Dkt. 118 at 2. Nonetheless,

starting on or about April 29, 2026, Applied began sending Mutual Customers a "Notice of Termination" stating that "[u]se of Applied Software in connection with the Comulate Integration after [June 30] will exceed the authorized scope of your agreement(s) with Applied and constitute a breach." Baker Decl. ISO Reconsideration, Ex. 1. Applied still does not identify any specific provision that purportedly authorizes Applied to take this action.

In light of the above, if Applied were to block Mutual Customers' use of Comulate with Epic, it necessarily would be in breach of its contractual obligations. And simply terminating those agreements—whether contractually permitted or not—would have a cascading effect, cancelling various third-party integrations on which Mutual Customers depend. *See* Dkt. 123-9. Thus, to block Comulate *and* evade massive disruption to various third parties, Applied sought to induce breaches and disruptions on Comulate's side of the equation. Put differently, by threatening to stop supporting Mutual Customers' use of Comulate on June 30 (and directing Customers to use Recon or Ascend instead), Applied forced Mutual Customers' hands. Dkt. 9-1 ¶¶ 79–81; Dkt. 97-42 ¶¶ 5–29; Dkt. 97-6 ███████████████████████████████████; Dkt. 118-1 (███████████████████████████████████████████████████████████); Dkt. 97-9 (███████████████████████████████); Dkt. 97-10 (███████████████████████████████████████████). Applied's intentional inference with Comulate's contracts is plainly tortious under California law.

### B. The Court Misconstrued California Law and Failed to Conduct the Relevant Justification Inquiry

Applied violated its duty not to interfere with Comulate's contracts. And there is no legal justification for the contractual disruptions it intentionally has caused. California law is clear that "[a]n action will lie for the intentional interference by a third person with a contractual relationship either by unlawful means or by means otherwise lawful when there is a lack of sufficient

justification." *Herron v. State Farm Mut. Ins. Co.*, 363 P.2d 310, 312 (Cal. 1961) (in bank) (emphasis added). Here, Applied's coercive manipulation of the parties' contractual duties is unlawful and, even if it were not, it lacks a justification to terminate Comulate's interoperability with Epic by compelling a breach of contracts to which Applied is not a party. In neglecting to grapple with that issue in its PI ruling, this Court committed manifests errors of law and fact.

California law requires courts to "apply a balancing test to determine whether the interests advanced by interference with contract outweigh the societal interest in contractual stability." *hiQ Labs*, 31 F.4th at 1193 (citing *Herron*, 363 P.2d at 312). California courts consider, *inter alia*, whether "the means of interference involve no more than recognized trade practices," the conduct is "within the realm of fair competition," *id.*, and the defendant could "have protected its interests . . . without interfering with the contract," *Herron*, 363 P.2d at 313. "The determinative question is whether the business interest is pretextual or asserted in good faith." *hiQ Labs*, 31 F.4th at 1193; *accord* 2 *Callmann on Unfair Competition, Trademarks & Monopolies* § 9:82 (4th ed. 2025).

Respectfully, the Court neglected to consider these factors. Indeed, while the Court acknowledged that "[t]here is some evidence to suggest that the decision was motivated by a desire to eliminate a potential or existing competitive threat," it disregarded that evidence of pretext—central to the justification inquiry—because, in its view, Applied owed no duty to Comulate in the first place, rendering its actions "authorized" by law. Apr. Tr. 4:17–23, 5:4. Moreover, Applied unquestionably had a means to "protect[] its interests" without specifically targeting Comulate's contractual right to service Epic—cancelling its own SDK agreements that govern all third-party integrations (not just Comulate's). Applied instead coerced a breach of Comulate's contracts to protect its own. That is not "within the realm of fair competition" nor done in "good faith." Given the facts and their application to California law, the Court was manifestly wrong to deem Applied's

11

interference likely to be lawful. At a minimum, Comulate has raised "serious questions going to the merits" of its claim, entitling it to preliminary injunctive relief. *hiQ Labs*, 31 F.4th at 1189–91.

### 1. *hiQ Labs* Establishes That Applied's Actions Were Not Justified

The Ninth Circuit's decision in *hiQ Labs* dictates that Applied's actions were tortious under California law. There, plaintiff hiQ's business depended on data publicly posted by users on LinkedIn's social media platform.[1] 31 F.4th at 1187, 1189. Although LinkedIn was aware of hiQ's business and had demonstrated some support for it in the past, *id.* at 1187, the two companies had no contractual relationship between them that obligated LinkedIn to continue allowing hiQ to access its data, *id.* at 1184–88. In fact, hiQ's scraping of LinkedIn's website with automated bots was prohibited by LinkedIn's terms of use and obstructed by automated platform features designed to prevent scraping. *Id.* at 1186. hiQ, however, had contracts with third parties to provide them with its services—something it could not do once LinkedIn shut off hiQ's access to the data on LinkedIn's platform. *Id.* at 1189. LinkedIn decided to terminate hiQ's access to its platform around the same time that it decided to explore developing competing products. *Id.* at 1187, 1193.

The Ninth Circuit affirmed the district court's grant of a preliminary injunction based on hiQ's tortious interference claim. "LinkedIn d[id] not specifically challenge hiQ's ability to make out any of the[] elements of a tortious interference claim." *Id.* at 1192. Instead, it asserted that it had legitimate business interests in terminating hiQ's access to its platform: (1) protecting its members' data, (2) protecting its investment in its platform, and (3) enforcing its User Agreements' prohibitions on automated scraping. *Id.* at 1192, 1194. The Ninth Circuit observed that, under California law, "interference with an existing contract is not justified simply because a competitor

---

[1] Although the data contained in Epic is not public, it belongs to the joint customers, not Applied. Dkt. 9.1 ¶ 51. Those customers have an even greater right to use their own data than hiQ had to use public data. *See hiQ Labs*, 31 F.4th at 1193–94 (discussing LinkedIn's unfair leveraging of its control over public data).

'seeks to further his own economic advantage at the expense of another.'" *Id.* at 1192. It characterized LinkedIn's asserted interests—including enforcing its prohibition against automated scraping—as "relatively weak" compared to "hiQ's interest in continuing its business" and the social value of ensuring the stability of contracts. *Id.* at 1190, 1194. The Ninth Circuit also doubted that LinkedIn's actions were within the realm of fair competition, concluding that hiQ "raised serious questions about whether LinkedIn's actions . . . were taken in furtherance of LinkedIn's own plans to introduce a competing professional data analytics tool." *Id.* at 1193. The court cited evidence of pretext—specifically, that LinkedIn knew about hiQ's reliance on its external data for years prior to its move to cut off hiQ's access to that data, and that the decision to cut off hiQ was made within a month of LinkedIn's announcement of a plan to develop a competing product. *Id.*

*hiQ Labs* compels this Court to grant Comulate's PI Motion. Comulate, like hiQ, "has a strong commercial interest in fulfilling its contractual obligations." *Id.* Applied, like LinkedIn, may not cut off access to its platform with knowledge that it will interfere with another company's contracts. *Id.* at 1191–94. Indeed, Comulate presents a far stronger case than hiQ, because Linkedin owed no contractual obligations to hiQ's contract partners, whereas Applied has contracted with Comulate's customers to guarantee the access its interference seeks to disrupt. Applied's asserted interests are even weaker than LinkedIn's. While Applied asserts interests in enforcing SDK agreements with joint customers and controlling who can access its SDK, Dkt. 110 at 21, it actively encouraged, benefited from, and—indeed—contracted to ensure the Comulate integration that it facilitated for years. Like LinkedIn, Applied decided to compete with a company that relied on its platform and, to gain a competitive advantage, tortiously interfere with its competitor's contracts.[2]

---

[2] *hiQ Labs* also indicates that Applied's actions are outside the realm of fair competition and recognized business practices under California law, which does not encompass practices that "fundamentally undermine a competitor's basic business model." 31 F.4th at 1193. Because Applied's actions will (indeed, are designed to) ██████████████████████████, *see* § I *supra*, they are not protected.

Such behavior is plainly tortious under California law. *hiQ Labs*, 31 F.4th at 1192.

### 2. Applied's Purported Contract Rights Provide No Justification

The at-will termination provisions in Applied's contracts with Mutual Customers provide no safe harbor. Quite the opposite. Those provisions do not authorize Applied to excise individual contract terms or block specific SDK integrations; they permit only full contract termination, and only on 60 days' notice. Dkt. 118 at 14–15. In fact, that is the motivation for Applied's chosen method of interference—to harm Comulate without losing its own customers. Put simply, a termination right Applied chose not to exercise does not justify interference it had no right to cause.

### C. Applied Tortiously Interfered with Comulate's Prospective Economic Advantage

For similar reasons, Comulate also has shown a likelihood of success on its tortious interference with prospective economic advantage claim. Whereas "intentionally interfering with an existing contract is generally a wrong in and of itself, intentionally interfering with prospective economic advantage requires pleading that the defendant committed an independently wrongful act." *Ixchel Pharma, LLC v. Biogen, Inc.*, 470 P.3d 571, 576 (Cal. 2020). Otherwise, "[e]ach tort contain[s] the same elements with the exception that interference with contractual relations require[s] the existence of a binding contract." *Id.* at 575. For the same reasons Applied tortiously interfered with Comulate's existing contracts, it likewise has interfered with Comulate's forward-looking business relationships. *See, e.g.*, Dkt. 9-1 ¶¶ 78, 96, 113, 117; Dkt. 97-42 ¶ 28.

### III. The Balance of the Equities Tips in Comulate's Favor

The narrow injunction Comulate seeks would merely preserve what both parties already have contracted for. Such injunction would not require Applied "to affirmatively support Comulate's product." Apr. Tr. 5:20–21. Rather, it would require Applied to *refrain* from interfering with existing, already bargained-for, contract rights between Comulate and Mutual Customers, and

14

from breaching Applied's own contracts with those customers—which expressly permit integrations with Comulate and (naturally) do not allow cancellation of individual provisions at will. *See supra* § II. As Applied's counsel represented to the Delaware Court of Chancery, an injunction of this sort would "maintain[] the status quo." Dkt. 7-16 at 43:18–19.

The equities overwhelmingly favor Comulate. Even if the requested injunction imposed any affirmative burden on Applied (it does not), that burden would pale in comparison to the burden to Comulate ██████████████. *See hiQ Labs*, 31 F.4th at 1191 (equities tipped "decidedly" in movant's favor because it risked going out of business); *Girl Scouts*, 549 F.3d at 1090; Dkt. 9-1 ¶ 116. Moreover, any such burden on Applied would be short-lived. If Comulate is granted an injunction and Applied ultimately wins, Applied can implement its cutoff then with only a slight delay. If Comulate does not receive an injunction, ████████████████.

## IV. The Public Interest Favors an Injunction

Mutual Customers have repeatedly emphasized their preference for Comulate and its product over the alternatives foisted on them by Applied. Dkt. 97-42 ¶¶ 13–29. Customer benefits naturally flow to consumers, as Comulate's automated billing process saves insurance brokers millions of dollars annually. Dkt. 9 at 3. Broadly speaking, the public benefits from full and fair competition. *See Shure, Inc. v. ClearOne, Inc.*, 2018 WL 1371170, at *18 (N.D. Ill. Mar. 16, 2018) ("Having more than one supplier of any product increases competition, which can drive down prices and promote innovation."). Only Applied gains from being allowed to █████████████ ██████████. Thus, the public interest heavily favors granting Comulate an injunction.

## CONCLUSION

Comulate respectfully requests that the Court reconsider its prior ruling and grant Comulate a preliminary injunction while this case is litigated on the merits.