**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ARDENT LABS, INC., d/b/a COMULATE<br><br>Plaintiff,<br>v.<br><br>APPLIED SYSTEMS, INC.,<br><br>Defendant. | ) | Case No. 26-cv-00591<br><br>Hon. Manish S. Shah |

**MEMORANDUM OF LAW IN FURTHER SUPPORT OF**
**APPLIED'S MOTION TO DISMISS COMULATE'S AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**


PRELIMINARY STATEMENT ... 1

ARGUMENT ... 2

I. COMULATE LACKS ANTITRUST STANDING ... 2

A. Comulate's Claimed Injury Is Not An Antitrust Injury ... 2

B. Comulate's Market-Wide-Harm Allegations Do Not Establish Standing ... 4

II. COMULATE'S ATTEMPTED MONOPOLIZATION CLAIM (COUNT I) FAILS ... 4

A. Comulate Does Not Allege Anticompetitive Conduct ... 4

1. Comulate Fails To Plead An *Aspen Skiing* Refusal-To-Deal Claim ... 5

2. Comulate Fails To Plead A Tying Claim ... 7

3. Unable To Satisfy Either Doctrine, Comulate Cannot Save Its Claim By Recasting It As An Amorphous "Course of Conduct" Theory ... 9

B. Comulate Does Not Allege Specific Intent To Monopolize ... 10

C. Comulate Does Not Allege A Dangerous Probability Of Monopoly Power ... 12

III. COMULATE'S CONSPIRACY CLAIMS (COUNTS II AND III) FAIL ... 13

A. Comulate's Conspiracy To Monopolize Claim (Count II) Lacks Legal Support And Is Implausible ... 13

B. Comulate Fails To Plead A Plausible Section 1 Conspiracy (Count III) ... 18

IV. APPLIED'S CONDUCT IS PRIVILEGED ... 23

A. *Noerr-Pennington* Bars Comulate's Claims Because Comulate Has Not Pleaded That Applied's Complaint Is A "Sham" ... 23

B. Illinois' Litigation Privilege Bars Claims Based On Applied's Statements Concerning Litigation To Interested Parties ... 25

V. COMULATE'S TORT CLAIMS (COUNTS VI-VIII) FAIL ... 26

A. The Amended Complaint Lacks Well-Pleaded Facts Supporting Comulate's Tortious Interference Claims (Counts VI-VII) ... 26

B. Comulate Fails To Plead False Statements Of Fact, Scienter, And Damages For Its Trade Libel Claim (Count VIII) ... 28

VI. COMULATE'S FAILURE TO PLEAD ITS ANTITRUST AND TORT CLAIMS DOOMS ITS UCL CLAIMS (COUNTS IV-V) ... 30

CONCLUSION ... 30

# TABLE OF AUTHORITIES

**Page**

## Cases

*A.D.M. Corp. v. Sigma Instruments, Inc.*,
481 F. Supp. 1297 (D. Mass. 1980)....................3

*Am. Backflow & Fire Prevention, Inc. v. Hincks*,
2025 WL 3514107 (Ill. App. Ct. Dec. 8, 2025)....................26

*Applied Sys., Inc. v. PBC Consulting Inc.*,
2026 WL 381866 (N.D. Ill. Feb. 11, 2026)....................1, 2, 5, 23, 27, 28

*Arista Recs. LLC v. Lime Grp. LLC*,
532 F. Supp. 2d 556 (S.D.N.Y. 2007)....................14

*Asahi Glass Co. v. Pentech Pharms., Inc.*,
289 F. Supp. 2d 986 (N.D. Ill. 2003)....................24

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................8, 12

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985)....................5, 6, 7

*Atl. Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990)....................3, 4

*August v. Hanlon*,
975 N.E.2d 1234 (Ill. App. Ct. 2012)....................25

*Bayer Schering Pharma AG v. Sandoz, Inc.*,
813 F. Supp. 2d 569 (S.D.N.Y. 2011)....................12

*Boulware v. Nev. Dep't of Hum. Res.*,
960 F.2d 793 (9th Cir. 1992)....................23

*Brownmark Films, LLC v. Comedy Partners*,
682 F.3d 687 (7th Cir. 2012)....................22

*In re Burlington N., Inc.*,
822 F.2d 518 (5th Cir. 1987)....................23

*Byton N. Am. Co. v. Breitfeld*,
2020 WL 3802700 (C.D. Cal. Apr. 28, 2020)....................26

*Camargo v. AbbVie, Inc.*,
2026 WL 115068 (N.D. Ill. Jan. 14, 2026)....................30

*Car Carriers, Inc. v. Ford Motor Co.*,
745 F.2d 1101 (7th Cir. 1984) ........................................ 15

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
973 P.2d 527 (Cal. 1999) ........................................ 30

*Celonis SE v. SAP SE*,
2025 WL 3013158 (N.D. Cal. Oct. 27, 2025) ........................................ 10

*CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*,
150 F.4th 1056 (9th Cir. 2025) ........................................ 9

*Diva Limousine, Ltd. v. Uber Techs., Inc.*,
392 F. Supp. 3d 1074 (N.D. Cal. 2019) ........................................ 30

*Ducere LLC v. Enbridge (U.S.) Inc.*,
2025 WL 81373 (N.D. Ill. Jan. 13, 2025) ........................................ 5

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) ........................................ 30

*Frame-Wilson v. Amazon.com, Inc.*,
591 F. Supp. 3d 975 (W.D. Wash. 2022) ........................................ 15, 19

*Franklin v. Dynamic Details, Inc.*,
116 Cal. App. 4th 375 (Cal. Ct. App. 2006) ........................................ 29

*Frantzides v. Northshore Univ. HealthSystem Fac. Prac. Assocs., Inc.*,
787 F. Supp. 2d 725 (N.D. Ill. 2011) ........................................ 16

*G. Heileman Brewing Co. v. Anheuser-Busch Inc.*,
676 F. Supp. 1462 (E.D. Wis. 1987) ........................................ 11

*Gibson v. City of Chicago*,
910 F.2d 1510 (7th Cir. 1990) ........................................ 12

*Golden v. Mullen*,
295 Ill. App. 3d 865 (Ill. App. Ct. 1997) ........................................ 25

*Goodman v. Goodman*,
226 N.E.3d 704 (Ill. App. Ct. 2023) ........................................ 25

*Great Escape, Inc. v. Union City Body Co.*,
791 F.2d 532 (7th Cir. 1986) ........................................ 11

*Guzman v. Whole Foods Mkt.*,
2024 WL 6982230 (N.D. Ill. Oct. 17, 2024) ........................................ 25

*In re High Fructose Corn Syrup Antitrust Litig.*,
295 F.3d 651 (7th Cir. 2002) .................................................................................... 17

*In re Humira (Adalimumab) Antitrust Litig.*,
465 F. Supp. 3d 811 (N.D. Ill. 2020) ........................................................... 2, 19, 23, 24

*IHS Dialysis Inc. v. Davita, Inc.*,
2013 WL 1309737 (S.D.N.Y. Mar. 31, 2013).....................................................17, 18

*Int'l Constr. Prods. LLC v. Caterpillar Inc.*,
2016 WL 264909 (D. Del. Jan. 21, 2016)................................................................... 14

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
466 U.S. 2 (1984) ........................................................................................................ 8

*Klor's, Inc. v. Broadway-Hale Stores*,
359 U.S. 207 (1959) ................................................................................................... 19

*Korea Supply Co. v. Lockheed Martin Corp.*,
29 Cal. 4th 1134 (2003) ............................................................................................. 27

*Kurczaba v. Pollock*,
742 N.E.2d 425 (Ill. App. Ct. 2000)........................................................................... 25

*Lanahan v. Cnty. of Cook*,
41 F.4th 854 (7th Cir. 2022) ..................................................................................8, 20

*Maritz Inc. v. Carlson Mktg. Grp., Inc.*,
2009 WL 3561521 (N.D. Cal. Oct. 30, 2009) ............................................................ 27

*McWane, Inc. v. F.T.C.*,
783 F.3d 814 (11th Cir. 2015) ...................................................................................... 9

*Meta Platforms, Inc. v. BrandTotal Ltd.*,
605 F. Supp. 3d 1218 (N.D. Cal. 2022) ..................................................................... 27

*Metro Cable Co. v. CATV of Rockford, Inc.*,
516 F.2d 220 (7th Cir. 1975) ...................................................................................... 24

*Midwest Gas Servs., Inc. v. Indiana Gas Co.*,
317 F.3d 703 (7th Cir. 2003) ...................................................................................... 13

*Midwest Underground Storage, Inc. v. Porter*,
717 F.2d 493 (10th Cir. 1983) .................................................................................... 22

*Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*,
815 F. Supp. 2d 679 (S.D.N.Y. 2011)......................................................................... 23

*Motor Works, LLC v. Safer Techs., Inc.*,
2010 WL 11485116 (N.D. Cal. Mar. 10, 2010) .......... 29

*N. Pac. Ry. Co. v. United States*,
356 U.S. 1 (1958) .......... 8

*New Mexico Oncology v. Presbyterian Healthcare Servs.*,
418 F. Supp. 3d 826 (D.N.M. 2019) .......... 7

*New York v. Meta Platforms, Inc.*,
66 F.4th 288 (D.C. Cir. 2023) .......... 9

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
472 U.S. 284 (1985) .......... 19

*NYNEX Corp. v. Discon, Inc.*,
525 U.S. 128 (1998) .......... 19

*OJ Com., LLC v. KidKraft, Inc.*,
34 F.4th 1232 (11th Cir. 2022) .......... 5

*Pac. Gas & Elec. Co. v. Bear Stearns & Co.*,
791 P.2d 587 (Cal. 1990) .......... 28

*Pac. Steel Grp. v. Com. Metals Co.*,
600 F. Supp. 3d 1056 (N.D. Cal. 2022) .......... 27

*Palmer v. BRG of Ga., Inc.*,
498 U.S. 46 (1990) .......... 22

*Partington v. Bugliosi*,
56 F.3d 1147 (9th Cir. 1995) .......... 28

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*,
729 F. Supp. 3d 298 (E.D.N.Y. 2024) .......... 14

*PeopleBrowsr, Inc. v. Twitter, Inc.*,
2013 WL 843032 (N.D. Cal. Mar. 6, 2013) .......... 30

*Ploss v. Kraft Foods Grp., Inc.*,
197 F. Supp. 3d 1037 (N.D. Ill. 2016) .......... 13

*Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*,
508 U.S. 49 (1993) .......... 23

*Reapers Hockey Ass'n v. Amateur Hockey Ass'n Ill.*,
412 F. Supp. 3d 941 (N.D. Ill. 2019) .......... 5

*Scarpelli v. McDermott Will & Emery LLP*,
117 N.E.3d 238 (Ill. App. Ct. 2018) ... 25

*Schneider v. City of Chicago*,
2023 WL 8019434 (N.D. Ill. Nov. 20, 2023) ... 17

*Schor v. Abbott Lab'ys*,
457 F.3d 608 (7th Cir. 2006) ... 9

*SEI Glob. Servs., Inc. v. SS&C Advent*,
2022 WL 2356730 (3d Cir. June 30, 2022) ... 3

*Sheridan v. Marathon Petroleum Co. LLC*,
530 F.3d 590 (7th Cir. 2008) ... 7

*SIC Metals, Inc. v. Hyundai Steel Co.*,
442 F. Supp. 3d 1251 (C.D. Cal. 2020) ... 27

*Signal Fin. Holdings LLC v. Looking Glass Fin. LLC*,
2018 WL 11365996 (N.D. Ill. Dec. 21, 2018) ... 20

*Spectrum Sports, Inc. v. McQuillan*,
506 U.S. 447 (1993) ... 12

*Strow v. B&G Foods, Inc.*,
633 F. Supp. 3d 1090 (N.D. Ill. 2022) ... 22

*In re Surescripts Antitrust Litig.*,
608 F. Supp. 3d 629 (N.D. Ill. 2022) ... 10, 11, 14, 15

*Tetra Tech EC, Inc. v. CH2M Hill Inc.*,
2022 WL 254346 (N.D. Cal. Jan. 27, 2022) ... 27

*In re Text Messaging Antitrust Litig.*,
630 F.3d 622 (7th Cir. 2010) ... 15, 17

*Thompson v. Frank*,
730 N.E.2d 143 (Ill. App. Ct. 2000) ... 25

*Thompson's Gas & Elec. Serv., Inc. v. BP Am. Inc.*,
691 F. Supp. 2d 860 (N.D. Ill. 2010) ... 13

*Toys "R" Us, Inc. v. FTC*,
221 F.3d 928 (7th Cir. 2000) ... 19

*U.S. Football League v. Nat'l Football League*,
842 F.2d 1335 (2d Cir. 1988) ... 3

*United States v. Apple*,
2025 WL 1829127 (D.N.J. June 30, 2025) ........ 10

*United States v. Google LLC*,
778 F. Supp. 3d 797 (E.D. Va. 2025) ........ 10

*Universal Film Exchanges, Inc. v. City of Chicago*,
288 F. Supp. 286 (N.D. Ill. 1968) ........ 22

*Universal Gaming Grp. v. Taft Stettinius & Hollister LLP*,
2017 IL App (1st) 150878-U (Ill. App. Ct. 2017) ........ 29

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004) ........ 5, 9

*Viamedia, Inc. v. Comcast Corp.*,
951 F.3d 429 (7th Cir. 2020) ........ 6, 7, 8

*Washington Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*,
328 F. Supp. 3d 824 (N.D. Ill. 2018) ........ 18

*White v. Keely*,
814 F.3d 883 (7th Cir. 2016) ........ 1

*X Corp. v. Bright Data Ltd.*,
782 F. Supp. 3d 770 (N.D. Cal. 2025) ........ 10

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
395 U.S. 100 (1969) ........ 2

**Statutes**

Cartwright Act, Cal. Bus. & Prof. Code §§ 16720–16770 ........ 27

Sherman Act, 15 U.S.C. §§ 1–7 ........ 1, 27

**Other Authorities**

Areeda & Hovenkamp, *Antitrust Law* (4th and 5th eds. 2025) ........ 3

## PRELIMINARY STATEMENT

In Comulate's third attempt to plead its case,[1] it still cannot identify a single authority under the 136-year-old Sherman Act supporting its novel theories. A supposed monopolist *sending business away* to an independent third party does not support a monopolization claim. Nor would any company rationally agree to a market allocation conspiracy that requires it to later *be eliminated from that market entirely*.

Per Comulate's own allegations and judicially noticeable findings: (1) Applied proposed, and Comulate rejected, four commercial arrangements, and the parties thus never made any joint AIAAS offerings (AC ¶¶ 88, 92, 107-10, 113-18, 147); (2) Applied never collected fees from Comulate for any AIAAS services or products (AC ¶¶ 109, 138, 159); (3) Applied tried to "block Comulate" in 2023, shortly after they began their failed discussions (AC ¶¶ 257-59); (4) "PBC is not a real company" but rather "a front for Comulate to gain access to Epic," *Applied Sys., Inc. v. PBC Consulting Inc.*, 2026 WL 381866, at *4 (N.D. Ill. Feb. 11, 2026);[2] and (5) the supposed "friction" and tactics which Comulate pleads had no impact because Comulate "*continued to grow*" "[redacted]" to a "65% and 75%" share until November 21, 2025 when Applied filed suit about Comulate's fraud (AC ¶¶ 110, 297, 309).

These concessions render Comulate's allegations implausible whether considered "as a whole" or in parts. They confirm Comulate is complaining about a failed business negotiation, not an antitrust violation. Applied has no duty to deal with Comulate. And far from engaging in an elaborate and confusing "conspiracy" (which, as Comulate speculates, even supposedly included Ascend's CEO sending a sympathetic text to Comulate's CEO as a smokescreen),

---

[1] Comulate filed its original complaint against Applied in Delaware. AC ¶ 231.

[2] *White v. Keely*, 814 F.3d 883, 885 & n.2 (7th Cir. 2016) (considering court findings of fraud, which show there "is a bit more to the story than what appears in [plaintiff's] complaint").

Applied rationally engaged Ascend to give its customers an alternative upon discovering Comulate's fraud.

Try as Comulate might, the antitrust laws do not protect failed business negotiations or force competitors to deal with their rivals. And because Comulate's non-antitrust claims are equally meritless, Comulate's complaint should be dismissed with prejudice.

## ARGUMENT

### I. COMULATE LACKS ANTITRUST STANDING

Comulate's claimed injury flows from its decision to defraud Applied; and the alleged competition-harming prices it points to were charged *by Ascend*, not Applied. That is neither antitrust injury nor a harm to competition caused by Applied.

#### A. Comulate's Claimed Injury Is Not An Antitrust Injury

Causation is central to antitrust injury. The "court must determine whether the 'violation was the cause-in-fact of the injury: that "but for" the violation, the injury would not have occurred'" and that the "injury … flow[ed] directly from the anticompetitive aspect of the practice under scrutiny." *In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d 811, 843 (N.D. Ill. 2020) (Shah, J.) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969)), *aff'd sub nom. Mayor & City Council of Baltimore v. AbbVie Inc.*, 42 F.4th 709 (7th Cir. 2022).

Here, the lack of causation is clear. "PBC is not a real company"; "it was a front for Comulate to gain access to Epic." *Applied Sys., Inc.*, 2026 WL 381866, at *4. And despite Applied's supposed market power and anticompetitive conduct throughout 2024 and 2025, Comulate "continued to grow" "[redacted]" to a "65% and 75%" share until November 21, 2025 *when Applied filed suit over the PBC fraud*. AC ¶¶ 110, 202, 297, 309.

Comulate's supposed injuries do not flow from the "competition-*reducing* aspect"[3] of Applied's conduct, *i.e.*, from the supposed "friction" and wielding of "necessary infrastructure"—SDK access, IVANS, and ACN[4]—as "chokepoint[s]" to pressure developers and "exclude" or "eliminate" competitors. Opp. 3. Instead, the injuries flow from acts taken against a single company in response to the PBC fraud. Indeed, Comulate concedes this by only pointing to post-November 2025 customer terminations and revenue loss.[5] Opp. 8. That is not antitrust injury.

Comulate instead tries to reframe the causation question into one about whether *in pari delicto* applies. Opp. 11-12. But Comulate's fraud does not nullify basic causation principles or antitrust doctrine. Indeed, as a leading treatise explains, "the facts bearing on the former pari delicto defense bear also on the existence of plaintiff's damage and on whether it was caused by the defendant's violation." Areeda & Hovenkamp, *Antitrust Law* ¶ 316a (4th and 5th eds. 2025); *see also U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1369 (2d Cir. 1988) (evidence bearing on *in pari delicto* defense "was highly probative on the central issue of whether the [plaintiff's] alleged injury and damages … were caused by the [defendant's] anticompetitive conduct or by the [plaintiff's] own deliberate business judgments"). More broadly, a plaintiff that makes decisions that harm its business cannot show antitrust injury. *See, e.g.*, *SEI Glob. Servs., Inc. v. SS&C Advent*, 2022 WL 2356730, at *3 (3d Cir. June 30, 2022) (no antitrust injury where plaintiff's harm flowed from its own business strategy); *A.D.M. Corp. v. Sigma Instruments,*

---

[3] *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 329 (1990) (emphasis in original).

[4] Comulate does not dispute that its allegations show: (1) migrations to a more modern API system caused Applied's slowdown in SDK authorizations; (2) Applied never denied Comulate IVANS access; and (3) ACN is not a competitive necessity. *See* MTD 7.

[5] Applied allegedly wielded its power and "chokepoints," which could have been (but were not) used to destroy Comulate prior to the discovery of the PBC fraud, since 2024. Comulate's assertion that Applied's response to the PBC fraud was "pretextual" is thus speculation.

*Inc.,* 481 F. Supp. 1297, 1299 (D. Mass. 1980) (no antitrust injury where plaintiff's harm flowed from the "alleged conflict of interest and duplicity" of its president).

Invoking *in pari delicto* thus cannot cure Comulate's lack of antitrust injury. In *In re Dealer Mgmt. Sys. Antitrust Litig*. (Opp. 12), the court rejected a standing challenge where plaintiffs' practices were legal and only took place *because* defendants conspired to block its access. 313 F. Supp. 3d 931, 948 (N.D. Ill. 2018).[6] Here, it is the other way around: Applied sued Comulate, and revoked its support of Comulate's SDK integration, *because* of the PBC fraud. Antitrust law does not protect Comulate from the effects of its own poor choices.

### B. <u>Comulate's Market-Wide-Harm Allegations Do Not Establish Standing</u>

Comulate's opposition confirms that it relies on an independent third party's pricing to plead harm to competition. Opp. 8 ("Comulate's exclusion will result in increased prices for consumers. To illustrate, after jointly forcing consumers away from Comulate, Ascend materially increased its prices."). But Applied is not alleged to have agreed with Ascend to increase prices;[7] and nothing in the Complaint attributes Ascend's pricing decisions to Applied. Comulate's speculative story of competitive harm—increased prices that Applied did not set, occurring while Applied offered "cheaper" prices (AC ¶ 303)—undermines its attempt to plead antitrust injury.

## II. <u>COMULATE'S ATTEMPTED MONOPOLIZATION CLAIM (COUNT I) FAILS</u>

### A. <u>Comulate Does Not Allege Anticompetitive Conduct</u>

Applied has no duty to deal with Comulate, and none of Comulate's three theories of anticompetitive conduct—refusal to deal, tying, or its new "course of conduct" argument—saves

[6] *Memorex Corp. v. International Business Machines Corp.* is even further afield. There, the Ninth Circuit sustained an antitrust claim where the plaintiff's trade secret theft was separate from the defendant's predatory conduct. 555 F.2d 1379, 1382-83 (9th Cir. 1977). Unlike here, the defendant did "not argue that there was no injury." *Id.*

[7] Nor does Ascend's decision to raise prices to viable levels reflect competitive harm. MTD 9.

its monopolization claims. Comulate's opposition does not identify a single case sustaining a claim against an alleged monopolist who: (1) refused to deal with a competitor with which it had *no* longstanding business relationship, or (2) sent business to a third party instead of taking that business for itself. And, in opposition, Comulate does not dispute that its allegations show it: (1) rejected each of the four commercial arrangements Applied proposed (AC ¶¶ 88, 92, 113-18, 147); (2) never signed a formal agreement under which it paid Applied for any AIAAS services or products (AC ¶¶ 107-10, 138, 159); and (3) accessed Applied's platform through a fake company, *Applied Sys., Inc.*, 2026 WL 381866, at *4. The Court has already (correctly) observed that "Applied is under no duty, contractual or tort, to continue to support Comulate's product." Hr'g Tr. 4:22-23 (Apr. 21, 2026); Hr'g Tr. 3:9-10 (May 14, 2026) ("I continue to conclude Applied was not under a duty to keep Comulate on board as an authorized integration.").

### 1. Comulate Fails To Plead An *Aspen Skiing* Refusal-To-Deal Claim

Comulate's opposition fails to rehabilitate its *Aspen Skiing* theory. AC ¶¶ 3, 86-112. That narrow exception requires a prior, longstanding, direct, bilateral, and profitable course of dealing, all of which are absent here.[8] Comulate's response (Opp. 18)—that *Aspen Skiing* does not require a "horizontal" relationship—misses the deficiency. The problem is not that Applied and Comulate are competitors. It is that they lacked the relationship *Aspen Skiing* contemplates: they had no joint offering, no contract, and no revenues paid by Comulate to Applied. *See, e.g.*, *Ducere LLC v. Enbridge (U.S.) Inc.*, 2025 WL 81373, at *7 (N.D. Ill. Jan. 13, 2025) (absence of prior, voluntary, and profitable course of dealing "all but fatal" to refusal-to-deal claim).

[8] *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 603-04 (1985); *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 409 (2004) ("*Trinko*"); *Reapers Hockey Ass'n v. Amateur Hockey Ass'n Ill.*, 412 F. Supp. 3d 941, 956 (N.D. Ill. 2019) (Shah, J.); *OJ Com., LLC v. KidKraft, Inc.*, 34 F.4th 1232, 1246 (11th Cir. 2022).

***No direct, longstanding relationship***. Although the Supreme Court made clear that a direct, longstanding relationship is essential to finding an antitrust duty to deal, Comulate seeks to avoid the requirement entirely. *Aspen Skiing*, 472 U.S. at 603, 604 n.31 (1985); MTD 12-15.[9] Comulate fails to cite a single case where there was no such relationship. And the cases it does cite do not help it. In *Tiz, Inc. v. Southern Glazer's Wine & Spirits, LLC*, "each Defendant had a relationship with [the plaintiff] for several years, and continually fulfilled orders placed through [plaintiffs' platform]." 2024 WL 2785142, at *15 (N.D. Ill. May 30, 2024). And in *Lindco*, the defendant "ceased supplying [plaintiff] with any of the products it had previously manufactured for [plaintiff]." 979 F. Supp. 632, 636 (N.D. Ill. 1997). Here, Comulate alleges the opposite: as early as 2023, Applied was seeking to "block Comulate," not partner with it. AC ¶¶ 257-59.[10]

***Applied is not foregoing short-term profits***. Comulate never grapples with how its own theory undermines the assertion that Applied is forsaking short-term profits. Customers that Applied refers to Ascend *still require* SDK access. AC ¶¶ 55-56, 217. Applied earns SDK fees from those customers and thus short-term profits—just through Ascend rather than Comulate.[11] That should end the matter. As to Comulate's argument (Opp. 19-20) that Applied will forgo infrastructural fees for Recon customers, Comulate ignores its own allegations that Applied is already earning fees from Recon. AC ¶ 332. And even if Comulate had pleaded a decrease in

[9] In *Aspen*, there was a 15-year history of joint arrangements. *Id.* at 591. In *Viamedia*, there was a 9-year history. *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 443-44 (7th Cir. 2020).

[10] According to Comulate (Opp. 17 n.11), the POC contract was immediately breached, underscoring the lack of a relationship. Comulate also notes its IVANS contract, but the allegation to which it points (AC ¶ 63) does not allege the existence of such a contract.

[11] That Applied will earn SDK fees through Ascend is not an "improper factual contention" (Opp. 19) but is required by Comulate's allegations. AC ¶ 55 ("When an Epic customer wishes to use a third-party application alongside Epic, the customer must purchase an SDK license from Applied and pay both upfront and ongoing monthly fees.").

total *revenue*, that would not equate to foregoing *profits*. *See New Mexico Oncology v. Presbyterian Healthcare Servs.*, 418 F. Supp. 3d 826, 865 (D.N.M. 2019) (considering decreasing costs as a component of short-term profits). As Comulate alleges, an SDK integration carries significant costs.[12]

***Applied's supposed actions in other markets are irrelevant***. Finally, seeking a duty to deal where none exists, Comulate reaches to Applied's support of integrations with other, non-AIAAS products. Opp. 20-21; AC ¶ 307. But *Aspen* and *Viamedia* considered only conduct related to *the same product* at issue in plaintiff's case, not conduct in other markets. In *Aspen*, the defendant continued to offer "interchangeable [ski] tickets … [for] other multimountain areas" while refusing to do so with the plaintiff. *Aspen Skiing Co.*, 472 U.S. at 603. And in *Viamedia*, Comcast offered "Interconnect-only agreements" in other markets while denying them to plaintiff. *Viamedia*, 951 F.3d at 465. Here, only Applied's alleged conduct in the proposed AIAAS market is material. In that market, Applied is not excluding all AIAAS integrations. It is *referring* customers to a competitor.[13] Under such facts, the narrow *Aspen Skiing* exception cannot apply.

### 2. Comulate Fails To Plead A Tying Claim

Comulate's tying theory likewise fails as a matter of law. The Seventh Circuit's tying standard requires that the seller "condition[] the sale of [the tying] product … on the buyer's buying *another product … from … the seller*." *Sheridan v. Marathon Petroleum Co. LLC*, 530 F.3d 590, 592 (7th Cir. 2008) (emphasis added). That is the antithesis of what Comulate alleges. Again, by

---

[12] *See, e.g.*, AC ¶ 102 ("Five Applied employees across three departments worked to troubleshoot" an issue concerning SDK access); *id.* ¶ 103 (with Comulate alone, "Applied's support personnel sent nearly 600 emails … over hundreds of threads" to resolve SDK defects).

[13] Comulate also points to Applied's alleged blocking of SimplePin and Eventual Treasury but those companies are only alleged to have a "negligible enterprise market share" while, in contrast, Ascend operates in the market "at a meaningful scale." AC ¶¶ 39, 193, 246.

its own telling, Applied is *directing* its customers to an independent third party—Ascend—as well as continuing to let them use other providers such as "ResourcePro or Patra." AC ¶ 237; *see also* dkt. 105-1 ("Ex. A") (LRA stating Applied "may refer Ascend"). Comulate identifies no case sustaining a tying claim where the alleged monopolist *steers business away from itself* to a third-party rival.[14] That is unsurprising: the tying doctrine prohibits sellers from using their power in the tying market to "force[] [buyers] to forego their free choice" and to purchase the tied product "from any other seller." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 6 (1958); *see also Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984) ("[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product"). Comulate does not allege that Epic customers are "forced" to buy Recon, because they are not.

Comulate responds (Opp. 24) by asking the Court to disregard Ascend's independence on the conclusory premise that Ascend is a mere "transitional vessel." But labeling a separately incorporated competitor a "shell" or "vessel" does not make it one—particularly where the Amended Complaint catalogs Ascend's independence and adversarial history with Applied. *See* AC ¶¶ 219-22 (Applied's President allegedly calling Ascend's CEO "a snake," personally ejecting him from an Applied event, and treating Ascend as a competitor). At the pleading stage, the Court must accept Comulate's well-pleaded facts, but it need not accept "sheer speculation, bald assertions, and unsupported conclusory statements" or treat allegations that contradict other portions of the pleading as plausible. *Lanahan v. Cnty. of Cook*, 41 F.4th 854, 862 (7th Cir. 2022); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Because Comulate pleads no facts to support veil

[14] *Viamedia* is not to the contrary. There, the defendant required its customers to use its own services in the tied market. 951 F.3d at 468. Applied has done the opposite—directing customers to Ascend and continuing to permit use of "ResourcePro or Patra." AC ¶ 237.

piercing, instead pleading facts to the contrary, Comulate's "transitional vessel" label is precisely the kind of unsupported, conclusory inference that *Twombly* and *Iqbal* forbid.

#### 3. Unable To Satisfy Either Doctrine, Comulate Cannot Save Its Claim By Recasting It As An Amorphous "Course of Conduct" Theory

Unable to plead a refusal to deal or tying claim,[15] Comulate switches to an amorphous "course of conduct" theory. Opp. 13-15. But Comulate's "course of conduct" authorities all undermine its claim. *Lorain Journal Co. v. United States* involved a near-total monopolist that used its power to "force[] advertisers to boycott a competing radio station"—the only meaningful rival in the market—on pain of losing all advertising. 342 U.S. 143, 152-53 (1951). Applied, by contrast, has not used its position to prevent customers from using all competitors. Rather, Applied is referring customers to Ascend, and offering "to help" customers deploy Ascend or other solutions like ResourcePro or Patra. AC ¶ 237. Customers can also move to Vertafore—the established competitor in the AMS market (AC ¶¶ 26, 38)—or to other AMS providers and use Comulate. Limiting only the use of one's own platform is not actionable under *Lorain Journal*. *See New York v. Meta Platforms, Inc.*, 66 F.4th 288, 304 (D.C. Cir. 2023) (affirming dismissal of antitrust claims where the challenged "policy limits only how canvas apps on Facebook operate, and leaves app developers entirely free to develop applications for Facebook's competitors.").

Comulate's remaining cases are no different. Each involves an alleged monopolist's conduct that excluded *all other competitors*. *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 150 F.4th 1056, 1074 (9th Cir. 2025) (contracts locked brokers into exclusive agreements); *McWane,*

---

[15] Comulate wrongly argues (Opp. 13, n.6) that the Seventh Circuit recognizes a monopoly leveraging theory. *Schor v. Abbott Lab'ys*, 457 F.3d 608, 611 (7th Cir. 2006) (rejecting "free-standing theory of 'monopoly leveraging'"); *see also Trinko*, 540 U.S. at 415 n.4 ("leveraging presupposes anticompetitive conduct, which in this case could only be the refusal-to-deal claim we have rejected"). And Comulate's lone essential-facilities footnote (Opp. 22 n.21) ignores that courts routinely reject claims that software (like Epic) is an essential facility. *See* MTD 16 & n.15.

*Inc. v. F.T.C.*, 783 F.3d 814, 819 (11th Cir. 2015) (customers required to purchase "all of their domestic fittings from [defendant]"); *United States v. Google LLC*, 778 F. Supp. 3d 797, 866-67 (E.D. Va. 2025) ("a series of exclusionary acts" compelled all of "[defendant's] publisher customers" to deal only with the defendant); *X Corp. v. Bright Data Ltd.*, 782 F. Supp. 3d 770, 779 (N.D. Cal. 2025) ("exclusionary agreement" prohibited data-purchasing customers from "ever buying from a business that scrapes [] public-square data"); *Celonis SE v. SAP SE*, 2025 WL 3013158, at *1 (N.D. Cal. Oct. 27, 2025) (defendant "exclud[ed] rivals" by requiring its preferred data extraction methods);[16] *United States v. Apple*, 2025 WL 1829127, at *2 (D.N.J. June 30, 2025) (defendant harmed competition by restricting technologies, which made it difficult "for consumers and developers to purchase and develop products for devices outside of the Apple ecosystem."). Applied has not excluded ***any*** competitors; customers are free to use Comulate (with Vertafore or other AMSs), Ascend, or any other integration. And far from imposing an exclusivity requirement, Applied is ***referring*** business to Ascend. Applied's actions prevent only ***one*** company from providing services on ***one*** platform.

### B. Comulate Does Not Allege Specific Intent To Monopolize

Comulate's specific intent argument fails under the standard Comulate invokes. According to Comulate, specific intent may be inferred from "conduct that is in itself an independent violation of the antitrust laws or that has no legitimate business justification other than to destroy or damage competition." Opp. 25 (quoting *In re Surescripts Antitrust Litig.*, 608 F. Supp. 3d 629, 648-49 (N.D. Ill. 2022)). But Comulate cannot satisfy either prong. It identifies no independent antitrust violation—nor could it. *See supra* § II.A; *infra* § III. And its own allegations foreclose any claim

[16] Comulate omits (Opp. 14 n.8) that the *Celonis* court did not retract its conclusion that the defendant had "no obligation to let its competitors access its databases in the way they prefer," 2025 WL 1810260, at *1—the very holding that defeats Comulate's claim.

that Applied's termination decision lacked a legitimate justification: Applied terminated Comulate only after discovering that Comulate had been systematically defrauding it. That is the paradigmatic legitimate business justification, and it is fatal to Comulate's claim.

*In re Surescripts* reinforces that conclusion. There, specific intent was plausibly alleged because the defendant's "only purpose" for engaging in the challenged conduct was to eliminate competition. 608 F. Supp. 3d at 649. That is, the defendant there had no justification whatsoever for its conduct other than to eliminate competition. *Id.*[17] Not so here. Applied has always been committed to third-party integrations and supported the Comulate integration for the benefit of its mutual customers—until it discovered Comulate's fraud. AC ¶¶ 3, 7. Applied's termination decision thus had a legitimate purpose, unrelated to eliminating competition.

Comulate's reliance on *G. Heileman Brewing Co. v. Anheuser-Busch Inc.*, 676 F. Supp. 1462 (E.D. Wis. 1987) to argue that statements made by Applied's President and CEO are direct evidence of specific intent is equally unavailing. *G. Heileman* does not stand for the rule that all statements reflecting a desire to win in the marketplace constitute such evidence. To the contrary, the court rejected the plaintiffs' attempted monopolization claim in that action, despite allegations that the defendant's personnel had repeatedly spoken of plans to "preempt" the market. *Id.* at 1462. Indeed, the court went on to hold: "A manifestation of intent to triumph in the competitive market, or to exclude competition and to expand one's own business, in the absence of unfair, anticompetitive or predatory conduct, is not enough to establish an antitrust violation." *Id.* at 1473; *see also Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 541 (7th Cir. 1986) ("mere intention to exclude competition and to expand one's own business is not

[17] In *Surescripts*, intent was shown because "the only justification for" the monopolist "contracting with [a non-plaintiff company] was to eliminate [plaintiff] as a potential competitor," as the deal would add "very little, if any, value." *In re Surescripts*, 608 F. Supp. 3d at 649.

sufficient" to establish specific intent). At best, Comulate's allegations show that Applied intended to compete aggressively and protected itself from a company that was defrauding it.

Comulate's attempt to conjure monopolistic intent from Applied's alleged treatment of third parties fares no better. Comulate claims (Opp. 26 n.24) that Applied "weaponized its SDK integrations" against Eventual Treasury and SimplePin and "telegraphed" SDK decay for ePayPolicy. But nowhere does Comulate explain why Applied's actions were anything other than legitimate business decisions, or how they give rise to an inference of specific intent to monopolize here. Such "naked assertions devoid of further factual enhancement" cannot survive a motion to dismiss. *Iqbal*, 556 U.S. at 678. This is especially true given the allegations that Applied is referring customers to Ascend—which has "meaningful scale" unlike SimplePin and Eventual Treasury (AC ¶¶ 39, 193, 246)—*instead of monopolizing that business for itself*, thus undermining any inference of specific intent.

Comulate's specific intent theory ultimately, thus, reduces to the unremarkable and inactionable proposition that Applied does not want to do business with only Comulate.

### C. <u>Comulate Does Not Allege A Dangerous Probability Of Monopoly Power</u>

Comulate cannot manufacture a "dangerous probability" of monopoly through speculation about future events.[18] *Spectrum Sports* and its progeny require that dangerous probability be grounded in a defendant's *actual* economic power, not in a chain of contingencies. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993); *see also Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F. Supp. 2d 569, 579 (S.D.N.Y. 2011) (alleged belief that defendant's market

[18] Recon's sales figures (Opp. 29 & n.27) do not appear in the AC, so they cannot be considered on a motion to dismiss. *See Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). Even if they were pleaded, those figures do not indicate monopoly power in a market that also includes Ascend, Comulate, and the AIAAS-adjacent providers Applied supports. *See* AC ¶¶ 282, 293.

share "continued to increase" was "speculative and insufficient"). Comulate's opposition does not contest that (i) Applied's current share of the AIAAS market is minimal; (ii) Comulate itself currently holds a 65-75% share of that market; and (iii) the customers leaving Comulate are being referred to a separate company, Ascend. AC ¶¶ 9, 38, 247-49, 332. It instead asks the Court to assume that, eventually, Ascend will be eliminated, Recon will sweep up Comulate's displaced customers, no new entrant will emerge, and other AMS competitors like Vertafore will not pick up the difference. Opp. 28-29. That is precisely the kind of speculation the law forecloses.

*L&W/Lindco* underscores the deficiency. The court there sustained the claim based on allegations that the market had only a "small" and "declining" "number of competitors" and that plaintiff would "cede its" market share to the defendant. 979 F. Supp. at 637. Here, Ascend remains a market competitor with "meaningful scale" and one that is *gaining share* per Comulate's pleading. AC ¶¶ 38-39, 241, 299. Comulate also continues to offer its product through Vertafore. AC ¶¶ 26, 38. And far from pleading a "declining" number of competitors, Comulate describes several "newer entrants" and a roster of AIAAS-adjacent firms that Applied supports. AC ¶¶ 39, 192-97, 282, 293.[19]

## III. COMULATE'S CONSPIRACY CLAIMS (COUNTS II AND III) FAIL

### A. Comulate's Conspiracy To Monopolize Claim (Count II) Lacks Legal Support And Is Implausible

***Comulate misstates settled law in two fundamental ways***. A conspiracy to monopolize claim, just like any Section 2 claim, "can only accuse one firm of being a monopolist." *Midwest*

[19] Comulate's remaining authorities depend on the same kind of price manipulation that *Lindco* required and that the AC does not allege. *See Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037, 1071 (N.D. Ill. 2016) ("commercially-unreasonable number of long positions" used "to force up" wheat prices); *Thompson's Gas & Elec. Serv., Inc. v. BP Am. Inc.*, 691 F. Supp. 2d 860, 867 (N.D. Ill. 2010) (defendants used a temporary supply constraint to "drive[] up" propane prices).

*Gas Servs., Inc. v. Indiana Gas Co.*, 317 F.3d 703, 713 (7th Cir. 2003); *Int'l Constr. Prods. LLC v. Caterpillar Inc.*, 2016 WL 264909, at *10 (D. Del. Jan. 21, 2016) ("the only type of actionable conspiracy to monopolize necessarily involves a single firm monopoly, *i.e.*, a conspiracy to make [one company] a monopoly"). Desperate to avoid dismissal, Comulate nonetheless argues "if the purpose of Applied and Ascend's conspiracy were to establish a 'shared monopoly,' that would state a cognizable conspiracy to monopolize claim." Opp. 34. But the case Comulate relies upon *says the exact opposite*: "courts in this and other districts have uniformly held or approved the view that allegations of a 'shared monopoly' do not state a claim under section 2." *Arista Recs. LLC v. Lime Grp. LLC*, 532 F. Supp. 2d 556, 580 (S.D.N.Y. 2007).[20]

Comulate also misstates the specific intent requirement. According to Comulate, Ascend's profit "motive" (*i.e.*, improving its alleged sales record and increasing its prices) suffices. Opp. 32. But that is not enough; one needs to plausibly allege that "*all parties* to the conspiracy had the *specific intent to monopolize*" not just profit. *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 729 F. Supp. 3d 298, 335 n.25 (E.D.N.Y. 2024) (emphasis added); MTD 24. Again, even Comulate's lead case (Opp. 32) recognizes this basic principle. *In re Surescripts Antitrust Litig.*, 608 F. Supp. 3d 629, 650 (N.D. Ill. 2022) ("on the face of the complaint, it is plausible to infer that [one conspirator] intended for [the other conspirator] to monopolize.").

Both of these legal flaws permeate Comulate's opposition arguments.

***The alleged conspiracy is implausible and speculative***. Comulate admits that its conspiracy theory depends on Ascend knowingly agreeing to a scheme that only "temporarily benefits" Ascend and ultimately ends with it being eliminated from the market, and with Applied

---

[20] The *Arista* court noted the "suggestion" that a conspiracy to monopolize claim might be premised on market allocation, *id.*, but it did not apply that theory. Comulate cites no modern case that does. In any event, Comulate's market allocation theory is implausible. *Infra* § III.B.

capturing all of the "long run" benefits. Opp. 7, 33; AC ¶ 254. Comulate never explains at all (let alone with any supporting plausible allegations) why Ascend would sign on to a scheme that would only give it a few months of customers and better pricing but could very well end with its "destruction" with Applied "killing Ascend" (*i.e.*, leaving it no profits at all). AC ¶¶ 217-18.

It "is inherently implausible" that Ascend would have "conspired to injure itself" in this manner if it was seeking a "profitable exit" (Opp. 32),[21] and Comulate cites no case validating such an implausible and speculative scheme. Rather, Comulate's lead case shows how lacking and incoherent its allegations are. Unlike here, the alleged conspiracy to monopolize in *Surescripts* was deemed plausible because the alleged co-conspirator (RelayHealth) "was being paid by Surescripts [the alleged monopolist] with a cut of Surescripts' monopoly profits to sit on the sideline rather than compete." *Surescripts*, 608 F. Supp. 3d at 650-51.[22] Here, the alleged scheme is the opposite: Ascend allegedly agreed to "temporarily" remain in the market before its eventual "destruction" (or cheap acquisition by Applied) with no cut of Applied's monopoly profits going forward.[23]

---

[21] *See Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1109 (7th Cir. 1984), *abrogated on other grounds by Schmees v. HC1.COM, Inc.*, 77 F.4th 483, 489 (7th Cir. 2023); MTD 21 n.19.

[22] Surescripts "gave RelayHealth a cut of the incentive payments … whenever RelayHealth secured exclusive dealing arrangements" and, later, a "wholesale discount." *Id.* at 648-49. In return, "RelayHealth agreed not to create its own [competing] e-prescribing network." *Id.* at 648.

[23] None of Comulate's cases involved a conspirator agreeing to its own destruction. In *Frame-Wilson v. Amazon.com*, *Inc.*, the alleged co-conspirators agreed to keep using Amazon while remaining in business. 664 F. Supp. 3d 1198, 1206 (W.D. Wash. 2023); *see also* W.D. Wash. 20-CV-00424, ECF 61, at 5-6. Similarly, in *SuperTurf, Inc. v. Monsanto Co.* and *Wagner v. Magellan Health Servs., Inc.,* there was no claim that supposed co-conspirators agreed to exit their lines of business. 660 F.2d 1275, 1280 (8th Cir. 1981); 121 F. Supp. 2d 673, 680-81 (N.D. Ill. 2000). Comulate's remaining cases—*In re Turkey Antitrust Litigation*, *High Fructose Corn Syrup Antitrust Litigation*, *In re Text Messaging Antitrust Litigation,* and *Dealer Management Systems*, *see* Opp. 31—did not involve Section 2 monopolization claims and thus are irrelevant.

Comulate doubles down on its economically irrational conspiracy theory by inventing an entirely new motive: that Ascend agreed to a scheme designed to eliminate itself "*in order to survive*." Opp. 31 (emphasis added). This argument is contradicted by Comulate's own pleading, which shows that Ascend's AIAAS division is a tiny portion of its business. Per the Amended Complaint, Ascend's "core business since founding has been in financial services, namely, premium financing and premium payment processing." AC ¶ 219. As of May 2025, "over 90 percent of its revenue comes from financial services, not software." *Id.*[24] Indeed, Ascend even allegedly uses its "core" financing business to "subsidize" its much smaller AIAAS business. *Id.*; AC ¶¶ 36, 221. A company that derives more than 90% of its revenue from a separate business line—and uses that "core" business to subsidize its smaller software offering—does not need to enter an antitrust conspiracy "in order to survive." That is precisely the "no obvious incentive" pleading failure that requires dismissal. *Frantzides v. Northshore Univ. HealthSystem Fac. Prac. Assocs., Inc.*, 787 F. Supp. 2d 725, 732 (N.D. Ill. 2011).

Comulate also strains to avoid dismissal by painting the sympathetic text message from Ascend's CEO as a smokescreen to "obfuscate Ascend's coordination with Applied." Opp. 31; MTD 22. But that speculative argument is contradicted by the very next sentence in Comulate's opposition: the text was sent the very "same day" that Applied and Ascend began "coordinated outreach to customers." *Id.* (citing AC ¶¶ 227-230). How could the message obfuscate anything when the companies were out in the marketplace that "same day" discussing their referral arrangement? Comulate provides no explanation, let alone a plausible one. Rather, common

---

[24] These allegations also contradict Comulate's assertion that Ascend is "dependent" on Applied and, thereby, "controllable." AC ¶¶ 217, 311; Opp. 8.

sense[25] and applicable law[26] dictate that the text message was, as it states, sent in solidarity, thus undermining the claim that Ascend was concurrently conspiring to eliminate Comulate.

***The LRA is a simple referral agreement, not "direct evidence" of conspiracy***. Comulate's tortured reading of simple communications continues with the LRA, which Comulate contends is "direct evidence" of conspiracy. Comulate, again, ignores basic principles. Comulate's own cited case (Opp. 31) states that, to qualify as "direct evidence," the asserted evidence must be the equivalent of a "smoking gun." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010); *see also In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002) (describing direct evidence as "tantamount to an acknowledgment of guilt"). The LRA is nothing of the sort. It is a simple referral agreement that merely states that Applied "*may* refer Ascend" to certain customers—permissive language that does not obligate Applied or Ascend to do anything. Ex. A at 1 (emphasis added); MTD 23. Indeed, this is confirmed by Applied's outreach to customers, which far from corroborating Ascend's "smoking gun" conspiracy theory, made clear that whether customers chose Ascend, Recon, ResourcePro or Patra, Applied was "here to help." AC ¶ 237.[27]

***Comulate fails to plead specific intent***. Section 2 requires that the alleged conspirators had "a shared, specific intent to monopolize" (and not merely, as Comulate argues, to profit). *IHS Dialysis Inc. v. Davita, Inc.*, 2013 WL 1309737, at *8 (S.D.N.Y. Mar. 31, 2013); *supra* at § II.B. Comulate's pleading forecloses that element. Ascend wants a "profitable exit" not the profitless

---

[25] Assessing plausibility "requires … common sense." *Schneider v. City of Chicago*, 2023 WL 8019434, at *1 (N.D. Ill. Nov. 20, 2023) (Shah, J.) (cleaned up).

[26] Comulate cannot plead around the actual contents of the text message. MTD 26.

[27] Comulate's argument (Opp. 31) that the LRA is suspicious because it was signed a mere few weeks after Applied filed suit is meaningless. That Applied reached out to Ascend after learning of the PBC fraud reflects nothing more than pragmatism and a desire to aid its customers.

"destruction" that would come from making Applied a monopolist. Opp. 32. And contrary to Comulate's suggestion (*id.* 33 n.31, 34) that Ascend's alleged "fear" and reluctance are relevant, one company's alleged "pressuring or threatening" of its supposed co-conspirator "point[s] in the opposite direction" of the requisite intent to monopolize. *IHS Dialysis Inc.*, 2013 WL 1309737, at *8. Further undermining the intent requirement, Ascend did not need to conspire "to survive" given that its core business is financial services, Opp. 31; and Ascend CEO's text reflects sympathy and solidarity with Comulate, not a desire for it to be destroyed, *supra* at § II.B. Nor does Applied have the requisite intent since the LRA does not even require customers to use Applied or Ascend—much less Applied alone, as a conspiracy to make Applied a monopolist would require.

### B. Comulate Fails To Plead A Plausible Section 1 Conspiracy (Count III)

Comulate's attempt to recast its Section 2 conspiracy to monopolize claim as a Section 1 "group boycott" or "market allocation" conspiracy claim fares no better since it depends on the same implausible allegations and economically irrational theories. There are no factual allegations plausibly demonstrating why Ascend would agree to an illegal conspiracy in which it is "just a temporary stand-in for Applied," merely "survives at Applied's pleasure," and that likely ends with its "destruction." Opp. 24, 37; AC ¶ 217; *supra* § III.A. Nor can Comulate identify a single case sustaining such an incoherent theory. *See, e.g.*, *Washington Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 837 (N.D. Ill. 2018) (granting dismissal of Section 1 claim where "plaintiffs offer no explanation, much less a plausible one, for why [one alleged conspirator] would agree to structure a scheme … that gave such a lop-sided benefit to its competitor."). Comulate's attempt to avoid dismissal by shoehorning the LRA into a Section 1 conspiracy claim must fail for this and the other reasons outlined below.

***The LRA is a vertical arrangement, meaning the rule of reason (not per se analysis) applies***. Under the LRA, Applied, the upstream provider of AMS software, may refer some of its

Epic customers to Ascend, the downstream provider of AIAAS. MTD 22-23. Notably, Comulate *concedes* that "Applied has a vertical relationship with Ascend (and Comulate)" and that Applied is independently "leveraging Applied's control over the Epic SDK integration as the principal means for excluding Comulate." Opp. 36. That should end the analysis. Comulate nevertheless contends that the vertical relationship should be disregarded since Applied's Recon competes with Ascend. *Id.* But "[e]ven if the Court were to find that the [LRA] … contained a horizontal element, such a 'hybrid arrangement' would be analyzed under the rule of reason." *Frame-Wilson v. Amazon.com, Inc.*, 591 F. Supp. 3d 975, 987 (W.D. Wash. 2022). Given all of this, *per se* condemnation cannot apply to the LRA. *See also* MTD 22-23.[28]

***Comulate fails to plead a group boycott***. A concerted refusal to deal is, by definition, a "joint effort[] by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle." *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985); *see NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998) (*per se* condemnation requires "horizontal agreements among direct competitors"). The operative words are "joint efforts": each alleged co-conspirator must *itself* participate in the refusal, denial, or coercion. As Comulate's cases confirm, mere benefit from another firm's unilateral conduct is not enough.[29]

---

[28] The LRA also does "not justify per se treatment because" it is "not facially anticompetitive in any way that would always or almost always tend to restrict competition" as it does "not set prices" or restrict output. *In re Humira*, 465 F. Supp. 3d at 836.

[29] In *Klor's*, every manufacturer and distributor agreed they would not sell to the plaintiff. *Klor's, Inc. v. Broadway-Hale Stores*, 359 U.S. 207, 212-13 (1959). In *Toys "R" Us*, each toy manufacturer agreed not to sell popular toys to warehouse clubs. *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000). And in *Fashion Originators' Guild*, every Guild member jointly refused to supply disfavored retailers; the joint refusal was the very lever that forced the retailer-customers to drop the design pirates. 312 U.S. 457, 467 (1941).

Comulate's own pleading concedes that Ascend engaged in no such "joint" efforts. Nothing in the LRA says Applied and Ascend agreed that customers would be foreclosed from ever utilizing Comulate. Rather, *after* Applied independently decided to deny Comulate access to Epic upon discovery of the PBC fraud, it merely agreed to potentially refer customers "impacted by the discontinuation of certain integrations" to Ascend. Ex. A; AC ¶ 248. Customers remain free to use Comulate with any other AMS system, such as Vertafore, and there are no allegations that either Applied or Ascend is seeking to prevent that. *See* AC ¶ 38 ("Comulate's product is compatible with Epic, as well as Vertafore and other insurance AMSs.").

Comulate's remaining cases all involved the alleged co-conspirators jointly engaging in coercive conduct directed at third parties—*i.e.*, through blacklisting (*PharmacyChecker.com*, 530 F. Supp. 3d at 318) and joint pressure campaigns (*Crimpers*, 554 F. Supp. at 841). Yet joint coercion is absent from the Amended Complaint. Comulate's opposition confirms that the only alleged coercion of any consequence is Applied's *unilateral* decision to terminate Comulate's SDK access.[30] Ascend, by contrast, is not alleged to have the power to coerce anyone, let alone to have actually done so. To the contrary, Ascend's CEO texted Comulate's CEO that he was "genuinely sorry to see the [A]pplied BS" and offered to do "anything … to help." AC ¶ 227 n.11. Comulate's only response—that the text was a diversionary smokescreen—is the type of speculative assertion that *Twombly* makes clear is not permissible. *See supra* § II.A.2.[31] Whatever

---

[30] *See, e.g.*, Opp. 23 ("*Applied has used its control over Epic and the SDK integration* to deprive customers of any choice"); *Id.* at 24 n. 22 ("'Applied's conduct and their threats to shut down Comulate's access to the SDK *is the only factor*" causing customer decision "to depart from Comulate.'"); AC ¶ 296 ("Numerous Comulate customers have breached or terminated their contracts with Comulate *as a result of Applied's actions*") (emphases added).

[31] *See, e.g.*, *Signal Fin. Holdings LLC v. Looking Glass Fin. LLC*, 2018 WL 11365996, at *3 (N.D. Ill. Dec. 21, 2018) (recognizing that allegations must be "enough to raise a right to relief above the speculative level" under *Twombly*, and dismissing "exotic antitrust theory"); *Lanahan v. Cnty. of*

else Comulate attributes to Ascend—customer outreach, being a referral partner, co-branded marketing materials (AC ¶¶ 229-30, 234, 240-44)—is the conduct of a company seeking to market its product to customers who are independently considering alternatives. That is independent competitive conduct, not anticompetitive conduct that might support a group boycott claim.

Comulate spills pages of ink (Opp. 31-32, 34-36) relying on *In re Dealer Mgmt. Sys. Antitrust Litigation*, but this too is misguided. 313 F. Supp. 3d 931 (N.D. Ill. 2018). There, defendants, two of three alleged main competitors in the data integrators market, *openly admitted* that they sought to "block [plaintiff] and the other third parties out" from accessing their upstream data management systems, explaining they were "mandated … to seek [plaintiff] out and destroy [plaintiff's] business." *Dealer Mgmt.*, 313 F. Supp. 3d at 943-44. There is no such "smoking gun" here. *Id.* at 949. All Comulate points to is the permissive LRA whereby Applied may refer certain customers to Ascend as an option for AIAAS services. Moreover, unlike the *Dealer Mgmt.* defendants, Applied is not seeking to "block" *all* "integrators from accessing necessary data from the dealers," and lock them out of the market, 313 F. Supp. 3d at 952. As explained *supra* § II.A.3, it is only prohibiting the fraudster Comulate from accessing Epic.

At bottom, a unilateral SDK termination by Applied plus marketing by Ascend is not a group boycott; it is two firms engaged in two different kinds of conduct, only one of which Comulate even attempts to characterize as exclusionary.

***Comulate fails to plead market allocation***. Comulate argues (Opp. 37) the LRA is a nefarious "customer-allocation" agreement between Applied and Ascend. Market allocation requires an agreement among competitors to divide customers or territories amongst themselves.

---

*Cook*, 41 F.4th 854, 862 (7th Cir. 2022) (a court is not obligated to accept "sheer speculation, bald assertions, and unsupported conclusory statements" on a motion to dismiss).

*See Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49-50 (1990) (per curiam). The LRA reflects nothing of the sort. It states only that Applied "*may* refer Ascend" (Ex. A at 1) to certain customers. While Comulate claims that the permissive nature of the LRA "rings hollow" (Opp. at 35 n.33), the LRA is clear on its face,[32] and its non-binding nature is corroborated by Applied's communications to customers that "[w]hether [they]'re leaning toward Ascend … or exploring our new Recon solution launching in February, we're here to help." AC ¶ 237. Such openness to alternative, non-Comulate providers is the antithesis of a customer or market allocation scheme. *See Midwest Underground Storage, Inc. v. Porter*, 717 F.2d 493, 497 n.2 (10th Cir. 1983) ("The essence of a market allocation violation [] is that competitors apportion the market among themselves").

Comulate's opposition further undermines its market allocation theory. Comulate alleges that Applied agreed to allocate approximately sixty customers to Ascend. AC ¶¶ 248, 254. Yet it now argues—referencing unpleaded assertions that this Court should not credit—that Applied "has signed up over 200 customers, more than 100 of which are live" and "will inherit most of Comulate's customers." Opp. 29. But if Applied has competed for and signed up over 200 customers and is "inherit[ing] most of Comulate's customers," it could not have allocated 60 customers to Ascend.[33] *See Universal Film Exchanges, Inc. v. City of Chicago*, 288 F. Supp. 286, 292 (N.D. Ill. 1968) (facts which are contradicted by plaintiff's own pleading need not be accepted at face value in deciding a motion to dismiss).

---

[32] Comulate does not dispute that the Court can take judicial notice of the LRA to dismiss Comulate's claims. *See Strow v. B&G Foods, Inc.*, 633 F. Supp. 3d 1090, 1100 n.1 (N.D. Ill. 2022) ("[A] court may consider 'documents attached to a motion to dismiss … if they are referred to in plaintiff's complaint and are central to his claim.'") (quoting *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012)).

[33] Because the alleged statements in the webinar to which Comulate refers undermine its market allocation theory, leave to amend to plead those statements would be futile.

*In re Humira* (Opp. at 37) is on point. There, this Court dealt with allegations of market allocation resulting from a pharmaceutical settlement, whereby AbbVie "allocated to itself the U.S. market" while "allocating to the other defendants the European market." *In re Humira*, 465 F. Supp. 3d at 837. This Court held that there was no market allocation, in part because there was no allegation that AbbVie planned to stop selling its drug in Europe after its alleged co-conspirators introduced their biosimilar versions there. *Id.* at 838. The same is true here. While Applied agreed to refer the former Comulate customers to Ascend (among other alternatives), there is no allegation, nor could there be given Comulate's theory, that Applied will not compete for those customers in the future.

## IV. APPLIED'S CONDUCT IS PRIVILEGED

### A. *Noerr-Pennington* Bars Comulate's Claims Because Comulate Has Not Pleaded That Applied's Complaint Is A "Sham"

Far from being a "sham" on which "no reasonable litigant could realistically expect success," *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993), Applied's complaint has already succeeded in part, *Applied Sys., Inc.*, 2026 WL 381866, at *4-6. Applied's preliminary-injunctive success precludes Comulate's "sham" theory. *Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*, 815 F. Supp. 2d 679, 685-86 (S.D.N.Y. 2011).

Though Comulate presses for a different legal framework (Opp. 40), it fails to plead a "sham" under either standard. Even Comulate's preferred framework acknowledges that preliminary success weighs heavily against a "sham" finding,[34] and Comulate pleads no

[34] *Boulware v. Nev. Dep't of Hum. Res.*, 960 F.2d 793, 798 (9th Cir. 1992) ("Our decisions instruct that success on the merits, while not dispositive, is an important factor to be considered under the sham inquiry."); *In re Burlington N., Inc.*, 822 F.2d 518, 527 n.6 (5th Cir. 1987) ("[S]uccess on the merits is forceful evidence that the petitioner did in fact wish to influence the governmental decision and obtain the relief prayed for.").

contradictory factual allegations to overcome that success. Setting aside its conclusory adjectives (Opp. 39), Comulate contends the Court should apply the "sham" exception based on three circumstances. None are persuasive. First, Comulate's fixation[35] (Opp. 39) with Applied's decision to amend its complaint says nothing about the merits of Applied's suit. Amendment is a routine pleading practice—one that Comulate performed in this very action—not evidence of a sham. Second, Comulate asserts (Opp. 39 (quoting AC ¶ 203)) that it could not have reverse engineered Epic's algorithms with its level of access. Even if true, that does not establish a "sham" because Applied also asserts theories based on improper testing, data scraping, and other methods of refining Comulate's products. *See Applied Sys., Inc. v. PBC Consulting Inc.*, 25-cv-14251 dkt. 54 ¶¶ 9-10, 14-43, 57, 68, 87-91, 144, 164. Third, Comulate's references (Opp. 39-40) to customer communications and pricing decisions merely reiterate *Comulate's* claims; they have no legal significance to *Applied's* misappropriation, breach of contract, and fraud claims.

Lacking any substantive reason it pleads a "sham" complaint, Comulate overreaches (Opp. 40), claiming there is "judicial consensus" that *Noerr-Pennington* arguments should not be resolved on a motion to dismiss. Not so. Courts in this district resolve *Noerr-Pennington* issues on the pleadings when the plaintiff fails to sufficiently allege the "sham" exception. *See Metro Cable Co. v. CATV of Rockford, Inc.*, 516 F.2d 220, 222 (7th Cir. 1975) (affirming dismissal on *Noerr-Pennington*); *In re Humira*, 465 F. Supp. 3d at 834 (holding "the entirety of alleged monopolization scheme immune" from suit under *Noerr-Pennington*); *see also Asahi Glass Co. v.*

[35] *See, e.g.*, AC ¶¶ 8, 203, 283, 389; *Applied Sys., Inc. v. PBC Consulting Inc.*, 25-cv-14251 dkt. 61 at 1; *id.* dkt. 65-1 at 1, 6; *id.* dkt. 89 at 1. In any event, as Applied has already explained, *Applied Sys., Inc. v. PBC Consulting Inc.*, 25-cv-14251 dkt. 75 at 11 n.15, Applied continues to allege the same ten categories of trade secrets were misappropriated.

*Pentech Pharms., Inc.*, 289 F. Supp. 2d 986, 993 (N.D. Ill. 2003) (dismissing "suit charging sham litigation as a method of monopolization" at pleading stage).[36]

### B. Illinois' Litigation Privilege Bars Claims Based On Applied's Statements Concerning Litigation To Interested Parties

Comulate bends over backwards to avoid the legal test for applying Illinois' litigation privilege. "The only requirement" for Illinois' litigation privilege to apply [is] "that the communication must pertain to proposed or pending litigation." *Scarpelli v. McDermott Will & Emery LLP*, 117 N.E.3d 238, 246 (Ill. App. Ct. 2018). Instead of addressing this straightforward inquiry, Comulate argues a series of legally irrelevant facts. It is true that Comulate pleads some statements by Applied "made outside any court proceeding." Opp. 40. But the litigation privilege protects out-of-court statements. *Golden v. Mullen*, 295 Ill. App. 3d 865, 870 (Ill. App. Ct. 1997). It is true that Comulate pleads statements by Applied made "to non-litigants." Opp. 40. But the litigation privilege protects statements to non-litigants with an interest in the litigation. *Guzman v. Whole Foods Mkt.*, 2024 WL 6982230, at *2 (N.D. Ill. Oct. 17, 2024).[37] And it is true that Comulate pleads statements by Applied that "went beyond any pleading." Opp. 40. But the litigation privilege protects statements beyond the pleadings. *Goodman v. Goodman*, 226 N.E.3d 704, 712 (Ill. App. Ct. 2023). Each of Applied's alleged statements to mutual customers pertain

[36] In *Hytera Commc'ns Corp. v. Motorola Sols., Inc.*, the plaintiff alleged that the defendant's petitioning activity was a sham because it marked an abrupt change in position. 623 F. Supp. 3d 857, 875 (N.D. Ill. 2022). Comulate's complaint alleges no comparable change in position, instead relying on conclusory allegations that Applied's complaint is baseless.

[37] Comulate's authorities that concern unrelated third parties are inapposite because, here, Applied's alleged statements were directed to mutual customers interested in the outcome of the litigation. *August v. Hanlon*, 975 N.E.2d 1234, 1248 (Ill. App. Ct. 2012) (statement made to a reporter "with no connection to the litigation"); *Kurczaba v. Pollock*, 742 N.E.2d 425, 441 (Ill. App. Ct. 2000) ("Defendant disseminated the materials to third persons who had no connection whatsoever to the [underlying] action."); *Thompson v. Frank*, 730 N.E.2d 143, 145-46 (Ill. App. Ct. 2000) ("letter sent by one party's attorney to the spouse of the opposing party" not privileged).

to Applied's litigation with Comulate, providing Applied's position on the litigation and informing customers about how the litigation would affect the services Applied and Comulate offer.

Comulate misconstrues (Opp. 40) the Court's March 5 findings—characterizing the Court as having found multiple "portions" of Applied's statements as non-privileged when the Court discussed a singular "sliver" (Hr'g Tr. 5:25 (Mar. 5, 2026))—and ignores the Court's subsequent finding—that Comulate's "likelihood of success" based on that sliver is "not as strong as" the Court previously believed. Hr'g Tr. 6:1-2 (Apr. 21, 2026).[38]

## V. <u>COMULATE'S TORT CLAIMS (COUNTS VI-VIII) FAIL</u>

### A. <u>The Amended Complaint Lacks Well-Pleaded Facts Supporting Comulate's Tortious Interference Claims (Counts VI-VII)</u>

Comulate's opposition does not excuse the threshold pleading defects Applied identified. Comulate still does not sufficiently plead which contractual rights were allegedly disrupted. Nor does it identify any non-privileged, independently wrongful act by Applied that proximately caused a breach or disruption. Instead, Comulate repackages the same failed antitrust theories and privileged litigation-related communications addressed above.

*First*, Comulate does not plead sufficient facts for the Court to determine what contractual rights were at issue and how Applied allegedly induced their breach or disruption.[39] Its own authority confirms as much. In *Byton*, the plaintiff described the relevant contracts—term employment and confidentiality agreements—the specific group of employees who were parties to them, and the conduct that allegedly breached those rights. *Byton N. Am. Co. v. Breitfeld*, 2020 WL 3802700, at *6 (C.D. Cal. Apr. 28, 2020). The Amended Complaint lacks those same

---

[38] *Am. Backflow & Fire Prevention, Inc. v. Hincks*, 2025 WL 3514107, at *8-9 (Ill. App. Ct. Dec. 8, 2025) supports Applied because there the litigation privilege barred the plaintiff's claims.

[39] Comulate's contract-identification argument (Opp. 41) is a strawman. Applied has never argued that Comulate was required to attach every customer contract to its complaint.

elements. Comulate points only to generalized "customer contracts" without identifying their number, material terms, or the contractual right Applied supposedly caused a customer to violate. That is not the "sufficient notice" *Byton* found adequate.[40]

*Second*, Comulate has not pleaded independent wrongfulness. Conduct that is "lawful and undertaken to enforce [one's] rights" does not supply independent wrongfulness. *SIC Metals, Inc. v. Hyundai Steel Co.*, 442 F. Supp. 3d 1251, 1256 (C.D. Cal. 2020); *see also Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218, 1274-76 (N.D. Cal. 2022). Comulate thus cannot bootstrap its implausible antitrust and tort claims to serve as predicates.[41] Applied's actions do not become wrongful simply because Comulate labels them "threats." Opp. 42. Nor do Comulate's allegations of "friction" and Applied "want[ing] to win" violate any legal standard. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1159 (2003). Applied was entitled to protect its platform and intellectual property, especially given that PBC "is not a real company" and was used as a front for Comulate to access Epic. *Applied Sys., Inc.*, 2026 WL 381866, at *4.

*Third*, Comulate does not plead causation. Comulate reads *Pacific Gas* to mean that "disruption" alone is enough, but that case says the opposite. It lists "actual breach or disruption" and "resulting damage" as separate elements for contract interference, and the prospective-advantage tort likewise requires "economic harm to the plaintiff proximately caused by the acts of

---

[40] Comulate's omission of material contract terms raises other problems as well. "[A] claim for interference with contract is improper if the contract is 'at-will,'" yet Comulate does not plead facts establishing its contracts were for a set term. *Maritz Inc. v. Carlson Mktg. Grp., Inc.*, 2009 WL 3561521, at *4 (N.D. Cal. Oct. 30, 2009). Instead, Comulate resorts to *Tetra Tech EC, Inc. v. CH2M Hill Inc.*, 2022 WL 254346, at *4 (N.D. Cal. Jan. 27, 2022) as an excuse for its lacking pleading. Comulate admits, however, that the contract in *Tetra Tech* was ***between the plaintiff and the defendant***—the defendant thus already knew the contract's operative terms. Opp. 42.

[41] *Pacific Steel* is not to the contrary, as the court had already held that the plaintiff plausibly pleaded Sherman Act and Cartwright Act claims, which served as a predicate act. *Pac. Steel Grp. v. Com. Metals Co.*, 600 F. Supp. 3d 1056, 1079-81 (N.D. Cal. 2022).

the defendant." *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 791 P.2d 587, 590 (Cal. 1990). *Pacific Gas* held only that an actual breach is not required; it did not eliminate the causation requirement. *Id.* at 592. Indeed, the California Supreme Court ultimately held that the plaintiff had not stated either interference claim where the alleged disruption flowed from potentially meritorious litigation rather than actionable interference. *Id.* at 598. Comulate's allegations that customers reacted to Applied's lawsuit, evaluated their own contractual obligations, or made independent business judgments about continued Comulate access do not plead that any non-privileged, independently wrongful act by Applied caused a breach or disruption of an identified contract or a reasonably probable future relationship. *See* Hr'g Tr. 7:12-16 (Mar. 5, 2026).

### B. Comulate Fails To Plead False Statements Of Fact, Scienter, And Damages For Its Trade Libel Claim (Count VIII)

None of the four alleged statements to which Comulate points support a trade libel claim.

*First*, Comulate gestures (Opp. 43) at Applied's press release[42] without identifying any false statement of fact in that document. Understandably so, as the excerpts quoted in the Amended Complaint concern "[Applied's] own complaint" (AC ¶ 389(a)), and are therefore subject to Illinois' litigation privilege. *See supra* § IV.B. Nevertheless, those statements—that Comulate "l[ied]" and perpetrated an "elaborate fraud scheme" (AC ¶ 389(a))—are either true according to Comulate's own representations, *see Applied Sys., Inc.*, 2026 WL 381866, at *4, or non-actionable characterizations, *Partington v. Bugliosi*, 56 F.3d 1147, 1156-57 (9th Cir. 1995). And Comulate's only allegations going to scienter are conclusory, not well-pleaded factual allegations.

*Second*, Applied's customer communications (AC ¶¶ 287, 389(b), 390) fit a similar mold. Comulate also alleged that those communications pertained to "[Applied's] lawsuit" (AC

---

42 Applied's full press release (AC ¶¶ 215, 389(a)) is available at https://www1.appliedsystems.com/siteassets/all-documents/legal/2-25-26_false-claims-v-fact.pdf.

¶ 389(b)). The communications were also either true or opinion. *Compare* AC ¶ 389 (opinions that Comulate developed its product and technology by "theft'" and "misappropriat[ed] and reverse engineer[ed]" Applied's trade secrets), *with Franklin v. Dynamic Details, Inc.*, 116 Cal. App. 4th 375, 386 (Cal. Ct. App. 2006) (opinion that plaintiff "stole copyrighted material"), *and Universal Gaming Grp. v. Taft Stettinius & Hollister LLP*, 2017 IL App (1st) 150878-U ¶¶ 18, 53 (Ill. App. Ct. 2017) (opinion that competitor "obtained a 'use agreement by … dishonest means'"). And Comulate similarly failed to plead facts that would establish scienter.

*Third*, Comulate failed to plead facts supporting that Mr. Blackwell knew his alleged statement "that Comulate 'd[id]n't work with any of the big five brokers'" was false. AC ¶¶ 267, 389(c). Comulate does not even plead the identity of the broker or when that relationship began. Even if it had, Comulate failed to plead the requisite "specific pecuniary damage"; the prospective client to whom the statement was directed contracted with Comulate anyway. AC ¶ 271; *Motor Works, LLC v. Safer Techs., Inc.*, 2010 WL 11485116, at *5 n.11 (N.D. Cal. Mar. 10, 2010).

*Fourth*, "that Comulate would soon be 'out of business'" (AC ¶¶ 161, 389(d)) cannot be trade libel because *Comulate has made identical statements about itself* throughout this litigation. *See, e.g.*, Hr'g Tr. 8:15-17 (Mar. 5, 2026) ("[W]hatever we're trying to preserve through the preliminary injunction *will no longer exist*." (emphasis added)); *id.* at 9:6-8 ("And I don't think anyone should be surprised if -- come June 30th that all the customers are gone and *Comulate is out of business*." (emphasis added)); *id.* at 9:18-21 ("absent some agreement by Applied to extend that June 30 cutoff … *everyone will be gone by then*." (emphasis added)); *id.* at 9:25-10:2 ("[T]he road we're going down is a road that … leads to *the certain destruction of Comulate*." (emphasis added)). Independently, Comulate cites no authority that a prediction about a future event can be a false statement of fact, and it (again) alleges no facts supporting scienter.

## VI. COMULATE'S FAILURE TO PLEAD ITS ANTITRUST AND TORT CLAIMS DOOMS ITS UCL CLAIMS (COUNTS IV-V)

Comulate admits (Opp. 38) that Counts IV and V are tied to the success of its other claims. It raises only two possibilities that might differently position Count V. Neither is persuasive.

*First*, Comulate suggests (Opp. 38) that Applied's actions could violate "spirit and policy" of the antitrust laws even if they do not threaten an actual violation of those laws, but it offers no explanation of how the conduct it alleges could fall short of an actual antitrust violation yet remain a viable violation-in-spirit predicate.[43] Comulate has no authority suggesting that the UCL imposes on Applied a duty to deal where the antitrust laws do not. Its allegations "do not plausibly suggest any antitrust violation or any harm to competition, whether in fact or in spirit." *Camargo v. AbbVie, Inc.*, 2026 WL 115068, at *6 (N.D. Ill. Jan. 14, 2026).

*Second*, Comulate hypothesizes (Opp. 39 n.35) that, if its antitrust claims were dismissed due to a pleading deficiency, rather than a categorical bar, Count V could survive. Its authorities do not support that argument. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1001 (9th Cir. 2023) (post-trial opinion distinguishing between a "*proof deficiency*"—not a pleading deficiency—and a "categorical legal bar"); *PeopleBrowsr, Inc. v. Twitter, Inc.*, 2013 WL 843032, at *1 (N.D. Cal. Mar. 6, 2013) (remand opinion declining to decide motion to dismiss).

## CONCLUSION

For these reasons, Applied respectfully requests that this Court dismiss Comulate's third attempt to plead its case with prejudice.

---

[43] Neither of Comulate's authorities clarifies, as they challenged behavior different in kind from that alleged here. *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 566 (Cal. 1999) (remanding case for determination on whether below-cost sales violated UCL); *Diva Limousine, Ltd. v. Uber Techs., Inc.*, 392 F. Supp. 3d 1074, 1090 (N.D. Cal. 2019) (misclassifying drivers as independent contractors rather than employees supported a UCL claim).

Dated: May 21, 2026

Respectfully submitted,

*/s/ Sam S. Stake*

Jonathan C. Bunge (Ill. Bar # 6202603)
Nathan Hamstra (Ill. Bar # 6286325)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1101 N. Wacker Dr., Suite 2700
Chicago, IL 60606
(312) 705-7400
jonathanbunge@quinnemanuel.com
nathanhamstra@quinnemanuel.com

Sam S. Stake (admitted *pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111-4624
(415) 875-6600
samstake@quinnemanuel.com

Aaron H. Perahia (admitted *pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 S. Figueroa Street
Los Angeles, CA 90017
(213) 443-3000
aaronperahia@quinnemanuel.com

Sami H. Rashid (admitted *pro hac vice*)
David LeRay (admitted *pro hac vice*)
Salvadore J. Diaz (admitted *pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
295 Fifth Avenue
New York, NY 10016
(212) 849-7000
samirashid@quinnemanuel.com
davidleray@quinnemanuel.com
salvadorediaz@quinnemanuel.com

*Attorneys for Defendant Applied Systems, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 21, 2026, I filed the foregoing document with the United States District Court for the Northern District of Illinois using the CM/ECF system and caused it to be served on all registered participants via the notice of electronic filing.

*/s/ Sam S. Stake*
Sam S. Stake